# APPENDIX OF UNPUBLISHED CASES



# Excell v. Fischer

United States District Court for the Northern District of New York

August 25, 2009, Decided; August 25, 2009, Filed

Civ. No. 9:08-CV-945 (DNH/RFT)

**Reporter**

2009 U.S. Dist. LEXIS 88506 *

MORTIMER EXCELL, Plaintiff, - v - BRIAN FISCHER, Commissioner, DOCS, et al., [1] Defendants.

**Subsequent History:** Accepted by, Adopted by, Motion granted by, in part, Motion denied by, in part, Dismissed by, in part, Injunction denied by Excell v. Fischer, 2009 U.S. Dist. LEXIS 88334 (N.D.N.Y, Sept. 23, 2009)

**Counsel:** [*1] MORTIMER EXCELL, Plaintiff, Pro se, Elmira, NY.

For Defendants: ADAM SILVERMAN, ESQ., Assistant Attorney General, OF COUNSEL, HON. ANDREW M. CUOMO, Attorney General for the State of New York, Albany, NY.

**Judges:** RANDOLPH F. TREECE, United States Magistrate Judge.

**Opinion by:** RANDOLPH F. TREECE

# Opinion

**RANDOLPH F. TREECE**

**United States Magistrate Judge**

## REPORT-RECOMMENDATION and ORDER

*Pro se* Plaintiff Mortimer Excell brings this civil rights action, pursuant to 42 U.S.C. § 1983, alleging that he suffered the following constitutional violations: (1) conspiracy to violate his First, Eighth, and Fourteenth Amendment rights; (2) excessive force; (3) deliberate indifference to his serious medical needs; (4) retaliation; (5) due process violations stemming from both Disciplinary and Parole Board Hearings; (6) violation of his First Amendment rights of religious affiliation and expression; and (7) interference with his personal and legal mail.

Presently before the Court are Plaintiff's Motion for a Preliminary Injunction and Temporary Restraining Order and Defendants' Motion to Dismiss. Dkt. Nos. 57, 59, & 62. [2] In support of his Opposition to Defendants' Motion, Plaintiff has submitted two Supplemental Briefs, both of which have [*2] Exhibits attached. Dkt. Nos. 79, 82, & 84. The Court has not considered these Exhibits in considering the instant Motion to Dismiss. For the reasons that follow, it is recommended that the Defendants' Motion to Dismiss be **GRANTED in part** and **DENIED in part**, and the Plaintiff's

---

[1] Plaintiff names a total of forty-three (43) Defendants in his eighty-eight (88) page Complaint. *See* Dkt. No. 1, Compl.

[2] Defendants Tamer, Urzech, T. Carter, and Moak filed an Answer to the Complaint and do not join in the Motion to Dismiss. Dkt. No. 61, Ans.; Dkt. No. 62, Defs.' Mem. of Law at p.1 n.2. The causes of action asserted against these Defendants for excessive force, conspiracy, retaliation, and interference with his religious practices survive this Motion. Also, Defendants C.O. Green, Labetz, Oltloff, and Karen Bellamy have not been served with process. Dkt. Nos. 17, 54, & 66 (no summons has been returned for Defendant Bellamy).

Motion for a Preliminary Injunction be **DENIED**.

# I. SUMMARY OF PLAINTIFF'S CLAIMS

Plaintiff's Complaint is eighty-eight (88) pages in length and contains eighty-one (81) numbered paragraphs and five (5) "Causes of Action" which are in sum and substance summaries of the claims alleged in the preceding 81 paragraphs. *See generally* Dkt. No. 1, Compl. Given the length of the Complaint and the amount [*3] of claims stated therein, we shall provide in this section a summary of Plaintiff's claims and delve into the finer points of his allegations within our discussion of the Defendants' bases for dismissal. This summary is derived from the facts alleged in Plaintiff's Complaint, which must be accepted as true for the purposes of addressing Defendants' Motion to Dismiss brought pursuant to FED. R. CIV. P. 12(b)(6). *See infra* Part II.A.

From July through September 4, 2007, Plaintiff was incarcerated at Upstate Correctional Facility ("Upstate"), where he was allegedly denied medication for various physical ailments by Defendant Nurse Fearchild, denied recreation for a period of three days by Defendant N. Bezio, threatened and harassed by Defendant Brian Bengmann, and had his due process rights violated during a Disciplinary Hearing. Dkt. No. 1, Compl. at PP 1-7. [3] In September 2007, Plaintiff was sent to Great Meadow Correctional Facility ("Great Meadow") in order to attend a medical appointment at Albany Medical Hospital. *Id*. at P 7. During his stay at Great Meadow, Plaintiff was denied his "medical draft bag" and therefore forced to wear the same clothes from September 2-18, denied drinking [*4] water for one twenty-four (24) hour period, threatened, and issued a false misbehavior report by Defendant Correctional Officer ("C.O") Green. *Id*. at PP 7-10.

Plaintiff alleges that on October 18, 2007, after his transfer back to Upstate, Defendant T. Ramsdell sexually assaulted him by grabbing and squeezing his penis during a body search and that Ramsdell and Defendant Rokece pushed his face against an iron rail, causing injuries to his face and forehead. *Id*. at PP 11-12 & 14. In the days that followed Plaintiff was threatened, harassed, issued a false Misbehavior Report accusing him of possessing contraband, and for a two-day period denied a bed pan and personal hygiene products. *Id*. at PP 13-19. In November 2007, Plaintiff was transferred to Clinton Correctional Facility ("Clinton"), where in December of that year, several Defendants, including S. Tyrell, R. Lawrence, Poltlos, and Frenyea, conspired to take his identification card, put him in keeplock, and improperly opened his legal mail. *Id*. at PP 22-27. During a Disciplinary [*5] Hearing held on December 24, 2007, before Hearing Officer Defendant Lieutenant ("Lt.") Miller, Plaintiff was denied the opportunity to present evidence or testimony and was not given a written disposition of the proceeding. *Id*. at P 32.

On January 15, 2008, Plaintiff had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, [4] during which Plaintiff articulated his complaints about the aforementioned alleged constitutional violations. These Defendants denied Plaintiff parole. *Id*. at PP 61-62.

On May 13, 1008, Defendant C.O.M. Orzech told Plaintiff to cut his beard by May 17th or he would issue Plaintiff a misbehavior report. *Id*. at P 36. That same day, Plaintiff filed a request to Department of Correctional Services ("DOCS") officials for a beard permit based on his Rastafarian religious beliefs and, on May 14th, received a receipt for said request stating that Plaintiff did not have to cut his beard during the pendency of the decision on his request. *Id*. at PP 37-39. On May 15th, Plaintiff explained to Orzech [*6] that he had

---

[3] All citations to the Plaintiff's Complaint refer to the paragraphs contained in the "Statement of Facts" section, starting on page twelve (12) of the Complaint.

[4] Defendant Ortloff's name is spelled "Oltloff" on the Docket Report. Because both parties refer to this Defendant as "Ortloff," we presume his name to be spelled as such.

submitted a request for a beard exemption and could not be forced to cut his beard until that request was decided, however, on May 17th, Orzech denied Plaintiff recreation time and placed him in keeplock because he had not cut his beard. *Id.* at PP 36-43. Also, Plaintiff alleges that on May 17th, Orzech allegedly threatened to beat him up if he filed any more complaints to Defendants Commissioner Fischer and Superintendent Artus. *Id.* at P 43.

On May 18, 2008, Plaintiff filed a medical services request to address his heart pain and weakness. *Id.* at P 45. On May 19, 2008, Defendant C.O.'s T. Carter and Orzech arrived at Plaintiff's cell to take him to the medical unit and proceeded to cuff Plaintiff's hands behind his back, then pushed him to the floor as he was being escorted out of his cell block and punched, kicked, and beat him, as did Defendant C.O.'s Tamer and Moak. *Id.* at PP 46-47. Plaintiff was escorted to the hospital where he was punched by Moak and Defendant Lieutenant ("Lt.") Labetz, and Defendant Nurse R. Rock allegedly refused to treat him for the injuries he sustained. *Id.* at PP 48 & 63(1). [5] Afterwards, Plaintiff was sent to the Special Housing Unit ("SHU"), **[*7]** where he was denied medical care, allegedly in order to prevent evidence of the incident in his medical records. *Id.* at PP 49-50.

On May 20, 2008, Orzech and Carter issued Plaintiff Misbehavior Reports alleging that Plaintiff had attacked Orzech while being escorted to the medical unit; on May 27, 2008, a Disciplinary Hearing was convened on those charges before Hearing Officer Defendant Captain D. Uhler. At the Disciplinary Hearing, Plaintiff was denied the opportunity to call witnesses and present evidence, and was improperly removed from the proceedings; in addition the Hearing was allegedly improperly extended through June 19, 2008. *Id.* at PP 52-54, 58, & 63(2)-64.

From July 2005 through July 2008, Plaintiff did not receive any mail from family or friends, and his family members did not receive outgoing mail he sent. *Id.* at PP 63(1) & 65. In addition, letters of complaint Plaintiff sent to various New York State Officials and Officers were not received. Plaintiff alleges that his incoming and outgoing mail was stolen by Defendants **[*8]** J. Rice, Quinn, and D. Waldron, who are mail clerks at Auburn, Upstate, and Clinton Correctional Facilities, respectively. *Id.* at PP 65, & 75-80.

Finally, on July 16, 2008, Plaintiff was transferred back to Upstate, where he was allegedly denied medical care from July 17 through August 14, 2008. *Id.* at P 81.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto*, 405 U.S. 319, 322, 92 S. Ct. 1079, 31 L. Ed. 2d 263 (1972). The trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski*, 1997 U.S. Dist. LEXIS 10111, 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991)). **[*9]** Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral*

---

[5] There are two consecutive paragraphs in the Complaint numbered 63. To avoid confusion, we will refer to them as paragraphs 63(1) and 63(2), respectively.

to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (emphasis added).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 753 n. 6, 83 S. Ct. 1461, 10 L. Ed. 2d 678 (1963); *see also Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, \_ U.S. \_, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible **[*10]** on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); *Ashcroft v. Iqbal*, \_ U.S. \_, 129 S.Ct. at 1950 (citing *Twombly*). [6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, \_ U.S. \_, 129 S.Ct. at 1949. This plausibility standard "is not akin to a 'probability requirement,' but it asks for

more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts which [he or she] has not alleged, or that the defendants have violated the . . . laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims . . . across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, \_ U.S. \_, 129 S.Ct. at 1950-51.

## B. Eighth Amendment Claims

### 1. *Medical Treatment*

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment. Prohibited punishment includes that which "involve[s] the unnecessary and wanton infliction of pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to [his] serious medical **[*12]** needs." *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotation marks and citations omitted) (alteration in original). This standard contains both objective and subjective elements. *Id.* "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberative indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* at 183-84 (citing *Chance v. Armstrong*, 143 F.3d at 702 & *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). The subjective element "entails something more than mere negligence . . . [but] something less

---

[6] By **[*11]** its opinion in *Bell Atlantic Corp. v. Twombly* and then again in *Ashcroft v. Iqbal*, the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 562-63, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L. Ed. 2d 80 (1957)). In so doing, the Court found that Conley "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Hathaway v. Coughlin*, 99 F.3d at 553 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

In this case, Plaintiff's medical indifference claims are as follows: (1) in mid-July 2007, he suffered from heart and chest pain for a period of five days, but received only non-aspirin medication and, on July 12, 2007, was denied a blood pressure test by Defendant Nurse Fearchild; (2) in November 2002, he was prescribed "Omeprazole 20 mg caps" for his [*13] "belly pains," but was denied refills of that medication by Defendant Nurses Travers and Fearchild at Upstate, and by Defendant Nurses Lashway, Rock, and Benthley at Clinton; and (3) Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, and falsified his medical records to cover-up the injuries he allegedly sustained on that date. [7] Compl. at PP 1, 48, 74 & 81.

In Plaintiff's first and second medical indifference claims, there is no allegation that he suffered from a serious medical condition. Plaintiff claims that he suffered from heart and chest pains for a period of five (5) days, and that he was denied refills for medication used to treat stomach pain. Compl. at [*14] PP 1 & 74. Such conclusory allegations of heart, chest, and stomach pain, without more, do not satisfy the objective prong of the Eighth Amendment test. *See Bell. Atl. Corp. v. Twombly*, 550 U.S. at 545 (stating that a valid claim must have enough factual allegations "to raise a right to relief above the speculative level"); *see also Hutchinson v. New York State Corr. Officers*, 2003 U.S. Dist. LEXIS 15417, 2003 WL 22056997, at *5

(S.D.N.Y. Sept. 4, 2003) (holding that a general allegation of chest pain is not sufficiently serious under the Eighth Amendment) (citations omitted); *Pender v. McClellan*, 1996 U.S. Dist. LEXIS 8853, 1996 WL 343253, at *4 (W.D.N.Y. Feb. 5, 1996) (dismissing plaintiff's Eighth Amendment claims based on stomach pain when there was no allegation that his condition was urgent or otherwise serious). Therefore, it is recommended that those claims be **dismissed**.

Likewise, in his third medical indifference claim alleging Defendants Rock, Benthley, Lashway, Fearchild, and Travers failed to treat him for the injuries he sustained during the alleged use of excessive force against him on May 19, 2008, Plaintiff fails to allege that he suffered from a constitutionally significant injury or medical condition. Plaintiff merely alleges [*15] in general terms that his head and neck were hurt, that he experienced head and heart pain, and that he requested x-rays for unspecified injuries to his head and body. Compl. at PP 48-49 & 81. These statements of general pain cannot sustain an Eighth Amendment claim because they do not allege that Plaintiff suffered from "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Therefore, these claims should be **dismissed**. [8]

2. *Conditions of Confinement*

In order to state a valid conditions of confinement claim under the Eighth Amendment, a plaintiff must allege: (1) the conditions were so serious that they constituted a denial of the "minimal civilized measure of life's necessities," and (2) the prison officials acted with "deliberate indifference." *Wilson v. Seiter*, 501 U.S. 294, 297-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (citation omitted) (cited in *Branham v. Meachum*, 77 F.3d 626, 630-31 (2d Cir. 1996)).

Plaintiff alleges the following conditions of

---

[7] Plaintiff also alleges that at a Disciplinary Hearing held on June 16, 2008, he told the presiding hearing officer, Defendant Uhler, about his medical problems, and that Uhler denied his requests for medical care. Compl. at P60. To the extent Plaintiff intended to raise an Eighth Amendment claim against Uhler, that claim must fail because Uhler was not responsible for Plaintiff's medical treatment.

---

[8] Plaintiff's other claims surrounding the alleged excessive use of force on May 19th remain. *See infra* Parts II.F & IV.

confinement claims: (1) he was denied recreation on July 12, 13, and 15, 2007, Compl. at P 2; (2) [*16] while on a multi-day visit to Albany Medical Hospital he was forced to wear the same clothes from September 2 through September 18, 2007, after being denied his "medical trip draft bag," Compl. at PP 7 & 10; (3) from September 12-13, 2007, he was forced to stay in a room without drinking water, Compl. at P 8; and (4) he was denied all personal hygiene items from October 19-20, 2007, Compl. at P 17.

With respect to Plaintiff's claim that he did not have drinking water in his cell for a 24-hour period from September 12-13, it unclear whether he is asserting that he did not have access to running water in his cell, or that he was completely denied water for a 24-hour period. Compl. at P 8. To the extent Plaintiff intended to allege the former, a lack of access to running water, without more, does not constitute an Eighth Amendment violation, *James v. Monroe County Jail*, 2005 WL 2030730, at *3 (W.D.N.Y. Aug. 23, 2005) (citation omitted); to extent Plaintiff intended to allege the latter, that claim is weakened by his statement that he was provided food on that date, but refused to eat it for fear that it was drugged, Compl. at P 8. Thus, Plaintiff admits that he was not deprived of sustenance, [*17] even if he refused to accept it. Also, although Plaintiff alleges he was forced to wear the same clothes from September 2 through September 18, 2007, he does not allege that he was denied the opportunity to bathe or otherwise clean himself during that period.

In sum, none of these deprivations are so serious as to constitute a denial of the "minimal civilized measure of life's necessities." *Wilson v. Seiter*, 501 U.S. at 297-99 (citation omitted). Plaintiff's claims amount to assertions that he was inconvenienced and perhaps discomforted for short periods of time, and are therefore *de minimis* and not cognizable under the Eighth Amendment, which only protects inmates from conditions that violate "contemporary standards of decency." *Hudson v. McMillan*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992);

see also, e.g., *Hamilton v. Conway*, 2008 U.S. Dist. LEXIS 6064, 2008 WL 234216, at *9 (W.D.N.Y. Jan. 28, 2008) (stating that "briefly denying hygienic materials does not violate contemporary standards of decency"), *Ochoa v. Connell*, 2007 U.S. Dist. LEXIS 77644, 2007 WL 3049889, at *12 (N.D.N.Y. Oct. 18, 2007) (citing cases for the proposition that the denial of recreation for a few days does not implicate the Eighth Amendment). Therefore, it is recommended that these claims [*18] be **dismissed**.

3. *Threats, Harassment, Excessive Force, and Sexual Abuse*

Plaintiff makes numerous allegations that various Defendants threatened, harassed, and subjected him to verbal abuse. Specifically, Plaintiff alleges that (1) on July 12, 2007, Fearchild threatened to issue a misbehavior report against him, Compl. at P 1; (2) Defendant Bengmann threatened him on August 8, 2007, Compl. at P 3; (3) on September 12, 2007, Defendant Green threatened to assault him, Compl. at P 8; (4) on October 19, 2007, Defendant Crossman threatened to beat him up if he did not stop talking and then verbally abused Plaintiff with profane language and gestures, Compl. at P 18; (6) on December 21, 2007, Defendants Tyrell, Lawrence, Poltlos, Frenyea, and other unnamed officers conspired to harass and provoke Plaintiff when they took his identification card, put him on keeplock, and improperly opened his legal mail, Compl. at PP 24-27; and (7) Defendant Poltlos threatened his life, pushed his face up against a wall, and made racial epithets against Plaintiff while escorting him to the mental health unit, Compl. at PP 28-29.

It is well settled law in this Circuit that "42 U.S.C. § 1983 is not designed to [*19] rectify harassment or verbal abuse." *Gill v. Hoadley*, 261 F. Supp. 2d 113, 129 (N.D.N.Y. 2003) (citing *Alnutt v. Cleary*, 913 F. Supp. 160, 165-66 (W.D.N.Y. 1996)); *Petway v. City of New York*, 2005 U.S. Dist. LEXIS 37783, 2005 WL 2137805, at *3 (E.D.N.Y. Sept. 2, 2005); *Larocco v. N.Y. City Dep't of Corr.*, 2001 U.S. Dist. LEXIS 13839, 2001 WL 1029044, at *5

(S.D.N.Y. Aug. 31, 2001). Thus, "verbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Moncrieffe v. Witbeck*, 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (quoting *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998)). Additionally, "threats do not amount to violations of constitutional rights." *Id.* (quoting *Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995)). Therefore, the aforementioned claims of threats and harassment should be **dismissed**.

To the extent Plaintiff intends to assert a claim of excessive force against Defendant Poltlos for allegedly pushing his face up against a wall, that action does not rise to the level of an Eighth Amendment violation, especially **[*20]** when, as here, Plaintiff has not alleged he was in any way injured by the Defendant's actions. *See Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.") (internal citations omitted); *see also Govan v. Campbell*, 289 F. Supp. 2d 289, 300 (N.D.N.Y. 2003) (prisoner's claim that he was pushed up against a wall, even if true, did not amount to a constitutional violation).

Plaintiff has also brought claims of sexual and physical abuse against Defendants Ramsdell and Rokece. Compl. at PP 11-14. Specifically, Plaintiff alleges that during a search of his person for contraband, Defendant Ramsdell grabbed and squeezed his penis, [9] and that Rokece pushed his face up against an iron rail. *Id.* at PP 11-12 & 14. Like Plaintiff's claim against Poltlos, his claim that Rokece pushed him against a rail, even if true, is *de minimis* and therefore fails to state a claim. *See Govan v. Campbell*, 289 F. Supp. 2d at 300. As per

Plaintiff's claim against Ramsdell, in some cases, "[s]exual abuse may violate contemporary standards of decency" so as to implicate the Eighth Amendment. **[*21]** *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). However, the Second Circuit has made clear that allegations of minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. *Id.* In this case, Plaintiff has alleged a quick, isolated incident of inappropriate touching that occurred during a search of his person for contraband. Such an incident, even if true, does not constitute an Eighth Amendment violation. *Id.* (prisoner's allegation that a corrections officer inappropriately touched his penis on one occasion did not state a valid claim), *see also Davis v. Castleberry*, 364 F. Supp. 319, 321 (W.D.N.Y. 2005) (prisoner's allegation that a corrections officer grabbed his penis during a pat frisk did not state a valid constitutional claim); *Montero v. Crusie*, 153 F. Supp. 368, 373 & 375 (S.D.N.Y. 2001) (squeezing an inmate's genitalia on several occasions during pat frisks did not constitute an Eighth Amendment violation).

Therefore, it is recommended that Plaintiff's allegations of sexual abuse, threats, excessive **[*22]** force, and harassment be **dismissed** for failure to state a claim.

## C. Due Process Claims

Plaintiff alleges that he suffered due process violations during a Parole Hearing held on January 15, 2008, and Disciplinary Hearings held in 2007 and 2008.

### 1. Parole Hearing

Plaintiff alleges that on January 15, 2008, he had a Parole Hearing before Defendants Loomis, Ferguson, and Ortloff, all Commissioners of the New York State Division of Parole. Compl. at P 61. Plaintiff states that he informed those Defendants about all of the constitutional violations he had suffered during his incarceration, but that

---

[9] Plaintiff does not allege that he was in any way injured when Ramsdell allegedly squeezed his penis.

Defendants Loomis and Ferguson prevented Plaintiff from pleading his side of the case and disregarded his suffering. *Id.* On January 16, 2008, Plaintiff was denied parole by Loomis, Ferguson, and Ortloff; Plaintiff alleges that but for such denial, he would not have been assaulted on May 19, 2008. *Id.* at P 62.

As Defendants point out, the Second Circuit has held that "parole board officials, like judges, are entitled to absolute immunity from suit for damages when they serve a quasi-adjudicative function in deciding whether to grant, deny or revoke parole." *Montero v. Travis*, 171 F.3d 757, 761 (2d Cir. 1999) **[*23]** (citations omitted). Therefore, because Defendants Loomis, Ferguson, and Ortloff were acting as quasi-judicial officers when they allegedly improperly denied Plaintiff's parole, they are entitled to absolute immunity and the claims for damages [10] against them should be **dismissed** pursuant to 28 U.S.C. § 1915(e)(2)(B)(I), which gives the Court authority to dismiss a claim brought by a plaintiff proceeding *in forma pauperis* "at any time" if it determines such claim to be frivolous.

2. *Disciplinary Hearings*

Plaintiff makes several due process claims concerning Disciplinary Hearings held on (1) November 21, 2007; (2) December 24, 2007; and (3) May 27 through June 19, 2008. Compl. at PP 21, 32, 58-60, 63(2), & 64. Plaintiff alleges that at the Disciplinary Hearing presided over by Defendant D. Kemp on November 21, 2007, Kemp prevented Plaintiff from presenting a defense by threatening him and stating that if Plaintiff did "it her way[,] she [would] not give [him] any time and [would] dismiss the charges against [him]." *Id.* at P 21. Plaintiff alleges **[*24]** Kemp found him guilty of smuggling and issued him a sentence of "counsel and release." *Id.*

Plaintiff alleges that on December 24, 2007,

Defendant Lieutenant Miller presided as Hearing Officer over a Disciplinary Hearing during which Plaintiff was denied the opportunity to present evidence and testimony and that he was not given a written disposition of the Hearing. [11] *Id.* at P 32. Plaintiff alleges that he was found guilty at the Hearing and sentenced to thirty (30) days keeplock. Plaintiff states that he filed a complaint with Defendant Racette requesting a new hearing, which was denied. *Id.*

Finally, Plaintiff alleges that on May 27, 2008, Defendant Uhler presided over a Disciplinary Hearing on charges brought by Defendants Orzech and T. Carter stemming from the May 19, 2008 incident, at which Plaintiff was denied the opportunity **[*25]** to present witnesses and other evidence. *Id.* at P 54. Plaintiff also alleges that such Hearing was adjourned to June 3, 2008, and then again to June 9, 2008, but he did not receive a copy of an extension form in either instance and was made to wait in SHU during those adjournments. *Id.* Plaintiff alleges that the Hearing reconvened on June 16, 17, and 19, 2008 before Defendant Uhler, during which time Plaintiff was again precluded from presenting evidence and Uhler allegedly improperly led the witnesses. *Id.* at PP 58, 63(2), & 64. Plaintiff also avers that he was improperly removed from the proceedings on June 16, 2008. *Id.* at P 63(2). Plaintiff does not state what the outcome of the May 27-June 19, 2008 Disciplinary Hearing was, nor if he received any form of punishment after its disposition. *Id.* at PP 54 & 58-60.

In order to state a procedural due process claim pursuant to the Fourteenth Amendment, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998) (citing *Kentucky Dep't of Corr. v.*

---

[10] Plaintiff does not ask for any other non-pecuniary form of relief against Defendants Loomis, Ferguson, and Ortloff. *See* Compl. at pp. 77-80.

[11] Plaintiff also alleges that he did not receive a written disposition after a Disciplinary Hearing held in November 2007. Compl. at P 20. However, that claim is alleged only against Superintendent Bukeco, who is not a named Defendant in this action, and therefore, should be dismissed as Plaintiff has alleged no personal involvement on the part of any Defendant.

*Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)). The Supreme Court held in *Sandin v. Conner* that state created liberty interests shall be limited **[\*26]** to those deprivations which subject a prisoner to "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).

In this case, Plaintiff has alleged that he was sentenced to thirty (30) days keeplock after his conviction in the Disciplinary Hearing conducted on December 24, 2007. Courts in this Circuit have held that a 30 day period of keeplock, absent additional egregious circumstances, is not "atypical and significant" so as to create a liberty interest and thereby trigger the protections of the Due Process Clause. *See Rivera v. Goord*, 2008 U.S. Dist. LEXIS 103311, 2008 WL 5378372, at *2-3 (N.D.N.Y. Dec. 22, 2008) (holding that 40 days of room restriction "did not constitute a constitutionally cognizable liberty deprivation"); *Uzzell v. Scully*, 893 F. Supp. 259, 263 (S.D.N.Y. 1995) (45 days of keeplock is not atypical and significant); *Rivera v. Coughlin*, 1996 U.S. Dist. LEXIS 560, 1996 WL 22342, at *5 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock does not create a liberty interest). Indeed, courts have roundly rejected the notion that such a short period of confinement, without additional hardships, creates a liberty interest even when that confinement is completely **[\*27]** segregated, such as when an inmate is sent to the Special Housing Unit ("SHU"). *See Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999) (101 days in normal SHU conditional was not atypical or significant) (cited in *Ochoa v. DeSimone*, 2008 U.S. Dist. LEXIS 76256, 2008 WL 4517806, at *4 (N.D.N.Y. Sept. 30, 2008) (30 days in SHU, without more, did not create a liberty interest)); *Thompson v. LaClair*, 2008 U.S. Dist. LEXIS 4467, 2008 WL 191212, at *3 (N.D.N.Y. Jan. 22, 2008) (30 days in SHU does not create a liberty interest).

With respect to Plaintiff's allegations regarding the Disciplinary Hearings held on November 21, 2007

and from May 27, 2008, through June 19, 2008, Plaintiff does not allege that he suffered any atypical or significant hardship as a consequence of those alleged due process violations. To the extent Plaintiff intended to allege that his confinement in SHU during the pendency of his Hearing that went from May 27 through June 19, 2008, was a due process violation, such a short period of confinement is not atypical and significant for the reasons mentioned above. Therefore, it is recommended that his due process claims be **dismissed** because he had failed to implicate a liberty interest with respect to any of the due process **[\*28]** violations alleged.

### D. First Amendment Claims

#### 1. **Interference with Personal Mail**

Plaintiff alleges that the Defendants interfered with his outgoing and incoming mail. Plaintiff states that his family members sent him numerous letters, but that he did not receive any mail from family or friends from September 2005 through July 2008. Compl. at PP 63(1) & 65. Plaintiff also states that on January 15, 2008, his mother informed Deacon Debiec [12] that she had not received any of Plaintiff's letters. *Id*. at P 63(1). Plaintiff alleges that he sent his daughter and her mother a certified letter while in Auburn in 2005, but that he never received the return receipt; he called his daughter's mother who informed him that she never received the letter. *Id*. at PP 75-76. Plaintiff accuses the Senior Mail Clerk at Auburn, Defendant J. Rice, of stealing his mail. *Id*. Also in 2005, Plaintiff allegedly sent complaint letters to the New York Department of State Ethics Commission and, having heard no response, sent another letter to the Ethics Commission asking if they received his complaints, to which they responded they had not. *Id*. at P 77. Plaintiff accuses Defendant Rice of stealing those complaints. *Id*.

Plaintiff alleges that from 2005 through March 24,

---

[12] Deacon **[\*29]** Debiec is not a named Defendant in this action.

2007, he sent over two hundred (200) letters to his daughter and her mother, all of which were allegedly stolen by Defendant Quinn, a mail clerk at Upstate. *Id.* at P 76. In addition, Plaintiff accuses Quinn of stealing letters he sent to DOCS' Rastafarian Priest Abuna A. Foxe in 2006, as well as a complaint of criminal misconduct sent to various government officers. *Id.* at P 78.

In March 2008, Plaintiff spoke with his father who advised him that he had not received any correspondence from Plaintiff for over three years, though Plaintiff alleges he sent his parents over sixty (60) letters between 2005 and 2008. *Id.* at P 79. Plaintiff accuses Defendants Rice, Quinn, and Defendant Waldron, who is a Senior Mail Supply Clerk at Clinton, of obstructing his written communications to his family. *Id.*

As Plaintiff correctly contends, the First Amendment protects an inmate's right to send and receive both legal and non-legal mail, though that right may be limited by restrictions that are "'reasonably related to legitimate penological interests.'" *Thornburgh v. Abbott*, 490 U.S. 401, 409, 109 S. Ct. 1874, 104 L. Ed. 2d 459 (1989) (quoting **[*30]** *Turner v. Safley*, 482 U.S. 78, 79, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987)). However, Plaintiff's sweeping accusations that his incoming and outgoing mail was obstructed for a period of over three years does not assert a plausible claim under § 1983. *See Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 173 L. Ed. 2d 868. Plaintiff's conclusory accusations that Defendants Rice, Quinn, and Waldron stole his incoming and outgoing mail appears to be based on nothing more than the fact that those Defendants were DOCS employees who worked in the mailrooms at Auburn, Upstate, and Clinton, respectively. Indeed, beyond his own suspicions, Plaintiff offers no factual allegations that link these Defendants to the alleged obstruction of his mail from 2005 through 2008. Therefore, we recommend that these claims be **dismissed** as conclusory.

2. *False Misbehavior Reports*

Plaintiff alleges that several Defendants filed false misbehavior reports against him. Some of those allegations include the additional claim that the false reports were filed in retaliation for the exercise of his First Amendment rights, some do not. We address first the claims that do not have the retaliation rider attached.

Plaintiff alleges that on October 19, 2007, Defendant Ramsdell, **[*31]** in an effort to cover-up staff misconduct, issued him a false Misbehavior Report accusing Plaintiff of carrying contraband in his crotch. Compl. at P 15. Plaintiff also alleges that on December 22, 2007, Defendant Tyrell filed a false Misbehavior Report accusing Plaintiff of threats in order to cover-up Tyrell's improper opening of Plaintiff's legal mail. *Id.* at P 31. However, there is "no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d at 862 (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)); *see also Gill v. Riddick*, 2005 U.S. Dist. LEXIS 5394, 2005 WL 755745, at *7 (N.D.N.Y. Mar. 31, 2005). While an inmate may have a valid cause of action where a false misbehavior report is filed *in retaliation* for the exercise of a constitutional right, *see, e.g.*, *Gill v. Riddick*, 2005 U.S. Dist. LEXIS 5394, 2005 WL 755745 at *7, Plaintiff has not established that he was engaged in constitutionally protected conduct with respect to these claims. Therefore, it is recommended that these claims be **dismissed** for failure to state a claim and pursuant to 28 U.S.C. § 1915(g). *See supra* Part II.C.1.

We now consider Plaintiff's claims that false misbehavior reports were filed **[*32]** against him with retaliatory animus. The Second Circuit has stated that courts must approach prisoner retaliation claims "with skepticism and particular care," since "virtually any adverse action taken against a prisoner by a prison official - even those otherwise not rising to the level of a constitutional violation - can be characterized as a constitutionally proscribed retaliatory act." *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citing *Flaherty v.*

*Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) & *Franco v. Kelly*, 854 F.2d 584, 590 (2d Cir. 1988)), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) prison officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).

In this case, Plaintiff alleges that (1) at some point prior to August 8, 2007, Defendant Bezio submitted a letter of complaint **[\*33]** Plaintiff had written to Defendant Bengmann of the DOCS Inspector General's Office in retaliation for a civil rights action Plaintiff had previously initiated against several DOCS officials, Compl. at P 3; (2) on August 11, 2007, Defendant Bengmann issued Plaintiff a false Misbehavior Report in retaliation for complaints Plaintiff had filed against several DOCS and New York State officials, Compl. at P 3; (3) on October 21, 2007, Defendant Crossman filed a false Misbehavior Report against Plaintiff in retaliation for his filing a civil lawsuit against numerous DOCS officials, Compl. at P 19; and (4) on December 22, 2007, Defendant Lawrence filed a false Misbehavior Report against Plaintiff in retaliation and in order to cover-up staff misconduct, Compl. at P 30.

With respect to the first two claims listed above, Plaintiff alleges that on August 8, 2007, he spoke with Defendant Brian Bengmann, who told Plaintiff that Bezio had forwarded him a letter written by Plaintiff that allegedly included threats against the Upstate staff. *Id*. at P 3. Plaintiff states that Bengmann produced a letter of complaint Plaintiff wrote to Defendant Woods about his medical issues, assaults he had endured, **[\*34]** and his allegedly improper SHU confinement. *Id*. Plaintiff

alleges that he received a Misbehavior Report on May 21, 2008, for sending that letter to Woods, and was eventually assessed ninety (90) days in SHU on that charge. Plaintiff states that notwithstanding the punishment he had already been assessed, Defendant Bezio sent his letter to Defendant Bengmann on August 8, 2007, in retaliation for a civil rights action he filed in federal court that Plaintiff has identified as 9:07-CV-0305. [13] Plaintiff alleges that he received a Misbehavior Report from Bengmann on August 21, 2007, in retaliation for a complaint Plaintiff filed against Defendant Richard Roy, former-Governor Eliot Spitzer, State Commission Chairman Daniel Stewart, DOCS Commissioner Defendant Brian Fischer, and Bezio. *Id*.

With respect to Bengmann, Plaintiff's claim that he wrote a false Misbehavior Report against Plaintiff **[\*35]** because of complaints and lawsuits Plaintiff filed against other individuals is conclusory because Plaintiff fails to allege a plausible causal connection between his protected conduct and Bengmann's allegedly false Misbehavior Report. Plaintiff himself alleges that Bengmann was acting on Plaintiff's letter of complaint that was forwarded to him by Bezio, a letter that was alleged to contain threats against DOCS officials. As per Bezio, the only retaliatory act Plaintiff has alleged is that he submitted Plaintiff's letter of complaint to Bengmann, who then authored a Misbehavior Report against Plaintiff. Thus, Plaintiff does not allege that Bezio took any adverse action directly against him. Therefore, it is recommended that these claims be **dismissed**.

Plaintiff's third and fourth retaliation claims listed above against Defendants Crossman and Lawrence, respectively, both suffer from the same deficiency: neither describes with any degree of specificity the constitutionally protected conduct that was the

---

[13] The Court takes judicial notice that Plaintiff has currently pending in the Northern District of New York another § 1983 action, *Excell v. Woods et al.*, civil action number 9:07-CV-305(GTS/GHL), in which he has brought claims against many of the same Defendants listed in this action, including Bezio.

basis for the alleged retaliatory acts. *See id.* at PP 19 (alleging that Crossman filed a false Misbehavior Report against him "as retaliation against the Plaintiff for his inmate civil  [*36] complaints against numerous fellow [DOCS] employees") & 30 (asserting no constitutionally protected conduct whatsoever). Therefore, it is recommended that these claims be **dismissed** as conclusory and pursuant to 28 U.S.C. § 1915(g).

### 3. *Access to the Courts*

In paragraph thirty-five (35) of his Complaint, Plaintiff appears to allege that he was denied access to the law library on May 8, 2008, but he does not state that any Defendant was personally involved in that alleged constitutional deprivation. *Id.* at P 35. In paragraph sixty-six (66) of his Complaint, Plaintiff alleges in conclusory fashion that Brousseau destroyed several grievances he filed. Once again, this claim appears to be based on nothing more than Plaintiff's own supposition and speculation. Therefore, it is recommended that these claims be **dismissed**.

### E. Conspiracy Claims

Plaintiff brings several conspiracy claims that are difficult to decipher and to the extent they can be logically interpreted, are wholly conclusory. Plaintiff alleges that Defendant Bezio (and perhaps Uhler and Boyea as well) was involved in a conspiracy to send Plaintiff to Upstate and to have him placed in a cell next to an inmate with whom Plaintiff would  [*37] likely have fights. Compl. at P 22. In another conspiracy claim, Plaintiff states his belief that Bezio was the mastermind behind the alleged May 19, 2008, attack against him because Plaintiff knew Bezio from Upstate and Defendants Bezio and Uhler had a history of working together against Plaintiff. *Id.* at P 58. Finally, Plaintiff alleges that Defendants Fischer, LeClaire, Bezio, Artus, and Uhler conspired to subject Plaintiff to "religious harassment and discrimination and physical assault and the prison disciplinary proceeding[s] and [to] transfer [him] back to

upstate." *Id.* at P 81.

All of the aforementioned conspiracy claims appear to be based solely on Plaintiff's own beliefs and conjecture and, in the absence of factual allegations, should therefore be **dismissed** as frivolous pursuant to 28 U.S.C. § 1915(g).

### F. Personal Involvement

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of  [*38] personal involvement." *Kinch v. Artuz*, 1997 U.S. Dist. LEXIS 13998, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995) & *Wright v. Smith*, 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. at 1948.

If a plaintiff seeks to bring a § 1983 action for supervisory liability, liability on the part of the supervisor may exist

> in one or more of the following ways: 1) actual direct participation in the constitutional violation, 2) failure to remedy a wrong after being informed through a report or appeal, 3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, 4) grossly negligent supervision of subordinates who committed a violation, or 5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d at 873) (further citations omitted).

Aside from naming them as Defendants, Plaintiff has [*39] failed to make any factual allegations whatsoever against Defendants Roy, Knapp, Lucia, and Diaz. Also, Plaintiff's only mention of Defendant LeClaire is the conclusory claim that LeClaire was somehow involved in his alleged First and Eighth Amendment violations. Compl. at P 81. Therefore, it is recommended that the Complaint be **dismissed** as against those Defendants.

Furthermore, because we have recommended dismissal of Plaintiff's underlying constitutional claims concerning mail theft, retaliation, medical indifference, conditions of confinement, and due process, his claims of supervisory liability against Defendants Woods, Bezio, Racette, Uhler, Wright, Johnson, Brousseau, Patnode, and Bellamy, for failure to remedy those alleged violations should also be **dismissed**. *See* Compl. at PP 10, 21-22, 32-34, 51, 58-59, 66-67, 72-73, & 79.

Defendants have not moved to dismiss Plaintiff's claims stemming from the alleged events of May 19, 2008, however, they argue that Defendants Artus and Fischer should be dismissed for lack of personal involvement. Defs.' Mot. at pp. 16-17. Plaintiff has alleged that prior to the alleged use of excessive force that occurred on May 19, 2008, he sent complaints [*40] to Artus and Fischer about his problems with Orzech and Orzech's alleged threat to assault him, and that such complaints were either ignored or not responded to, and therefore, Artus and Fischer failed to protect him. Compl. at PP 41, 44, 57, & 68.

In order to state a valid failure to protect claim, a prisoner must demonstrate that the prison officials "acted with deliberate indifference with respect to his safety or with an intent to cause harm to him." *Hendricks v. Coughlin*, 942 F.2d at 113. The key element of a failure to protect claim is the existence or potential existence of a substantial risk of serious harm and not the actual harm which may or may not ensue. *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). To prove deliberate indifference, the plaintiff must

show that the "official knew of and disregarded an excessive risk to the plaintiff's health or safety." *Id.* at 837 (cited in *Ramirez v. Mantello*, 1998 U.S. Dist. LEXIS 3843, 1998 WL 146246, at *2 (N.D.N.Y. Mar. 24, 1998). "The official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists *and* he must also draw the inference." *Id.* at 836.

In this case, Plaintiff alleges that Artus and Fischer [*41] were put on notice of the threat to his safety by his letters of complaint dated May 15, 17, and 18, 2008. Based on these allegations, we find that Plaintiff has stated a facially adequate claim for failure to protect. Therefore, we recommend against dismissal of these claims against Artus and Fischer. Similarly, Plaintiff has alleged that Defendants Warner and Rock were involved in a conspiracy to cover-up the alleged May 19th assault. Although we recommended dismissal of Plaintiff's medical indifference claims against Rock in Part II.B.1, *supra*, Plaintiff also alleges that Rock falsified his medical records in furtherance of the alleged conspiracy to violate his Eighth Amendment rights. Compl. at PP 48 & 70. Warner is alleged to have participated in the conspiracy by directing Defendant Tamer not to take any close-up pictures of Plaintiff's injuries after the assault. *Id.* at P 48. Considering that Plaintiff's underlying excessive force claim has not been challenged, dismissal of his conjoining conspiracy claims would be premature at this stage. Therefore, it is recommended that these claims against Warner and Rock not be dismissed.

## G. Unserved Defendants

Under Federal Rule of Civil Procedure 4(c)(1), [*42] the plaintiff is responsible for service of the summons and complaint for each defendant within a specified time period. Specifically, the plaintiff must effectuate service of process within 120 days of the filing of the complaint. FED. R. CIV. P.

4(m). [14] Failure to properly serve any defendant in accordance with the Federal Rules will result in the court, upon motion or on its own initiative, to dismiss the case without prejudice as to that defendant. *Id*.

In this case, there is no indication that the Defendants C.O. Green, Labetz, Ortloff, or Karen Bellamy have been served. *See* Dkt. Nos. 17, 54, & 66. Although courts must afford plaintiffs notice before they may dismiss a claim for failure to serve a defendant, FED. R.CIV. P. 4(m), in this case, because Plaintiff's claims against Defendants Green, Ortloff, and Bellamy lack merit, granting Plaintiff the opportunity to properly serve these unnamed Defendants would be futile. Thus, it is recommended that Plaintiff's claims against Green, Ortloff, and Karen Bellamy be **dismissed**. With respect to **[*43]** Labetz, Plaintiff has alleged that he used excessive force against Plaintiff during the May 19, 2008 incident. Compl. at P 63(1). Because Defendants have not moved to dismiss Labetz for failure to state a claim, we will afford Plaintiff **one final opportunity to effectuate service of process on Defendant Labetz**. **Plaintiff is forewarned that a failure to do so will result in the Court's recommendation of dismissal of his claims against Labetz**. The Court will afford Plaintiff **thirty (30) days from the date this Report-Recommendation is issued** to effectuate service upon Labetz.

### III. Plaintiff's Motion for a Preliminary Injunction

On February 23, 2009, Plaintiff submitted a Motion for a Preliminary Injunction and Temporary Restraining Order seeking an order enjoining the Defendants from: interfering with his Rastafarian religious practices, physically assaulting him, confining him in SHU under the pretext of false misbehavior reports, denying him medical care,

stealing his mail, and denying him access to the law library. Dkt. No. 57 at pp. 1-6.

In the Second Circuit, the standard for granting a temporary restraining order and a preliminary injunction is the same. *See* FED. R. CIV. P. 65; *see* **[*44]** *also Local 1814 Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n Inc*., 965 F.2d 1224, 1228 (2d Cir. 1992).

> In general, to secure a preliminary injunction, the moving party must demonstrate: (1) irreparable harm, and (2) either: (a) a likelihood of success on the merits of [the case], or (b) sufficiently serious questions going to the merits of the case to make it a fair ground for litigation, and a balance of hardships tipping decidedly in [favor of the moving party].

*D.D. v. New York City Bd. of Educ*., 465 F.3d 503, 510 (2d Cir. 2006) (internal quotation marks and citation omitted).

Irreparable harm "means an injury for which a monetary award cannot bring adequate compensation." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc*., 596 F.2d 70, 72 (2d Cir. 1979). The Second Circuit has held that the alleged violation of a constitutional right triggers a finding of irreparable injury. *See Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). Therefore, in cases involving alleged constitutional violations, the issue of irreparable harm merges with the question of success on the merits. *See Metropolitan Council, Inc. v. Safir*, 99 F. Supp. 2d 438, 443 (S.D.N.Y. 2000) **[*45]** (citation omitted).

Finally, when the injunction sought "will alter, rather than maintain the status quo," or will "provide the movant with . . . relief [that] cannot be undone even if the defendant prevails at a trial on the merits," the moving party must show a "clear" or "substantial" likelihood of success. *Beal v. Stern*, 184 F.3d 117, 122-23 (2d Cir. 1999) (citation omitted).

In this case, Plaintiff has failed to demonstrate

---

[14] Under the Local Rules for the Northern District of New York, a plaintiff must effectuate service within sixty (60) days. N.D.N.Y.L.R. 4.1(b).

either irreparable harm or a likelihood of success on the merits of his claims. Indeed, we have already recommended for dismissal the majority of Plaintiff's claims. In addition, Plaintiff's Motion for Preliminary Injunction is presented in conclusory fashion and, for the most part, simply repeats the accusations brought in his Complaint. Therefore, it is recommended that Plaintiff's Motion be **denied**.

## IV. CONCLUSION

For the reasons stated above, it is recommended that the majority of the aforementioned claims be dismissed. To clarify, should the district court adopt this Report-Recommendation, the following claims will remain: (1) excessive force and retaliation against Defendants Tamer, Orzech, T. Carter, Moak, and Labetz; (2) conspiracy against Defendants Tamer, **[*46]** Orzech, T. Carter, Moak, Labetz, R. Rock, and Warner; (3) violation of Plaintiff's First Amendment right to practice religion against Orzech; and (4) supervisory liability against Artus and Fischer.

Therefore, it is hereby

**RECOMMENDED**, that the Defendants' Motion to Dismiss (Dkt. No. 59) be **GRANTED in part** and **DENIED in part** in accordance with the above opinion; and it is further

**RECOMMENDED**, that the following Defendants be **DISMISSED** from this action: T. Ramsdell, C. Crossman, Fearchild, D. Uhler, M. Patnode, Lucien LeClair, Jr., Vonda Johnson, Fenyea, R. Lawrence, S. Tyrell, Lt. Miller, Lashway, Benthley, Knapp, Lucia, Loomis, Ferguson, Poltlos, Brousseau, J.T. Rice, D. Waldron, Quinn, Travers, Pedro Diaz, Robert Woods, Richard Roy, Brian Bengmann, N. Bezio, Steven Racette, Sgt. Rokece, Green, Ortloff (spelled "Oltloff" on the Docket), Karen Bellamy; [15] and it is further

---

[15] To clarify further, should the District Court adopt this Report-Recommendation, the following Defendants shall remain as parties in this action: T. Carter, Tamer, Moak, M. Orzech, Labetz, R. Rock, H. Warner, Artus, and Fischer.

**RECOMMENDED**, that Plaintiff's Motion for a Preliminary Injunction (Dkt. No. 57) be **DENIED**; and it is further

**ORDERED**, that should the District Court adopt this Court's recommendation that Defendant Labetz not be dismissed from the action, the Clerk shall issue a Summons and forward it, along with a copy of the Complaint, **[*47]** to the United States Marshal for service upon Defendant Labetz. Plaintiff is warned that failure to effectuate service upon Labetz within **thirty (30) days of the date this Report-Recommendation is issued will** result in this Court recommending dismissal of his claims against Labetz; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), & 6(e).

Date: August 25, 2009

Albany, New York

/s/ Randolph F. Treece

RANDOLPH F. TREECE

United **[*48]** States Magistrate Judge

---



# Figueroa v. Holmes

United States District Court for the Northern District of New York

September 20, 2013, Decided; September 20, 2013, Filed

9:13-CV-048 (FJS/ATB)

**Reporter**

2013 U.S. Dist. LEXIS 150971 *

JULIO FIGUEROA, Plaintiff, vs. MS. HOLMES, et al., Defendants.

**Subsequent History:** Adopted by, Motion granted by, in part, Motion denied by, in part, Dismissed by, in part Figueroa v. Holmes, 2013 U.S. Dist. LEXIS 150026 (N.D.N.Y, Oct. 18, 2013)

**Counsel:** [*1] JULIO FIGUEROA, Plaintiff, Pro se.

For Defendants: CHARLES J. QUACKENBUSH, AAG.

**Judges:** ANDREW T. BAXTER, United States Magistrate Judge.

**Opinion by:** ANDREW T. BAXTER

## Opinion

### REPORT-RECOMMENDATION

This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Frederick J. Scullin, Senior United States District Judge. In this *pro se* civil rights complaint (Dkt. No. 1), plaintiff alleges that, while he was an inmate in the custody of the Upstate Correctional Facility ("Upstate"), defendants denied him constitutionally adequate medical care and retaliated against him. He seeks substantial damages.

Presently before this court is defendants' motion to dismiss plaintiff's complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 10).[1] Plaintiff has informed the court that he does not intend to respond in opposition to defendants' motion. (Dkt. Nos. 14, 22). For the following reasons, this court recommends that defendants' motion to dismiss be granted as to plaintiff's retaliation claim, and denied as to plaintiff's claim that he was denied adequate medical care.

### I. Facts and Contentions

While under the care of medical staff at Gowanda Correctional Facility, plaintiff was diagnosed with Paget's disease[2] and prescribed Tramadol. (Compl.

---

[1] This motion was originally filed only [*2] by defendant Holmes. (Dkt. No. 10). However, following service, defendants Parmer and Smith each requested that they be added to the motion. (Dkt. Nos. 12, 20). The Court granted these motions. (Dkt. Nos. 13, 21).

[2] "Paget's disease is a disorder that involves abnormal bone destruction and regrowth, which results in deformity. . . . In people with Paget's disease, there is an abnormal breakdown of bone tissue, followed by abnormal bone formation. The new bone is bigger, but weaker and filled with new blood vessels. The disease may only be in one or two areas of the skeleton, or throughout the body. . . . Most patients have no symptoms. If they do occur, symptoms may include [b]one pain, joint pain or stiffness, and neck pain (the pain may be severe and present most of the time) . . . ." *See* http://www.nlm.nih.gov/medlineplus/ency/article/000414.htm (last visited September 20, 2013).

2013 U.S. Dist. LEXIS 150971, *2

at 4).[3] Plaintiff later came under the care of defendants Parmer and Holmes at Upstate, where his medication was discontinued in October 2010. (Compl. at 4). As a result, plaintiff filed a grievance against these defendants in November 2010 and appealed it to the Central Office Review Committee. (Compl. at 4-5). A specialist subsequently placed plaintiff on Indomethacin and "upped the original pain medication," however, defendants refused to issue the Ultram.[4] (Compl. at 5). Plaintiff further asserts that despite several requests, he has "been denied [his] pain medication for 27 months," and when he files sick call slips, they are ignored and the defendants simply advise him to "'drink more water.'" (Compl. at 5, 8).[5] According to plaintiff, Nurse Holmes told him she will not provide him pain medication **[*3]** because she believes that prisoners "are nothing but a bunch of drug addicts." (Compl. at 8).

Plaintiff alleges that he has suffered extreme pain as a result of these denials—"some days [he] feel[s] as if [he is] going to die in [his] cell," he "wake[s] up screaming for medical attention," and is losing weight because he is in too much pain to get out of bed and eat. (Compl. at 5-6). Plaintiff has written letters to Chief Medical Director Koenigsmann who advised him that defendant Smith would address his concerns. (Compl. at 5). He also wrote and spoke to "both defendant doctors mentioned in this complaint" and "in retaliation, defendant Holmes advised [him] that if [he] keep[s] writing '[he] will really need some medical attention along with some bandages!!'" (Compl. at 6).

## II. Motion to Dismiss

To survive dismissal for failure to state a claim, the complaint **[*5]** must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

For the reasons discussed below, the court concludes that plaintiff **[*6]** has stated a plausible claim against the defendants for deliberate indifference to plaintiff's serious medical needs, and that defendants' motion to dismiss should be denied as to that claim. Additionally, the court concludes that plaintiff has not stated a plausible claim based on retaliation, and that defendants' motion to dismiss should be granted as to that claim.

---

[3] The Court's references to page numbers are to the page numbers electronically generated by the CM/ECF system.

[4] Ultram is a brand name of tramadol hydrochloride. *See, e.g.*, http://www.pdr.net/drug-information/ultram?druglabelid=950 (last visited September 18, 2013).

[5] The Court notes that it is unclear from plaintiff's complaint what medications have been issued to plaintiff, and at what times. *Compare* Compl. at 5 (noting that **[*4]** he was issued 25 mg of Indocin twice a day) *with* Compl. at 5 (stating that he has been denied pain medication for 27 months and the doctors "only advise him to 'drink more water'"). However, at this stage in the proceeding, and given plaintiff's *pro se* status, the complaint must be liberally construed and interpreted to raise the strongest arguments they suggest. *See, e.g., Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006).

## III. Denial of Medical Care

### A. Legal Standards

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

### 1. Objective Element

In order to meet the objective requirement, the alleged deprivation of adequate medical care [*7] must be "sufficiently serious." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006) (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Determining whether a deprivation is sufficiently serious also involves two inquiries. *Id.* The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Id.* (citing *Farmer*, 511 U.S. at 844-47).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Id.* at 280. The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff. *Id.* (citing *Helling v. McKinney*, 509 U.S. 25, 32-33, 113 S. Ct. 2475, 125 L. Ed. 2d 22 (1993)). If the "unreasonable care" consists of a failure to provide *any* treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Id.* (citing *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003)). However, in cases where the inadequacy is in the medical treatment that was actually [*8] afforded to the inmate, the inquiry is narrower. *Id.* If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone. *Id.* (citing *Smith*, 316 F.3d at 185). The court in *Salahuddin* made clear that although courts speak of a "serious medical condition" as the basis for an Eighth Amendment claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Id.* at 280.

### 2. Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Id.* (citing *Wilson v. Seiter*, 501 U.S. 294, 300, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Id.* (citing *Farmer*, 511 U.S. at 835-37). Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition. *Id.* Deliberate indifference is equivalent to subjective recklessness. *Id.* (citing *Farmer*, 511 U.S. at 839-40).

In [*9] order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance*, 143 F.3d at 702). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she

must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin* 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001). **[*10]** Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.*; *see also Daniels v. Williams*, 474 U.S. 327, 332, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

**B. Application**

Defendants assert that plaintiff did not establish a serious medical need, and that the **[*11]** complaint alleges nothing to suggest that any defendant was deliberately indifferent in treating plaintiff. However, under the liberal standards for construing a *pro se* complaint in the context of a motion to dismiss, plaintiff has alleged enough to state a facially plausible claim that defendants acted with deliberate indifference to plaintiff's serious medical needs.

The Second Circuit has set forth factors to consider when determining whether an alleged medical condition is sufficiently serious, including but not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702. Plaintiff has described the pain he experiences from Paget's disease, allegedly as a result of the denial of medication. More specifically, plaintiff claims that he "feel[s] as if [he is] going to die in [his] cell," "wake[s] up screaming for medical attention," cannot get out of bed to eat, is losing weight, and is in too much pain to leave his cell. (Compl. **[*12]** at 5-6). At this stage in the proceeding, plaintiff has set forth enough facts to plausibly suggest that the deprivation in medical care was sufficiently serious.

As noted above, the complaint is not a model of clarity or consistency with respect to the medications plaintiff has been given. However, it can be construed to allege that, notwithstanding plaintiff's extreme pain and requests for treatment, the defendants refused to provide him with adequate medications or other treatment for the pain. Plaintiff further asserts that defendants were aware of his pain and took no action in response to his complaints. In the absence of additional facts, it

is not clear why plaintiff's medications were changed, or whether the defendants disregarded an excessive risk that would support a facially plausible claim for "deliberate indifference" sufficient to defeat a motion to dismiss. While the defendants may be able to marshal facts in a summary judgment motion to undermine plaintiff's claim that defendants acted with deliberate indifference in discontinuing plaintiff's medications and/or not providing adequate treatment, the complaint, liberally construed, states a facially plausible Eighth Amendment **[*13]** cause of action against the defendants.

## IV. Retaliation

### A. Legal Standards

In order to establish a viable claim of retaliation under the First Amendment, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The plaintiff must establish a causal connection between the protected conduct or speech and the adverse action. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill v. Pidlypchak*, 389 F.3d at 381 (citations omitted). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id*.

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett*, 343 F.3d at 137 (citation omitted). Accordingly, **[*14]** plaintiff must set forth non-conclusory allegations. *Id*. Even if plaintiff makes the appropriate showing, defendants may avoid

liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id*. (citing, *inter alia, Mount Healthy Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977)).

### B. Application

Plaintiff asserts, in conclusory fashion, that defendants retaliated against him. Defendants respond that plaintiff has not alleged a protected activity and that defendant Holmes did not take an adverse action against plaintiff. The complaint contains only three vague references to retaliation.

First, plaintiff alleges that defendant Holmes retaliated against him for speaking to "both defendant doctors mentioned in this complaint" by telling him that if he kept writing he would need "medical attention along with some bandages." (Compl. at 6). Here, plaintiff alleges only that defendant Holmes engaged in a verbal threat, therefore, he has not asserted an adverse action sufficient to support a retaliation claim. *See Taylor v. Conway*, 381 F. App'x 40, 41 (2d Cir. 2010) (noting that inmate could not sustain retaliation claim because verbal harassment **[*15]** is not actionable under Section 1983), *cert. denied*, __ U.S. __, 131 S. Ct. 1701, 179 L. Ed. 2d 634 (2011); *Johnson v. Brown*, No. 09 Civ. 2, 2011 U.S. Dist. LEXIS 29674, 2011 WL 1097864, at *6 (N.D.N.Y. Mar. 22, 2011) (defendant's threat of planting contraband in plaintiff's cell, which never came to fruition, was insufficient to establish adverse action for purposes of retaliation claim) (citing *Bartley v. Collins*, No. 95 Civ. 10161, 2006 U.S. Dist. LEXIS 28285, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (finding, in retaliation cases, that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action")).

Plaintiff next asserts that he saw a specialist who prescribed medications, and "in retaliation" plaintiff was taken off one medication, and the dosage for the other was cut in half. (Compl. at 7). Here there

2013 U.S. Dist. LEXIS 150971, *15

is no allegation of any "protected activity" that could have caused defendants retaliation. Plaintiff mentions only a visit with a specialist, which clearly is not constitutionally protected speech or conduct.

The final reference to retaliation in the complaint is in the "Causes of Action" section where plaintiff states, in conclusory fashion that "all defendant[s] retaliated against me for filing **[\*16]** grievances and contacting DOCCS Chief Medical Officer in Central Office." (Compl. at 10). Here plaintiff does not specifically assert how defendants retaliated against him; however, the overarching allegation of retaliation in the complaint appears to be that defendants were influenced in denying plaintiff medical treatment by his grievance and complaints to others. This allegation is appropriately considered within the ambit of the explicit Eighth Amendment medical claim. Moreover, it is unsupported by any specific factual allegations.

It is well-settled that filing a grievance is constitutionally protected conduct, *Johnson v. Eggersdorf*, 8 Fed. App'x 140, 144 (2d Cir. 2001); *Graham v. R.J. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996), however, plaintiff cannot meet the remaining elements of a retaliation claim. There is no stated temporal or other connection between the complaints and the denial of medication. Indeed, plaintiff specifically asserts that he filed a grievance because the medication prescribed at Gowanda Correctional Facility was discontinued. The adverse action alleged (denying plaintiff his medication) occurred, at least in part, before the alleged protected conduct. Therefore, **[\*17]** the initial denial of the medication could not have been in retaliation for the exercise of plaintiff's constitutional right to file a grievance. The complaint does not indicate any other connection between the denial of medication and his complaints. The complaint contains no factual allegations that would support the apparent conclusion that defendants harbored a retaliatory motive because plaintiff filed a grievance and contacted Chief Koenigsmann.

Plaintiff's conclusory allegations of retaliation fail to state a plausible claim and should be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 10) be **GRANTED** as to plaintiff's claims based on retaliation, and it is further

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 10) be **DENIED** as to plaintiff's claim based on deliberate indifference to serious medical needs.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) **[\*18]** (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 20, 2013

/s/ Andrew T. Baxter

Andrew T. Baxter

U.S. Magistrate Judge

**End of Document**



# Jones v. Rock

United States District Court for the Northern District of New York

August 14, 2013, Decided; August 14, 2013, Filed

9:12-CV-0447 (NAM/TWD)

**Reporter**

2013 U.S. Dist. LEXIS 127809 *

EUGENE JONES, Plaintiff, v. ROCK, Superintendent, Upstate Correctional Facility; J. MARIENELLI, MHU Counselor, Upstate Correctional Facility; JOHN DOE #3, Mental Health Doctor, Upstate Correctional Facility; MICHAEL HOGAN, Mental Health Commissioner; J. HEALY, C.O., Upstate Correctional Facility; JOHN DOE #2, C.O., Upstate Correctional Facility; JOHN DOE #3, C.O., Upstate Correctional Facility; LAVEEN, C.O., Upstate Correctional Facility; DWYER, C.O., Upstate Correctional Facility; JOHN DOE #4, Lt., Upstate Correctional Facility; S. SANTAMORE, Sgt., Upstate Correctional Facility; BURGESS, C.O., Upstate Correctional Facility; JOHN DOE #5, C.O., Upstate Correctional Facility; JOHN DOE #6, C.O., Upstate Correctional Facility; JERRY MILLER, Dental Doctor, Upstate Correctional Facility, Defendants.

**Subsequent History:** Adopted by, Dismissed by, in part Jones v. Rock, 2013 U.S. Dist. LEXIS 127218 (N.D.N.Y, Sept. 6, 2013)

Magistrate's recommendation at Jones v. Rock, 2015 U.S. Dist. LEXIS 22529 (N.D.N.Y, Jan. 30, 2015)

**Counsel:** [*1] EUGENE JONES, Plaintiff, Pro se, Elmira, New York.

For Defendants: COLLEEN GALLIGAN, ESQ., Assistant Attorney General, OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, The Capitol, Albany, New York.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

# Opinion

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

Plaintiff Eugene Jones claims that from September, 2009, through November, 2010, while he was confined at Upstate Correctional Facility ("Upstate"), Defendants, in violation of his rights under the Eighth Amendment to the Constitution, denied him proper and adequate care for his serious mental health, and dental needs; used excessive force against him; sexually harassed and assaulted him; and subjected him to unlawful conditions of confinement. (*See generally* Dkt. No. 1.) Defendants Rock, Superintendent at Upstate; J.

2013 U.S. Dist. LEXIS 127809, *1

Marienelli ("Marienelli"), Mental [*2] Health Unit ("MHU") Counselor at Upstate; T. Kemp ("Kemp"), MHU Unit Chief at Upstate; Michael Hogan ("Hogan"), New York State Commissioner of Mental Health; J. Healy ("Healy"), C.O. at Upstate; Lavigne, incorrectly sued as Laveen, C.O. at Upstate; Dwyer, C.O. at Upstate; S. Santamore ("Santamore"), Sgt. at Upstate; Burgess, C.O. at Upstate; and Jerry Miller ("Miller"), Dentist at Upstate, filed an Answer to Plaintiff's Complaint (Dkt. No. 20) and now move for judgment dismissing Plaintiff's Complaint on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[1] (Dkt. No. 23.) Plaintiff has opposed the motion. (Dkt. No. 27.)

For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

# I. BACKGROUND[2]

## A. Plaintiff's Alleged Lack of Proper and Adequate Mental Health Treatment at Upstate

Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in a Special Housing Unit. (Dkt. No. 1 at ¶ 14.) According to Plaintiff, nearly half of the eleven buildings house single cell inmates, who are housed in single cells because of assaultive behavior, homosexual activity, or mental illness. Plaintiff was confined in a single cell in A-Block in 11-Building where mentally ill inmates were housed together without any treatment. *Id*. at ¶¶ 15, 26.

Shortly after Plaintiff was moved into the single cell, he was interviewed by Defendant Marienelli, his MHU Counselor. *Id*. at ¶ 15. Plaintiff explained to Marienelli that he had a long history of mental illness and treatment both before and during his incarceration. *Id*. at ¶ 16. Despite Plaintiff's long history of treatment for mental illness, when he was seen by a mental health doctor approximately a week later, Plaintiff was told [*4] that all inmates on the same medication as that being taken by Plaintiff were being removed from the medication. *Id*. at ¶ 17. Plaintiff requested that he be given the same type of medication for his mood disorder and other mental health problems, and the doctor said, "you'll be alright," and did not prescribe any other medication or mental health treatment. *Id*. at ¶ 18. Thereafter, despite his protest, Plaintiff received no mental health medication or treatment during the remainder of his time at Upstate. *Id*. at ¶¶ 15, 19. Plaintiff wrote letters complaining about his lack of treatment to Defendant Kemp, MHU Unit Chief at Upstate, on January 13, 2010, March 22, 2010, June 17, 2010, August 30, 2010, and October 14, 2010.[3] *Id*. at ¶ 20; Dkt. No. 27-1 at 9-13. Kemp never responded to Plaintiff. *Id*. However, after nearly every one of Plaintiff's complaint letters to Kemp, Marienelli would appear at Plaintiff's cell door and warn him against writing the complaints and going over Marienelli's head. *Id*. Plaintiff also wrote letters of complaint to State Mental Health Commissioner Hogan, on May 3, 2010, September 21, 2010, and November 8, 2010. *Id*. at ¶ 21; Dkt. No. 27-1 at 5-8. Hogan did not [*5] respond. (Dkt. No. 1 at ¶ 21.)

On August 30, 2010, Plaintiff used a piece of metal to cut his arms. *Id*. at ¶ 22. When he showed his

---

[1] Plaintiff has also named John Does #1-6 as Defendants. (Dkt. No. 1.) It appears from the Docket maintained by the Clerk's Office that none of the Doe Defendants have yet been identified or served, and they are not parties to the motion now before me.

[2] The background facts set forth herein are taken from the allegations in Plaintiff's Complaint, which I have, as I am required to do, accepted as true for purposes of this motion, [*3] (*see Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002)), as well as other submissions that may properly be considered by the Court on a Rule 12(c) motion involving a *pro se* plaintiff.

---

[3] Plaintiff stated in his Complaint that copies of the letters to Kemp were included as Exhibit A-1. (Dkt. No. 1 at ¶ 20.) However, neither the letters, nor any of the other exhibits identified in the Complaint were filed with the Complaint. On August 15, 2012, I issued a Text Order denying Defendants' letter motion requesting an order compelling Plaintiff to file the exhibits identified in his Complaint. (Dkt. No. 19.) Plaintiff has filed copies of his letters to Defendant Kemp, along with copies of a number of other documents originally identified as exhibits to his Complaint, in opposition to Defendants' motion. (Dkt. No. 27-1 at 9-13.)

arms to Marienelli, Marienelli responded, "they don't look that bad." *Id.* Marienelli told Plaintiff that he would not take him out of his cell for those little things and to just run some water on them, and he would be fine. *Id.* Plaintiff then began screaming for help, and Marienelli walked away. *Id.*

In the early morning of October 21, 2010, Plaintiff made a rope from his sheets and hanged himself in the shower. *Id.* at ¶ **[\*6]** 23. Defendant Healy, a Corrections Officer at Upstate, and two other corrections officers entered Plaintiff's cell and cut him down. The three then began beating Plaintiff with their hands and feet. Plaintiff begged them to stop. *Id.*; Dkt. No. 27-1 at 15. Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. (Dkt. No. 1 at ¶ 23.) Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24; Dkt. 27-1 at 15.

## B. Conditions of Plaintiff's Confinement

The mentally ill inmates with whom Plaintiff was housed in Building 11 constantly screamed; beat on metal toilets, beds, desks, and showers; flooded the cells; and threw liquids and feces. *Id.* at ¶ 26. There was also an unpleasant smell because many of the inmates smeared themselves with feces and did not take showers. *Id.* In addition, the regular procedure at Upstate was to have one light or another on twenty-four hours a day. *Id.* at ¶ 25.

On March 10, 2010, Plaintiff made a written complaint to Defendant **[\*7]** Rock, Superintendent at Upstate, concerning the conditions under which he was forced to live. He received no response from Rock. *Id.* at ¶ 27. On October 1, 2010, Plaintiff filed a grievance concerning the housing of inmates in constant illumination. *Id.* at ¶ 28; Dkt. No. 27-1 at 17. The grievance was denied by the Inmate Grievance Review Committee ("IGRC") based upon a prior Central Office Review Committee

("CORC") determination in which CORC upheld the discretion of the facility administrator to make top level decisions regarding night lights being turned on for the safety, security, and good order of their facilities. (Dkt. No. 27-1 at 18.) Plaintiff's grievance was denied on appeal by the Acting Superintendent, who found that "[t]he night lights are used to ensure clear visibility into the cell, this is of vital importance to the safety and security of both staff and inmates." *Id.* at 19. CORC unanimously denied Plaintiff's grievance for the reasons given by the Acting Superintendent and also noted that the night lights installed produced "a minimum amount of light given the low wattage bulb used to ensure the safety and security of [the] population, without unduly interfering with **[\*8]** the populations's sleep." *Id.* at 20.

## C. Alleged Sexual Harassment and Assault

### 1. May 4, 2010

In April of 2010, an Alcohol and Substance Abuse Treatment ("ASAT") program was started at Upstate. (Dkt. No. 1 at ¶ 29.) Defendant Corrections Officers Lavigne and Dwyer were the escort officers responsible for taking inmates assigned to the ASAT program from their cells, frisking them, and escorting them to the program. *Id.* On May 4, 2010, Plaintiff was handcuffed and led out of his cell by Lavigne and Dwyer for a pat-frisk. *Id.* at ¶ 30. Dwyer held Plaintiff's hands above his head and against the wall by the handcuffs, while Lavigne did the patfrisk. *Id.* According to Plaintiff, Lavigne pulled Plaintiff's pants up as high as they would go causing Plaintiff to wince in pain. *Id.* at ¶ 31. Lavigne allegedly screamed at Plaintiff, "don't move or we will take you down," and shoved his fingers between Plaintiff's buttocks with such force that one of his fingers, along with Plaintiff's pants and underwear, invaded Plaintiff's anus. *Id.* Plaintiff has alleged that when he screamed, Dwyer laughed and said, "oh, you're still a virgin, don't worry about it, we'll take care of that." *Id.* at ¶ 32. Lavigne **[\*9]** then groped Plaintiff's genitals and squeezed them until

Plaintiff cried out in pain. *Id.* at ¶ 33. Lavigne became verbally abusive, screaming in Plaintiff's face and smelling strongly of alcohol, and yelling at Plaintiff the entire way to the ASAT program. *Id.*

Plaintiff filed a grievance concerning the alleged actions of both Lavigne and Dwyer. *Id.* at ¶ 34.; Dkt. No. 27-1 at 22. The grievance was not nearly as explicit concerning Lavigne and Dwyer's alleged actions as Plaintiff's Complaint. Plaintiff offered no additional information when interviewed in connection with the grievance, and the officer named in the grievance denied sexually harassing Plaintiff during the pat-frisk or acting unprofessionally in any way. (Dkt. No. 27-1 at 23.) Finding no evidence to support Plaintiff's claim, the Acting Superintendent denied Plaintiff's grievance as unsubstantiated, as did CORC. *Id.* at 24.

## 2. September 14, 2010

According to Plaintiff, while he was standing in the shower, naked and wet, on September 14, 2010, Defendant Santamore, a Corrections Sergeant at Upstate, was standing at Plaintiff's cell door looking into the cell at the shower. (Dkt. No. 1 at ¶¶ 37-38.) Plaintiff screamed that he **[*10]** was done with his shower but naked, and Santamore ordered plaintiff to "drop the sheet," which, according to Plaintiff, would have meant exposing his naked body in violation of the Department of Correction and Community Supervision ("DOCCS") standard of inmate behavior and rule 101.20 regarding sex offenders intentionally exposing their private parts. *Id.* at ¶ 38. Plaintiff also informed Santamore that taking the sheet down would put Plaintiff in violation of DOCCS standard of inmate behavior rules 118.22, unhygenic acts; 118.30 maintain cleanliness and orderliness of living quarters; and 118.33, intentionally causing a flood in living quarters. *Id.* at ¶ 39. Santamore allegedly responded, "you can either take the sheet down and let me see in there and let me see that dick or I take the sheet and you get a ticket." *Id.* at ¶ 40. Plaintiff screamed for help from Defendant Lieutenant John Doe #4, who was in the area, but the Lieutenant instead yelled at Plaintiff to take the sheet down. *Id.*

at ¶ 42. Santamore then allegedly looked up and down at Plaintiff's naked body, smirked and walked away, saying "I'll see you later." *Id.*

Santamore filed a misbehavior report against Plaintiff in connection **[*11]** with the incident, in which he stated that after twice being given a direct order to take down the sheet covering the shower, Plaintiff complied saying, "I think you are gay and want to watch us take showers," and yelling out to the gallery, "They won't think it is funny when we set it off tomorrow morning." (Dkt. Nos. 1 at ¶ 44; 27-1 at 25.) According to Plaintiff, after a review of the videotape of the incident at the disciplinary hearing on the misbehavior report, which supported Plaintiff's side of the incident, the misbehavior report was dismissed. (Dkt. Nos. 1 at ¶¶ 45-46; 27-1 1 at 29.)

Plaintiff filed a grievance concerning the incident. (Dkt. No. 27-1 at 26-27.) The grievance was denied by the IGRC based upon a prior CORC ruling that a curtain or private screen would not be provided for obvious security reasons. *Id.* at 28. CORC denied Plaintiff's appeal. *Id.* at 29.

## D. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

On August 29, 2010, while eating breakfast, one of Plaintiff's teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff thereafter submitted a number of sick call slips **[*12]** to the dental department requesting assistance and sent letters to Dentist Defendant Miller asking for help on September 6th and 14th, 2010. *Id.* at ¶ 29; Dkt. No. 27-1 at 31-32.

When Plaintiff went to a dental appointment on September 29, 2010, he learned that the appointment was for a cleaning, not to treat his cracked tooth and lost filling. (Dkt. No. 1 at ¶ 50. Plaintiff showed his cracked tooth and two impacted wisdom teeth to the hygienist and saw her write in his file. *Id.* at ¶ 51. The September 29,

2010, entry in Plaintiff's dental treatment record reads in part, "Pl claims he lost filling in lower molar and wisdom teeth are bothering him. Plaintiff claims he's in pain & feels like theres not enough room in mouth." (Dkt. No. 27-1 at 45.) The entry notes a referral to an oral surgeon for extraction of teeth #17 and #32. *Id*.

On October 5, 2010, Plaintiff filed a grievance complaining of the Dental Department's failure to provide treatment for his lost filling. (Dkt. No. 1 at ¶ 52; 27-1 at 33.) Despite the entry in Plaintiff's dental treatment record showing that he had informed the hygienist of the missing filling during his September 29th cleaning, the IGRC response was that Plaintiff **[*13]** had not mentioned the missing filling when he went in for a cleaning that day. (Dkt. No. 27-1 at 34.) The IGRC also noted that filing a grievance was not the proper way to get an appointment and recommended that Plaintiff write to the Dental Department. *Id*.

On Plaintiff's appeal, the Acting Superintendent wrote on October 20, 2010 that: "According to Dr. Miller and investigation of dental records and dental staff interviews, treatment has been provided consistent with Dental Department Policy. Inmate Jones was seen on 11/16/09, 1/28/10 and 2/1/10. The inmate's remaining dental work is elective (not requiring immediate attention) and he has been scheduled for it. Grievance denied." *Id*. at 35.

On November 3, 2010, Plaintiff was taken from his cell for an ASAT treatment and a dental call out by two corrections officers. (Dkt. No. 1 at ¶ 55.) Plaintiff told Defendant Dwyer that he wanted to refuse the ASAT call out because he was really in pain and needed to see the dental staff. *Id*. Dwyer is alleged to have told Plaintiff that he made the rules and the rules were that if Plaintiff refused one call out, he refused both. *Id*. at ¶ 56. Once ASAT was over, Plaintiff watched a number of inmates **[*14]** enter dental before him, and when Defendant John Doe #4 attempted to take Plaintiff to see dental, Dwyer waived Defendant Doe away and stated Plaintiff would see the dentist last if he saw

him at all. *Id*. at ¶ 57.

When Plaintiff asked Dwyer why he was doing that to Plaintiff, Dwyer, Defendant Burgess, and two Defendant John Doe correctional officers began screaming at Plaintiff and making threats to his person. *Id*. Defendant Santamore refused to intervene. *Id*. at ¶ 58. According to Plaintiff, Burgess retrieved a dental refusal slip and demanded that Plaintiff sign the slip and go back to his cell, telling Plaintiff that he would be visiting the facility hospital if he refused. *Id*. at ¶ 59. Plaintiff wrote on the refusal slip, "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but correctional staff refuse to let me see dental staff." (Dkt. No. 23-2 at 5.)

Plaintiff filed a grievance regarding the November 3, 2010 incident the following day. (Dkt. No. 27-1 at 37-38.) Defendant Rock denied Plaintiff's grievance on appeal based upon the staff members' contradiction of Plaintiff's allegations and Santamore's statement that Plaintiff had been **[*15]** yelling that he was going to see the dentist and saw the dentist later in the day. *Id*. at 39. Plaintiff denies seeing a dentist later in the day on November 3, 2010, and the dental records for that date indicate only that "pt refused per c.o." (Dkt. No. 27-1 at 45.) CORC upheld the denial of Plaintiff's grievance. *Id*. at 40.

Plaintiff was transported to Clinton Correctional Facility on November 14, 2010. (Dkt. Nos. 1 at ¶ 63.) He received a temporary filling, which stopped his pain, approximately a week later. *Id.; see also* Dkt. No. 23-2 at 3.

## II. PROCEDURAL HISTORY

Plaintiff filed his Complaint in this lawsuit, along with a motion for leave to proceed *in forma pauperis*, on March 13, 2012. (Dkt. Nos. 1, 2.) I subsequently issued an Order granting Plaintiff's application to proceed *in forma pauperis* and requiring a response to Plaintiff's Complaint. (Dkt.

No. 4.) I also directed Plaintiff to take reasonable steps through discovery to learn the names of the "John Doe" Defendants. *Id.* The named Defendants were served in June of 2012 and filed their Answer to the Complaint on August 20, 2012. (Dkt. Nos. 7-16, 20.) A Mandatory Pretrial Discovery Order was entered on August 27, 2012. (Dkt. **[\*16]** No. 21.) The named Defendants thereafter filed the Rule 12(c) motion for judgment on the pleadings now before me, (Dkt. No. 23), and Plaintiff filed papers in opposition. (Dkt. No. 27.)

## III. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS ON THE PLEADINGS

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983). "The standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as for a Rule 12(b)(6) motion to dismiss for failure to state a claim." *Cleveland v. Caplaw Enterprises*, 448 F.3d 518, 521 (2d Cir. 2006). Therefore, Plaintiff's Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to avoid dismissal. *Ashcroft v. Iqbal*, 556 U.S. 662, 663, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

"Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded **[\*17]** facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but has not shown — that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted). Plausibility requires "enough facts to raise a reasonable expectation that discovery will reveal evidence of [the alleged

misconduct]." *Twombly*, 550 U.S. at 556. A complaint may be dismissed pursuant to Rule 12(b)(6), and thus pursuant to Rule 12(c), only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a) of the Federal Rule of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"The court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) **[\*18]** (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). This principle merits particular weight when a civil rights violation is claimed. after Twombly). This principle merits particular weight when a civil rights violation is claimed. *See McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

In considering a Rule 12(c) motion, "the court considers the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc.*

*v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) **[*19]** (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may also consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation and internal quotation marks omitted). Furthermore, "[i]n cases where a *pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they are consistent with the allegations in the complaint." *See, e.g., Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (considering factual allegations in plaintiff's opposition papers) (citations and internal quotations marks omitted), *vacated and amended in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss **[*20]** without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

# IV. ANALYSIS

## A. Plaintiff's Official Capacity Claims For Money Damages Against Defendants

Plaintiff has asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all

of the Defendants. (Dkt. No. 1 at ¶ 8.) The moving Defendants seek dismissal of those official capacity claims on Eleventh Amendment grounds.[4] (Dkt. No. 23-4 at 3-4.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 57 L. Ed. 2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006)), and bars **[*21]** all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham*, 473 U.S. 159, 167-68, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity). Therefore, I recommend that Plaintiff's claims for money damages against all of the Defendants, including the Doe Defendants, in their official capacities, be dismissed on Eleventh Amendment grounds without leave to amend.

## B. Plaintiff's Eighth Amendment Conditions of Confinement Claim

Plaintiff claims the conditions of his confinement, namely, the constant noise caused by the mentally ill prisoners, foul odors from the throwing and

---

[4] Although only the moving Defendants seek dismissal of Plaintiff's official capacity claims for money damages, the District Court is empowered to dismiss those official capacity claims *sua sponte* as against Defendants John Doe #1-6 as well. *See Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (Eleventh Amendment may be raised *sua sponte* because it affects the court's subject matter jurisdiction); *see also Saxon v. Attica Medical Dept.*, 468 F. Supp. 2d 480, 484 (W.D.N.Y. 2007) (recognizing that 28 U.S.C. § 1915A **[*22]** directs district courts *sua sponte* to dismiss prisoner claims barred by the Eleventh Amendment).

smearing of feces by those prisoners, and continuous illumination in the area in which he was housed, constituted cruel and unusual punishment in violation of his Eighth Amendment rights. (Dkt. No. 1 at ¶¶ 25-28, 74.) In his October 1, 2010, grievance complaining of the constant illumination, Plaintiff stated that it was impossible to get a full restful sleep, and that having a light on at all times was torture and caused fatigue, frustration, and depression. (Dkt. No. 27-1 at 17.)

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The prohibition extends to prison conditions. *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998). "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which [*23] he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations and internal quotation marks omitted).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must allege that: "(1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measures of life's necessities, and (2) subjectively, the defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Id.* (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is

no "static test" for determining whether a deprivation is serious enough [*24] to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar*, 683 F.3d at 57 (citation and internal quotation marks omitted). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable, human need such as food, warmth, or exercise.'" *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)).

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety. *Jabbar*, 683 F.3d at 57; *see also Trammell v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). Mere negligence is not enough. *Farmer*, 511 U.S. at 835.

1. Objective Element

Plaintiff claims that the constant illumination made it impossible for him to get a full restful sleep, was torture, and [*25] caused fatigue, frustration, and depression. (Dkt. No. 27-1 at 17.) Although Plaintiff's Complaint does not allege specific harm resulting from the constant noise, he has included as an exhibit to his Complaint, his September 21, 2010 letter to Defendant Hogan, in which he complained that the excessive noise of the other inmates kept him from sleeping. (Dkt. No. 27-1 at 7.) In addition, the Affidavit of another inmate describes the screaming, banging, and crying of mentally ill inmates throughout the night as making it impossible to rest until overwhelmed by exhaustion. (Dkt. No. 27-1 at ¶ 5.) Even then, according to the inmate, one was quickly jolted out of sleep by the noises. *Id.*

"[S]leep is critical to human existence, and

conditions that prevent sleep have been held to violate the Eighth Amendment." *Walker*, 717 F.3d at 126 (citing *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 367 (N.D.N.Y. 2010)) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights."). Furthermore, "public conceptions of decency inherent in the Eighth Amendment," have been found to "require that [inmates] be housed in [*26] an environment that, if not quiet, is at least reasonably free of excess noise." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996), *amended on other grounds on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) (quoting *Toussaint v. McCarthy*, 597 F. Supp. 1388, 1397, 1410 (N.D. Cal. 1984), *aff'd in part, rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986)); *see also Hamilton v. Conway*, No. 03-CV-527S, 2008 U.S. Dist. LEXIS 6064, at *37-38, 2008 WL 234216, at *12-13 (W.D.N.Y. Jan. 28, 2008) (allegations of excessive noise and inmates throwing feces in SHU may support an Eighth Amendment claim).

Requiring inmates to live in constant illumination can also, under certain circumstances, rise to the level of an Eighth Amendment violation. *See Keenan*, 83 F.3d at 1090-91 (an allegation that large fluorescent lights directly in front of and behind an inmate's cell that shown into his cell twenty-four hours a day, causing him grave sleeping problems and other mental and psychological problems stated a claim of cruel and unusual punishment). "Whether constant security lighting in prison cells violates the Eighth Amendment is fact-specific and often depends upon the brightness of the light [*27] at issue." *Jose v. Thomas*, No. CV 11-0486-PHX-GMS (SPL), 2012 U.S. Dist. LEXIS 80199, at *16-17, 2012 WL 2091527, at *6 (D. Ariz. June 11, 2012); *see, e.g., Vasquez v. Frank*, 290 Fed. Appx. 927, 929 (7th Cir. 2008) (twenty-four hour lighting with one 9-watt fluorescent bulb not an extreme deprivation). Exposure to low wattage night time security lighting has been found permissible based on legitimate penological interests such as security

concerns. *See Chavarria v. Stacks*, 102 F. App'x 433, 436-37 (5th Cir. 2004) (policy of constant illumination related to legitimate security concerns); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987) (same); *see also Jones v. Beaver County Jail*, No. Civ. A 11-0816, 2013 U.S. Dist. LEXIS 13702, at *27-28, 2013 WL 409439, at *10 (W.D. Pa. Feb. 1, 2013) (collecting cases).

Although the likelihood that Plaintiff could ultimately prevail on his conditions of confinement claim as alleged seems questionable at best,[5] [*28] the conditions alleged by Plaintiff, i.e, excessive noise and constant illumination which prevented him from sleeping, taken as true and considered in their totality, arguably satisfy the objective element of the claim for pleading purposes.

2. Subjective Element

However, neither the allegations in Plaintiff's Complaint, nor his submissions in opposition to Defendant's motion, satisfy the subjective element of his conditions of confinement claim — that a defendant acted with a "sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker*, 717 F.3d at 125. The only defendant tied to Plaintiff's conditions of confinement claim by the allegations in his Complaint is Defendant Rock. (Dkt. No. 1 at ¶ 27.) Plaintiff claims to have sent a letter to [*29] Rock complaining about the conditions under which he and other inmates were living. *Id.* According to Plaintiff, Rock did not respond. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . §

---

[5] The IGRC response denying Plaintiff's illumination grievance, submitted by Plaintiff in opposition to Defendants' motion, indicates that the night lights used in the SHU where Plaintiff was housed were low wattage and were used to "ensure the safety and security of its population with out unduly interfering with the population's sleep." (Dkt. No. 27-1 at 18.) *See Chavarria*, 102 F. App'x at 436-37.

2013 U.S. Dist. LEXIS 127809, *29

1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, at *22-23, 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). **[*30]** Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[6]

Although the Court of Appeals has expressly held that a supervisor can be held liable under § 1983 for a failure to remedy a wrong after being informed through a report or appeal, *Colon, id.*, courts in this district have repeatedly held that supervisory liability cannot be established by an official's failure to respond to grievance letters or requests for investigations from prisoners. *See, e.g., Johnson v. Wright*, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) (noting that a number of courts have held that "[i]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (citation and internal quotation marks omitted); *Walker v. Pataro*, No. 99 Civ. 4607 (GBD)(AJP), 2002 U.S. Dist. LEXIS 7067, at *43, 2002 WL 664040, at *12 (S.D.N.Y. Apr. 23, 2002) ("[I]f mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would **[*32]** result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose *respondeat superior* liability."); *Rivera v. Goord*, 119 F. Supp. 2d 327, 344 (S.D.N.Y. 2000) (allegations that inmate wrote to prison officials and was ignored are insufficient to hold those officials liable under § 1983).

Plaintiff has conceded that Rock did not respond to his complaint letter, and the Complaint and Plaintiff's opposition to Defendant's motion contain no facts that make a plausible showing of personal involvement by Rock with respect to Plaintiff's conditions of confinement claim. Therefore, I recommend that Plaintiff's conditions of confinement claim against Rock be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

## C. Deliberate Indifference to Plaintiff's Serious Mental Health Needs and Use of Excessive Force in Violation of the Eighth Amendment

A few months after he was taken off his

---

[6] The Supreme Court's decision in *Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 has arguably nullified some of the categories set forth in *Colon. See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). However, the Second Circuit **[*31]** has yet to issue a decision addressing *Iqbal's* effect on the *Colon* categories, and I will assume for purposes of this motion that *Colon* remains good law.

medication, Plaintiff began writing complaint letters to Defendant Kemp, MHU Unit Chief.[7] (Dkt. No. 27-1 at 9-12.) In his January 13, 2010 letter, Plaintiff wrote:

> I'm writing you because I was taken of my meds when I first got to [*33] this jail and I really tried to manage but I'm having a lot of symptoms of mental illness now and I can't keep living like this. I talked to or tried to talk to Marienelli but he thinks it's a game or something, could you please change my therapist to some one that will treat me according to my issues and not treat this like a joke.

(Dkt. No. 27-1 at 10.)

On March 22, 2010, Plaintiff sent another letter to Kemp:

> How is it that I write you complaining about this guy Marienelli and a couple of weeks later he show up at my cell bragging that you gave him my letter of complaint? Please don't give this man the letters I write to you. He's coming around threatening me. He says he's going to get me more time here.

> Why can't you help me see a doctor, I talked to Marienelli about seeing a doctor and he laughed in my face. Instead of helping that guy in his efforts to liven up his day at [*34] my expense, why not allow me to see a doctor so I could get some meds that can stop these voices.

(Dkt. No. 27-1 at 9.)

In his June 17, 2000 letter, Plaintiff told Kemp that he had written to Hogan to inform him that "Kemp and Marienelli refuse to treat mentally ill inmates, won't put in refurls (sic) for [them] to see a mental health doctor." (Dkt. No. 27-1 at 13.) Plaintiff sent a third letter to Kemp on August 30, 2010, the same

day he cut his arms with a piece of metal. Id. at ¶ 22. In his August 30th letter, Plaintiff wrote:

> I'm writing because I attempted suicide today. I cut my arms open and showed it to Marienelli on his rounds and he laughed at it. I need help now. At least send someone for me to talk to (not Marienelli!) I'm telling you I'm trying to deal with this but I don't know how much longer I can hold on. Next time I try this suicide thing, I'm not going to cut up. I'm going to hang myself! No mistakes next time!

(Dkt. No. 27-1 at 11.) In his October 14, 2010 letter to Kemp, Plaintiff threatened to sue Kemp for violating the law by not treating inmates for mental illness, and wrote "I hope to god I make it out of this place, and live to do it. I don't know how the world [*35] could look at a person like me as the scum of the earth but see you as a 'good guy.' I would never treat people the way you do." (Dkt. No. 27-1 at 12.) A week after his October 14th letter to Kemp, Plaintiff attempted to hang himself in the shower. (Dkt. No. 1 at ¶ 23.)

Assuming the facts alleged by Plaintiff to be true, as I must for this motion, while Kemp did not respond directly to any of Plaintiff's letters, he did give copies of the letters to Marienelli. He continued to do so even after Plaintiff informed him that Marienelli had threatened to get Plaintiff more time in the block where he was being housed if he kept going over Marienelli's head to Kemp, and had specifically asked Kemp to stop giving them to Marienelli because of the threat. (Dkt. Nos. 1 at 20; 27 at 12; see also Dkt. No. 27-1 at 9.)

Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. Farmer, 511 U.S. at 832. Prison officials must ensure, among other things, that inmates receive adequate medical care. Id. (citing Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). The [*36] requirement extends to adequate mental

---

[7] Plaintiff also wrote three complaint letters to Hogan. In his May 3, 2010 letter, Plaintiff told Hogan that his medication had been stopped, and he felt like he was slipping back into mental illness. (Dkt. No. 27-1 at 8.) Plaintiff wrote "I keep hearing people talking & I can't tell if its in my head or not." Id.

health care. *See Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble*, [429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)], that it must be provided to prisoners."); *Guarneri v. Hazzard*, No. 9:06-CV-985 (NAM/DRH), 2010 U.S. Dist. LEXIS 26966, at *52, 2010 WL 1064330, at 16 (N.D.N.Y. Mar. 22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

As with conditions of confinement claims, a claim that prison officials have intentionally disregarded an inmate's serious medical needs has both objective and subjective elements. *See Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Id.* at 72. "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable **[*37]** state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dept. of Correction Medical Dept.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008) (quoting *Salahuddin*, 467 F.3d at 280).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. **[*38]** *Id.* If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id.*

A "serious medical condition" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly*, 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard **[*39]** of a substantial risk of serious harm.'" *Id.* at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway*, 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that

inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id*. at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith*, 316 F.3d at 184 **[\*40]** ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703 (quoting *Hathaway*, 99 F.3d at 553).

### 1. Marienelli

After Plaintiff's medication was stopped in September of 2009, he received no medication or treatment for his long term mental health problems while at Upstate. (Dkt. No. 1 at ¶¶ 15, 19.) It can be inferred from Plaintiff's March 22, 2010 letter to Kemp that Marienelli had an element of control over whether Plaintiff was allowed to see a doctor for his mental illness, and that Marienelli had refused Plaintiff's requests. (Dkt. No. 27-1 at 9.)

Where a plaintiff has received no treatment, the court examines whether the inmate's medical condition is sufficiently serious. *See Salahuddin*, 467 F.3d at 280. "Mental illness can constitute a serious medical need." *Hale v. Rao*, 768 F. Supp. 2d 367, 378 (N.D.N.Y. 2011). **[\*41]** Moreover, "[a] propensity to attempt suicide or harm oneself is undoubtedly a serious medical condition, as are the health effects that flow[ ] from . . . mental illness

such as lacerations from cutting and hanging." *Barnes v. Ross*, No. 12 Civ 1916(PKC), 926 F. Supp. 2d 499, 2013 U.S. Dist. LEXIS 24103, at *11, 2013 WL 646551, at *4 (W.D.N.Y. Feb. 21, 2013); *see also Loadholt v. Lape*, No. 9:09-CV-0658 (LEK/RFT), 2011 U.S. Dist. LEXIS 31368, at *9-10, 2011 WL 1135934, at *3 (N.D.N.Y. Mar. 3, 2011) ("This Court, in accord with multiple decisions in this Circuit, recognizes that allegations of mental illness, especially when accompanied by suicidal ideation, state a plausible claim that Plaintiff's mental health needs were sufficiently serious."); *Allah v. Kemp*, No. 9:08-CV-1008 (NAM/GHL), 2010 U.S. Dist. LEXIS 25781, at *19, n.9, 2010 WL 1036802, at *6, n.9 (N.D.N.Y. Feb. 25, 2010) (failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard).

Although Plaintiff's Complaint is far from specific as to the nature of his mental health problems, his allegations of mood disorder and other mental problems **[\*42]** and long history of medication and treatment, considered with Plaintiff's allegations that he: (1) was taking medication for his mental health problems when he arrived at Upstate; (2) was housed in an area designated for mentally ill inmates; (3) was assigned a mental health counselor; and (4) attempted suicide on two occasions, by cutting and hanging, while at Upstate, state a plausible claim that Plaintiff had serious mental health problems that went untreated.[8]

Further, the allegations in Plaintiff's Complaint and the claims in Plaintiff's letters to Defendant Kemp, accepted as true for this motion, are sufficient to make a plausible showing of deliberate indifference on Marienelli's part. As Plaintiff's mental health counselor, Marienelli was aware of his mental health problems and that he had been taken off his medication. (Dkt. No. 1 at ¶¶ 16-19.) According to

---

[8] In addition, in his letters to Defendant Hogan, Plaintiff wrote of fear of slipping back into mental illness without his medication and hearing people talking and not being able to tell if the voices were in his head or not. (Dkt. No. 27-1 at 8.)

2013 U.S. Dist. LEXIS 127809, *42

Plaintiff, Marienelli laughed in his face when Plaintiff talked to him about **[*43]** seeing a doctor for his mental illness. (Dkt. No. 27-1 at 9.) When Plaintiff cut his arms, in what he described as a suicide attempt in his August 30, 2010 letter to Kemp, Marienelli laughed, told Plaintiff to run some water on the cuts, and walked away without arranging for any mental health intervention. (Dkt. Nos. 1 at ¶ 22; 27-1 at 11.) Less than two months after that cutting incident, Plaintiff attempted to hang himself. (Dkt. No. 1 at ¶ 23.)

Based upon the forgoing, I recommend that Marienelli's Rule 12(c) motion for judgment on the pleadings be denied.

2. Kemp

Plaintiff has also asserted an Eighth Amendment medical indifference claim against Defendant Kemp based upon his failure to take steps to ensure that Plaintiff received needed medication and treatment for his mental health problems. I have already concluded that Plaintiff has made a facially plausible showing that he received no medication or treatment for his mental health problems while at Upstate, and that his mental problems constituted a serious medical need for purposes of satisfying the objective element of his medical indifference claim.

Moreover, I find that under the circumstances alleged, Plaintiff has an adequate **[*44]** showing of deliberate indifference by Kemp. Plaintiff wrote four letters to Kemp. In each of those letters, Plaintiff complained about Marienelli including: (1) Marienelli treating Plaintiff's attempts to talk to him about his mental health issues as a game or a joke; (2) Marienelli threatening Plaintiff about his letters to Kemp and laughing in Plaintiff's face when he asked to see a doctor; and (3) Marienelli laughing when Plaintiff cut his arms in a suicide attempt. (Dkt. No. 27-1 at 9-11.) In his second letter, Plaintiff specifically implored Kemp not to give copies of his letters to Marienelli because of his threats. *Id*. at 9.

According to Plaintiff, Kemp's sole response to his letters was to continue to give copies letters to Marienelli — the subject of Plaintiff's complaints. (Dkt. No. 1 at ¶ 20.) The failure of a supervisory official to investigate or respond to a complaint letter from an inmate is alone insufficient to establish the personal involvement necessary for liability on a § 1983 claim. *Johnson*, 234 F. Supp. 2d at 363; *Risch v. Hulihan*, No. 9:09-CV-330, 2010 U.S. Dist. LEXIS 137094, at *12-13, 2010 WL 5463339, at *4 (N.D.N.Y. Dec. 29, 2010) (writing letters to the **[*45]** MHU Unit Chief at Mid-State and Commissioner Hogan was insufficient to establish personal involvement). While mere receipt of a letter from an inmate is insufficient to establish individual liability . . . "[p]ersonal involvement will be found . . . where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint." *Boddie v. Morgenthau*, 342 F. Supp.2d 193, 203 (S.D.N.Y. 2004) (quoting *Johnson*, 234 F. Supp. 2d at 363).

"Where a supervisor's involvement in a prisoner's complaint is limited to forwarding of correspondence to appropriate staff, the supervisor has insufficient personal involvement to sustain a § 1983 cause of action." *Liner v. Goord*, 310 F. Supp. 2d 550, 555 (W.D.N.Y. 2004); *see also Woods v. Goord*, No. 01 Civ. 3255(SAS), 2002 U.S. Dist. LEXIS 7157, at *25, 2002 WL 731691, at *7 (S.D.N.Y. April 23, 2002) (referring a letter requesting medical assistance to a lower ranking supervisor does not constitute personal involvement). Therefore, if giving copies of Plaintiff's letters to Marienelli were viewed as merely the routine forwarding of inmate correspondence to the appropriate staff member for handling, I **[*46]** would be compelled to conclude that Plaintiff has not alleged facts sufficient to show Kemp's personal involvement in his medical indifference claim. However, in this case, Kemp responded to Plaintiff's letters by giving copies to the individual whom Plaintiff claimed was not only denying him mental health care, but threatening him for writing letters. Moreover, assuming the facts alleged by Plaintiff to be true, Kemp took no

steps to ensure that Marienelli did not follow through on his threats, and that Plaintiff received needed mental health treatment. Under the circumstances of this case, I find that while Plaintiff's claim against Kemp may not survive a summary judgment motion, for purposes of this motion, he has adequately alleged not only Kemp's personal involvement, but his deliberate indifference to Plaintiff's serious mental health needs. Therefore, I recommend that Kemp's motion for judgment on the pleadings be denied.

3. Hogan

Plaintiff has acknowledged that Hogan never responded to his letters and has failed to make any showing of personal involvement by Hogan in his claim that he was denied adequate mental health care. Therefore, I recommend that Hogan's motion for judgment **[*47]** dismissing Plaintiff's claim against him be dismissed, and that in light of Plaintiff's *pro se* status, he be granted leave to amend.

4. Healy

Plaintiff claims that Defendant Healy, a Corrections Officer at Upstate, and two other corrections officers beat Plaintiff with their hands and feet after discovering he had hanged himself in the shower and cutting him down. (Dkt. Nos. 1 at ¶ 23; 27-1 at 15.) After beating Plaintiff, Healy and the other officers made Plaintiff promise he wouldn't hang himself again, Healy then warned Plaintiff that if he wrote up the incident they would be back and he would really wish he were dead, and left. (Dkt. No. 1 at ¶ 23.) Later in the day, Plaintiff cut his wrist and showed it to Healy, who still did nothing to seek mental health or medical care for Plaintiff. *Id.* at ¶ 4. Plaintiff has asserted Eighth Amendment claims for medical indifference and excessive force against Healy.

a. Plaintiff's Medical Indifference Claim

Plaintiff has made a plausible showing that he had a serious mental condition. I find that Plaintiff has also made an adequate showing that Healy acted with deliberate indifference. "Non-medical personnel may engage in deliberate indifference **[*48]** if they intentionally deny or delay access to medical care." *Jean v. Barber*, No. 9:09-CV-430 (MAD/GHL), 2011 U.S. Dist. LEXIS 79499, at *13, 2011 WL 2975218, at *5 (N.D.N.Y. Jul. 21, 2011). It can reasonably be inferred from Plaintiff's Complaint that finding Plaintiff hanging in the shower placed Healy on notice that he could be a suicide risk, particularly since Plaintiff was being housed in an area designated for mentally ill inmates. Healy's alleged actions in beating and threatening Plaintiff, rather than seeing to it that Plaintiff's apparent suicidal ideation was addressed through the Upstate mental health system, suggests an intentional disregard of that risk. Therefore, I recommend that Defendant Healy's motion for judgment on the pleadings on Plaintiff's Eighth Amendment medical indifference claim against him be denied.

b. Excessive Force Claim

The Eighth Amendment prohibition on cruel and unusual punishments precludes the "unnecessary and wanton infliction of pain," *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976), and protects inmates against the use of excessive force. *Hudson v. McMillian*, 503 U.S. 1, 9-10, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). As with Plaintiff's other Eighth Amendment claims, in order to **[*49]** bring an excessive force claim, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

"The objective element is 'responsive to contemporary standards of decency' and requires a showing that 'the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection.'" *Brooks v. Brennon*, No. 9:12-CV-0624 (NAM/CFH), 2013 U.S. Dist. LEXIS 98942, at *22, 2013 WL 3716399 at *7 (N.D.N.Y. Jul. 12, 2013) (quoting *Hudson*, 503 U.S. at 9) (internal citations omitted). "'The malicious use of force to cause harm constitute[s] [an] Eighth Amendment violation *per se*' regardless of the seriousness of the

injuries." *Id.* (quoting *Blyden*, 186 F.3d at 263) (citing *Hudson*, 503 U.S. at 9). That is so because "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.*

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness in light of the circumstances surrounding the challenged conduct." *Sims v. Artuz*, 230 F.3d 14, 21 (2d Cir. 2000). Whether actions are characterized [*50] by wantonness "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). The Second Circuit has set forth several factors to be considered in determining whether a defendant acted maliciously or wantonly, including "the extent of the injury and the mental state of the defendant, as well as the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendant to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003) (citation and internal quotation marks omitted).

Plaintiff does not claim that he sustained any physical injuries as a result of the beating allegedly inflicted by Healy and the two other corrections officers. However, assuming the truth of Plaintiff's allegations regarding the beating, I find that beating Plaintiff immediately after his apparent attempt to commit suicide by hanging constitutes a malicious use of force, and that Plaintiff has stated a *per se* claim for excessive force regardless [*51] of the lack of factual allegations concerning injuries. I also find that for pleading purposes, Plaintiff has satisfied the subjective element of an excessive force claim. There are no allegations in the Complaint suggesting that any amount of force was needed against Plaintiff after Healy cut him down, and there is no suggestion that Plaintiff presented any threat to the safety of Healy or the other

officers at the time the beating was allegedly inflicted. The allegations in Plaintiff's Complaint instead support the inference that Healy was acting maliciously and sadistically in beating Plaintiff.

I therefore recommend that Healy's motion for judgment on the pleadings dismissing Plaintiff's Eighth Amendment excessive force claim also be denied.

## D. Plaintiff's Sexual Harassment and Abuse Claims Against Defendants Lavigne, Dwyer, and Santamore

### 1. Lavigne and Dwyer

Sexual abuse of a prisoner by a corrections officer may, under some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishments. *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). It may violate contemporary standards of decency and "can cause severe physical and psychological [*52] harm." *Id.* For those reasons, "severe or repetitive sexual abuse of an inmate by a prison officer can be objectively serious enough to constitute an Eighth Amendment violation" where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." *Id.* (citation and internal quotation marks omitted).

The Second Circuit and district courts require "allegations of very extreme and severe conduct with no imaginable penological purpose before finding an inmate has stated an Eighth Amendment sexual abuse claim." *McCarroll v. Matteau*, No. 9:09-CV-0355 (NAM/GHL), 2010 U.S. Dist. LEXIS 56574, at *11, 2010 WL 2346327, at *4 (N.D.N.Y. May 17, 2010). *See, e.g., Caldwell v. Crossett*, No. 9:09-CV-576 (LEK/RFT), 2010 U.S. Dist. LEXIS 56573, 2010 WL 2346337 (N.D.N.Y. May 24, 2010) (claim that corrections officer grabbed plaintiff's testicles during a pat-frisk causing serious pain around his groin area failed to allege a violation of the Eighth Amendment based

upon claims of sexual abuse or excessive force); *Excell v. Fischer*, No. 9:08-CV-945 (DNH/RFT), 2009 U.S. Dist. LEXIS 88506, 2009 WL 3111711 (N.D.N.Y. Sept. 24, 2009) (allegations that guard grabbed  **[*53]** and squeezed prisoner's penis during pat-frisk insufficient to state an Eighth Amendment claim); *Morrison v. Cortright*, 397 F. Supp. 2d 424 (W.D.N.Y. 2005) (allegation that corrections officer shone light up inmate's anus, ran his middle finger between inmate's buttocks, causing inmate to urinate on himself, and rubbing his penis against inmate's buttocks during strip search did not implicate Eighth Amendment); *Montero v. Crusie*, 153 F. Supp. 2d 368, 375 (S.D.N.Y. 2001) (failure to state an Eighth Amendment claim where plaintiff failed to allege injury as a result of guard's squeezing his genitalia on several occasions during pat-frisking).

Plaintiff has alleged a single incident of sexual abuse by Lavigne during a pat-frisk. According to Plaintiff, while Dwyer was holding up Plaintiff's hands, Lavigne "pulled plaintiffs pants up as high as they would go causing him to winch (sic) in pain . . . . [;] shoved his fingers between plaintiffs buttock with such force that one of his fingers along plaintiffs pants, and underwear, ultimately invading plaintiff's anus . . . . [; and] groped plaintiff genitals and squeezed them until plaintiff cried out in pain. " (Dkt. No. 1 at ¶¶ 31, 33.) Plaintiff  **[*54]** has not alleged that he sustained any physical injury as a result.

While by no means condoning the acts alleged in Plaintiff's Complaint, Plaintiff has alleged only a single instance of alleged sexual abuse by Lavigne, the actions were not extreme or severe when measured against the case law cited herein, and Plaintiff has alleged no physical injury. Additionally, Lavigne was performing a pat-frisk, which has a penological purpose. Therefore, I find that Plaintiff has not stated a plausible claim against him for sexual abuse or assault in violation of the Eighth Amendment.[9]

Plaintiff has alleged that Dwyer's threat of sexual assault ("oh, you're still a virgin, don't worry about it, we'll take care of that") left him in a constant state of fear and depression. (Dkt. No. 1 at ¶¶ 31, 36.) However, there are  **[*56]** no allegations in the Complaint that Dwyer sexually abused Plaintiff[10] and the law is clear that "although indefensible and unprofessional, verbal threats or abuse are not sufficient to state a constitutional violation cognizable under § 1983." *Harris v. Lord*, 957 F. Supp. 471, 475 (S.D.N.Y. 1997).

Given the foregoing, I recommend that Defendants Lavigne and Dwyer's motion for judgment on the pleadings dismissing Plaintiff's claims against them relating to the alleged sexual abuse in violation of the Eighth Amendment be granted, but that Plaintiff be given leave to file an amended complaint.

## 2. Santamore

Plaintiff claims that Defendant Santamore sexually

---

excessive force as against Lavigne with respect to the pat-frisk. "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers violates a prisoner's constitutional rights," *Boddie*, 105 F.3d at 862 (citation omitted), and "not even every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* at 862. (citation and internal quotation marks omitted). *See, e.g., Rodriguez v. Peguero*, No. 9:09-CV-1005 (TJM/ATB), 2011 U.S. Dist. LEXIS 18096, at *15-16, 2011 WL 754123, at * 5 (Jan. 27, 2011) **[*55]** (allegations that defendant handcuffed plaintiff and slammed him against a wall hurting his chest and twisting his arm in an upward motion causing injury to his shoulder, chest and ear failed to meet the objective standard for stating an excessive force claim); *Tavares v. City of New York*, No. 08 Civ. 3782(PAE)(JCF), 2011 U.S. Dist. LEXIS 137381, at *3, 2011 WL 5877550, at *6 (S.D.N.Y Oct. 17, 2011) (defendant granted summary judgment because force used was *de minimis* and did not rise to the level of a constitutional violation where plaintiff claimed defendant threw him against the wall, kicked him harshly on both ankles, and compressed his chest against the wall so that he thought he was going to pass out); *James v. Phillips*, No. 05 Civ. 1539 (PKC)(KNF), 2008 U.S. Dist. LEXIS 30615, at *12, 2008 WL 1700125, *4-5 (S.D.N.Y. Apr. 9, 2008) (finding *de minimis* use of force where prison guard had shoved inmate into a door resulting in swelling of his chin).

[10] Inasmuch as I have concluded that Plaintiff has not stated a claim for sexual abuse in violation of the Eighth Amendment against Lavigne, Plaintiff has no viable Eighth Amendment claim against Dwyer either for sexual abuse because he was holding Plaintiff's hands during the pat-frisk or his failure to intervene.

---

[9] Furthermore, I find that Plaintiff has not stated a plausible claim for

harassed him by ordering him to take down a sheet he had put up while he was taking a shower. At the time Santamore directed Plaintiff to take down the sheet, Plaintiff was naked and allegedly believed that exposing his naked **[*57]** body would be a violation of DOCCS standards of behavior. (Dkt. No. 1 at ¶¶ 37-39.) Santamore threatened Plaintiff with a misbehavior report if he did not comply with the directive. When Plaintiff complied, Santamore allegedly "looked at plaintiff's naked body up and down, smirked and walked away saying 'I'll see you later.'" *Id.* at ¶ 42. Santamore thereafter filed a misbehavior report, which was dismissed after review of a videotape of the incident.[11] *Id.* at ¶¶ 44-46.

"[T]o date, in this Circuit there has been 'no case in which a plaintiff ha[s] established an actionable claim of sexual harassment under *Boddie* without having physical contact with the alleged perpetrator[.]'" *Vaughn v. Strickland*, Nos. 12 Civ. 2696(JPO), 12 Civ. 3335(JPO), 12 Civ. 2995(JPO), 12 Civ. 3333(JPO), 2013 U.S. Dist. LEXIS 97122, at *12, 2013 WL 3481413, at *4 (S.D.N.Y. Jul. 11, 2013) (citation and internal quotation marks omitted). Plaintiff has not alleged physical conduct by Santamore **[*58]** and has not alleged facts setting forth a facially plausible claim of sexual harassment under *Boddie*. I therefore recommend that Plaintiff's claim for sexual harassment against Santamore be dismissed. Even though it appears virtually certain that Plaintiff will be unable to allege facts stating a plausible claim against Santamore in connection with the shower incident, given Plaintiff's *pro se* status, I recommend that the dismissal be with leave to amend.

**E. Eighth Amendment Claim for Indifference to Plaintiff's Serious Dental Needs by Defendants Dwyer, Burgess, and Miller**

---

[11] Plaintiff has no constitutional protection against the filing of a false misbehavior report, unless, for instance, it was filed in retaliation for the exercise of a protected First Amendment right. *See Boddie*, 105 F.3d at 862.

**1.** Plaintiff's Unsuccessful Attempts to Obtain Dental Treatment

Plaintiff cracked a molar and lost the filling in the tooth on August 29, 2010. (Dkt. Nos. 1 at ¶ 48; 27-1 at 45.) Plaintiff, who was in pain and unable to eat from one side of his mouth as a result of the lost filling, began submitting dental sick call slips every evening. (Dkt. Nos. 1 at ¶ 48; 27-1 at 31.) However, as of September 6, 2010, when Plaintiff wrote to Defendant Miller, the Dentist at Upstate, asking that him be called out for treatment as soon as possible, Plaintiff had heard nothing in response to the sick call slips. (Dkt. No. 27-1 at 31.)

In **[*59]** his September 6th letter, Plaintiff told Miller that "since the filling came out I've been in such great pain I can't eat correctly I think I'm losing weight. . . . I need your help Sir." *Id.* Plaintiff continued to submit dental slips with no reply. *Id.* at 32. On September 14, 2010, Plaintiff wrote a second letter to Miller, who had not responded to the initial letter. *Id.* at 32. In his September 14th letter, Plaintiff informed Miller that he had been submitting dental call slips with no response and wrote "Sir, I need help! I don't know what else to do. This pain is driving me crazy. I can't eat, or sleep right. If there is something I can do to insure that I'm called out sooner, please tell me & I will do it. What ever it takes." *Id.*

On September 29, 2010, Plaintiff was called out for a dental appointment. He asked the dental hygienist if the appointment was to treat the cracked tooth and missing filling and was told it was only for a cleaning. (Dkt. No. 1 at ¶ 50.) Plaintiff showed his tooth to the hygienist, who made a notation about it on Plaintiff's dental treatment record. *Id.*; (Dkt. No. 27-1 at 45.)

Plaintiff filed a grievance complaining of the lack of treatment for the lost **[*60]** filling on October 5, 2010. (Dkt. No. 27-1 at 33.) The grievance stated: "For over a month I've been writing request to Dental because my filling came out and I need emergency treatment, but the Dental Dept will not call me out. I've been in pain if they aren't going to

call me, treat me for the pain until they see me." *Id.* The IGRC response stated that when Plaintiff was seen on September 29, 2010, for a cleaning, he didn't mention the missing filling. That is contrary to Plaintiff's dental treatment record. *Id.* at 34. The IGRC also noted that, contrary to the information in Plaintiff's letters to Miller, the Dental Department had no call out slips from Plaintiff. *Id.* The IGRC stated that writing to the IGRC was not the proper procedure and recommended that Plaintiff write to the Dental Department, which Plaintiff had already done twice with no response. *Id.*

The Acting Superintendent, in denying the grievance on appeal on October 20, 1010, wrote that "[a]ccording to Dr. Miller and investigation of dental records and dental staff interviews, treatment has been provided consistent with Dental Department Policy." (Dkt. No. 27-1 at 35.) He indicated that Plaintiff had been seen on 11/16/09, **[*61]** 11/23/09, 1/28/10 and 2/1/10, long before he lost the filling, and that all remaining work was "elective (not requiring immediate attention) and had been scheduled." *Id.*

2. Plaintiff's November 3, 2010 Dental Call Out

On November 3, 2010, Defendant Dwyer took Plaintiff to a dental call out after a scheduled ASAT. (Dkt. No. 1 at ¶ 55.) Dwyer had refused to allow Plaintiff to skip the ASAT to go to the dentist when Plaintiff told him that he was "really in pain and needed to see dental staff." *Id.* Plaintiff saw a number of inmates enter dental before him. *Id.* at ¶ 57. When a corrections officer attempted to take Plaintiff to see dental, Dwyer waived him away and said that Plaintiff would see the dentist last if he saw him at all. *Id.* Dwyer and Defendant Burgess began screaming at Plaintiff, and Burgess retrieved a dental refusal slip and threatened Plaintiff with "a visit to the facility Hospital" if he did not sign it. *Id.* at ¶¶ 58-59. Defendant Santamore, who was nearby, refused to intervene. *Id.* at ¶ 58. Plaintiff signed the refusal slip under coercion and was taken back to his cell. *Id.* at ¶¶ 60-61. Plaintiff wrote his reason for refusal as "I've been waiting & staff refuse to let **[*62]** me see dental staff. I can

see a number of inmates going in but correctional staff refuse to let me see dental staff." (Dkt. No. 23-2 at 5.) A notation made in Plaintiff's dental treatment record for November 3, 2010 states "pt. refused per c.o." (Dkt. No. 27-1 at 45.)

Plaintiff was transferred to Clinton on or about November 14, 2010 and received a temporary filling shortly thereafter. *Id.* at ¶ 63.

3. Plaintiff's Serious Dental Condition

In order to state an Eighth Amendment claim for deliberate indifference to his serious dental condition, Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference. *See Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000); *Chance*, 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *Chance*, 143 F.3d at 702 (citing *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997). Specifically, "[a] cognizable claim regarding inadequate dental care . . . can be based on various **[*63]** factors, such as the pain suffered by the plaintiff . . . the deterioration of the teeth due to a lack of treatment . . . or the inability to engage in normal activities."[12] *Chance*, 143 F.3d at 703 (citations omitted). "[B]ecause a tooth cavity will degenerate with increasingly serious implications if neglected over sufficient time, it presents a 'serious medical need' within the meaning of our case law." *Harrison*, 219 F.3d at 137.

Logic suggests that a tooth with a lost filling, if

---

[12] "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support an Eighth Amendment claim." *Smith*, 316 F.3d at 185 (quoting *Chance*, 143 F.3d at 702).

neglected over time, would not be any less likely than a cavity to degenerate with increasingly serious implications or any less a serious dental need. *See Hoover v. Hardman*, No. 9:99-CV-1855, 2005 U.S. Dist. LEXIS 42974, at *23-24, 2005 WL 1949890, at *8 (N.D.N.Y. Aug. 15, 2005) [*64] (finding an issue of fact as to whether a lost filling was a serious medical need). Moreover, Plaintiff claims that he suffered from extreme pain and an inability to eat or sleep properly as a result of the lost filling. *See Hauschulz v. Bourbon Cty. Board of Commissioners*, Civil Action No. 04-3475-KHV, 2006 U.S. Dist. LEXIS 39511, at *21, 2006 WL 1675907, at *7 (D. Kan. June 14, 2006) (The law does not require that an inmate's tooth be abscessed or infected before a lost filling can be considered a serious medical condition. Pain can be considered substantial harm resulting from delay). Therefore, even though a temporary filling was ultimately put in the tooth, and there are no allegations in the Complaint indicating further problems with the molar as a result of the delay, I find that Plaintiff has made a plausible showing that he suffered from a serious dental condition for purposes of this Eighth Amendment claim.

4. Miller

In order to establish an Eighth Amendment claim arising out of inadequate medical care against Defendant Miller, Plaintiff must prove that Miller showed "deliberate indifference" to his serious medical needs. *See Chance*, 143 F.3d at 702. Plaintiff must show that [*65] Miller "knew of and disregarded [his] serious medical needs." *Id.* at 703. Denying or delaying access to dental care may constitute deliberate indifference. *Harrison*, 219 F.3d at 138.

Plaintiff has alleged facts, assumed to be true for this motion, showing that he sent two letters to Miller informing him of the lost filling, the great pain he was suffering, and his inability to eat or sleep properly. Miller did not respond to Plaintiff's requests for emergency treatment for the lost filling. When Miller was consulted as a part of the investigation into Plaintiff's grievance complaining

of the lack of treatment, he responded that treatment had been provided consistent with Dental Department policy when, according to Plaintiff and his dental treatment records, no treatment whatsoever had been provided.[13] (Dkt. No. 27-1 at 44-46.)

Discovery in this matter may reveal that Miller's failure to treat Plaintiff and to provide [*66] accurate information in response to the grievance investigation were inadvertent failures or negligence on his part rather than deliberate indifference. *See Estelle*, 429 U.S. at 105-06. However, for purposes of this Rule 12(c) motion, I find that Plaintiff has made a plausible showing of deliberate indifference on Miller's part and recommend that his motion for judgment on the pleadings be denied. *See Washington v. Farooki*, No. 9:11-CV-1137, 2013 U.S. Dist. LEXIS 93712, at *18-19, 2013 WL 3328240, at *1, 7 (N.D.N.Y. Jul 2, 2013) (letters from plaintiff to defendant dentist complaining of severe pain and the need for dental treatment, in conjunction with defendant's silence, found to create factual issue as to whether defendant intentionally delayed plaintiff's care).

5. Dwyer, Burgess, and Santamore

"[W]hen an inmate alleges that non-medical subordinate prison personnel were deliberately indifferent to his serious medical needs, he must demonstrate that they 'intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel.'" *Hoover*, 2005 U.S. Dist. LEXIS 42974, 2005 WL 1949890, at *4 (quoting *Baumann v. Walsh*, 36 F. Supp.2d 508, 512 (N.D.N.Y. 1999)).

Assuming [*67] the truth of Plaintiff's allegations, Defendant Dwyer was aware that Plaintiff was in extreme pain and needed dental care and nonetheless interfered with his access to dental care

---

[13] Miller cannot be faulted for Plaintiff missing his dental call out on November 3, 2010. However, by then, it had been nearly two months since Plaintiff first wrote to Miller informing him of the severe pain and problems with eating and sleeping that he was experiencing.

2013 U.S. Dist. LEXIS 127809, *67

on November 3, 2010 by waiving away a corrections officer who tried to take Plaintiff in to see the dental provider and stating that Plaintiff would see the dentist last if he saw him at all.[14] *Id.* at ¶ 57. (Dkt. No. 1 at ¶¶ 55, 57.) Furthermore, it can be inferred from the allegations in Plaintiff's Complaint that Dwyer was present when Burgess coerced Plaintiff into signing the dental refusal slip with threats of bodily harm and even if not a participant, Dwyer did not attempt to intervene. *Id.* at ¶ 59. Therefore, I conclude that Plaintiff made a plausible showing of deliberate indifference on Dwyer's part and recommend that Dwyer's motion for judgment on the pleadings on Plaintiff's Eighth Amendment medical indifference claim be denied. *See Hoover*, 2005 U.S. Dist. LEXIS 42974, 2005 WL 1949890, at *9 (where court found a question of fact with regard to defendant corrections officer's deliberate indifference where he instructed a nurse not to see plaintiff for his dental problem and a week later instructed the same nurse not to provide **[*68]** plaintiff with medication).

Plaintiff does not claim that he told Burgess or Defendant Santamore, who is alleged to have refused to intervene and correct the situation when Dwyer and Burgess interfered with Plaintiff seeing the dental provider, that he was in extreme pain and needed dental work. I find that Plaintiff has thus failed to make a facially plausible showing of deliberate indifference to his serious dental needs by either Burgess or Santamore. Therefore, I recommend that their motion for judgment on the pleadings dismissing Plaintiff's dental indifference claim be granted, but that Plaintiff be granted leave to amend.

## F. Qualified Immunity

Defendants have raised qualified immunity as a basis for granting them judgment on the pleadings.

---

[14] Plaintiff does not allege that he described his pain to Dwyer as "extreme." However, "really in pain," the language used by Plaintiff in his Complaint, can be construed as "extreme pain." (Dkt. No. 1 at ¶ 55.)

(Dkt. No. 23-4 at 16-18.) "A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was 'clearly established' **[*69]** at the time of the challenged conduct." *Walker*, 717 F.3d at 125 (citing *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011)) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 131 S. Ct at 2083 (citations and internal quotation marks omitted). The Supreme Court "[does] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id*. If a defendant's conduct "did not violate a clearly established constitutional right, or if it was objectively reasonable for the [official] to believe that his conduct did not violate such a right, then the [official] is protected by qualified immunity." *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011) (citation omitted).

Qualified immunity is an affirmative defense on which defendant officials have the burden of proof. *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012). "[A] defendant presenting **[*70]** an immunity defense on a Rule 12(b)(6) motion [or a Rule 12(c) motion in this case] instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *Walker*, 717 F.3d at 126 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Included in that standard is that the facts supporting the defense appear on the face of Plaintiff's Complaint. *McKenna, id*.

While recognizing that qualified immunity should be decided as early as possible in the litigation, *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001), *abrogated on*

other grounds by *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), the Second Circuit has taken the position that qualified immunity "is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker*, 717 F.3d at 130 (citing *Castro v. United States*, 34 F.3d 106, 112 (2d Cir. 1994) ("Although a defense of qualified immunity should ordinarily be decided at the earliest possible stage in litigation, and it is a defense that often can and should be decided on a motion for summary judgment, some limited and carefully tailored discovery may be needed before summary **[\*71]** judgment will be appropriate.")

In this case, I have concluded that Plaintiff has asserted plausible claims for violation of his Eighth Amendment right to receive adequate medical care against Defendants Marienelli, Kemp, and Healy (mental health care), and Miller and Dwyer (dental care), and for excessive force against Defendant Healy, and recommended that Defendants' motion for judgment on the pleadings be denied as to those claims. If the district court adopts those recommendations, further facts will be required to decide the question of qualified immunity with regard to those defendants. Therefore, as in *Walker*, I find that it would be "inappropriate to conclude as a matter of law at the pleadings stage of the litigation that defendants did not violate [Plaintiff's] clearly established constitutional rights," 717 F.3d at 130, and recommend that Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's motion for judgment on the pleadings on qualified immunity grounds be denied.[15]

**ACCORDINGLY**, **[\*72]** it is hereby

**RECOMMENDED**, that Defendants' Rule 12(c) motion for judgment on the pleadings dismissing Plaintiff's Complaint (Dkt. No. 23) be **GRANTED IN PART AND DENIED IN PART**. Specifically,

I recommend that Defendants' motion be **GRANTED** as follows:

1. Dismissal on Eleventh Amendment grounds of all claims seeking money damages against all of the Defendants, including John Doe #1-6, in their official capacities, without leave to amend;

2. Dismissal of Count #1 for deliberate indifference to Plaintiff's serious medical (mental health) needs in violation of the Eighth Amendment against Defendant Hogan, with leave to amend; and

3. Dismissal of Count #3 for conditions of confinement in violation of the Eighth Amendment against Defendant Rock, with leave to amend;

4. Dismissal of Count #4 for sexual harassment, assault/excessive force in violation of the Eighth Amendment against Defendants Lavigne, Dwyer, and Santamore, with leave to amend;

5. Dismissal of Count #5 for deliberate indifference to Plaintiff's serious medical (dental) needs in violation of the Eighth Amendment against Defendants Burgess and Santamore, with leave to amend; and it is further

**RECOMMENDED** that Defendants' motion be **DENIED** **[\*73]** as to the following: (1) Count #1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marienelli, and Kemp; (2) Count #2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and for excessive force against Defendant Healy; (3) Count #5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dwyer; and (4) Defendants Marienelli, Kemp, Healy, Miller, and Dwyer's request for dismissal on qualified immunity grounds; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections

---

[15] Because I have recommended that Plaintiff's Complaint be dismissed as against Defendants Rock, Hogan, Lavigne, Burgess, and Santamore, I do not find it necessary to address their motion for qualified immunity.

shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: August 14, 2013

Syracuse, New York

/s/ Thérèse Wiley Dancks

Thérèse Wiley Dancks

United **[*74]** States Magistrate Judge

---

End of Document



# King v. McIntyer

United States District Court for the Northern District of New York

March 17, 2015, Decided; March 17, 2015, Filed

9:11-CV-1457 (DNH/TWD)

**Reporter**

2015 U.S. Dist. LEXIS 46277 *

JAMEL KING, Plaintiff, v. C.O. MCINTYER, LT. MCDERMOTT, C.O. STEVENS, SGT. YOUNG, C.O. KANE, C.O. HESSLE, C.O. CATLIN, DEPT. C. MILLER, COMM. BRIAN FISCHER, SUP. MARTUSCELLO, Defendants.

**Subsequent History:** Adopted by, Dismissed by, in part King v. McIntyre, 2015 U.S. Dist. LEXIS 45679 (N.D.N.Y, Apr. 8, 2015)

**Prior History:** King v. McIntyer, 2013 U.S. Dist. LEXIS 185277 (N.D.N.Y, Dec. 31, 2013)

**Counsel:** **[*1]** JAMEL KING, Plaintiff, Pro se, Elmira, NY.

For Defendants: MICHAEL G. MCCARTIN, ESQ., OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, NY.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

## Opinion

**REPORT-RECOMMENDATION and ORDER**

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable David N. Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Jamel King alleges that an unnamed corrections officer asked Plaintiff to assault another inmate and that, based on Plaintiff's refusal to do so, the named Defendants retaliated against Plaintiff by: (1) issuing false misbehavior reports; (2) placing Plaintiff in keeplock; (3) finding Plaintiff guilty in disciplinary hearings; and (4) affirming Plaintiff's guilt on appeal. (Dkt. No. 9.) Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 90.) For the reasons discussed below, I recommend that the motion be granted in part and denied in part.

### I. BACKGROUND

Plaintiff alleges that in November 2010, while he was incarcerated at Coxsackie Correctional Facility, **[*2]** an unnamed non-party corrections officer asked Plaintiff to assault another inmate. (Dkt. No. 9 ¶ 7.) The officer stated, "We have someone who like [sic] to touch kids, and if you will like to beat him up I would not see nothing." *Id*. Plaintiff refused to assault the other inmate, telling the officer, "I'm not down with that and can you please not approach me with something like that." *Id*. The officer stated, "[I]f you're not going to beat him up, then you must be down with touching kids to [sic]." *Id*. Plaintiff replied to the officer, "No you have that wrong, you are the one that touch [sic] kids." *Id*. ¶ 8. The officer became upset and

stated, "Your ass is going to cellblock C or D, the house of pain so pack your things and I will let my pals up their [sic] know that you are an asshole." *Id.*

Plaintiff alleges that Defendant Corrections Officers Jeffry Hoessle,[1] Patrick McIntyre,[2] Jerrad V. Catlin, and James Stevens issued several misbehavior reports to him over the next six months in retaliation for his refusal to assault the other inmate and for his complaints to prison officials about the alleged retaliation. (Dkt. No. 9.) Plaintiff alleges that Defendant McDermott retaliated against him **[*3]** and violated his due process rights during disciplinary hearings conducted as a result of the misbehavior reports. *Id.* He alleges that Defendant Sergeant Jason Young made threatening comments to him and that Defendant Corrections Officer Robert Kane separated him from other inmates. *Id.* ¶¶ 24, 29. Finally, Plaintiff alleges that Defendants Daniel F. Martuscello and Christopher Miller violated his constitutional rights by affirming the results of the disciplinary hearings. *Id.* ¶ 28. These incidents will be discussed in more detail in Section III, below.

Plaintiff filed his original complaint in **[*4]** this action on December 14, 2011. (Dkt. No. 1.) Plaintiff amended his complaint on January 5, 2012. (Dkt. No. 9.) Defendants filed a motion for partial summary judgment, which upon Defendants' request was considered as a motion to dismiss. (Dkt. Nos. 58, 68-69.) The Court granted the motion in part and denied it in part. (Dkt. No. 83.)

Defendants now move for summary judgment. (Dkt. No. 90.) Plaintiff has opposed the motion. (Dkt. No. 99.)

---

[1] This Defendant's name is spelled "Hessle" in the caption. Defendant spells his surname "Hoessle" according to the declaration he filed in support of the motion for summary judgment. (Dkt. No. 90-7.) The Clerk is directed to amend the caption to reflect the correct spelling of Defendant's last name.

[2] This Defendant's name is spelled "McIntyer" in the caption. Defendant spells his surname "McIntyre" according to the declaration he filed in support of the motion for summary judgment. (Dkt. No. 90-10.) The Clerk is directed to amend the caption to reflect the correct spelling of Defendant's last name.

## II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 & n.11 (1986). **[*5]** Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material[3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

## III. ANALYSIS

Plaintiff claims that Defendants retaliated against him by issuing false misbehavior reports, placing him in keeplock, finding him guilty in disciplinary hearings, and affirming his guilt on appeal. (Dkt. No. 9.) The Court will discuss Plaintiff's claims and Defendants' motion incident by incident in

---

[3] A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

chronological order.

## A. November 30, 2010, Misbehavior Report

### 1. Facts

Plaintiff alleges that after he refused to assault the other inmate, he was moved to Cellblock D-3, where Defendant Hoessle placed him in keeplock. (Dkt. No. 9 ¶ 9.) When Plaintiff asked Defendant Hoessle why he was in keeplock, Defendant Hoessle responded, "[B]ecause you wouldn't take care of business over in cellblock B-1 for my pal so you're [an] asshole." Id. Defendant Hoessle denies that he made that statement. (Dkt. [*6] No. 90-7 ¶ 9.) Indeed, he declares that he was not aware until April 2012 of Plaintiff's allegation that he had refused to assault another inmate. Id. ¶ 5.

The record shows that Defendant Hoessle issued a misbehavior report to Plaintiff on November 30, 2010. (Dkt. No. 90-18 at 4.) The report states that Defendant Hoessle

> observed [Plaintiff] enter the school with bulging pockets. I gave [him] a direct order to come back to my desk, he refused and kept walking. A second direct order was given. He complied. I then pat frisked [him] and found the following items of contraband. 5 cassette tapes, 1 tooth brush with case, 1 tooth paste, 1 Bare Necessity's magazine.

Id. Defendant Hoessle charged Plaintiff with smuggling, possessing items in an unauthorized area, and refusing a direct order. Id. Plaintiff was confined to keeplock as a result of the incident. Id. At his deposition, Plaintiff admitted that he had the tooth brush, tooth paste, magazine, and cassettes that morning and that he intended to give the cassette tapes to another inmate. (Dkt. No. 90-13 at 33:22-34:24.[4])

The record shows that Defendant McDermott

conducted the disciplinary hearing on the misbehavior report on December 3, 2010. (Dkt. No. 90-18 at 1.) Plaintiff pleaded guilty to the charge of possessing items in an unauthorized area and not guilty to the charges of smuggling and refusing a direct order. Id. at 3. Defendant McDermott found Plaintiff not guilty of refusing a direct order and guilty of smuggling and possessing items in an unauthorized area. Id. at 1. Defendant McDermott sentenced Plaintiff to fourteen days of keeplock and loss of privileges. Id. Plaintiff served that keeplock sentence between November 30, 2010, and December 14, 2010. Id.

Broadly construed, the complaint asserts retaliation claims against Defendants Hoessle and McDermott and a due process claim against Defendant McDermott as a result of this incident.

### 2. Retaliation

Plaintiff alleges that Defendants Hoessle and McDermott retaliated against him for his refusal to assault the other inmate by issuing the misbehavior report and finding him guilty. (Dkt. No. 9 ¶¶ 9-10.) Defendants move for summary judgment of these claims. (Dkt. No. 90-2 at 19-25.[5]) For the [*8] reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss these claims.

Claims of retaliation find their roots in the First Amendment. See Gill v. Pidlypchak, 389 F.3d 379, 380-81 (2d Cir. 2004). Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. See Flaherty v. Coughlin, 713 F.2d 10, 13 (2d Cir. 1983). The Second Circuit has noted the following:

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated.

---

[4] Citations to page numbers in Plaintiff's deposition transcript refer to the page numbers in the original document rather [*7] than to the page numbers assigned by the Court's electronic filing system.

[5] Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

To succeed on a retaliation claim under 42 U.S.C. § 1983, a plaintiff **[*9]** must show that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff — namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action — in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492). Once a plaintiff meets this burden, "[t]he burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (citations omitted).

Regarding the first element, Defendants argue that Plaintiff cannot establish that he was engaged in protected conduct because "[w]hile Plaintiff contends that he was issued the misbehavior report[] because he refused to beat up a child molester . . . , he can offer nothing to

substantiate **[*10]** his allegation other than his own conclusory allegations." (Dkt. No. 90-2 at 22, citations omitted.) Plaintiff has offered more than "conclusory allegations." He has offered sworn testimony in the form of his verified complaint. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d. Cir. 2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) (holding that the plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"); *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit for summary judgment purposes . . . .") (citations omitted). The issue, though, is not whether Plaintiff has offered any evidence of his version of events. The issue is whether an alleged refusal to commit an illegal act constitutes protected conduct. The parties have not cited, and the Court has not found, any cases on point. However, it is logical to conclude that citizens have a right to refuse to commit crimes at the request of law enforcement officers. Therefore, the Court will assume for the purposes of this motion that Plaintiff has raised a triable issue of fact that he was engaged in protected conduct.

Regarding the second element, the Second Circuit defines **[*11]** "'adverse action' objectively, as retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights.'" *Gill*, 389 F.3d at 381 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 2003 U.S. App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)). Defendants implicitly concede that Plaintiff has shown adverse action. (*See* Dkt. No. 90-2 at 23, proceeding directly from "protected conduct" element to "causal connection" element.) Indeed, it is black-letter law that filing allegedly false misbehavior reports and imposing keeplock sentences constitute adverse action. *Gill*, 389 F.3d at 384.

Regarding the third element, Defendants argue that

Plaintiff cannot establish a causal connection between the protected conduct and the adverse action. (Dkt. No. 90-2 at 23-25.) Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). Those factors include: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his or her motivation. *Id.* "The causal connection must be sufficient to support an inference [*12] that the protected conduct played a substantial part in the adverse action." *Id.*

Regarding temporal proximity, Plaintiff alleges that he refused to assault the other inmate in November 2010. (Dkt. No. 9 ¶ 7.) Defendant Hoessle issued the misbehavior report on November 30, 2010. (Dkt. No. 90-18 at 4.) Defendant McDermott conducted the disciplinary hearing on December 3, 2010. *Id.* at 1. The Second Circuit has held that the passage of "only six months" is sufficient to support an inference of a causal connection. *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (citing *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 555 (2d Cir. 2001)). Here, Defendant Hoessle issued the misbehavior report in the same month that the alleged protected conduct occurred, and Defendant McDermott conducted the disciplinary hearing three days later. Therefore, Plaintiff has established temporal proximity between the alleged protected conduct and the adverse action.

Regarding Plaintiff's prior disciplinary record, Defendants assert that it was "dismal." (Dkt. No. 90-2 at 24.) Defendants are correct. Plaintiff was issued misbehavior reports and found guilty of multiple charges each year for the seven years preceding his alleged refusal to assault the other inmate. (Dkt. No. 90-15.) Indeed, Plaintiff admitted at his deposition that [*13] his disciplinary record was extensive because he was "out of control at one

time." (Dkt. No. 90-13 at 24:1-5.) Therefore, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct.

Regarding vindication at the hearing on the matter, Plaintiff was found guilty of two of the three charges in the misbehavior report. (Dkt. No. 90-18 at 1.) Indeed, Plaintiff *pleaded guilty* to one of those charges. *Id.* at 3. Therefore, Plaintiff has not established that he was vindicated at the hearing.

Finally, Plaintiff alleges that Defendant Hoessle stated that he was placing Plaintiff on keeplock "because you wouldn't take care of business over in cellblock B-1 for my pal." (Dkt. No. 9 ¶ 9.) Defendant Hoessle denies making that statement. (Dkt. No. 90-7 ¶ 9.) Neither the complaint nor Plaintiff's opposition to the motion for summary judgment assert any statements by Defendant McDermott concerning his motivation at the disciplinary hearing on this matter. (Dkt. No. 9 ¶¶ 9-10; Dkt. No. 99 ¶¶ 24-29.) Therefore, Plaintiff has raised a triable issue of fact as to this factor regarding Defendant Hoessle, but not regarding Defendant McDermott.

Accordingly, Plaintiff has [*14] raised a triable issue regarding two of the causal connection factors regarding Defendant Hoessle. Given the skepticism with which retaliation claims must be viewed, it is unlikely that this is sufficient to establish a causal connection. But even assuming that Plaintiff has established a causal connection, this would simply shift the burden to Defendants to demonstrate "that there is no dispute that the plaintiff 'committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report.'" *Gayle*, 313 F.3d at 681 (quoting *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998)). Defendants have met that burden. Plaintiff pleaded guilty to the charge of possessing items in an unauthorized area (Dkt. No. 90-18 at 3) and admitted at his deposition that he intended to pass the cassette tapes to another inmate. (Dkt. No. 90-13 at 34:14-24.) The prison rule against smuggling states that "[a]n inmate shall

not . . . attempt to smuggle . . . any item . . . from one area to another." N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2(B)(15)(i) (2014). Transferring items that are classified as contraband—such as items carried by an inmate into an unauthorized area—constitutes smuggling under the rule. *See Farid v. Ellen*, 593 F.3d 233, 237 (2d Cir. 2010) (discussing the connection between Rule 113.23—the "catch-all" contraband provision of the prison rules—and the **[*15]** rules prohibiting smuggling). Plaintiff has, accordingly, conceded that he was guilty of the two most serious charges in the misbehavior report. Thus, Defendants have met their burden of showing the Plaintiff would have received the same punishment absent a retaliatory motive. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

3. Procedural Due Process

Plaintiff alleges that Defendant McDermott violated his right to due process during the December 3, 2010, disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim.

Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 563-67, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

Here, Plaintiff received advanced written notice of the **[*16]** charges against him. (Dkt. No. 90-18 at 3.) He did not request any witnesses. *Id.* Defendants were not able to locate the audio recording of the disciplinary hearing (Dkt. No. 90-12 ¶ 8), so the Court cannot determine whether

Plaintiff was afforded a reasonable opportunity to present documentary evidence. Plaintiff received a written statement of Defendant McDermott's disposition, which stated that Defendant McDermott relied on Defendant Hoessle's misbehavior report and Plaintiff's plea of guilty to the charge of possessing items in an unauthorized area and imposed the punishment on Plaintiff to "impress upon [him] not to bring items into the school building that are not authorized." (Dkt. No. 90-18 at 2.)

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, it is well settled "that 'the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally.'" *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (quoting *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989)). Due process in this context requires only that the hearing officer's decision not be "arbitrary." *Wolff*, 418 U.S. at 571. A decision is not "arbitrary" if it is supported by "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455, 105 S. Ct. 2768, 86 L. Ed. 2d 356 (1985). "This standard is extremely tolerant and is satisfied **[*17]** if 'there is *any* evidence in the record that supports' the disciplinary ruling." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)). Prison officials acting as hearing officers are entitled to a rebuttable presumption that they are unbiased. *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996).

Here, evidence in the record supports Defendant McDermott's ruling. Defendant Hoessle's misbehavior report described his observation that Plaintiff initially refused a direct order to return to his desk and Defendant Hoessle's discovery of contraband on Plaintiff's person. (Dkt. No. 90-18 at 4.) Plaintiff admitted that he had taken the items into the school building. *Id.* at 3. Based on this evidence, it was not arbitrary for Defendant McDermott to find Plaintiff guilty. Therefore, I recommend that the Court grant Defendants'

motion for summary judgment and dismiss this due process claim against Defendant McDermott.

## B. December 2, 2010, Misbehavior Report

### 1. Facts

The record shows that on December 2, 2010, Plaintiff was issued another misbehavior report by a non-defendant officer. (Dkt. No. 90-33 at 4.) Plaintiff was charged with refusing two direct orders, interfering, blocking visibility into his cell, and delaying the evening count. *Id*. at 3.

The record shows that Defendant McDermott **[*18]** conducted the disciplinary hearing on the misbehavior report on December 13, 2010. (Dkt. No. 90-33 at 1.) Plaintiff pleaded guilty to the visibility obstruction charge and not guilty to the other charges. *Id*. at 3. Defendant McDermott found Plaintiff guilty of the visibility obstruction charge and not guilty of the other charges. *Id*. at 1. Defendant McDermott sentenced Plaintiff to fifteen days of keeplock and loss of privileges, suspended and deferred sixty days. *Id*.

Broadly construed, the complaint asserts retaliation and due process claims against Defendant McDermott as a result of this incident.

### 2. Retaliation

Plaintiff alleges that Defendant McDermott retaliated against him for his refusal to assault the other inmate by finding him guilty after the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim.[6]

As discussed above, Plaintiff **[*19]** has raised a triable issue of fact that he engaged in protected

conduct by refusing to assault the other inmate. As discussed above, imposing a keeplock sentence constitutes adverse action. The issue, then is whether Plaintiff has raised a triable issue of fact that Defendant McDermott's adverse action was causally connected to Plaintiff's protected conduct.

As discussed above, courts consider four factors in determining whether there was a causal connection between protected conduct and an adverse action. *Baskerville*, 224 F. Supp. 2d at 732. As with the claim discussed above, Plaintiff has established temporal proximity between his protected conduct and the adverse action because he refused to assault the other inmate in November 2010 and the hearing at issue here occurred the next month. As discussed above, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. Likewise, Plaintiff has not established that he was vindicated at the hearing because he, in fact, pleaded guilty to one charge. And finally, as with the claim discussed above, Plaintiff has not alleged that Defendant McDermott made any statements concerning his motivation. (*See* Dkt. No. 9; Dkt. No. 99.) Thus, **[*20]** the only factor weighing in favor of a finding of a causal connection is the temporal proximity factor.

The Second Circuit has held that where "timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise," particularly where other adverse actions preceded the protected conduct. *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).[7] Here, timing is the only basis for Plaintiff's retaliation claim. Moreover, Plaintiff's disciplinary record shows that he was routinely subject to disciplinary sanctions for years before the alleged protected conduct. (Dkt. No. 90-15.) Thus, other adverse actions preceded the protected conduct. Therefore, I

---

[6] Defendants make the same arguments for each of Plaintiff's retaliation claims. Having addressed those arguments explicitly in Section III(A)(2), the Court will not repeat the arguments in the subsequent sections.

[7] *Slattery* was an employment law case. The Second Circuit routinely cites to employment cases when discussing retaliation in the prison law context. *See e.g. Espinal*, 558 F.3d at 129 (citing *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)). Thus, it is appropriate to apply the *Slattery* rule here.

2015 U.S. Dist. LEXIS 46277, *20

recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### 3. Due Process

Plaintiff alleges that Defendant McDermott violated his due process rights during the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend **[*21]** that the Court grant Defendants' motion and dismiss this claim.

Plaintiff received advanced written notice of the charges against him. (Dkt. No. 90-33 at 3.) He did not request any witnesses. *Id.* Plaintiff received a written statement of Defendant McDermott's disposition, which stated that Defendant McDermott relied on the misbehavior report and Plaintiff's plea of guilty to the visibility obstruction charge in reaching his disposition and imposed the punishment on Plaintiff to "impress upon [him] not to block your cell door window." (Dkt. No. 90-33 at 2.)

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports Defendant McDermott's ruling. Most importantly, Plaintiff *pleaded guilty* to the only charge of which Defendant McDermott found him guilty. (Dkt. No. 90-33 at 1, 3.) Indeed, Plaintiff admits in his opposition to the motion for summary judgment that he "did block visibility," although he states that he did so "because he was showing a female officer respect because after he worked out he was washing up." (Dkt. No. 99 ¶ 34.) Based on this evidence, it was not arbitrary for Defendant McDermott to find Plaintiff guilty. **[*22]** Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this due process claim against Defendant McDermott.

## C. December 20, 2010, Misbehavior Reports

### 1. Facts

Plaintiff alleges he was moved to Cellblock C-2 after the December 2, 2010, misbehavior report. (Dkt. No. 9 ¶ 11.) He alleges that Defendant McIntyre then started harassing him. (Dkt. No. 9 ¶ 12.) Plaintiff alleges that he wrote a complaint to Defendant Brian Fischer regarding Defendant McIntyre's conduct.[8] *Id.* Plaintiff alleges that Defendant McIntyre retaliated against him for that complaint by issuing three false misbehavior reports. (Dkt. No. 9 ¶ 13.) From the record, it appears that two of these misbehavior reports were issued on December 30, 2010, and that the third was issued on January 3, 2011. (Dkt. No. 90-19 at 4-5; Dkt. No. 90-21 at 4.) This section will address the December 30, 2010, reports.

The record shows that Defendant McIntyre issued two misbehavior reports against Plaintiff on December 30, 2010. (Dkt. No. 90-19 at 4-5.) In the first, Defendant McIntyre stated that Plaintiff had exchanged an item from his kosher meal tray for a chicken patty from another inmate's regular meal tray. *Id.* at 4. Defendant McIntyre charged Plaintiff with unauthorized exchange and violating mess hall serving policies. *Id.* In the second misbehavior report, Defendant McIntyre stated that Plaintiff asked him to "exchange an unknown item with an inmate on the opposite side of the division." *Id.* at 5. The report states that after Defendant McIntyre refused, he observed Plaintiff hand off the unknown item. *Id.* Defendant McIntyre charged Plaintiff with refusing a direct order and unauthorized exchange. *Id.*

Plaintiff alleges that Defendant McDermott conducted the disciplinary hearing on the misbehavior reports. (Dkt. No. 9 ¶¶ 14-16.) In

---

[8] Defendants assert that "Plaintiff never produced his letters of complaint[] to Defendants during the course of this litigation." (Dkt. No. 90-3 ¶ 14.) Plaintiff asserts that he gave the letters to a hearing officer on January 5, 2011, and that the officer confiscated them. (Dkt. No. 99 ¶ 14.) **[*23]** Given the special solicitude that must be given to pro se plaintiffs, the Court has assumed that Plaintiff actually wrote to Defendant Fischer.

opposition to the motion for summary judgment, Plaintiff asserts that a non-defendant lieutenant conducted a hearing on one of the misbehavior [*24] reports, but that Defendant McDermott conducted the other. (Dkt. No. 99 ¶ 50.) However, the record shows that the non-defendant lieutenant conducted the disciplinary hearing on both of the misbehavior reports.[9] (Dkt. No. 90-15 at 5; Dkt. No. 90-19 at 1.) The hearing was conducted on January 12, 2011. *Id.* Plaintiff pleaded not guilty to all of the charges. (Dkt. No. 90-19 at 3.) The lieutenant found Plaintiff guilty of all four charges and sentenced him to fifteen days of keeplock and loss of privileges, suspended and deferred for ninety days. *Id.* at 1.

Plaintiff alleges that he appealed the finding of guilt to Defendant Martuscello and Defendant Miller. (Dkt. No. 9 ¶ 16.) According to the complaint, Defendant Martuscello and Defendant Miller affirmed Defendant McDermott's finding of guilt. *Id.* The record shows that Defendant Miller affirmed the finding of guilt. (Dkt. No. 90-15 at 5.)

Broadly construed, the complaint asserts a retaliation claim against Defendant McIntyre and a due [*25] process claim against Defendant Miller as a result of this incident.

## 2. Retaliation

Plaintiff alleges that Defendant McIntyre retaliated against him for writing to Defendant Fischer by issuing the misbehavior report. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim.

The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.

1996). "Complaining to a superior officer about a subordinate officer's misbehavior, while not equivalent to the filing of a grievance, is conduct at least arguably protected by the First Amendment." *Jones v. Harris*, 665 F. Supp. 2d 384, 398 (S.D.N.Y. 2009). As discussed above, filing a misbehavior report constitutes an adverse action. *Gill*, 389 F.3d at 384. The issue, then, is whether Plaintiff has established a causal connection between his protected conduct and Defendant McIntyre's adverse action.

As discussed above, courts consider four factors in determining whether there was a causal connection between protected conduct and an adverse action. *Baskerville*, 224 F. Supp. 2d at 732. First, regarding temporal proximity, Plaintiff alleges that he wrote a letter of complaint to Defendant Fischer sometime after December [*26] 2, 2010. (Dkt. No. 9 ¶¶ 11-12.) Defendant McIntyre issued the misbehavior reports on December 30, 2010. (Dkt. No. 90-19 at 4-5.) Thus, Plaintiff has raised a triable issue of fact as to temporal proximity. Second, as discussed above, Plaintiff cannot establish that he had a good disciplinary record before writing the letter of complaint. (Dkt. No. 90-15.) Third, Plaintiff was not vindicated at the disciplinary hearing. (Dkt. No. 90-19 at 1.) Fourth, regarding statements by Defendant McIntyre regarding his motivation, Plaintiff has alleged only that Defendant McIntyre was "upset" and "retaliated." (Dkt. No. 99 ¶ 40.) He has not alleged any specific statements by Defendant McIntyre. Thus, timing appears to be the only factor supporting a finding of causal connection. As discussed above, timing alone is insufficient to support a finding of causal connection. *Slattery*, 248 F.3d at 95. Thus, Plaintiff has not raised a triable issue of fact regarding the causal connection element of his retaliation claim against Defendant McIntyre. Therefore, I recommend that the Court grant Defendants' motion and dismiss this claim.

## 3. Due Process

Plaintiff alleges that Defendant Miller is personally responsible for the alleged [*27] violation of due

---

[9] Plaintiff alleges that Defendant McDermott made comments indicating retaliatory animus during this hearing. (Dkt. No. 9 ¶¶ 14-15.) However, it is clear from the record that he did not conduct any part of the hearing.

2015 U.S. Dist. LEXIS 46277, *27

process rights at the disciplinary hearing because he affirmed the finding on appeal. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 16-18, 25-28.) Defendants argue that Defendant Miller was not personally involved, that there was no violation of due process on the merits, and that Defendant Miller is entitled to qualified immunity. *Id*. For the reasons discussed below, I recommend that the Court find that Defendant Miller was personally involved, find that there was no due process violation on the merits, decline to address the qualified immunity argument, and dismiss this claim against Defendant Miller.

a. *Personal Involvement*

Defendants argue that Defendant Miller was not personally involved in the alleged constitutional violation. (Dkt. No. 90-2 at 16-18.) For the reasons discussed below, I recommend that the Court reject this argument.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the [*28] unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather,

supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon*, 58 F.3d at 873 (citations omitted).[10]

Earlier in this litigation, Defendants moved to dismiss the claims against Defendant Miller for lack of personal involvement. (Dkt. No. 58-3 at 5-7.[11]) The Court denied that motion, noting that, while district courts are split on the issue, the better view is that affirming a disciplinary decision constitutes personal involvement. (Dkt. No. 80 at 18-20; Dkt. No. 83.) Defendants have not addressed that aspect of the Court's earlier decision. (Dkt. No. 90-2 at 16-18.) For instance, Defendants have not argued that the Court [*30] should change course and adopt the view of the district courts holding that affirming a disciplinary decision is *not* sufficient to constitute personal involvement. *Id*. Instead, Defendants' personal involvement

---

[10] In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather [*29] than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012). The Second Circuit declined to address the issue in *Reynolds*, however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

[11] Citations to page numbers in Defendants' earlier memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

argument centers on distinguishing the case of *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013). That case deals with a personal involvement issue—the receipt of letters of complaint—that is different than the issue presented here regarding Defendant Miller. Because Defendants have not advanced any argument sufficient to alter the Court's earlier ruling, I recommend that the Court decline to dismiss the due process claim against Defendant Miller on personal involvement grounds.

b. *Merits*

Defendants argue that Plaintiff's due process rights were not violated during the January 12, 2011, disciplinary hearing and that, accordingly, Defendant Miller cannot be held liable for affirming the decision. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that the Court grant Defendants' motion for summary judgment on this **[*31]** ground and dismiss this claim against Defendant Miller.

Plaintiff received advanced written notice of the claims against him. (Dkt. No. 90-19 at 3.) Plaintiff received a written statement of the disposition, which stated that the hearing officer relied on the misbehavior reports and Plaintiff's testimony in reaching his disposition and imposed the punishment "to serve as a deterrent for future misconduct." *Id*. at 2. Plaintiff did not request any witnesses, not even the inmate with whom he exchanged food and the inmate to whom he exchanged the "unknown item." *Id*. at 3. At the hearing Plaintiff asserted that he had requested a copy of the video from the date in question. (Dkt. No. 90-20 at 2.) The hearing officer stated that he had "no indication" of that request. *Id*. Plaintiff stated that "the video I requested, would show that—I didn't pass nothing on." *Id*. at 5. Testimony from the other inmates presumably could have served as an adequate proof for this assertion, but Plaintiff did not request it. Thus, he cannot raise a triable issue of fact that he was prejudiced by the denial of the video evidence.

Regarding the issue of whether the non-defendant lieutenant was a fair and impartial hearing officer, evidence **[*32]** in the record supports his ruling. Specifically, he had the misbehavior reports and was present to judge Plaintiff's credibility in the hearing room. Thus, I recommend that the Court find that the hearing officer did not violate Plaintiff's due process rights. Accordingly, Defendant Miller, who simply affirmed the decision, cannot be held liable and I recommend that the Court grant Defendants' motion and dismiss this claim against Defendant Miller.

Because I have recommended that the Court grant the motion for summary judgment of this claim on the merits, I decline to address Defendants' qualified immunity argument.

## D. January 3, 2011, Misbehavior Report

1. Facts

The record shows that Defendant McIntyre issued another misbehavior report against Plaintiff on January 3, 2011. (Dkt. No. 90-21 at 4.) The report stated that Defendant McIntyre, while walking behind Plaintiff from the C Block to the school, noticed that Plaintiff's rear pocket was bulging. *Id*. Defendant McIntyre ordered Plaintiff to take all items out of his pockets and place them on the desk. *Id*. After Plaintiff did so, Defendant McIntyre frisked Plaintiff and found matches, a pen, and some pictures still in his pockets. *Id* **[*33]** . The report states that Plaintiff then became verbally abusive and threatened to write Defendant McIntyre up. *Id*. Despite Defendant McIntyre's order to be quiet, Plaintiff yelled that Defendant McIntyre was harassing him. *Id*. Defendant McIntyre charged Plaintiff with refusing to obey a direct order, threats, failure to comply with frisk procedures, possessing articles in an unauthorized area, and harassment. *Id*. Plaintiff pleaded not guilty to all of the charges. *Id*. at 3.

The record shows that Defendant McDermott conducted the disciplinary hearing on the

misbehavior report on January 5, 2011. (Dkt. No. 90-21 at 1.) During his testimony, Plaintiff admitted that he had pictures in his pocket. (Dkt. No. 90-22 at 4-5.) Defendant McDermott found Plaintiff not guilty of threats and guilty of possessing property in an unauthorized area, harassment, refusing a direct order, and failing to comply with frisk procedures. (Dkt. No. 90-21 at 1.) Defendant McDermott sentenced Plaintiff to fifteen days of keeplock and loss of privileges, along with fifteen days that had previously been deferred. *Id.* Plaintiff served the keeplock sentence from January 3, 2011, through February 2, 2011. *Id.*

Broadly construed, the complaint asserts retaliation claims against Defendants McIntyre and McDermott and a due process claim against Defendant McDermott.

2. Retaliation

Plaintiff claims that Defendants McIntyre and McDermott retaliated against him for his complaint to Defendant Fischer by issuing the misbehavior report and finding him guilty. (Dkt. No. 9.) Defendants **[*34]** move for summary judgment of these claims. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss these claims.

Regarding the first element of Plaintiff's retaliation claim, as discussed above, writing a letter of complaint to a superior officer is at least arguably protected conduct. *Jones*, 665 F. Supp. 2d at 398. Regarding the second element, as discussed above, both filing a misbehavior report and imposing a keeplock sentence constitute adverse action. *Gill*, 389 F.3d at 384. Thus, the issue is whether Plaintiff has raised a triable issue of fact that there was a causal connection between the protected conduct and the adverse action.

As discussed above, courts consider four factors in determining whether there was a causal connection between protected conduct and adverse action.

*Baskerville*, 224 F. Supp. 2d at 732. First, as with the claims discussed above, Plaintiff has established temporal proximity. Plaintiff alleges that he wrote a letter of complaint to Defendant Fischer sometime after December 2, 2010. (Dkt. No. 9 ¶¶ 11-12.) The record shows that Defendant McIntyre issued the misbehavior report on January 3, 2011, and that Defendant McDermott conducted the disciplinary hearing on January 5, 2011. **[*35]** (Dkt. No. 90-21 at 1, 4.) Thus, Plaintiff has established temporal proximity. Second, as noted above, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. Third, Plaintiff was not vindicated at the hearing on the matter. (Dkt. No. 90-21 at 1.) Finally, Plaintiff does not allege any specific statements by either Defendant McIntyre or Defendant McDermott connecting his letter of complaint to Defendant Fischer to this misbehavior report and disciplinary hearing. (Dkt. No. 9; Dkt. No. 99.) Thus, again, timing appears to be the only factor supporting a finding of causal connection. As established above, timing alone is insufficient. *Slattery*, 248 F.3d at 95. Thus, Plaintiff has not raised a triable issue of fact regarding the causal connection of his retaliation claims against Defendants McIntyre and McDermott. Therefore, I recommend that the Court grant Defendants' motion and dismiss this claim.

3. Due Process

Plaintiff claims that Defendant McDermott violated his right to due process during the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that the **[*36]** Court grant Defendants' motion and dismiss this claim.

Plaintiff received advanced written notice of the charges against him. (Dkt. No. 90-21 at 3.) He did not request any witnesses. *Id.* Plaintiff received a written statement of Defendant McDermott's disposition, which stated that Defendant McDermott relied on the misbehavior report in reaching his disposition and imposed the

punishment "[t]o impress upon this inmate not to act in this manner." *Id*. at 2.

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports Defendant McDermott's ruling. Specifically, Plaintiff admitted in his hearing testimony that he had pictures in his pocket. (Dkt. No. 90-22 at 4-5.) Accordingly, Defendant McDermott's decision was not arbitrary. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### E. January 21, 2011, Misbehavior Report

#### 1. Facts

Plaintiff alleges that on or about January 12, 2011, he wrote to Defendant Fischer complaining about the "constant harassment" by the staff at Coxsackie Correctional Facility. (Dkt. No. 9 ¶ 16.)

The record shows that a non-defendant correctional officer issued two **[*37]** misbehavior reports to Plaintiff on January 21, 2010. (Dkt. No. 90-23 at 5-6.) In the first, the officer charged Plaintiff with disobeying a direct order and creating a disturbance because he refused to stop yelling across the tier to another inmate. *Id*. at 5. In the second, issued a little more than an hour later, the officer charged Plaintiff with unauthorized exchange, lying to staff, and disobeying a direct order after seeing Plaintiff exchange stamps for tobacco via a "string-like line" between Plaintiff's cell and another inmate's cell. *Id*. at 6. Plaintiff pleaded not guilty to all charges. *Id*. at 3.

Defendant McDermott conducted the disciplinary hearing on the misbehavior reports on January 25, 2011. (Dkt. No. 90-23 at 1.) Defendant McDermott found Plaintiff guilty of all charges and sentenced him to forty-five days of keeplock and loss of privileges. *Id*. Plaintiff served the keeplock sentence from February 2, 2011, to March 19, 2011. *Id*. Defendant Miller affirmed the decision. (Dkt. No. 90-15 at 5-6.)

Broadly construed, the complaint asserts retaliation and due process claims against Defendant McDermott and a due process claim against Defendant Miller as a result of this incident.

#### 2. Retaliation

Plaintiff **[*38]** alleges that Defendant McDermott retaliated against him for his letter of complaint to Defendant Fischer by finding him guilty at the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim.

Regarding the first element of Plaintiff's retaliation claim, as discussed above, writing a letter of complaint to a superior officer is at least arguably protected conduct. *Jones*, 665 F. Supp. 2d at 398. Regarding the second element, as discussed above, imposing a keeplock sentence constitutes adverse action. *Gill*, 389 F.3d at 384. Thus, the issue is whether Plaintiff has raised a triable issue of fact that there was a causal connection between the protected conduct and the adverse action.

As noted above, courts consider four factors when determining the causal connection issue. *Baskerville*, 224 F Supp. 2d at 732. Regarding the first factor, Plaintiff has raised a triable issue of fact as to temporal proximity by alleging that he wrote to Defendant Fischer on January 12, 2011, and that Defendant McDermott conducted the disciplinary hearing on January 25, 2011. (Dkt. No. 9 ¶ 16; Dkt. No. 90-23 at 1.) Regarding the second **[*39]** factor, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. (Dkt. No. 90-15.) Regarding the third factor, Plaintiff was not vindicated at the hearing on the matter or on appeal. (Dkt. No. 90-15 at 5-6; 90-23 at 1.) Regarding the fourth factor, Plaintiff has not alleged that Defendant McDermott made any comments regarding his motivation at the January 25, 2011, disciplinary hearing. (Dkt. No. 9; Dkt. No. 99 ¶¶ 64-73.) Thus, timing appears to be the only factor supporting a finding of causal

connection. As previously discussed, timing alone is insufficient to support such a finding. *Slattery*, 248 F.3d at 95. Thus, Plaintiff has not raised a triable issue of fact regarding the causal connection element of his retaliation claim against Defendant McDermott. Therefore, I recommend that the Court grant Defendants' motion and dismiss this claim.

### 3. Due Process

Plaintiff alleges that Defendants McDermott and Miller violated his due process rights by finding him guilty at the disciplinary hearing and affirming that decision. (Dkt. No. 9.) Defendants move for summary judgment of these claims. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that **[\*40]** the Court grant the motion and dismiss these claims.

Plaintiff received advanced written notice of the claims against him. (Dkt. No. 90-23 at 3.) Plaintiff requested that Inmate Bush testify, and that request was granted.[12] *Id*. Plaintiff received a written statement of the disposition, in which Defendant McDermott stated that he relied on the misbehavior reports in reaching his decision and that he imposed the punishment "[t]o impress upon this inmate that this type of misconduct will not be tolerated." *Id*. at 2.

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports his ruling. Defendant McDermott had the misbehavior reports, Inmate Bush's testimony, and Plaintiff's testimony. (Dkt. No. 90-24.) He was able to weigh the credibility of the witnesses who appeared before him. Accordingly, his decision was not arbitrary. Thus, there is no triable issue of fact that he violated Plaintiff's due process rights during his conduct of the hearing or that Defendant Miller violated Plaintiff's due **[\*41]** process rights by affirming the decision. Therefore, I recommend that

---

[12] Unfortunately, the transcript of the majority of Inmate Bush's testimony states that it was inaudible on the audio tape. (Dkt. No. 90-24 at 6-8.)

the Court grant Defendants' motion and dismiss these claims.

## F. March 28, 2011, Misbehavior Report

### 1. Facts

Plaintiff alleges that on or about March 27, 2011, he wrote another letter to Defendant Fischer complaining about harassment. (Dkt. No. 9 ¶ 17.) Plaintiff alleges that after writing the letter, he was released from keeplock confinement and moved back to Cellblock C-3 where he "became a target of harassment" by Defendant McIntyre. (Dkt. No. 9 ¶ 18.)

Plaintiff alleges that on or about March 28, 2011, he returned to his cell block from the prison law library. (Dkt. No. 9 ¶ 19.) Defendant McIntyre saw Plaintiff and stated to Defendant Catlin, "King like[]s to write complaint[]s against officer[]s in Coxsackie and you know what we do to people like him." *Id*. Defendant Catlin smiled and stated, "[Y]es, we do like we always do, jump on them and write tickets." *Id*. Defendant Catlin declares that this exchange "never happened and is fabricated." (Dkt. No. 90-5 ¶ 6.)

Plaintiff alleges that on or about March 28, 2011, Defendant Catlin wrote Plaintiff a false misbehavior report and stated, "[T]his is only the beginning, you will be seeing **[\*42]** move [sic] from my pals soon." (Dkt. No. 9 ¶ 20.) The record shows that in the report, Defendant Catlin stated that when he instructed Plaintiff to stop smoking in his cell, Plaintiff said "You caught me. I may as well finish my smoke." (Dkt. No. 90-25 at 4.) Defendant Catlin charged Plaintiff with disobeying a direct order and smoking. *Id*. Defendant Catlin declares that he issued the misbehavior report because he witnessed Plaintiff engaging in prohibited conduct, not in retaliation for protected conduct. (Dkt. No. 90-5 ¶ 7.) Indeed, he declares that he was not aware at the time that Plaintiff had written any letters of complaint. *Id*. Plaintiff pleaded not guilty to both charges. (Dkt. No. 90-25

2015 U.S. Dist. LEXIS 46277, *42

at 3.)

The record shows that Defendant McDermott conducted the disciplinary hearing on the misbehavior report on April 6, 2011. (Dkt. No. 90-25 at 1.) Plaintiff alleges that he explained to Defendant McDermott that the misbehavior report was motivated by his complaints against staff. (Dkt. No. 9 ¶ 23.) Plaintiff alleges that he explained to Defendant McDermott that he had been threatened in response to his complaints. *Id.* Plaintiff testified that he was not smoking and that the misbehavior **[*43]** report was false. (Dkt. No. 90-26 at 3-4.) Defendant McDermott found Plaintiff guilty and sentenced him to thirty days in keeplock, suspended and deferred, plus loss of privileges. (Dkt. No. 90-25 at 1.) Plaintiff alleges that when the disciplinary hearing was over, Defendant McDermott turned off the tape recorder and stated, "[Y]ou picked the wrong one to write a complaint against, Officer McInty[re] is my brother in law." (Dkt. No. 9 ¶ 23.) Broadly construed, the complaint asserts retaliation claims against Defendants Catlin and McDermott and a due process claim against Defendant McDermott as a result of this incident.

2. Retaliation

Plaintiff claims that Defendants Catlin and McDermott retaliated against him for his letters of complaint to Defendant Fischer by issuing the misbehavior report and finding him guilty. (Dkt. No. 9.) Defendants move for summary judgment of these claims. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court deny Defendants' motion.

Regarding the first element of Plaintiff's retaliation claim, complaining to a superior officer is at least arguably protected conduct. *Jones*, 665 F. Supp. 2d at 398. Regarding the second element, both filing a misbehavior report and imposing **[*44]** a keeplock sentence constitute adverse action. *Gill*, 389 F.3d at 384. The issue, then, is whether Plaintiff has raised a triable issue of fact that there was a causal connection between the protected conduct and the adverse action.

As with the claims discussed above, Plaintiff has established temporal proximity. Plaintiff alleges that he wrote a letter of complaint to Defendant Fischer on March 27, 2011. (Dkt. No. 9 ¶ 17.) Defendant Catlin issued the misbehavior report on March 28, 2011. (Dkt. No. 90-25 at 4.) Defendant McDermott conducted the disciplinary hearing on April 6, 2011. *Id.* at 1. Thus, Plaintiff has established temporal proximity. Regarding the second factor, as reviewed above, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. Regarding the third factor, Plaintiff was not vindicated at the hearing on the matter. *Id.*

Regarding the fourth factor, Plaintiff alleges statements by both Defendant Catlin and Defendant McDermott suggesting that they had retaliatory motives for their actions. Plaintiff alleges that Defendant Catlin said that "we always . . . write tickets" on inmates who write complaints. (Dkt. No. 9 ¶ 19.) Defendant Catlin declares that **[*45]** he never made that statement (Dkt. No. 90-5 ¶ 6) Plaintiff alleges that Defendant McDermott said, "[Y]ou picked the wrong one to write a complaint against, Officer McInty[re] is my brother in law." *Id.* ¶ 23. Defendant McDermott declares that he "never retaliated against Mr. King for filing grievances or letters of complaint." (Dkt. No. 90-9 ¶ 6.) Defendants argue that Plaintiff's allegations about their statements are "baseless" because they have denied making those statements. (Dkt. No. 90-2 at 24-25.) The parties' contrasting version of events raises credibility issues that cannot be resolved on a motion for summary judgment. "Credibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Rule v. Brine, Inc*., 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Thus, Plaintiff has raised a triable issue of fact regarding the fourth factor.

Having raised a triable issue of fact as to two of the causal connection factors, the burden shifts to

Defendants to show "that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior **[*46]** report." *Gayle*, 313 F.3d at 681 (citations omitted). Unlike the November 30, 2010, misbehavior report discussed in Section III(A)(2) above, the parties dispute whether Plaintiff committed the conduct charged in the misbehavior report. Unlike situations in which Plaintiff admitted, either at the disciplinary hearing or at his deposition, that he committed some or all of the charged conduct, Plaintiff flatly denies that he was smoking in his cell. (Dkt. No. 90-26 at 3-4; Dkt. No. 99 ¶¶ 74-75.) Therefore, Plaintiff has raised a triable issue of fact that Defendants Catlin and McDermott retaliated against him. Accordingly, I recommend that the Court deny Defendants' motion for summary judgment of this claim.

3. Due Process

Plaintiff claims that Defendant McDermott violated his right to due process during the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss this claim.

Plaintiff received written notice of the charges against him. (Dkt. No. 90-25 at 3.) Plaintiff did not request any witnesses. *Id*. Plaintiff received a written statement of the disposition, **[*47]** in which Defendant McDermott stated that he relied on the misbehavior report in reaching his decision and that he imposed the punishment "[t]o impress upon the inmate to follow the smoking policy." *Id*. at 2.

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports his ruling. Defendant McDermott had the misbehavior report and Plaintiff's testimony. (Dkt. No. 90-26.) He was able to weigh Plaintiff's credibility. Accordingly, his decision was not arbitrary.[13] Thus, there is no

triable issue of fact that Defendant McDermott violated Plaintiff's due process rights during his conduct of the hearing. Therefore, I recommend that the Court grant Defendants' motion and dismiss this claim.

## G. April 5, 2011, Misbehavior Report

1. Facts

Plaintiff alleges that on or about April 5, 2011, Defendant Stevens stated to Plaintiff, "I heard that you like to write complaint[]s against staff. Well you pick[ed] the **[*48]** wrong one this time." (Dkt. No. 9 ¶ 21.) Defendant Stevens declares that he never made that statement. (Dkt. No. 90-11 ¶ 8.)

Plaintiff alleges that later that day, upon returning to his cell from a program, his cell had been searched and he had received a misbehavior report issued by Defendant Stevens. (Dkt. No. 9 ¶ 22.) The record shows that the misbehavior report charged Plaintiff with possessing unauthorized expired medication, creating a fire safety hazard, and being noncompliant with cell orderliness rules. (Dkt. No. 90-27 at 4.) In the misbehavior report, Defendant Stevens stated that, while making a security round, he noticed an antenna hanging out of Plaintiff's cell window. *Id*. The antenna was constructed of bare wires, covered wires, and a can opener. *Id*. While investigating the antenna, Defendant Stevens also confiscated twenty Naproxen pills and a vial of cream that had been issued to Plaintiff at Attica Correctional Facility. *Id*. Defendant Stevens declares that, at the time he issued the misbehavior report, he was not aware that Plaintiff had written letters of complaint. (Dkt. No. 90-11 ¶ 9.)

The record shows that Defendant McDermott conducted the disciplinary hearing on **[*49]** April 15, 2011.[14] (Dkt. No. 90-27 at 1.) Plaintiff pleaded

---

[13] As discussed above, Plaintiff has raised a triable issue of fact that

the decision was retaliatory. Although these two conclusions may seem mutually exclusive, they do not contradict each other because different legal standards apply to the two claims.

[14] The record shows that on April 15, 2011, Defendant McDermott

not guilty to all charges. *Id.* at 3. Plaintiff alleges that he explained to Defendant McDermott that the misbehavior report was false and motivated by retaliation for Plaintiff having written complaints against prison staff concerning Plaintiff's refusing the request to assault another inmate. (Dkt. No. 9 ¶ 26.) Plaintiff alleges that Defendant McDermott stated that he did not care about Plaintiff's defense and that Plaintiff picked the wrong person to complain about. *Id.* Defendant McDermott stated that Plaintiff should have done what the correctional officers wanted and that doing so would have saved him from all of his problems. *Id.* Defendant McDermott found Plaintiff guilty and sentenced him to fifteen days loss of privileges.[15] (Dkt. No. 90-27 at 1.)

Broadly construed, the complaint asserts retaliation claims against Defendants Stevens and McDermott and a due process claim against Defendants McDermott as a result of this incident.

2. Retaliation

Plaintiff alleges that Defendants Stevens and McDermott retaliated against him for writing letters of complaint by issuing the misbehavior report and finding him guilty. (Dkt. No. 9.) Defendants move for summary judgment of these **[*51]** claims. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant

also conducted the disciplinary hearing regarding a misbehavior report issued by former Defendant Doty. (Dkt. No. 90-29 at 1.) Plaintiff pleaded not guilty to both charges. *Id.* at 3. Defendant McDermott found Plaintiff guilty and sentenced him to sixty days in keeplock and loss of privileges. *Id.* at 1. Plaintiff served the keeplock sentence from **[*50]** April 15, 2011, through June 14, 2011. *Id.* As discussed further below in Section I, Defendant McDermott also began the disciplinary hearing regarding an April 13, 2011, misbehavior report on April 15, 2011. (Dkt. No. 90-31.)

[15] Plaintiff alleges that on or about April 16, 2011, Plaintiff appealed Defendant McDermott's decision to Defendant Martuscello. (Dkt. No. 9 ¶ 28.) Plaintiff alleges that he explained to Defendant Martuscello the circumstances behind all of the misbehavior reports. *Id.* The record shows that this appeal related only to the decision regarding former Defendant Doty's misbehavior report. (Dkt. No. 90-15 at 6.) Defendant Miller affirmed that decision. *Id.* This appeal did not involve Defendant Stevens' misbehavior report and will not be discussed here.

Defendants' motion and dismiss these claims.

Regarding the first element of Plaintiff's retaliation claim, as discussed above, complaining to a superior officer is at least arguably protected conduct. *Jones*, 665 F. Supp. 2d at 398. Regarding the second element, as discussed above, both filing a misbehavior report and imposing a keeplock sentence constitute adverse action. *Gill*, 389 F.3d at 384. The issue, then, is whether Plaintiff has raised a triable issue of fact that there was a causal connection between the protected conduct and the adverse actions.

As with the claims discussed above, Plaintiff has established temporal proximity. Plaintiff alleges that he wrote a letter of complaint to Defendant Fischer on March 27, 2011. (Dkt. No. 9 ¶ 17.) Defendant Stevens issued the misbehavior report on April 5, 2011. (Dkt. No. 90-27 at 4.) Defendant McDermott conducted the disciplinary hearing on April 15, 2011. *Id.* at 1. Thus, Plaintiff has raised a triable issue of fact as to temporal proximity. Regarding the second factor, as previously shown, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. **[*52]** (Dkt. No. 90-15.) Regarding the third factor, Plaintiff was not vindicated at the hearing on the matter. (Dkt. No. 90-27 at 1.)

Regarding the fourth factor, Plaintiff alleges that both Defendant Stevens and Defendant McDermott made statements suggesting that they had retaliatory motives for their actions. Plaintiff alleges that Defendant Stevens said "I heard that you like to write complaint[]s against staff. Well you pick[ed] the wrong one this time." (Dkt. No. 9 ¶ 21.) Defendant Stevens declares that he never made that statement. (Dkt. No. 90-11 ¶ 8.) Plaintiff declares that Defendant McDermott said that he did not care about Plaintiff's defense and that Plaintiff picked the wrong person to complain about. (Dkt. No. 9 ¶ 26.) Defendant McDermott declares that he "never retaliated against Mr. King for filing grievances or letters of complaint." (Dkt. No. 90-9 ¶ 6.) Defendants argue that Plaintiff's allegations

about their statements are "baseless" because they have denied making those statements. (Dkt. No. 90-2 at 24-25.) The parties' contrasting version of events raises credibility issues that cannot be resolved on a motion for summary judgment. "Credibility determinations . . . are jury functions, [*53] not those of a judge." *Anderson*, 477 U.S. at 255; *see also Rule*, 85 F.3d at 1011 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Thus, Plaintiff has raised a triable issue of fact regarding the fourth factor.

Having raised a triable issue of fact as to two of the causal connection factors, the burden shifts to Defendants to show "that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle*, 313 F.3d at 681 (citations omitted). Under Rule 118.21, which Plaintiff was charged with violating, "[i]nmates shall not create a fire, health or safety hazard in any area of the facility by improperly storing flammable materials or other property." N.Y. Comp. Codes R. & Regs. tit. 7, § 270.2(B)(19)(iii). At the disciplinary hearing, Plaintiff asserted that he had not created a fire hazard but admitted that he attached a can opener to wires and hung it out a window. (Dkt. No. 90-28 at 4.) Courts are required to grant prison officials deference in their decisions regarding prison safety. *Cutter v. Wilkinson*, 544 U.S. 709, 723, 125 S. Ct. 2113, 161 L. Ed. 2d 1020 (2009). Here, prison officials determined that the presence of a can opener and wires—which Plaintiff admitted having—created a safety hazard. Thus, there is no dispute **[*54]** that Plaintiff committed the conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

3. <u>Due Process</u>

Plaintiff alleges that Defendant McDermott violated his due process rights during the disciplinary hearing. (Dkt. No. 9.) Defendants move for summary judgment of this claim. (Dkt. No. 90-2 at 25-27.) For the reasons discussed below, I recommend that the Court dismiss this claim.

Plaintiff received advanced notice of the claims against him. (Dkt. No. 90-27 at 3.) Plaintiff did not request any witnesses. *Id*. Plaintiff received a written statement of the disposition, in which Defendant McDermott stated that relied on the misbehavior report in reaching his decision and that he imposed the punishment "[t]o impress upon this inmate not to act in this manner." *Id*. at 2.

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports his ruling. Defendant McDermott had the misbehavior report and Plaintiff's testimony before him. (Dkt. No. 90-28.) He was able to weigh Plaintiff's credibility. Accordingly, his decision was not arbitrary. Thus, there is no **[*55]** triable issue of fact that he violated Plaintiff's due process rights during the hearing. Therefore, I recommend that the Court grant Defendants' motion and dismiss this claim.

## H. Statements by Defendant Young

Plaintiff alleges that on April 9, 2011, Defendant Young had him brought to the dayroom area of Cellblock C-1. (Dkt. No. 9 ¶ 24.) Plaintiff alleges that in the presence of approximately five other officers, Defendant Young threatened Plaintiff. *Id*. Defendant Young allegedly told Plaintiff to "drop [Plaintiff's] complaints and the problems will stop." *Id*. Defendant Young allegedly stated that if Plaintiff continued to write complaints, that Plaintiff would "have a hard time here in Coxsackie." *Id*. Plaintiff alleges that he refused to drop his complaint and was returned to his cell. *Id*.

Plaintiff alleges that later in 2011, Defendant Young told Defendant Kane that Plaintiff likes to write complaints and to make sure that Plaintiff gets "the special treatment" while on keeplock. (Dkt. No. 9 ¶ 29.)

Broadly construed, the complaint asserts retaliation claims against Defendant Young as a result of these incidents. Defendants have not addressed these claims. (Dkt. No. 90-2.) For the reasons **[*56]** discussed below, I recommend that the Court sua sponte dismiss these claims because Plaintiff has not alleged any facts plausibly suggesting that Defendant Young took adverse action against him.

Under some circumstances, verbal threats may constitute adverse action, depending on their degree of specificity and the context in which they are uttered. *See, e.g., Hepworth v. Suffolk County*, No. 2:02-cv-6473, 2006 U.S. Dist. LEXIS 98422, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (denying summary judgment where "continued verbal threats" that inmate "would receive another beating or be killed" was sufficient "evidence . . . such that a reasonable jury could find that the officers unconstitutionally retaliated against [inmate] . . . for exercising his First Amendment" rights). Thus, vague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim. *See, e.g., Bartley v. Collins*, No. 95 Civ. 10161, 2006 U.S. Dist. LEXIS 28285, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) (stating that "verbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action") (citing *Dawes*, 239 F.3d at 493, for the proposition that "[n]ot every unnecessary statement of a prison guard regarding an inmate's exercise of free speech violates the First Amendment")*; Alicea v. Howell*, 387 F. Supp.2d 227, 237 (W.D.N.Y.2005) (defendant's "alleged statements **[*57]** to plaintiff about there being 'no secrets in prison' and that plaintiff would 'have to pay the consequences' for filing a grievance against [defendant] d[id] not give rise to a First Amendment retaliation claim"); *Cruz v. Hillman*, No. 01 Civ. 4169, 2002 U.S. Dist. LEXIS 17705, 2002 WL 31045864, at *7 (S.D.N.Y. May 16, 2002) (allegation that

defendant made statement which "expressed his dislike for inmates who file civil lawsuits, and later came to plaintiff's cell and said 'Green Haven is an open battlefield, so be careful'" was insufficient to state retaliation claim).

*Bumpus v. Canfield*, 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) (allegation that correctional officer "chastised" prisoner and said that he was "getting tired of" prisoner filing grievances insufficient to state a retaliation claim). Plaintiff's allegations about Defendant Young are not distinguishable from the type of statements held to be non-actionable. Therefore, I recommend that the Court dismiss the retaliation claims against Defendant Young sua sponte pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2).

# I. April 13, 2011, Misbehavior Report

## 1. Facts

Plaintiff alleges that on or about April 13, 2011, Defendant Stevens stated to Plaintiff, "[Y]ou [are] still here, you're not [on] keeplock. Well I will take care of that." (Dkt. No. 9 ¶ 25.) Defendant Stevens declares that he never made that statement. (Dkt. No. 90-11 ¶ 11.)

The record shows that **[*58]** Defendant Stevens issued a misbehavior report to Plaintiff on April 13, 2011, charging him with possessing gang-related literature, possessing handwritten material to a potential hate crime, possession of altered state property, possession of prohibited items, and possession of excess property. (Dkt. No. 90-31 at 4.) According to the misbehavior report, Defendant Stevens discovered seven categories of contraband in Plaintiff's cell during an assigned daily cell search. *Id.* These ranged from altered sheets and extra sweatshirts to twelve photographs "depicting gang hand signs and potential criminal activity including an order to murder." *Id.* A note on the back of one of the photographs said, "If you see this cat don't trust him or just kill him!" *Id.* at 10. A note on the back of another said, "Silk the bitch ass

cat!" *Id*. Defendant Stevens declares that he did not issue the misbehavior report in order to retaliate against Plaintiff. (Dkt. No. 90-11 ¶ 12.) Rather, he declares, he issued the misbehavior report because Plaintiff was in violation of facility rules. *Id*. In particular, he declares that, based on his training in gang recognition and signs of gang activities, he was concerned about **[*59]** the photographs. *Id*. ¶¶ 13-15.

The record shows that Defendant McDermott began conducting the disciplinary hearing regarding the misbehavior report on April 15, 2011. (Dkt. No. 90-31 at 1.) Plaintiff pleaded not guilty to all charges. *Id*. at 3. The hearing was continued to May 6, 2011. *Id*. at 1. Defendant McDermott found Plaintiff guilty of all charges and sentenced him to thirty days of keeplock, loss of privileges, and confiscation of some property. *Id*. Plaintiff served the keeplock sentence from June 14, 2011, to July 14, 2011. *Id*. Defendant Miller affirmed the decision. (Dkt. No. 90-15 at 6.)

Broadly construed, the complaint asserts retaliation claims against Defendants Stevens and McDermott and due process claims against Defendants McDermott and Miller as a result of this incident.

2. Retaliation

Plaintiff alleges that Defendants Stevens and McDermott retaliated against him for writing letters of complaint to Defendant Fischer by issuing the misbehavior report and finding him guilty. (Dkt. No. 9.) Defendants move for summary judgment of these claims. (Dkt. No. 90-2 at 19-25.) For the reasons discussed below, I recommend that the Court grant Defendants' motion and dismiss these claims.

Regarding the **[*60]** first element of Plaintiff's retaliation claims, complaining to a superior officer is at least arguably protected conduct. *Jones*, 665 F. Supp. 2d at 398. Regarding the second element, both filing a misbehavior report and imposing a keeplock sentence constitute adverse action. *Gill*, 389 F.3d at 384. The issue, then, is whether

Plaintiff has a raised a triable issue of fact that there was a causal connection between the protected conduct and the adverse action.

As with the claims discussed above, Plaintiff has raised a triable issue of fact regarding temporal proximity. Plaintiff alleges that he wrote a letter of complaint to Defendant Fischer on March 27, 2011. (Dkt. No. 9 ¶ 17.) Defendant Stevens issued the misbehavior report on April 13, 2011. (Dkt. No. 90-31 at 4.) Defendant McDermott began the disciplinary hearing on April 15, 2011. *Id*. at 1. Thus, Plaintiff has raised a triable issue of fact as to temporal proximity. Regarding the second factor, Plaintiff has not established that he had a good disciplinary record before the alleged protected conduct. (Dkt. No. 90-15.) Regarding the third factor, Plaintiff was not vindicated at the hearing on the matter. (Dkt. No. 90-31 at 1.)

Regarding the fourth factor, Plaintiff alleges that Defendant **[*61]** Stevens said "[Y]ou're not [on] keeplock. Well I will take care of that" on the same day he issued the misbehavior report. (Dkt. No. 9 ¶ 25.) Defendant Stevens denies making that statement. (Dkt. No. 90-11 ¶ 11.) Plaintiff declares that Defendant McDermott said that he did not care about Plaintiff's defense and that Plaintiff picked the wrong person to complain about. (Dkt. No. 9 ¶ 26.) Defendant McDermott declares that he "never retaliated against Mr. King for filing grievances or letters of complaint." (Dkt. No. 90-9 ¶ 6.) Defendants argue that Plaintiff's allegations about their statements are "baseless" because they have denied making those statements. (Dkt. No. 90-2 at 24-25.) Again, the parties' contrasting version of events raises credibility issues that cannot be resolved on a motion for summary judgment. "Credibility determinations . . . are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *see also Rule*, 85 F.3d at 1011 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Thus, Plaintiff has raised a triable issue of fact regarding the fourth factor.

Having raised a triable issue of fact as to two of the causal **[\*62]** connection factors, the burden shifts to Defendants to show "that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle*, 313 F.3d at 681 (citations omitted). Defendants have met that burden. Plaintiff admitted in testimony at the disciplinary hearing that he did, indeed, have altered sheets, extra sweatshirts, fifty cassette tapes, and two pillows. (Dkt. No. 90-32 at 4.) Plaintiff does not dispute that he possessed the photographs or the content of the notes on the back of them. Viewing the photographs, it was not arbitrary for Defendants to conclude that they depicted gang activity. (Dkt. No. 90-31 at 5-11.) Thus, Defendants have shown that Plaintiff committed the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss these claims.

3. <u>Due Process</u>

Plaintiff alleges that Defendants McDermott and Miller violated his right to due process during the disciplinary hearing and by affirming the result of that hearing. (Dkt. No. 9.) Defendants move for summary judgment of these claims. (Dkt. No. 90-2 at 25-27.) For the reasons discussed **[\*63]** below, I recommend that the Court grant Defendants' motion and dismiss these claims.

Plaintiff received advanced notice of the charges against him. (Dkt. No. 90-31 at 3.) Plaintiff received a written statement of the disposition, in which Defendant McDermott stated that he relied on the misbehavior report in reaching his decision and that he imposed the punishment "[t]o impress upon this inmate that this type of misconduct will not be tolerated." *Id.* at 2.

Plaintiff requested six witnesses, and Defendant McDermott allowed two of them to testify. (Dkt. No. 90-31 at 3.) Defendant McDermott refused to call the package room sergeant to testify about Plaintiff's attempts to get rid of the excessive

cassette tapes because "I don't see what the package room Sergeant is going to tell me other than what I already know, that you have more tapes than you['re] supposed to and yeah, you may have been making a step toward getting rid of them, but you didn't." (Dkt. No. 90-32 at 8.) Defendant McDermott refused to call two mental health staff members, who Plaintiff said would testify that he had informed them about harassment by correctional officers. *Id.* at 8-12. It is not clear from the record why Defendant McDermott refused **[\*64]** to call Defendant Superintendent Martuscello as a witness.

Defendant McDermott's refusal to call the witnesses did not violate Plaintiff's right to due process. An inmate's right to call witnesses is not the same as a defendant's in a criminal trial, but rather is qualified by the circumstances of prison life. *Wolff*, 418 U.S. at 566-67. The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case. *Id.* Here, Defendant McDermott reasonably concluded that the proposed witnesses would offer duplicative testimony.

Regarding the issue of whether Defendant McDermott was a fair and impartial hearing officer, evidence in the record supports his ruling. Defendant McDermott had the misbehavior report, Plaintiff's testimony, and the testimony of two witnesses before him. (Dkt. No. 90-32.) He was able to view the photographs and property discovered in Plaintiff cell. *Id.* He was able to weigh the witnesses' credibility. Accordingly, his decision was not arbitrary. Thus, there is no triable issue of fact that he violated Plaintiff's due process **[\*65]** rights during the hearing or that Defendant Miller violated Plaintiff's due process rights by affirming the decision. Therefore, I recommend that the Court grant Defendants' motion and dismiss these claims.

## J. June 6, 2011, Separation From Other Inmates

Plaintiff alleges that on or about June 6, 2011, Defendant Kane separated Plaintiff from the rest of the inmates during keeplock recreation as retaliation for the complaints Plaintiff wrote against Defendants. (Dkt. No. 9 ¶ 29.) Defendants have not addressed this claim. (Dkt. No. 90-2.) I recommend that the Court dismiss this claim sua sponte for lack of adverse action. "Case law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation." *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK) (GWG), 2007 U.S. Dist. LEXIS 38660, at *65-66, 2007 WL 1544629, at *20-21 (S.D.N.Y. May 29, 2007[16]) (collecting cases).[17] Here, Plaintiff does not even allege that he was denied privileges. He alleges that he was *separated* from other inmates during recreation, not that he was denied recreation. Therefore, I recommend that the Court dismiss this claim sua sponte.

## K. Defendants Fischer and Martuscello

Defendants move for summary judgment of the claims against Defendants Fischer and Martuscello for lack of personal involvement. (Dkt. No. 90-2 at 16-18.) The claims against Defendant Martuscello should be dismissed for lack of personal involvement because there is no evidence that he was involved in any way with the surviving claim against Defendants Catlin and McDermott. (*See* Dkt. No. 90-15 at 6.) Similarly, given the lack of record evidence about what any letters that Plaintiff wrote to Defendant Fischer said or whether those letters were sent to Defendant Fischer's proper address, it is recommended that the claims against Defendant Fischer also be dismissed for lack of personal involvement.

---

[16] Lexis and Westlaw list different dates for this decision. The Court has used the date listed by Westlaw.

[17] The Court will provide **[\*66]** Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 90) be **GRANTED IN PART AND DENIED IN PART**. Specifically, I recommend that the Court dismiss all claims except the retaliation claims against Defendants Catlin and McDermott arising from the March 28, 2011, misbehavior report and the April 6, 2011, disciplinary **[\*67]** hearing on that report; and it is further

**RECOMMENDED** that the Court sua sponte dismiss the claims against Defendants Young and Kane; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK) (GWG), 2007 U.S. Dist. LEXIS 38660, 2007 WL 1544629 (S.D.N.Y. May 29, 2007); and it is further

**ORDERED** that the Clerk amend the caption to change the spelling of Defendant "CO. Hessle"'s last name to "Hoessle" and the spelling of Defendant "CO. McIntyer"'s last name to "McIntyre."

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: March 17, 2015

Syracuse, New York

/s/ Thérèse Wiley Dancks

Thérèse Wiley Dancks

United States Magistrate Judge

2015 U.S. Dist. LEXIS 46277, *67

---

**End of Document**



# King v. McIntyre

United States District Court for the Northern District of New York

April 8, 2015, Decided; April 8, 2015, Filed

No. 9:11-CV-1457

**Reporter**

2015 U.S. Dist. LEXIS 45679 *; 2015 WL 1781256

JAMEL KING, Plaintiff, -v- C.O. MCINTYRE, Correctional Officer; LT. MCDERMOTT, Correctional Lieutenant; C.O. STEVENS, Correctional Officer; SGT. YOUNG, Correctional Sergeant; C.O. KANE, Correctional Officer; C.O. HOESSLE, Correctional Officer; C.O. CATLIN, Correctional Officer; DEPT. C. MILLER, Deputy Superintendent of Security; COMM. BRIAN FISCHER, Commissioner of the Department of Corrections Community Supervision; and SUP. MARTUSCELLO, Defendants.

**Prior History:** King v. McIntyer, 2015 U.S. Dist. LEXIS 46277 (N.D.N.Y, Mar. 17, 2015)

**Counsel:** [*1] JAMEL KING, Plaintiff, Pro se, Elmira, NY.

For Defendants: OF COUNSEL, MICHAEL G. MCCARTIN, ESQ., Ass't Attorney General, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, NY.

**Judges:** David N. Hurd, United States District Judge.

**Opinion by:** David N. Hurd

# Opinion

## DECISION and ORDER

Pro se plaintiff Jamel King brought this action pursuant to 42 U.S.C. § 1983. On March 17, 2015,

the Honorable Thérèse Wiley Dancks, United States Magistrate Judge, advised by Report-Recommendation that defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be granted in part and denied in part. No objections to the Report-Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report-Recommendation is accepted in whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED in part and DENIED in part;

2. All claims are DISMISSED except the retaliation claims against defendants Catlin and McDermott arising from the March 28, 2011, misbehavior report and the April 6, 2011, disciplinary hearing on that report;

3. All claims against defendants Young and Kane are sua sponte DISMISSED; and

4. The Clerk is directed to serve [*2] a copy of this Decision and Order upon the parties in accordance with the Local Rules.

IT IS SO ORDERED.

/s/ David N. Hurd

2015 U.S. Dist. LEXIS 45679, *2

United States District Judge

Dated: April 8, 2015

Utica, New York.

---

**End of Document**



# Lunney v. Brureton

United States District Court for the Southern District of New York

January 21, 2005, Decided

04 Civ. 2438 (LAK) (GWG)

**Reporter**
2005 U.S. Dist. LEXIS 770 *

GEORGE LUNNEY, Plaintiff, -v.- LIEUTENANT BRURETON, DONALD SELSKY, and BRIAN FISCHER, Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Complaint dismissed at, in part Lunney v. Brureton, 2005 U.S. Dist. LEXIS 2822 (S.D.N.Y., Feb. 23, 2005)

**Disposition:** Magistrate Judge's recommendation to grant in part and deny in part defendants' motions to dismiss.

**Counsel:** [*1] George Lunney, Plaintiff, Pro se, Collins, NY.

For Brureton, Correction Lieutenant, Donald Selsky, in his individual and official capacity, Brian Fischer, in his individual and official capacity, Defendants: Benjamin J. Lee, New York State Office of the Attorney General, New York, NY.

**Judges:** GABRIEL W. GORENSTEIN, United States Magistrate .

**Opinion by:** GABRIEL W. GORENSTEIN

## Opinion

REPORT AND RECOMMENDATION

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

George Lunney, currently an inmate at the Collins Correctional Facility, has brought this suit *pro se* under 42 U.S.C. § 1983 against three employees of the Sing Sing Correctional Facility ("Sing Sing"), where Lunney was previously housed. Lunney alleges that defendants Lieutenant Brureton, [1] Donald Selsky, and Brian Fischer violated his Due Process rights by improperly conducting a disciplinary hearing which resulted in his confinement in the Special Housing Unit ("SHU") of Sing Sing. He further alleges that Brureton and Fischer were deliberately indifferent to inhumane conditions of confinement in the SHU in violation of his Eighth Amendment rights, that he was the victim of an assault, and that [*2] he was retaliated against for filing grievances with respect to conditions in the SHU in violation of his rights under the First Amendment. Defendants have moved to dismiss Lunney's complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons, the defendants' motion should be granted in part and denied in part.

I. *BACKGROUND*

A. *Facts*

For the purposes of deciding this motion, the Court assumes that the facts alleged in Lunney's complaint and his memorandum of law are true. *See, e.g., Donahue v. United States Dep't of Justice*, 751 F. Supp. 45, 49 (S.D.N.Y. 1990) ("The policy reasons favoring liberal construction of *pro se*

---

[1] This name is spelled "Brereton" in the defendants' submissions.

2005 U.S. Dist. LEXIS 770, *2

pleadings warrant the Court's consideration of the allegations contained in plaintiffs' memorandum of law, at least where those allegations are consistent with the allegations in the complaint."); *accord Torrico v. IBM Corp.*, 213 F. Supp. 2d 390, 400 n.4 (S.D.N.Y. 2002). **[*3]** In addition, Lunney's complaint may be deemed "to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, as well as . . . documents that [Lunney] either possessed or knew about and upon which [he] relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000) (internal citations omitted).

On May 21, 2002, Lunney returned to his cell following a "medical shower" to find Correction Officer Hadzovic leaving the cell. Complaint, filed March 29, 2004 (Docket # 2) ("Compl."), P 1. Hadzovic informed Lunney that he had just searched his cell. *Id.* After conducting a pat frisk on Lunney, Hadzovic reentered the cell and came out with a box of spaghetti. *Id.* Hadzovic announced that he would confiscate the box, which appeared to be altered, and locked Lunney in his cell. *Id.*

Approximately 45 minutes after Hadzovic left, Correction Sergeant Guadagno came to Lunney's cell with two other corrections officers. *Id.* P 2. Guadagno informed Lunney that a "shank type weapon" was discovered in the confiscated spaghetti box. *Id.* Lunney asserted that the weapon was not his and **[*4]** that he had merely purchased the spaghetti from the commissary. *Id*. Nonetheless, he was escorted to the SHU to await disciplinary action. *Id.*

Lunney received a "Tier III" misbehavior report on May 22, 2002. *Id.* P 3; Inmate Misbehavior Report (reproduced as Ex. A to Motion to Dismiss, filed June 10, 2004 (Docket # 15) ("Motion to Dismiss")). Following a disciplinary hearing on June 13, 2002, Lunney was found guilty of possession of a weapon and sentenced to nine months' confinement in the SHU. Compl. P 3. Lunney filed an administrative appeal with Donald

Selsky, the Director of Special Housing for the New York State Department of Correctional Services, who affirmed the disposition on August 22, 2002. *Id.*

Lunney then filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in the New York State Supreme Court, Albany County. *Id.* P 4. On September 16, 2002, Justice Thomas J. McNamara issued an order to show cause directing Selsky to respond to the petition. *Id.* On October 3, 2002, Selsky rescinded the disciplinary determination and ordered a rehearing on the ground that Lunney had not been given adequate assistance in preparing his **[*5]** defense. *Id.* Lunney subsequently withdrew his Article 78 petition. *Id.* P 5.

The rehearing commenced on October 15, 2002. *Id.* P 6; Disciplinary Hearing Transcript (reproduced as Ex. B to Motion to Dismiss) ("Transcript"). During the hearing, a dispute arose between the hearing officer, Correction Lieutenant Brureton, and Lunney. Compl. P 6; Transcript at 29-37. Lunney requested permission to leave the hearing, Brureton granted him permission to do so, and Lunney was escorted out. Compl. P 6, Transcript at 36-37. Lunney was again convicted for possessing a weapon and sentenced to nine months in the SHU with a corresponding loss of all privileges. Compl. P 6; Transcript at 59.

Lunney subsequently filed a request for review with Brian Fischer, the Superintendent of Sing Sing. Compl. P 7. The disciplinary disposition was affirmed by First Deputy Superintendent Paul Kikendall. *Id.* An appeal to the Commissioner of the New York State Department of Correctional Services followed. *Id.* P 8. In the appeal, Lunney argued that he had not been provided with a copy of the hearing disposition and that Selsky had no authority to order a new disciplinary hearing once the action **[*6]** in state court had been filed. *Id.* The Acting Director of Special Housing denied the appeal on November 7, 2002, although he reduced Lunney's sentence from nine to six months in the

SHU. *Id.*; Review of Superintendent's Hearing, (reproduced as Ex. D to Motion to Dismiss) ("Hearing Review").

Lunney filed a second Article 78 petition on November 19, 2002 with respect to the rehearing. Article 78 Petition, dated November 19, 2002 (reproduced as Ex. E to Motion to Dismiss). On August 13, 2003, Justice Edward Sheridan of the Albany County Supreme Court dismissed the misbehavior report and ordered the Department of Correctional Services to expunge all references to the incident from Lunney's institutional record. Decision, Order and Judgment, dated August 13, 2003 (reproduced as Ex. D to Combined Affirmation and Memorandum of Law in Opposition to Defendants' Motion for Dismissal, filed July 6, 2004 (Docket # 18) ("Pl. Opp.")). Justice Sheridan concluded that the failure to provide Lunney with a copy of the hearing disposition was a violation of Due Process and that Selsky had no authority to order the rehearing once Lunney filed an Article 78 petition in state court. *Id.*

 [*7] Lunney was confined to the SHU for six months, from May 21, 2002 until November 21, 2002. Compl. P 10. During this period, Lunney filed a number of grievances alleging, *inter alia*, cold, spoiled, or poorly prepared food, an inadequate law library, insufficient reading materials, inadequate laundry services, lack of medical attention, and harassment by SHU staff. *Id.* P 16. In his grievances, Lunney also alleged that he was criticized and threatened for filing grievances related to prison conditions by SHU staff, particularly by Brian Fischer. *Id.* PP 17, 19. On one occasion, Lunney asserts that he was physically assaulted by prison guards in retaliation for complaining about conditions in his cell. Memorandum of Law, dated June 28, 2004 (annexed to Pl. Opp.) ("Pl. Mem."), at 9-10.

B. *Procedural History*

The complaint in this action was filed March 29, 2004. *See* Compl. In his complaint, Lunney alleges

that his Due Process rights were violated by two "faulty disciplinary hearings." *Id.* at 7 (P 1). The first violation occurred when Selsky convened a new disciplinary hearing while an Article 78 review of the first hearing was pending, and Lunney alleges that his [*8] Due Process rights were violated a second time when Brureton failed to provide a timely written disposition of the second hearing and neither Selsky nor Fischer corrected the error. *See* Pl. Mem. at 18. He also alleges that he was subject to "inhumane" conditions of confinement in the SHU of Sing Sing, *id.* at 17, including the service of cold, spoiled, and improperly prepared food; inadequate laundry services; inadequate law library services; and inadequate reading material. Compl. P 16, Pl. Mem. at 6-9. He also alleges that he was assaulted, Pl. Mem. at 9-10, and that he was retaliated against for filing grievances with respect to conditions in the SHU, Compl. PP 17, 19; *id.* at 7 ; (P 2)Pl. Mem. at 18, in violation of his rights under the First Amendment. Lunney seeks $ 10 million in punitive and compensatory damages. Compl. at 8.

Defendants filed a motion to dismiss on June 10, 2004 arguing that Lunney failed to state any constitutional claims. Defendants' Memorandum of Law in Support of Their Motion to Dismiss, filed June 10, 2004 (Docket # 16) ("Def. Mem"), at 2. Defendants also argue sovereign immunity under the Eleventh Amendment, qualified immunity, and the lack [*9] of personal involvement of the defendants. *Id.* Lunney filed opposition papers on July 6, 2004. *See* Pl. Mem. Defendants thereafter submitted a reply memorandum of law. *See* Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss, filed August 4, 2004 (Docket # 19) ("Def. Reply"). This Court also received a letter from Lunney dated December 18, 2004, which attached copies of several of Lunney's grievances and responses to the grievances. *See* Letter from George Lunney, dated December 18, 2004.

C. *Law Governing a Motion to Dismiss*

In resolving a motion to dismiss under Fed. R. Civ.

P. 12(b)(6), a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir. 2004); *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. **[*10]** " *Conley v. Gibson*, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957). In making this determination, complaints drafted by *pro se* plaintiffs are held "'to less stringent standards than formal pleadings drafted by lawyers,'" *Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 30 L. Ed. 2d 652, 92 S. Ct. 594 (1972) (per curiam)), and they "should be interpreted 'to raise the strongest arguments that they suggest,'" *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

## II. *DISCUSSION*

The defendants have moved to dismiss the complaint on the following grounds: (1) Lunney has failed to allege that defendants Fischer and Brureton subjected him to inhumane conditions of confinement, or knew of and disregarded an excessive risk to Lunney's health and safety in violation of his Eighth Amendment rights; (2) Lunney failed to state a claim under the First Amendment because he does not allege adverse action in retaliation for his grievances; (3) Lunney has failed to state a Due Process claim with respect to his second **[*11]** disciplinary hearing; (4) because Lunney cannot show personal involvement; all claims should be dismissed as to Selsky; the First and Eighth Amendment claims should be dismissed as to Brureton; and the Due Process claim should be dismissed as to Fischer; (5) all defendants are entitled to qualified immunity; and (6) the defendants have sovereign immunity in their official capacities under the Eleventh Amendment. Def. Mem. at 6-13.

In his responsive papers, Lunney clarified that he was raising a Due Process claim against Selsky, Due Process and Eighth Amendment claims against Brureton, and Due Process, First and Eighth Amendment claims against Fischer. Affirmation of George Lunney, dated June 28, 2004 (included as first pages to Pl. Opp.) ("Affirm."), P 3(d); Pl. Mem. at 17. These grounds are discussed below to the extent necessary for disposition of the defendants' motion.

## A. *Sovereign Immunity*

The Eleventh Amendment provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. **[*12]** Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare*, 411 U.S. 279, 280, 36 L. Ed. 2d 251, 93 S. Ct. 1614 (1973). Thus, "it is clear . . . that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, 79 L. Ed. 2d 67, 104 S. Ct. 900 (1984) (citations omitted). The same rule applies to suits for money damages against individual employees of the State named in their official capacities. *See, e.g., Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan*, 440 U.S. 332, 340-45, 59 L. Ed. 2d 358, 99 S. Ct. 1139 (1979). A finding of sovereign immunity under the Eleventh Amendment deprives **[*13]** a federal court of jurisdiction. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 73, 145 L. Ed. 2d 522, 120 S. Ct. 631

2005 U.S. Dist. LEXIS 770, *13

(2000) (citations omitted); *Atl. Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (citations omitted), *cert. denied*, 510 U.S. 1043, 126 L. Ed. 2d 656 (1994).

Lunney's complaint names the three defendants in both their individual and official capacities. Although the Eleventh Amendment does not bar suit against the defendants in their individual capacities, it does bar this suit insofar as it is brought against the defendants in their official capacities.

B. *Analysis of Lunney's Claims Under 42 U.S.C. § 1983*

Lunney has brought this action under 42 U.S.C. § 1983. *See* Compl. at 1. In order to assert a claim under section 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *West v. Atkins*, 487 U.S. 42, 48, 101 L. Ed. 2d 40, 108 S. Ct. 2250 (1988). Section 1983 does not grant any substantive rights, but rather "provides **[*14]** a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution or federal statutes. *See Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted), *cert. denied*, 512 U.S. 1240, 129 L. Ed. 2d 867 (1994).

Because the defendants do not dispute that their actions were under the color of state law, the only issue presented is whether Lunney has alleged any violations of a constitutional right. Lunney has presented three different claims in which he alleges: (1) violations of the Eighth Amendment with respect to the conditions of his confinement; (2) that he was the victim of retaliation in violation of the First Amendment; and (3) Due Process violations under the Fourteenth Amendment based on the conduct of his disciplinary hearing and his confinement in the SHU. Each claim is discussed separately.

1. *Eighth Amendment Claims*

The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832, 128 L. Ed. 2d 811, 114 S. Ct. 1970 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349, 69 L. Ed. 2d 59, 101 S. Ct. 2392 (1981)). **[*15]** The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement" including "adequate food, clothing, shelter, and medical care." *Id.* To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of "'the minimal civilized measure of life's necessities,'" *Wilson v. Seiter*, 501 U.S. 294, 298, 115 L. Ed. 2d 271, 111 S. Ct. 2321 (1991) (quoting *Rhodes*, 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference." *Wilson*, 501 U.S. at 302-03.

Lunney's Eighth Amendment claims relate to five distinct areas: food, laundry services, physical assault, regular library services and law library services. Each is discussed below.

a. *Cold, spoiled and improperly prepared food*

i. *Merits of the Claim.* Lunney maintains that he was served food that was **[*16]** "cold, spoiled and poorly prepared" "on a near daily basis" during his detention in the SHU. Pl. Mem. at 6. Lunney asserts that he and other inmates regularly refused the meals -- or portions of meals -- that "were clearly spoiled and or poorly prepared." *Id.* at 7. On one occasion, Lunney describes how he and other SHU inmates became ill after a meal of chili and rice, began vomiting violently, and required treatment by medical staff. *Id.* Lunney and other inmates filed formal grievances with the Inmate Grievance Committee and sent informal letters to the Director of Inmate Nutritional Services and the

2005 U.S. Dist. LEXIS 770, *16

State Commission of Correction, but the authorities found no problems with the food service. *Id.* at 6. As a result of regularly having to refuse meals, Lunney states that he suffered "weight loss, muscle atrophy, lethargy and the inability to maintain mental focus." *Id.* at 7.

Under Eighth Amendment case law, prisoners are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 14 (2d Cir. 1983) [*17] (per curiam) (citation omitted) (claim that food was purposely contaminated with dust, rocks, glass, and human waste sufficient to withstand dismissal of § 1983 complaint); *see also Griffin v. Smith*, 493 F. Supp. 129, 131 (W.D.N.Y. 1980) (allegation of "unsanitary food utensils, including cigarette burns and hair on food trays" sufficient to sustain an Eighth Amendment claim); *Murphy v. Wheaton*, 381 F. Supp. 1252, 1261 (N.D. Ill. 1974) ("spoiled, rotted and foul" food served in a wagon used to dispose garbage indicates "existence of unsanitary conditions which transcend mere unpleasantness").

Insofar as Lunney alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a cause of action. *See Waring v. Meachum*, 175 F. Supp. 2d 230, 238 (D. Conn. 2001) (Report and Recommendation) ("The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (citation and quotation [*18] omitted); *see also Hutto v. Finney*, 437 U.S. 678, 683, 686, 57 L. Ed. 2d 522, 98 S. Ct. 2565 1000 calorie per day diet of "grue," a substance "created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste" and baking it, "might be tolerable for a few days and intolerably cruel for weeks or months").

Here, however, Lunney alleges that his meals were regularly spoiled and/or improperly prepared on "numerous occasions." Pl. Mem. at 7. Thus, eating the meals caused him to get sick and not eating them caused him to suffer the effects of malnutrition. *See id.* Because Lunney's allegations are sufficient to support the inference that prison officials were aware of the risk to his health and safety created by the condition of the food served but disregarded the excessive risk of harm, his allegations are sufficient to state an Eighth Amendment claim.

ii. *Qualified Immunity*. To hold an individual defendant liable, however, it is not sufficient merely to state a constitutional claim. Prison officials are entitled to qualified immunity if their actions either "did not violate clearly established law," or "it was objectively reasonable for the defendants [*19] to believe that [their] actions did not violate such law." *Anderson*, 317 F.3d at 197 (citations and internal quotations omitted). Prison officials performing discretionary functions thus "are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Ford v. McGinnis*, 352 F.3d 582, 596 (2d Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 102 S. Ct. 2727 (1982)). To determine whether defendants are entitled to qualified immunity, the court must decide whether a constitutional right was violated, whether the law clearly established the right alleged to have been violated, and whether a reasonable person under the same circumstances would have understood that his conduct was unlawful. *See Hanrahan v. Doling*, 331 F.3d 93, 98 (2d Cir. 2003) (per curiam) (citing *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001)).

A qualified immunity defense may be asserted as part of a motion under Fed. R. Civ. P. 12(b)(6) if it is based on [*20] facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle" given that all inferences must be drawn in plaintiff's favor. *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir.

2004). Here, defendants have argued the applicability of the qualified immunity defense only in the most general terms. *See* Def. Mem. at 13-15; Def. Reply at 9-10. Significantly, they make no specific argument with respect to whether the case law regarding serving spoiled food was "clearly established," stating only that "there is no clearly established constitutional right to perfectly prepared meals." Def. Reply at 10. Lunney, of course, is not asserting a right to "perfectly prepared meals" and thus defendants have not asserted a qualified immunity defense with respect to these allegations.

iii. *Personal Involvement*. Lunney seeks to sue only Brian Fischer and Lieutenant Brureton for Eighth Amendment violations. *See* Affirm. P 3(d); Pl. Mem. at 17. An individual defendant's liability under 42 U.S.C. § 1983 is predicated on his or her personal involvement in the constitutional deprivation. *See* **[*21]** , *e.g.*, *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). A plaintiff may prove personal involvement by supervisory defendants by showing one of the following:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Fischer does not contest that he meets the *Colon* test with respect to the conditions in the SHU and thus he remains a proper defendant on this claim. With respect to Lieutenant Brureton,

however, Lunney makes no allegation that Brureton had any **[*22]** role in creating the conditions of confinement in the SHU or that his involvement satisfied any of the other *Colon* factors. Accordingly, Brureton cannot remain as a defendant as to this or any other claim relating to conditions at the SHU.

b. *Laundry services*

Lunney alleges that the laundry services in the SHU were inadequate. In his memorandum of law, Lunney describes how the staff would collect inmates' soiled laundry and place it outside the "Officer's In Charge station" but never send it to the laundry. Pl. Mem. at 9. The day staff would not advise later shifts that the clothing had not been sent to be cleaned and the laundry would be returned to the inmates unwashed. *Id.* Furthermore, the soiled laundry of all the inmates would be mixed together and the inmates would have to sort through the piles of clothing to look for their own clothes. *Id.*

Prisoners are entitled to "reasonably adequate sanitation" and "personal hygiene" under the Eighth Amendment, particularly over long periods of time. *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989). Courts have held that these rights encompass the right to adequate laundry services. **[*23]** *Id.* (denial of laundry service for five months, followed by service in which laundry was returned wet and dirty sufficiently serious under the circumstances to state a claim); *Divers v. Dep't of Corr.*, 921 F.2d 191, 194 (8th Cir. 1990) ("inmates are . . . entitled to adequate laundry facilities") (citation omitted).

There is no Eighth Amendment violation, however, in instances where inmates are provided the opportunity and the supplies to wash their own clothes. *Green v. Ferrell*, 801 F.2d 765, 771 (5th Cir. 1986) (no constitutional violation where inmates were permitted to wash their clothes in sinks and were provided with laundry detergent); *Benjamin v. Fraser*, 161 F. Supp. 2d 151, 178-79 (S.D.N.Y. 2001) (availability of sinks and laundry detergent or bar soap sufficient under the Eighth

Amendment), *aff'd in part and vacated in part*, 343 F.3d 35 (2d Cir. 2003). Thus Lunney's mere allegation that his clothes were returned to him without being cleaned on various occasions does not state an Eighth Amendment claim as to inadequate laundry services.

### c. *Assault*

Lunney asserts that he was routinely subject **[*24]** to threats and harassment by the SHU staff -- an allegation discussed below as a First Amendment retaliation claim -- but he also describes a specific incident of assault which is more properly addressed here. Lunney alleges that, three days after entering the SHU on May 21, 2002, he complained that his cell lacked, *inter alia*, a toothbrush, toothpaste, and a working sink. Pl. Mem. at 9. He says that after "shouting to" an officer regarding the missing items, two unnamed officers came to the cell and told him to "shut the fuck up or we [are] coming in there and you will not like the results." *Id.* at 10. Lunney claims that one officer became increasingly hostile, and eventually the officers ordered the cell open, "began punching [him] in the head and body," and put him in a choke hold. *Id.*

Defendants argue that Lunney's claim for assault should be dismissed for failure to exhaust administrative remedies. Def. Reply at 4. It is not necessary to reach this argument, however, as Lunney's claim cannot proceed in its current form because he has not alleged that any of the three named defendants were personally involved in the assault under any of the prongs of the *Colon* **[*25]** test. Accordingly, the assault claim must be dismissed against the existing defendants. Obviously, Lunney would be free to file an amended complaint that names the officers involved, though he is cautioned that he should do so only if he meets the exhaustion requirements of 42 U.S.C. § 1997e(a) or has a basis for being relieved of the obligation to meet those requirements.

### d. *Inadequate library services*

Lunney alleges that library services in the SHU were inadequate. He asserts that in spite of inmate grievance complaints, the general library cart was not "properly stocked" as it was "void of magazines, newspapers and periodicals." Pl. Mem. at 7. These allegations, however, fail to state a claim under the Eighth Amendment because magazines, newspapers and periodicals are not considered one of life's "basic necessities" within the meaning of the Eighth Amendment. *See, e.g.*, *Loe v. Wilkinson*, 604 F. Supp. 130, 136 (M.D. Pa. 1984) (diminished access to the general library while prisoner was in administrative detention not an Eighth Amendment violation); *see also May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. **[*26]** 1997) (prisoner's First Amendment rights were not violated when his confinement to the special housing unit prevented him from using the general prison library); *cf. Boyd v. Anderson*, 265 F. Supp. 2d 952, 966 (N.D. Ind. 2003) (no equal protection violation where prisoners confined to detention unit could not use general prison library).

### e. *Inadequate law library services*

Lunney's final claim under the Eighth Amendment relates to the inadequacy of the "mini law library" in Sing Sing's SHU. Pl. Mem. at 8. Lunney alleges that Sing Sing is under a consent degree issued by a court in the Southern District of New York and is obligated to stock the mini law library within SHU with legal books and materials. *Id.* He contends that these materials were often missing and had to be ordered from the prison's main law library. *Id.* He alleges that there were "extensive delays" in getting books from the main law library and, as a result, he was unable to do legal research with respect to the Article 78 petition he filed in the New York State Supreme Court in a timely fashion and was forced to seek extensions from the court. *Id.*

The adequacy of law library **[*27]** services does not implicate the Eighth Amendment, however, but rather the right of access to the courts. *See Bounds v. Smith*, 430 U.S. 817, 828, 52 L. Ed. 2d 72, 97 S. Ct. 1491 (1977) (establishing that "the fundamental

constitutional right of access to the courts requires prison authorities" to provide adequate law libraries or adequate assistance with filing legal papers from a person trained in the law); *Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004). This right is grounded "in the constitutional guarantees of equal protection and due process." *Bourdon*, 386 F.3d at 92 (citations omitted). A prisoner, however, must allege more than inadequate facilities to state a constitutional claim. Rather, the prisoner "must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis v. Casey*, 518 U.S. 343, 351, 135 L. Ed. 2d 606, 116 S. Ct. 2174 (1996). The examples in *Lewis* used to demonstrate a cognizable injury -- for example, that a complaint was dismissed because the plaintiff failed "to satisfy some technical requirement which, because of deficiencies **[*28]** in the prison's legal assistance facilities, he could not have known" or was unable to file a complaint at all because he was "so stymied by inadequacies of the law library" -- all show a real and prejudicial effect arising from the denial of legal material. *Id.*

Here, by contrast, Lunney alleges no such denial. Although he alleges delays in conducting research for his lawsuits in the State Supreme Court and the need to request extensions on deadlines, Pl. Mem. at 8, he does not allege that he was not granted the extensions or suffered any harm from having to request extensions. We note that "if an inmate experienced delays in pursuing a civil claim, but files acceptable legal pleadings within court deadlines, he cannot claim that he was prejudiced by shortcomings in a prison facility's law library, because he has sustained no relevant actual injury." *Benjamin v. Kerik*, 102 F. Supp. 2d 157, 164 (S.D.N.Y. 2000) (citing *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)), *aff'd Benjamin v. Fraser*, 264 F.3d 175 (2d Cir. 2001). The fact that Lunney not only successfully filed his claims in the State Supreme Court but even won a favorable **[*29]** judgment obviously cannot support any inference of injury resulting from inadequate access to the law library. *See id.* at 166-67 (dismissing claims of four inmates complaining of an inadequate law library because each inmate was able to properly file a claim in court); *Amaker v. Coombe*, 1998 U.S. Dist. LEXIS 14523, 1998 WL 637178, at *1 (S.D.N.Y. Sept. 16, 1998) ("The very fact that the plaintiff has been able to proceed on this motion (as well as the numerous other motions filed in this case) tends to indicate that he has not been prejudiced by any lack of access to the law library."). Accordingly, Lunney has not stated a constitutional violation of his right of access to the courts under the Fifth and Fourteenth Amendments.

## 2. *First Amendment Claim of Retaliation*

Lunney states that he filed "numerous grievance complaints" regarding the conditions of his confinement in the SHU as well as the Inmate Grievance Committee's perceived lack of proper attention to inmate complaints. Compl. P 16. Lunney claims that he "was often criticized and threatened by S.H.U. staff and defendant Fischer" in retaliation for filing these grievances. *Id.* P 17. Specifically, Lunney asserts that he was **[*30]** "threatened with physical violence on several occasions by S.H.U. staff for his writing of grievances," *id.* P 19, that he was denied recreation and showers by staff who knew of his complaints, Pl. Mem. at 11, and that Fischer threatened to transfer him to Attica for writing grievances, Compl. P 19. As mentioned above, Lunney also describes being assaulted by two corrections officers after complaining about the conditions in his cell, an assault he did not report "fearing for his life and not wanting to receive another ticket." Pl. Mem. at 10.

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, including submitting grievances regarding prison conditions. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) ("Retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First

and Fourteenth Amendments and is actionable under § 1983.") (citing *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988)). To establish a prima facie case of retaliation, an inmate must show: 1) that his speech or conduct was **[*31]** constitutionally protected; 2) that the defendant took adverse action against the plaintiff; and 3) a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) (citing *Morales v. Mackalm*, 278 F.3d 126, 131 (2d Cir. 2002)). However, only those acts that are likely to "'chill a person of ordinary firmness from continuing to engage' in activity protected by the First Amendment" will support a claim of retaliation. *Rivera v. Goord*, 253 F. Supp. 2d 735, 749 (S.D.N.Y. 2003) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999)); *accord Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999) (per curiam); *Crawford-El v. Britton*, 320 U.S. App. D.C. 150, 93 F.3d 813, 826 (D.C. Cir. 1996) (en banc), *vacated on other grounds*, 523 U.S. 574, 140 L. Ed. 2d 759, 118 S. Ct. 1584 (1998).

Lunney's general allegations of threats and harassment are insufficient to state a claim because comments that are merely "insulting" or "disrespectful" do not give rise to a constitutional violation. *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) **[*32]** (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)) (sarcastic comments do not rise to the level of retaliatory action); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) ("name calling" insufficient to state a constitutional claim); *Montero v. Crusie*, 153 F. Supp. 2d 368, 376 (S.D.N.Y. 2001) ("Verbal threats or harassment, unless accompanied by physical force or the present ability to effectuate the threat, are not actionable under § 1983.") (citations omitted). In addition, "prisoners may be required to tolerate more . . . than average citizens, before a [retaliatory] action taken against them is considered adverse." *Davis*, 320 F.3d at 353 (internal citations and quotations omitted) (alterations in original). Thus, Lunney's general allegations regarding improper behavior by staff against other inmates

that he is alleged to have witnessed while confined in the SHU, Pl. Mem. at 11, do not state a claim.

Lunney makes an additional claim that defendant Fischer threatened to transfer Lunney to another facility for writing grievances. Compl. P 19. Although prisoners have no liberty interest **[*33]** in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (internal citation omitted). At least one circuit has held that threats to transfer an inmate who complained about the administration of the law library can constitute the basis of a retaliation claim, even if the inmate is never transferred. *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001). In *Gomez*, the Ninth Circuit held that because threats to transfer a prisoner had a "chilling effect" on the prisoner's exercise of his First Amendment rights, the threats were sufficient to sustain a retaliation claim. *Id.* at 1127-28

Even under the standard of *Gomez*, however, Fischer's threats cannot be said to constitute retaliation. Although Lunney is no longer at Sing Sing, he does not allege that he was transferred because he filed grievances against prison officials. In addition, Lunney does not allege that he was actually deterred from filing grievances because of Fischer's threats. Consequently, Lunney's retaliation claim against Fischer must **[*34]** fail with respect to the threatened transfer.

Nonetheless, Lunney does assert that he was threatened with physical violence for filing grievances, Compl. P 19; Pl. Mem. at 11, and thus he has stated a claim under the First Amendment. *See*, *e.g.*, *Hernandez v. Goord*, 312 F. Supp. 2d 537, 545 (S.D.N.Y. 2004) (threatened bodily injury and threats to inmate's life sufficient to state a claim); *but see Malsh v. Austin*, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) (threats of "disciplinary action, physical violence, an extension of his time in keeplock, and possible segregation" in retaliation for seeking dental care do not state a claim where plaintiff does not suffer an injury). No "greater

level of detail," Def. Reply at 5, is required for Lunney's pleading. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992 (2002). While Lunney does not allege that Selsky and Breuton had any responsibility for these retaliatory practices, he does allege that Fischer was responsible, Affirm. P 3(b), and thus he has stated a claim against Fischer. Fischer does not appear to attempt to raise a qualified immunity defense at this time with respect [*35] to the First Amendment claim. *See* Def. Reply at 9-10. Nor does he allege a lack of personal involvement to the extent a claim is stated. *See id.* at 8-9. Consequently, the First Amendment claim remains against Fischer with respect to Lunney's claims of threats of physical violence.

3. *Fourteenth Amendment Due Process Claim*

Lunney argues that his right to Due Process was violated by two separate actions. First, he argues that the defendants' failure to provide him with a timely written disposition of his second disciplinary hearing was a violation of his Due Process rights. Compl. at 7 (P 1); Pl. Mem. PP 18, 26, 27, 28. Second, Lunney claims that Selsky improperly ordered a second disciplinary hearing after an Article 78 proceeding had been filed with respect to the first hearing. Compl. P 8; Pl. Mem. at 6. Each claim will be analyzed separately. Although Lunney mentions a dispute with the hearing officer over the hearing officer's alleged bias in the second hearing, Compl. P 6, he does not appear to raise it as an additional basis for his Due Process claim.

a. *Law governing disciplinary proceedings*

A party asserting a Due Process claim "must establish [*36] (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the

ordinary incidents of prison life.'" *See Hanrahan v. Doling*, 331 F.3d 93, 97 (2d Cir. 2003) (per curiam) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995)). "Factors relevant to determining whether the plaintiff endured an atypical and significant hardship include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.'" *Palmer v. Richards*, 364 F.3d 60, 66 (2d Cir. 2004) (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)).

There is no bright line rule in determining whether [*37] a particular period of confinement in a SHU meets the *Sandin* standard of an "atypical and significant" hardship thereby implicating Due Process protection. *Palmer*, 364 F.3d at 64 (citations omitted). Defendants do not argue that Lunney's liberty interests were not implicated by his nine-month sentence of confinement to the SHU -- which was later reduced to six months - under the standard established in *Sandin*. It is assumed, therefore, that Lunney's sentence of confinement did implicate a liberty interest for purposes of this motion. Consequently, the issue is whether Lunney was denied Due Process when he was not provided with a written disposition of his disciplinary hearing and when the second hearing was scheduled.

b. *Written disposition of disciplinary hearing*

Under the Fourteenth Amendment, the following procedural protections are required in disciplinary hearings when the length or conditions of confinement trigger due process protections: "advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, [*38] including supporting facts and reasons for the action taken." *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (citing *Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999)); *accord McCann v.*

*Coughlin*, 698 F.2d 112, 121-22 (2d Cir. 1983); *Higgins v. Coombe*, 2002 U.S. Dist. LEXIS 3757, 2002 WL 362776, at *2 (S.D.N.Y. Mar. 6, 2002); *Silva v. Sanford*, 1998 U.S. Dist. LEXIS 5905, 1998 WL 205326, at *6 (S.D.N.Y. Apr. 24, 1998). The importance of providing inmates with a detailed written disposition is well established. "Without a detailed statement of the [decisionmaker's] findings and conclusions, a reviewing court or agency cannot determine whether the finding of guilt was based on substantial evidence or whether it was sufficiently arbitrary so as to be a denial of the inmate's due process rights." *Chavis v. Rowe*, 643 F.2d 1281, 1287 (7th Cir. 1981) (citation omitted). Without a written disposition of a charge, an "inmate will be at a severe disadvantage in propounding his own cause to or defending himself from others." *Wolff v. McDonnell*, 418 U.S. 539 at 565, 41 L. Ed. 2d 935, 94 S. Ct. 2963. Defendants contend that there is no Due Process violation, in part, because Lunney [*39] admits that he requested, and was granted, permission to leave the hearing. *See* Def. Mem. at 10. It is unclear why this circumstance should have any bearing on the right to receive a "written statement of the disposition," *Luna*, 356 F.3d at 487, a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell*. *See* 418 U.S. at 563.

Defendants assert that Lunney eventually received a transcript of the disposition on or about April 16, 2003, prior to the conclusion of his Article 78 proceeding. Def. Mem. at 10. The transcript does contain the required elements of the written disposition, *see* Transcript, at 59-60, but it hardly satisfies Due Process to receive such a transcript five months following the prisoner's release from the SHU. *See generally Walker v. Bates*, 23 F.3d 652, 658-59 (2d Cir. 1994) ("Once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the prison official responsible for the due process deprivation must respond in damages . . . [*40] ."). The defendants

may have a stronger argument that any Due Process violation was mitigated, or perhaps obviated, based on the allegation that Lunney was informed of the results of the disposition, or was otherwise given the opportunity to obtain the written disposition, but no such facts are available to the Court on this motion to dismiss. *See McKenna*, 386 F.3d at 436 ("The plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense.").

Finally, defendants argue that New York law provides that the remedy for failure to provide a written disposition is an order that the disposition be served, not that the penalty be expunged. Def. Mem. at 10-11 (citing *Vargas v. Coughlin*, 168 A.D.2d 917, 566 N.Y.S.2d 571 (4th Dep't 1990) and *Matter of Ramos v. Herbert*, 256 A.D.2d 1191, 685 N.Y.S.2d 143 (4th Dep't 1998)). The defendants' argument is irrelevant, however, as Lunney is seeking damages for a violation of the federal constitution, not for a violation of state law.

The defendants' argument on qualified immunity for this claim is confusing. They assert that the "plaintiff [*41] has failed to identify any Supreme Court or Second Circuit case law that clearly establishes a right to receive a written copy of a disciplinary hearing decision." Def. Reply at 9. This may be literally true inasmuch as Lunney notes that "the State of New York and the [Department of Correctional Services] have promulgated regulations and procedures governing disciplinary hearings in prison so as to comply with those minimal due process requirements established by the Supreme Court in *Wolff v. McDonnell*," but only claims that "these regulations and procedures were not followed." Pl. Mem. at 16. The issue, however, is not what legal argument Lunney has been able to muster but whether or not there is clearly established law requiring a written disposition of disciplinary charges. Tellingly, defendants make no reasoned argument that this right is not clearly established. While they assert that *Ramos* and *Vargas* have cast doubt on whether

an inmate is entitled to a written disposition of the charges, both cases in fact explicitly affirm the existence of such a right and *Ramos* actually identifies the entitlement as a requirement of "due process." 256 A.D.2d at 1192. **[*42]**

As already noted, *Wolff* unambiguously established the right to receive a written notice of the disposition. *Wolff*, 418 U.S. at 563-65. Second Circuit case law has reaffirmed this requirement. *See Luna*, 356 F.3d at 487; *Kalwasinski*, 201 F.3d at 108; *McCann*, 698 F.2d at 121-22. Further, courts have rejected other claims that procedural rights set forth under *Wolff* are not clearly established. *See*, *e.g.*, *Pino v. Dalsheim*, 605 F. Supp. 1305, 1314 n.9 (S.D.N.Y. 1985) (decisions in *Wolff* and in subsequent litigation put Department of Corrections staff on notice with respect to constitutional principles at stake in disciplinary proceedings). While additional specifics regarding the circumstances under which defendants did not supply Lunney with this written disposition might show that "a reasonable person, acting under the circumstances then confronting [the] defendant, would [not] have understood that his actions were unlawful," *Hanrahan*, 331 F.3d at 98 (internal citation and quotation omitted), that determination cannot be made in the context of this motion to **[*43]** dismiss. Accordingly, Lunney's claim must stand.

### c. *Validity of the second disciplinary hearing*

Lunney claims that his Due Process rights were violated when Selsky ordered a rehearing after Lunney exhausted his administrative appeals and had commenced an Article 78 proceeding. *See* Compl. P 8, *id.* at 7 (P 1). Lunney argues that because Justice Sheridan of the New York Supreme Court found that the rehearing was invalid under New York law, he should be entitled to collateral estoppel. Pl. Mem. at 14.

The collateral estoppel doctrine "prevents a party from relitigating an issue decided against that party in a prior adjudication." *Curry v. City of Syracuse*, 316 F.3d 324, 331 (2d Cir. 2003) (citation and quotation omitted). Lunney's argument is rejected because no determination was made by the State Supreme Court of any issue of federal law, let alone the issue of "qualified immunity." *See id.* (collateral estoppel "may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate") (citation and quotation omitted). Indeed, **[*44]** as a general matter, the Second Circuit has held that Article 78 judgments may not be used to estop defendants from litigating the same claims in § 1983 lawsuits because the incentive to litigate is not the same and the defenses available in § 1983 suits are not available in Article 78 proceedings. *See Gutierrez v. Coughlin*, 841 F.2d 484, 486 (2d Cir. 1988) (per curiam).

Lunney's argument on the merits is also unavailing. Whatever violation Lunney claims of New York law is not relevant because violations of state procedural rules are not necessarily violations of the federal constitution. *See*, *e.g.*, *Shakur v. Selsky*, 391 F.3d 106, 118-19 (2d Cir. 2004); *Russell v. Coughlin*, 910 F.2d 75, 78 n.1 (2d Cir. 1990). The Court is not aware of any cases suggesting that the federal Due Process clause bars the ordering of a second hearing and it is not clear why this should even be the case. As long as the essential requirements of Due Process were met -- such as notice of the charges and a hearing conducted in accordance with Due Process, *see*, *e.g.*, *Luna*, 356 F.3d at 487 -- there is no basis on which to conclude **[*45]** that Lunney's constitutional rights were violated.

### d. *Personal involvement*

Lunney charges Brureton, Fischer, and Selsky with violations of his Due Process rights at the prison disciplinary hearing. *See* Pl. Mem. P 3(d). Each defendant's personal involvement is examined in turn.

The basis for Lunney's Due Process claim against Lieutenant Brureton is Brureton's role as a hearing officer in the rehearing that began October 15, 2002

2005 U.S. Dist. LEXIS 770, *45

at which Lunney was eventually sentenced to SHU confinement. Compl. PP 6, 21; Pl. Mem. at 18. Defendants do not contest that Brureton's involvement in the disciplinary hearing is sufficient to allege personal involvement and thus he remains as a defendant on this claim.

Lunney's Due Process claim against Fischer stems from Fischer's failure to correct Brureton's procedural error when the plaintiff applied for a Superintendent's Review immediately after the disciplinary hearing. Compl. P 7; Pl. Mem. at 18. With respect to his Due Process claims, Lunney has not adequately alleged Brian Fischer's personal involvement. Although Lunney filed a Request for Superintendent's Review with Brian Fischer, the review of the second hearing was conducted **[*46]** by the First Deputy Superintendent of Sing Sing, Paul Kikendall. Compl. P 7. Lunney does not allege that Fischer himself had any involvement with deciding the appeal or reviewing Kikendall's disposition of the appeal. Mere "linkage in the prison chain of command" is insufficient to ground a claim of personal involvement, *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam) (citations omitted), and submitting an appeal or complaint to a subordinate for disposition is not sufficient to find personal involvement, *see Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (referring an appeal from an administrative segregation hearing to another official for determination and responding to an inquiry regarding the status of the appeal insufficient to create personal involvement); *Farid v. Goord*, 200 F. Supp. 2d 220, 235 (W.D.N.Y. 2002) (no personal involvement where a prisoner's petition was received by defendant but "sent . . . down the chain of command for investigation"). Therefore, the Due Process claims against Fischer must be dismissed.

With respect to Selsky, he is sued only because he ordered the second hearing -- a claim **[*47]** that we have determined is subject to a qualified immunity defense -- and for "failing to provide plaintiff with a written copy of the hearing disposition." Pl. Mem. at 18. But no facts are alleged showing his

involvement in this latter failure. Lunney asserts that he appealed to the Commissioner of the Department of Correctional Services and that, while the appeal was "turned over" to Selsky for review and consideration, Compl. P 8, it was ultimately decided by Robert J. Murphy, *id.* P 9; Hearing Review, who has not been named as a defendant. Accordingly, the claim against Selsky cannot proceed. *Cf. Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986) (personal involvement stated where defendant superintendent of prison either affirmed improper disciplinary conviction, was directly responsible for the conduct of prison disciplinary hearings, or permitted the challenged unconstitutional practice to occur as a matter of custom or policy).

III. *CONCLUSION*

For the foregoing reasons, the defendants' motion should be granted in part and denied in part. Specifically, the following claims should remain in the case: (1) the Eighth Amendment claim against Fischer **[*48]** with respect to improperly prepared food; (2) the First Amendment claim against Fischer alleging that Lunney was threatened with physical retaliation for filing grievance complaints; and (3) the Due Process claim against Brureton regarding the failure to receive a written disposition of his disciplinary hearing. The remaining claims should be dismissed. Lunney should be given the opportunity to file an amended complaint in the event that he can cure any of the defects in his original complaint. *See*, *e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("it is the usual practice upon granting a motion to dismiss to allow leave to replead") (citing cases), *cert. denied*, 503 U.S. 960 (1992).

**PROCEDURE FOR FILING OBJECTIONS TO THIS**

**REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)

2005 U.S. Dist. LEXIS 770, *48

of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed. R. Civ. P. 6(a), (e). Such objections **[*49]** (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn*, 474 U.S. 140, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985).

Dated: January 21, 2005

New York, New York

GABRIEL W. GORENSTEIN

United States Magistrate Judge

---

**End of Document**



# Lunney v. Brureton

United States District Court for the Southern District of New York

February 23, 2005, Decided

04 Civ. 2438 (LAK)

**Reporter**
2005 U.S. Dist. LEXIS 2822 *; 2005 WL 433285

GEORGE LUNNEY, Plaintiff, -against- LIEUTENANT BRURETON, et al., Defendants.

**Subsequent History:** Summary judgment proceeding at, Magistrate's recommendation at Lunney v. Brureton, 2007 U.S. Dist. LEXIS 38660 (S.D.N.Y., May 25, 2007)

**Prior History:** Lunney v. Brureton, 2005 U.S. Dist. LEXIS 770 (S.D.N.Y., Jan. 21, 2005)

**Counsel:** For Brureton, Brian Fischer, Donald Selsky, Defendants: Benjamin J. Lee, New York State Office of the Attorney General, New York, NY.

For George Lunney, Plaintiff: PRO SE, Collins, NY.

**Judges:** **[*1]** Lewis A. Kaplan, United States District Judge.

## Opinion

### ORDER

LEWIS A. KAPLAN, *District Judge.*

Plaintiff's objections to the report and recommendation of Magistrate Judge Gabriel W. Gorenstein are overruled. Defendants' motion to dismiss is granted to the extent set forth at page 29 of the report and recommendation and otherwise denied.

SO ORDERED.

Dated: February 23, 2005

Lewis A. Kaplan

United States District Judge

**End of Document**



# Mayo v. Bauer

United States District Court for the Western District of New York

March 29, 2016, Decided; March 29, 2016, Filed

13CV104A

**Reporter**

2016 U.S. Dist. LEXIS 42681 *

MATTHEW J. MAYO, Plaintiff, v. D. BAUER, et al., Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by Mayo v. Bauer, 2016 U.S. Dist. LEXIS 62562 (W.D.N.Y., May 9, 2016)

**Counsel:** **[*1]** Matthew J. Mayo, Plaintiff, Pro se, Elmira, NY.

For D. Bauer, Corrections Officer; Attica Correctional Facility, B. Hembrook, Corrections Officer; Attica Correctional Facility, R. Hansen, Corrections Officer; Attica Correctional Facility, Superintendent Powell, OMH, Chief of Staff; Attica Correctional Facility, C.O. Anderson, OMH; Case Worker/Counselor; Attica Correctional Facility, Defendants: Kathleen M. Kaczor, LEAD ATTORNEY, Attorney General's Office, Buffalo, NY.

**Judges:** Hon. Hugh B. Scott, United States Magistrate Judge.

**Opinion by:** Hugh B. Scott

# Opinion

## Report & Recommendation

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(C) (Docket No. 13). The instant matter before the Court is a motion of defendants (Docket No. 22, May 19, 2015) for summary judgment.

At a status conference prior to filing of this motion, plaintiff (an inmate proceeding <u>pro se</u>) orally requested appointment of counsel (Docket No. 21; <u>see</u> Docket No. 31). This Court indicated that it would review that application and would determine if counsel could be appointed for him (Docket No. 21); to date, counsel has not been found.

Meanwhile, response to defendants' motion was due by June 19, 2015, and any reply by July 2, 2015, with the motion **[*2]** deemed submitted on July 2, 2015 (Docket No. 31). Plaintiff did not respond.

## BACKGROUND

This is a <u>pro se</u> civil rights action alleging excessive force while plaintiff was incarcerated at Attica Correctional Facility ("Attica") on September 24, 2012 (Docket No. 1, Compl.; <u>see</u> Docket No. 22, Defs. Statement ¶ 1). The first cause of action alleged cruel and unusual punishment in violation of the Eighth Amendment (Docket No. 1, Compl. at page 17 of 18). In the second cause of action, plaintiff alleges that his Fourth, Ninth, and Fifth Amendment rights were violated, presumably from the alleged sexual assault and sexual harassment (<u>id.</u>). In the third cause of action, plaintiff claims that, as a mental health patient for the last fifteen years and having never experienced such treatment, was left severely scarred physically, mentally, and emotionally (<u>id.</u>).

He seeks $250,000 in compensatory damages, regularly scheduled physical therapy and mental health sessions and to have defendants "prosecuted & tried to the full extent of Justice" (id. at page 18 of 18).

Plaintiff filed this action in the United States District Court for the Northern District of New York (Docket No. 1) and that court transferred this action to this Court (Docket No. 4). Plaintiff [*3] moved for poor person status (Docket No. 2), which this Court granted (Docket No. 6). Defendants answered on June 27, 2013 (Docket No. 12).

According to defendants' unopposed Statement (Docket No. 22, Defs. Statement; see infra), plaintiff testified that he attempted self-harm by cutting himself on September 24, 2012, with a staple from his legal papers (Docket No. 22, Defs. Statement ¶¶ 2-4). As plaintiff was removed out of his cell following this attempt, plaintiff claims that he argued with one corrections officer, defendant Hembroke, but Hembroke denies this occurred (id. ¶¶ 5-6). Plaintiff claims that he was assaulted by unknown officers during the transport from his cell (id. ¶ 7), but not any of the named defendant officers in this case (id. ¶ 8). Plaintiff never complained of injuries from this alleged assault (id. ¶¶ 9-10). Plaintiff does not know who he asked for medical assistance (id. ¶ 12).

At the Residential Crisis Treatment Program (or "RCTP") in the Mental Health Unit ("MHU") (id. ¶¶ 9, 80; Docket No. 1, Compl. at 5), plaintiff complains he was denied a spork, toothbrush, and ability to shower (Docket No. 22, Defs. Statement ¶ 13; Docket No. 1, Compl. at 6). Because inmates [*4] in RCTP are at a greater risk for self-harm (such as the reason for plaintiff's placement), they are not afforded certain amenities that may be used to inflict further harm (Docket No. 22, Defs. Statement ¶ 18). Plaintiff's treatment notes indicated that plaintiff still exhibited suicidal ideation (id. ¶ 19). Thus, it was appropriate to deny plaintiff implements (such as a spork or toothbrush)

that he could use to further harm himself (id. ¶ 20); instead, plaintiff was given a smaller toothbrush and cardboard utensils that could not be used to harm him (id. ¶¶ 21, 22). There was no deprivation order to deny plaintiff showers, in fact he was issued shower shoes while in RCTP (id. ¶ 23). Also the record did not indicate that plaintiff complained of these alleged deprivations (id. ¶ 24).

Plaintiff next complains that defendant corrections officer Bauer performed a pat frisk on him when he was transferred from MHU to his cell (id. ¶ 25), alleging that he was groped and touched wrong (id. ¶ 26). To detect concealed contraband, pat frisks inspect the crotch and buttocks (id. ¶¶ 27-28) with searches in those areas necessary and for legitimate penological purposes (id. ¶ 30). Bauer claims that [*5] he did the frisk not in a lewd or sexual manner (id. ¶ 29).

When he returned to his cell, plaintiff found toilet tissue and other material clogging the toilet, which he tried to unclog (id. ¶¶ 33-34). Plaintiff requested cell cleanup and, without this, proceeded to clean the toilet himself, falling back and hitting himself (id. ¶¶ 35-38). The cell was locked for the sixteen days plaintiff was in MHU (id. ¶ 40) and officers could not enter (id. ¶ 41). Plaintiff claims he asked defendant officer Hansen for a towel and soap but does not know if he delivered these items (id. ¶¶ 42-43) and Hansen has no knowledge of the incident (id. ¶ 44). Plaintiff does not know if Cell Services, the agency responsible for cell maintenance and mechanical issues, was contacted about his cell (id. ¶¶ 46, 47).

Plaintiff next claims that individuals in the MHU denied him items (such as toiletries and legal work) in his special housing unit cell following his return from RCTP (id. ¶¶ 48-50). Plaintiff recognized that he would get these items back once he acted appropriately in light of his attempted self-harm (id. ¶¶ 51-52). Plaintiff claims that he should have had the items returned to him upon his discharge [*6] from RCTP (id. ¶ 53). Treatment plans following discharge from MHU includes following the patient

to monitor suicidal behavior, mental stability, and functionality outside of MHU (id. ¶ 54). Plaintiff in his deposition later testified that he admitted to previous attempts at self-harm with items in his cell (id. ¶ 62) and self-harm after he left Attica (id. ¶ 59). Plaintiff was to be transferred to Upstate Correctional Facility ("Upstate") and his personal items were packed up for that move (id. ¶¶ 67, 70). Defendant Anderson, social worker in RCTP, states that he lacks authority on his own to return an inmate's personal effects (id. ¶ 63).

Plaintiff does not know how his Fourth, Fifth, or Ninth Amendment rights were violated, as alleged in the Complaint (id. ¶ 87). He claims that he suffered from emotional scarring but denied being deprived a religious meal (id. ¶¶ 88, 89-90). He claims that he made a verbal grievance (id. ¶ 93), claiming that he did not have paper or pen until he arrived at Upstate (id. ¶¶ 94, 106) on October 18, 2012 (id. ¶ 108). Plaintiff admits that he knew of the grievance procedures but did not pursue them (id. ¶¶ 98, 103-04; see id. ¶¶ 95-97, 100-02). Plaintiff did not file a grievance, **[*7]** seek an extension of time to file a grievance, and had paper and pen available to file a grievance within the time allotted (with extension) for filing (id. ¶¶ 109-10, 111-14, 115). Instead, plaintiff made oral complaints at Upstate, but the grievance process does not allow for verbal grievances (id. ¶ 117). There are no appeals of any complaints or grievances (id.¶ 118). Plaintiff failed to exhaust his administrative remedies (id. ¶ 119); furthermore, plaintiff did not file a grievance for being deprived of pen and paper (id. ¶ 120).

*Defendants' Summary Judgment Motion*

Defendants moved for summary judgment (Docket No. 22), including notice to plaintiff that his failure to respond might lead to granting judgment to defendants and dismissal of the action (id., Notice of Motion at 2). Defendants argue that sovereign immunity bars plaintiff's action by not specifying whether plaintiff sued defendants in their official (thus immune) or individual capacities (Docket No. 22, Defs. Memo. at 2-3). Next, they claim that plaintiff failed to exhaust his administrative remedies (id. at 3-9). Defendants contend that plaintiff fails to state a claim for sexual assault arising from the single pat frisk (id. at 9-10) or **[*8]** his verbal harassment claim (id. at 10-11). Plaintiff cannot hold the named defendants liable for an alleged assault by unknown officers (id. at 11-12). Defendants next argue that plaintiff cannot show that they subjected him to cruel and unusual punishment in his confinement (id. at 12-21). Plaintiff also cannot claim compensatory damages because he fails to allege any physical injury (id. at 21-22). Plaintiff's Fourth, Fifth, and Ninth Amendment claims fail (on plaintiff's own admission) because he fails to state claims under these Amendments (id. at 22-23). Finally, defendants claim qualified immunity (id. at 23).

## DISCUSSION

I. Applicable Standards

A. Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003); Fed. R. Civ. P. 56(a) (effective Dec. 2010). The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists. In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Ford, supra, 316 F.3d at 354. "A dispute regarding **[*9]** a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1535 (2d Cir.) (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106

2016 U.S. Dist. LEXIS 42681, *9

S. Ct. 2505, 91 L. Ed. 2d 202 (1986)), cert. denied, 522 U.S. 864, 118 S. Ct. 169, 139 L. Ed. 2d 112 (1997). While the moving party must demonstrate the absence of any genuine factual dispute, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986), the party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original removed); McCarthy v. American Intern. Group, Inc., 283 F.3d 121, 124 (2d Cir. 2002); Marvel Characters v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002). The opponent to summary judgment may argue that he cannot respond to the motion where it shows, by affidavit, "that, for specified reasons, it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d).

The Local Civil Rules of this Court require that movant and opponent each submit "a separate, short, and concise" statement of material facts, and if movant fails to submit such a statement it may be grounds for denying the motion, W.D.N.Y. Loc. Civ. R. 56(a)(1), (2) (effective Jan. 1, 2011). The movant is to submit facts in which there is no genuine issue, id. R. 56(a)(1), while the opponent submits an opposing statement of material facts as to which it is contended that there **[*10]** exists a genuine issue to be tried, id. R. 56(a)(2). Each numbered paragraph in the movant=s statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id. Each statement of material fact is to contain citations to admissible evidence to support the factual statements and all cited authority is to be separately submitted as an appendix to that statement, id. R. 56(a)(3).??

Here, plaintiff did not respond or ask for extension of time to respond or await action on his application for appointment of counsel. Under this Court's local rules, the unopposed statement of fact from defendants is deemed admitted, W.D.N.Y. Loc. Civ. R. 56(a)(2).

B. Cruel and Unusual Punishment Under the Eighth Amendment

The Eighth Amendment provides that "excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted," U.S. Const. Amend. VIII. The Eighth Amendment prohibits inhumane conditions of confinement, see Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001); Phillips v. Roy, No. 9:08-CV-878, 2011 U.S. Dist. LEXIS 96615, at *41 (N.D.N.Y. Aug. 29, 2011). For an Eighth Amendment conditions of confinement cruel and unusual punishment claim, plaintiff needs to prove the objective and subjective components of that claim, Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The Eighth Amendment is violated if two tests are met, Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997). First, the punishment must be "objectively, **[*11]** sufficiently serious," id. (quoting Farmer, supra, 511 U.S. at 834) (Docket No. 22, Defs. Memo. at 13). Second, plaintiff has to establish subjectively that defendants knew the excessive risk and disregarded it (id.).

II. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate plaintiff to exhaust his administrative remedies before suing under 42 U.S.C. § 1983 complaining about prison conditions. Under Hemphill and other cases, Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004) (citing cases, discussed below), there is a three-part inquiry whether prisoner plaintiff can plausibly counter defendants' contention that plaintiff failed to exhaust. First, are there administrative remedies in fact available to plaintiff, Abney v. McGinnis, 380 F.3d 663 (2d Cir. 2004). Second, whether defendants forfeited the affirmative defense of non-exhaustion, Johnson v.

Testman, 380 F.3d 691 (2d Cir. 2004), or whether defendant's actions inhibited plaintiff from exhausting remedies. And, third, whether "special circumstances" exist to justify plaintiff's failure to exhaust, Giano v. Goord, 380 F.3d 670 (2d Cir. 2004). Hemphill, supra, 380 F.3d at 686.

Here, the first and second questions are combined in whether denial of paper and pen to plaintiff while in Attica (prior to his transfer to the Upstate) and plaintiff's subsequent oral grievances at Upstate excuse plaintiff's failure to exhaust. This also falls under the [*12] third question of whether "special circumstances" exist to justify plaintiff's failure. "A prisoner may invoke 'estoppel when defendants took affirmative action to prevent him from availing himself of grievance procedures,' such as 'verbal and physical threats of retaliation, physical assault, [or] denial of grievance forms or writing implements,'" Heyliger v. Gebler, 624 Fed. App'x 780, 782 (2d Cir. 2015) (summary order, quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011) (internal quotation marks omitted)); Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004).

Defendants here establish that plaintiff had time (up to 45 days with extension, if sought) to file a written grievance while at Attica and plaintiff had the ability to file a timely written grievance when he arrived at Upstate. Had plaintiff remained at Attica beyond the period for filing a written grievance and was denied access to writing materials (due to his mental condition) that might have been grounds for "special circumstances" to excuse his failure to grieve, but plaintiff never complained that he was denied writing implements (even though he was not allowed toiletries or legal papers) and plaintiff had the opportunity to file a written grievance upon his transfer to Upstate. Plaintiff did not claim his deprived legal papers included materials to file new grievances. [*13] He submitted a written complaint on September 12, 2012, at Attica regarding his religious diet (Docket No. 1, Compl. at page 14 of 18). Defendants also point to the Complaint in this action, dated November 19, 2012, within the 45-day period for a

written grievance, written by plaintiff on paper and with a pen (Docket No. 22, Defs. Memo. at 8; cf. Docket No. 1, Compl.). This shows that plaintiff had access to writing materials in both facilities that he cannot argue defendants were estopped from raising the exhaustion defense.

Plaintiff failed to exhaust his administrative remedies and had the means to do so. Defendants' motion (Docket No. 22) for summary judgment should be **granted**.

III. Plaintiff's Claims

Assuming plaintiff somehow grieved his claims, these claims arise from plaintiff's removal from his cell to the RCTP and his return prior to reassignment to Upstate. On the removal from his cell claims, plaintiff does not allege them against the present defendants, did not allege John Does as defendants, and does not allege a connection between the named parties and the unknown guards. These claims thus should be **dismissed**. On the denial of a spork and his toothbrush in the RCTP, legitimate [*14] penological and safety purposes exist for that deprivation. Defendants afforded plaintiff with safer alternatives given that he was placed in RCTP due to his self-harm. There also was no proof of plaintiff being deprived a shower while he was in RCTP. These claims also **should be dismissed**. Similarly, penological reasons exist for depriving certain personal effects after plaintiff returned from RCTP because he was on observation after his discharge. When he was deemed well enough to receive these items, he was being transferred to Upstate and had his personal effects packed for that transfer; it made little sense to give him items that would be packed up prior to his relocation. These claims as well **should be dismissed**.

On Bauer's pat frisk after plaintiff's discharge from RCTP, penological, safety and security grounds exist for frisking plaintiff's buttocks and groin. These claims also **should be dismissed**. Accepting plaintiff's version of events, it constitutes a single, isolated incident. An isolated instance is not

actionable under the Eighth Amendment, Boddie, supra, 105 F.3d at 861. Under Boddie, sexual abuse by a corrections officer may constitute cruel and unusual punishment violative of the Eighth Amendment if it is "severe or repetitive," **[\*15]** id. Under the Second Circuit's subsequent decision in Crawford v. Cuomo, 796 F.3d 252 (2d Cir. 2015), the court clarified the standard set forth in Boddie, stating that a "single incident of sexual abuse, **if sufficiently severe or serious**, may violate an inmate's Eighth Amendment rights no less than repetitive abusive conduct," 796 F.3d at 257 (emphasis added), and that "a corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or to humiliate the inmate, violates the Eighth Amendment," id. As noted by Judge William Skretny in McCray v. Sedita, No. 15cv425, 2015 U.S. Dist. LEXIS 140992, at \*13 (W.D.N.Y. Oct. 8, 2015) (quoting Crawford, supra, 796 F.3d at 257-58), the principal inquiry "is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate," 2015 U.S. Dist. LEXIS 140992, at \*13. Aside from defendant's Bauer's denial, plaintiff does not claim sexual gratification or other illicit reason for the pat frisk. Plaintiff only alleges this single incident following his transfer from RCTP and does not allege a sufficient severe or egregious contact to make it actionable. Plaintiff's claim arising from that pat **[\*16]** frisk therefore **should be dismissed**.

As for the clogged toilet, the toilet was unattended while plaintiff was in the RCTP and was clogged for one day after plaintiff's return to his cell. That does not meet the objective standard for constituting cruel and unusual punishment. "The Eighth Amendment 'does not mandate comfortable prisons,' Rhodes v. Chapman, 452 U.S. 337, 349, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981), but prisons nevertheless 'must provide humane conditions of confinement,' Farmer . . ., [511 U.S. at 832],"

Willey v. Kirkpatrick, 801 F.3d 51, 66 (2d Cir. 2015). In Willey, supra, 801 F.3d at 66, and Gaston v. Coughlin, 249 F.3d 156, 161 (2d Cir. 2001), inmate plaintiffs were exposed to human waste over several days and the Second Circuit held in both cases that it unwilling to adopt as a matter of law that it was "not cruel and unusual punishment for prison officials knowingly to allow an area to remain filled with sewage and excrement for days on end," Gaston, supra, 249 F.3d at 166; Willey, supra, 801 F.3d at 66. Here, defendants had locked plaintiff's cell during his time at the RCTP and did not access to it (see Docket No. 22, Defs. Memo. at 17-18; Docket No. 22, Defs. Statement ¶¶ 41, 44). Plaintiff, after he returned to the cell, was exposed to the accumulated waste for one day. Such exposure was too brief to constitute cruel and unusual punishment or to shock the conscience that an inmate would be exposed in such a manner, cf. Willey, supra, 801 F.3d at 67 (citing cases with at least three **[\*17]** days or more exposure to inmate's own waste). Plaintiff's claims here also **should be denied**.

Defendants claim that plaintiff alleges claims under the Fourth, Fifth, and Ninth Amendments, but later denied knowing how rights under those Amendments were violated (Docket No. 22, Defs. Statement ¶ 87). As potentially applicable to plaintiff's claims, the Fourth Amendment involves searches and seizures, the Fifth Amendment involves due process in legal proceedings, while the Ninth Amendment states that "the enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people," U.S. Const. Amend. IX. If alleged as violations of these rights arising from the pat frisk discussed above, plaintiff's claims should be **dismissed**. Plaintiff fails to allege what other, unenumerated rights were violated by defendants. Thus, these claims also **should be dismissed**.

In sum, plaintiff's claims should be dismissed and defendants' motion for summary judgment (Docket No. 22) to that effect **should be granted**.

III. Qualified Immunity

Finally, defendants argue in the alternative that they are entitled to qualified immunity (Docket No. 22, Defs. Memo. at 23). When confronted by a claim of qualified immunity, one of the first questions for the Court to **[*18]** resolve is whether the facts, taken in the light most favorable to the party asserting the injury, show the official's conduct violated a constitutional right. See Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). As required by the Saucier Court, this Court first considered the constitutional question, then considered the qualified immunity question, id. But the Supreme Court in Pearson v. Callahan, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009), overruled Saucier in requiring courts to first determine whether a constitutional violation occurred before considering whether defendants enjoy qualified immunity. Instead, district courts determine in each case whether to consider first the question of immunity or whether a constitutional violation has occurred, id. at 231-32.

Government officials performing discretionary functions generally are shielded by qualified immunity from liability in their individual capacities, see Frank v. Relin, 1 F.3d 1317, 1327 (2d Cir. 1993), "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). "If it was objectively reasonable for the defendant to believe that his act did not violate the plaintiff's constitutional rights, the defendant may nevertheless be entitled to qualified immunity." Anderson v. Creighton, 483 U.S. 635, 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987); Lowth v. Town of Cheektowaga, 82 F.3d 563, 568-69 (2d Cir. 1996).

Given the recommendations above on the merits **[*19]** of plaintiff's claims, this Court need not address defendants' claim to qualified immunity.

IV. Plaintiff's Oral Application for Appointment of Counsel

Prior to defendants' motion, plaintiff urged this Court to appoint counsel, contending that his mental health condition required assistance (Docket No. 21). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc., 865 F.2d 22, 23 (2d Cir. 1988). Assignment of counsel in this matter is clearly within the judge's discretion, see In re Martin-Trigona, 737 F.2d 1254 (2d Cir. 1986). The factors to be considered in deciding whether or not to assign counsel are set forth by the Second Circuit in Hodge v. Police Officers, 802 F.2d 58 (2d Cir. 1986). Counsel may be appointed in cases filed by indigent plaintiffs where it appears that such counsel will provide substantial assistance in developing petitioner's arguments, the appointment will otherwise serve the interests of justice, and where the litigant has made "a threshold showing of some likelihood of merit," Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir. 1989).

The Court has reviewed the facts presented herein in light of the factors required by law, including the analysis above on defendants' motion for summary judgment. Based on this review, plaintiff's motion for appointment of counsel is **DENIED WITHOUT PREJUDICE AT THIS TIME**. Despite plaintiff's mental condition **[*20]** on record before this Court, he is capable enough to prosecute this action and to respond to defendants' motion. Plaintiff cannot make the threshold showing of some likelihood of merit and assistance of counsel would not help in resisting defendants' present motion.

## CONCLUSION

Based upon the above, it is recommended that defendants' motion for summary judgment (Docket No. 22) be **granted**.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation

to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b) (effective December 1, 2009) and W.D.N.Y. Local Civil Rule 72.3(a)**.

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME OR TO REQUEST AN EXTENSION OF SUCH TIME WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT DISTRICT COURT'S ORDER ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN**. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d Cir. 1995); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The District Court on de novo review will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. See Paterson-Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. Local Civil Rule 72.3(a)(3), "written objections shall specifically identify the portions of the proposed findings and recommendations **[*21]** to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District Court's refusal to consider the objection**.

SO ORDERED.

*/s/ Hugh B. Scott*

Hon. Hugh B. Scott

United States Magistrate Judge

Dated: Buffalo, New York

March 29, 2016

---



# Mayo v. Bauer

United States District Court for the Western District of New York

May 9, 2016, Decided; May 10, 2016, Filed

13-CV-104A

**Reporter**

2016 U.S. Dist. LEXIS 62562 *

MATTHEW J. MAYO, Plaintiff, v. D. BAUER, et al., Defendants.

**Prior History:** Mayo v. Bauer, 2016 U.S. Dist. LEXIS 42681 (W.D.N.Y., Mar. 29, 2016)

**Counsel:** **[*1]** Matthew J. Mayo, Plaintiff, Pro se, Elmira, NY.

For D. Bauer, Corrections Officer; Attica Correctional Facility, B. Hembrook, Corrections Officer; Attica Correctional Facility, R. Hansen, Corrections Officer; Attica Correctional Facility, Superintendent Powell, OMH, Chief of Staff; Attica Correctional Facility, C.O. Anderson, OMH; Case Worker/Counselor; Attica Correctional Facility, Defendants: Kathleen M. Kaczor, LEAD ATTORNEY, Attorney General's Office, Buffalo, NY.

**Judges:** HONORABLE RICHARD J. ARCARA, UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICHARD J. ARCARA

## Opinion

DECISION AND ORDER

The above-referenced case was referred to Magistrate Judge Hugh B. Scott, pursuant to 28 U.S.C. § 636(b)(1)(B). On March 29, 2016, Magistrate Judge Scott filed a Report and Recommendation (Dkt. No. 33), recommending that defendants' motion for summary judgment

(Dkt. No. 22) be granted.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Scott's Report and Recommendation, defendants' motion for summary judgment is granted.

The Clerk **[*2]** of Court shall take all steps necessary to close the case.

IT IS SO ORDERED.

*/s/ Richard J. Arcara*

HONORABLE RICHARD J. ARCARA

UNITED STATES DISTRICT COURT

Dated: May 9, 2016

**End of Document**



# Monko v. Cusack

United States District Court for the Northern District of New York

July 25, 2013, Decided; July 25, 2013, Filed

9:11-CV-1218 (GTS/TWD)

**Reporter**

2013 U.S. Dist. LEXIS 142053 *

DANIEL K. MONKO, Plaintiff, v. ROBERT CUSACK, CORRECTIONS OFFICER; GERALD GARDNER, CORRECTIONS LIEUTENANT, Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Dismissed by Monko v. Cusack, 2013 U.S. Dist. LEXIS 139074 (N.D.N.Y, Sept. 27, 2013)

**Counsel:**  [*1] DANIEL K. MONKO, Plaintiff, Pro se, Elmira, New York.

For Defendant: KEVIN P. HICKEY, ESQ., Assistant Attorney General, OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, New York.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

# Opinion

## REPORT-RECOMMENDATION AND ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation pursuant to 28

U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).[1] Plaintiff alleges in his Amended Complaint that Defendant Robert Cusack ("Cusack"), a Corrections Officer at Shawangunk Correctional Facility ("Shawangunk"), violated his First and Fourteenth Amendment rights by filing two false misbehavior reports against him in retaliation for Plaintiff's verbal complaint to regular area supervisor, Corrections Sergeant Lutz ("Lutz"), that he was not being given contraband receipts when food items were removed from his cell. (Dkt. No. 28-3 at 41-43.) Defendant Gerald Gardner ("Gardner"), a Corrections Lieutenant at Shawangunk and hearing officer at the disciplinary proceedings on the two misbehavior reports, is alleged to have found Plaintiff [*2] guilty despite the clear and compelling nature of Plaintiff's defense, and to have imposed sanctions against him. (Dkt. Nos. 12 at ¶¶ 57-62; 12-2 at 21-22, 33-34.) Plaintiff has asserted claims against Gardner for both retaliation and for violation of his Fourteenth Amendment right to due process in finding Plaintiff guilty of the charges in the allegedly false misbehavior reports. (Dkt. No. 12 at ¶¶ 83-84, 87-88.)

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 28.) Plaintiff has opposed the motion. (Dkt. No. 35.) For the reasons that follow, I recommend that Defendants' motion be granted.

---

[1] *See* Text Entry of October 29, 2012.

2013 U.S. Dist. LEXIS 142053, *2

# I. BACKGROUND

## A. Daily Cell Searches and Confiscation of Food Without Issuing Contraband Receipts

Plaintiff has been incarcerated within the Department of Corrections and Community Supervision ("DOCCS") system since September of 1985. (Dkt. No. 28-3 at 13.) During the late summer and early fall of 2010, the time period relevant to Plaintiff's claims, he was confined at Shawangunk. *Id.* at 14, 16. Plaintiff had been at Shawangunk since 2001. *Id.* at 14.

Plaintiff was placed **[*3]** in the Special Housing Unit ("SHU") at Shawangunk in early August of 2010 for a contraband-related infraction. *Id.* at 26; Dkt. No. 28-4 at ¶ 7. He was housed with twelve or so other inmates when corrections officer David Degraff ("Degraff") moved from the night shift to the day shift. (Dkt. No. 28-3 at 16.) During the months of July and August of 2010, every time one particular inmate left his cell for a shower or his hour of recreation, Degraff went into his cell and took out food items. *Id.*; Dkt. No. 12 at ¶ 22. When that inmate began writing grievances complaining that Degraff was singling him out, Degraff started going into all of the inmate's cells and removing, among other things, food items that inmates had saved from breakfast to consume later in the day. (Dkt. No. 12 at ¶ 23.) Degraff told inmates who complained that they could blame the inmate who had filed the grievances. (Dkt. No. 28-3 at 18-19.) On September 10, 2010, when it became clear to Plaintiff that Degraff was trying to pit one inmate against another, Plaintiff complained verbally to Lutz about DeGraff's conduct and also wrote to the DOCCS Inspector Generals Office. (Dkt. No. 12 at ¶ 22.) Plaintiff told both Lutz **[*4]** and the Inspector Generals Office that Degraff was the only corrections officer performing the daily searches and removing food items. *Id.* at ¶ 29.

Plaintiff initially believed that Lutz would instruct Degraff to stop the searches. (Dkt. No 12 at ¶ 31.)

Instead, beginning in September of 2010, all of the corrections officers, including Defendant Cusack, began going into the SHU inmates' cells and removing the inmates' things, including food items, on a daily basis, without leaving contraband receipts. (Dkt. No. 28-3 at 21-23, 28.) According to Plaintiff, because contraband receipts were not being issued, there was no record of the cell searches and inspections. (Dkt. No. 12 at ¶ 32.)

Plaintiff filed a grievance on October 10, 2010, complaining that contraband receipts were not being left when food items were removed from his cell. (Dkt. Nos. 12 at ¶ 33;12-2 at 13-14.) Lutz submitted an October 16, 2010, memorandum to the Inmate Grievance Program Supervisor responsive to the grievance. (Dkt. No. 12-2 at 15.) The memorandum stated that on or about September 10, 2010, Lutz had instructed the floor officers that he expected them to conduct daily cell inspections in addition to daily cell **[*5]** searches and, as had been the practice, to confiscate contraband, including but not limited to "food, food containers, and drag lines," in plain view.[2] *Id.*; Dkt. No. 28-4 at ¶ 12. Lutz explained in the memorandum that visual inspections "are a good security practice to minimize the introduction of contraband in the Special Housing Unit." (Dkt. No. 12-2 at 15.) Lutz also disclosed in the memorandum that he had instructed the officers to give inmates contraband receipts for any items taken from their cells. *Id.* On October 20, 2010, the Inmate Grievance Review Committee concluded that contraband receipts should be given for items taken out of inmates' cells. *Id.* at 16.

Prior to the determination of Plaintiff's grievance, on October 12, 2010, Cusack performed a regular scheduled search of Plaintiff's cell.[3] (Dkt. No. 28-3

---

[2] Cusack explained in his Affidavit that "[a]lthough food is generally harmless in its original form, it can be altered or changed into many improper forms [e.g., fruit can be fermented into prison wine] if not properly controlled." (Dkt. No. 28-4 at ¶ 6.)

[3] Plaintiff described the scheduled cell search as one done when an inmate's name comes up on the computer, and a thorough search of **[*7]** the inmate's property is conducted. (Dkt. No. 28-3 at 28.)

at 28, 30-31.) During the search, Cusack confiscated state food, an extra state towel, and a fishing pole from Plaintiff's [*6] cell and left a contraband receipt.[4] (Dkt. No. 28-7 at 1.) According to Cusack, contraband receipts are required whenever a cell search is conducted whether or not contraband is found. (Dkt. No. 28-4 at ¶ 16.) Plaintiff had no complaint with the regular cell search, except for his belief that there was no rule in effect prohibiting inmates from keeping food in their cells at the time. (Dkt. No. 28-3 at 30-31.) Cusack, on the other hand, believed that all of the items confiscated from Plaintiff's cell were contraband and violated SHU policy. (Dkt. No. 28-4 at ¶ 17.) While Cusack believed that the items warranted confiscation, he did not issue a misbehavior report because it appeared to be an isolated incident. *Id*. In addition, it was Cusack's understanding from his training and experience that misbehavior reports are issued at the discretion of the corrections officer depending on the circumstances, and at that time Cusack believed discarding the items would resolve the issue. *Id*. at ¶ 18.

The following day, October 13, 2010, while Plaintiff was in the yard, Cusack conducted a visual inspection of Plaintiff's cell and confiscated a container of milk and four slices of bread that were in a paper bag in his cell.[5] (Dkt. No. 28-3 at 31-33.) Cusack, believing that contraband receipts were not required for items found in a visual cell inspection, did not give Plaintiff a contraband receipt. (Dkt.

Nos. 12 at ¶ 37; 28-4 at ¶ 22.) Cusack claims to have warned Plaintiff that he was not allowed to keep food items in his cell. (Dkt. No. 28-4 at ¶ 21.) Plaintiff contends that Cusack never gave him a direct order or any sort of direction on whether he could have food in his cell. (Dkt. No. 35 at p. 10, ¶ 23.)

The morning of October 14, 2010, Plaintiff made a verbal complaint to Lutz regarding Cusack's failure to give Plaintiff a contraband receipt for the food items he had confiscated the day before. (Dkt. Nos. 28-3 at 33-34;12 at ¶ 38.) Fifteen or twenty minutes later, Cusack and another corrections officer escorted Plaintiff to the yard for his recreation period. *Id*. at ¶ 40. According to Plaintiff, as they were walking towards the yard, Cusack said "So you want me to give you a contraband receipt for the food items I removed from your cell yesterday?"[6] Plaintiff replied, "If you are saying that the food items are contraband, then yes I want a contraband receipt." Cusack then asked Plaintiff, "Do you want the misbehavior report that's gonna come with it?"[7] Plaintiff replied "If you are saying I broke a rule, then yes, I'll [*9] take that as well." Plaintiff then said "There is no rule saying we can't keep food in our cells." Cusack responded "we'll see." (Dkt. No. 35 at ¶ 24.) When Plaintiff returned to his cell after recreation, he noticed that Cusack had removed an apple, a banana, and half of a cucumber and had left contraband receipts for the food taken on October 13th and 14th. (Dkt. Nos. 12 at ¶ 41; 35 at ¶ 25.)

## B. Misbehavior Reports and Plaintiff's Disciplinary Hearings

The following day, Plaintiff was given two Tier II

---

[4] A fishing pole is a drag line crafted by prisoners and used as a tool to pass and retrieve items between inmates. (Dkt. Nos. 28-3 at 23; 28-4 at ¶ 15.) It is considered contraband. *Id*.

[5] Plaintiff, who converted to Judaism in 2005, received the Kosher cold alternative diet, which contained substantially more unprepared foods, including fruits and vegetables, than the regular meals served to the majority of inmates. (Dkt. [*8] No. 12 at ¶¶ 21-22, 34.) Because it was difficult to consume an entire meal in the short time allotted, Plaintiff was in the habit of saving his fresh fruits and vegetables to be consumed during the day. *Id*. at ¶ 34. Plaintiff had also been given authorization to keep the containers of milk given to him with breakfast when the milk was frozen. (Dkt. No. 28-3 at 32-33.)

---

[6] Cusack claims to have asked Plaintiff "in words or substance, whether he truly wanted to received contraband receipts for food items [Cusack] felt constituted illegal contraband." (Dkt. No. 28-4 at ¶ 21.)

[7] According to Cusack, he asked Plaintiff "in words or substance, whether he also wanted the misbehavior report that would result from his disregard for SHU rules." (Dkt. No. 28-4 at ¶ 28.)

misbehavior reports written by Cusack. (Dkt. No. 12 at ¶ 42.) The first misbehavior report involved Cusack's October 13, 2010 visual inspection of Plaintiff's cell and confiscation of Plaintiff's milk and bread. (Dkt. No. 12-2 at 20.) Cusack indicated in the misbehavior report that Plaintiff "has been [*10] previously told that he can not keep food items in his cell." *Id*. Plaintiff was charged with possession of contraband, having an untidy cell or person, refusing a direct order, and property damage or loss. (Dkt. No. 28-15 at 1.) The second misbehavior report, which involved the confiscation of the banana, apple, and half a cucumber from Plaintiff's cell on October 14, 2010, included the same charges as the first. (Dkt. No. 12-2 at 32.) The misbehavior reports were endorsed by Lutz. (Dkt. Nos. 28-11 at 9; 28-13; 28-14.)

Defendant Gardner, as hearing officer, made a determination to hold a separate disciplinary hearing for each of the misbehavior reports. (Dkt. Nos. 28-11 at 1, 3; 28-12 at 1.) The disciplinary hearings were held on October 19th and 20th of 2010.[8] (Dkt. No. 28-11 at 1.) Plaintiff pleaded not guilty to the charges at both hearings. (Dkt. Nos. 28-11 at 2; 28-12 at 3.) Plaintiff argued that there was no rule prohibiting him from saving food given to him at meals, and that neither Cusack nor any other corrections officer or sergeant had given him a direct order that he could not keep food in his cell. (Dkt. Nos. 28-11 at 5-6; 28-12 at 4.) Cusack testified that he had told [*11] Plaintiff he could not keep food in his cell prior to writing the misbehavior reports. (Dkt. No. 28-11 at 15-17.) When asked if he had given Plaintiff a "direct order" to that effect, Cusack testified that while he had not used the words "direct order," when he makes a statement to an inmate, the statement constitutes a direct order whether he uses the word "direct order" or not.[9] *Id*. at 16-17.

In their testimony at the hearings, Lutz and Cusack both identified Section 2.401, subsection 5, of the SHU rulebook as the source of the rule prohibiting inmates from keeping food in their cells.[10] (Dkt. Nos. 28-11 at 14; 28-12 at 8, 13.) The rule provides:

> Inmates will receive their meals in a food tray (unless on a restricted diet) and are expected to return both parts of that tray, utensils, and all other foods/liquid containers at the completion of each meal. Failure [*12] to do so will be considered a violation of Standards of Inmate Behavior Rule 116.10 and will result in a Tier III misbehavior report and pre-hearing restricted diet. Damage to the trays will be considered a violation of Standards of Inmate Behavior Rule 116.10 and may result in the requirement that monetary restitution be made.

(Dkt. No. 28-8 at 1.) Plaintiff argued that the provision applied only to containers, not food. (Dkt. No. 28-12 at 4.) Cusack testified that he considered food in inmates cells to be contraband according to the Rulebook provision. *Id*. at 12-13; *see also* Dkt. No. 28-4 at ¶¶ 19-20.

Lutz acknowledged telling Plaintiff on October 14, 2010, that he was supposed to have been given a contraband receipt for the food taken from his cell on October 13, 2010. *Id*. at 9. Lutz also testified that he had told Cusack to give Plaintiff a receipt. *Id*. Gardner, over Plaintiff's objection and without explanation, refused to ask Lutz whether he had instructed [*13] Cusack to write the misbehavior report or Cusack had done it on his own. *Id*. at 10-11. However, Cusack testified that Lutz did not direct him to write the misbehavior reports. (Dkt. No. 28-11 at 13.)

Cusack testified at the hearings that if Plaintiff had not asked for contraband receipts, he would not

---

[8] The transcripts from the hearings, submitted by Defendants in support of their motion for summary judgment, contain a substantial number of gaps in the testimony. (Dkt. Nos. 28-11 and 28-12.)

[9] Lutz testified that when Cusack told Plaintiff he could not keep food in his cell, it constituted a "direct order." (Dkt. No. 28-12 at 10.)

[10] The referenced SHU rulebook is SHU/PC/IPC Guidelines & Regulations No. 2.401. (Dkt. No. 28-8.) The provision at issue is subsection 6 of part V. Disciplinary Special Housing Rules (Directive 4933), not subsection 5. (Dkt. No. 28-8.)

have written the two misbehavior reports. (Dkt. Nos. 28-11 at 14; 28-12 at 11-13.) When asked why he had written the misbehavior reports, Cusack testified that because once Plaintiff asked for the contraband receipts, Cusack wanted to make it official — have everything on record. (Dkt. No. 28-12 at 15.)

Gardner found Plaintiff guilty of having contraband in his cell and refusing a direct order at the end of the disciplinary hearings on the two misbehavior reports and not guilty of untidy cell or person and property damage or loss. (Dkt. Nos. 28-15 at 1; 28-16 at 1.) The only penalty imposed on Plaintiff in connection with the guilty finding on the misbehavior report dealing with the October 13, 2010 contraband incident was counseling and reprimand. (Dkt. No. 28-15 at 1.) The penalty imposed in connection with the guilty finding on the misbehavior report for the October 14, 2010 contraband [*14] incident was thirty days keeplock and thirty days loss of packages, commissary, and phone. (Dkt. No. 28-16 at 1.) According to Plaintiff, he lost his post-adjustment privileges — extra benefits such as headphones, extra clothing and personal property — for approximately a month as a result of the misbehavior reports. (Dkt. No. 28-3 at 45-46.)

## C. Reversal of the Guilty Findings and Revision of the SHU Rulebook

Plaintiff appealed the two determinations of guilt to Shawangunk Superintendent Joseph T. Smith, who designated Deputy Superintendent John Maly ("Maly") to handle the appeals. (Dkt. Nos. 12 at ¶¶ 63-65; 12-2 at 24-29, 36-39.) On February 9, 2011, Maly reversed both of the disciplinary hearing determinations and directed that all records of the hearings be expunged. (Dkt. No. 12-2 at 29-30, 39-40.) As a result of the expungement, the thirty days of keeplock was never imposed on Plaintiff. (Dkt. No. 28-3 at 46.) The same day the determinations were reversed, Maly issued a memorandum effective immediately prohibiting inmates in SHU

from possessing unconsumed food and requiring unconsumed food to be returned with the feeding utensils at the end of each meal.[11] (Dkt. No. 28-19.) The [*15] memorandum stated that unconsumed food items retained by inmates after the meal period is over would be considered contraband. *Id*. The SHU rulebook section relied upon by Lutz and Cusack at Plaintiff's disciplinary hearings was revised on February 14, 2011, to add subsection 7, which provides that "Inmates must consume all meals at the time served. Inmates are not allowed to store food in their cell." (Dkt. No. 28-20.)

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on October 11, 2011. (Dkt. No. 1.) His application to proceed *in forma pauperis* was granted on November 11, 2011. (Dkt. Nos. 2, 4.) On December 12, 2011, Plaintiff filed an Amended Complaint, which was accepted as the operative pleading in this lawsuit by Order dated December 14, 2011. (Dkt. Nos. 12, 13.)

Defendants filed their Answer to Plaintiff's Amended Complaint on January 19, 2011 (Dkt. No. 14), and a day later, Plaintiff filed a motion for partial summary judgment on liability and for an [*16] order directing Defendants to produce certified copies of the transcripts from the two disciplinary hearings at issue in the lawsuit. (Dkt. No. 16.) Defendants moved for denial of Plaintiff's motion for partial summary judgment without prejudice on the grounds that it was premature. (Dkt. No. 17.) In response, Plaintiff requested that he be allowed to withdraw the motion as premature. (Dkt. No. 18.) Plaintiff's request was granted by Text Order dated January 1, 2012.

Following discovery, Defendants filed the motion for summary judgment now before me for report

---

[11] Cusack understands that the guilty findings were expunged because the rule on which he and Lutz had relied in deciding that inmates were not allowed to keep food in their cells was deemed ambiguous. (Dkt. No. 28-4 at ¶ 53.)

and recommendation. (Dkt. No. 28.) Plaintiff thereafter filed papers in opposition to the motion. (Dkt. No. 35.)

## III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). **[*17]** A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.[12] *Salahuddin*, 467 F.3d at 272-73. The

nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999)[13] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. ANALYSIS

### A. Retaliation Claim Against Cusack

Plaintiff claims that Defendant Cusack filed two false misbehavior reports against him in retaliation

---

[12] Only admissible evidence need be considered by a court in ruling on a motion for summary judgment, and the court has "broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc*., 582 F.3d 244, 264 (2d Cir. 2009). Because Plaintiff's Amended Complaint (Dkt. No. 12) is verified, it will be treated as an affidavit in opposition to Defendants' summary judgment **[*18]** motion. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995). The Affirmation submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 35 at 5-14) is unsworn and was not signed under penalty of perjury. *See* 28 U.S.C. § 1746 (authorizing the use of declarations made under penalty of perjury when an affidavit is required or permitted to be used); *see also* 10B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362-63 (Civil 3d ed. 1998) (affidavits submitted for or in opposition to a motion for summary judgment need not be notarized when they are made under penalty of perjury, but unsworn statements will be rejected). However, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider papers that did not constitute affidavits or declarations. *See, e.g., Robles v. Khahaifa*, No. 09CV718, 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20-22 (W.D.N.Y. June 25, 2012). In light of Plaintiff's *pro se* status, and because: (1)

Plaintiff explained in his Affirmation that he was unable to submit a sworn affidavit because notary service was unavailable (although he presumably could have signed the **[*19]** Affirmation under penalty of perjury); (2) Defendants have not objected to consideration of the Affirmation; and (3) the Affirmation is generally consistent with the allegations in Plaintiff's Amended Complaint and his deposition testimony submitted as an Exhibit by Defendants, I have considered the Affirmation in opposition to Defendants' motion.

[13] Copies of unpublished decisions **[*20]** cited herein will be provided to Plaintiff by the Clerk.

for Plaintiff going over his head and complaining to Lutz that corrections officers, including Cusack, were confiscating food from inmates' cells without giving the inmates a contraband receipt. (Dkt. No. 28-3 at 41-43.) "[A] prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citing *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986)). False accusations contained in a misbehavior report can, however, rise to the level of a constitutional violation when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie*, 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of **[*21]** First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds,*

*Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" **[*22]** against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action--in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill*, 389 F.3d at 381, 383 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) **[*23]** (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The protected First Amendment conduct on which

Plaintiff relies in his retaliation claim is his complaint to Lutz that corrections officers were confiscating food from inmates' cells without giving the inmates contraband receipts. (Dkt. No. 28-3 at 41-43.) An inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim. *Smith v. Woods*, No. 9:03-CV-480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS 29745 at *46 (N.D.N.Y. April 24, 2006) (finding that oral complaints made to corrections officers may have First Amendment protection for purposes of a retaliation claim), aff'd, 219 F. App'x 110 (2d Cir. 2007); *Brewer v. Kamas*, 533 F. Supp. 2d 318, 328 (W.D.N.Y. 2008) **[\*24]** (same). Therefore, the evidence may support a finding that Plaintiff was engaging in protected conduct when he complained to Lutz.

However, the evidence does not support a finding of adverse action. Defendant Gardner imposed a penalty of only counseling and reprimand upon finding Plaintiff guilty after the hearing on the first misbehavior report. (Dkt. No. 28-15 at 1.) Gardner imposed a penalty of thirty days in keeplock, and thirty days loss of packages, commissary, and phones on the second. (Dkt. No. 28-16.) However, Plaintiff, by his own admission, did not spend any time in keeplock and testified at his deposition that his damages as a result of the finding of guilt were limited to a thirty-six day loss of post-adjustment privileges, including things like radio, headphones, and personal photographs. (Dkt. No. 28-3 at 46-48.) "The filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary [does] not constitute adverse action because they are *de minimis*." *Gantt v. Lape*, No. 9:10-CV-0083 (GTS/GHL), 2012 WL 4033729, at *8, 2012 U.S. Dist. LEXIS 130052, at *24-25 (N.D.N.Y. July 31, 2012); *see also Bartley v. Collins*, No. 95-CV-10161(RJH), 2006 WL 1289256, *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006) **[\*25]** ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the

commissary . . . do not constitute adverse action because they were too de minimis; they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights."); *Shaheen v. McIntyre*, No, 9:05-CV-0173 (TJM/GHL), 2007 WL 3274835, at *9, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007) ("allegations of lost privileges, standing alone, would be too *de minimis* to constitute 'adverse action'").

Even giving due consideration to Plaintiff's argument that because SHU inmates have so few privileges, losing what they do have is a significant loss (Dkt. No. 35 at 31), I find that Plaintiff's temporary loss of post-adjustment privileges in this case is too *de minimis* to constitute adverse action for purposes of his retaliation claim against Cusack.[14] Therefore, I recommend that the Court grant Defendant Cusack's motion for summary judgment.

## B. Retaliation and Due Process Claims Against Gardner

### 1. Retaliation

Plaintiff claims that Gardner retaliated against him by failing to take steps in his supervisory capacity to rectify Cusack's issuance of false misbehavior reports and by finding him guilty at the disciplinary hearings despite the clear and convincing evidence of his innocence. (Dkt. Nos. 12 at ¶¶ 83-84, 28-3 at 70-72.) As discussed above with regard to Plaintiff's retaliation claim against Cusack, the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Bartley v. Collins*, 2006 U.S. Dist. LEXIS 28285,

---

[14] While it is not entirely clear from the summary judgment record whether the thirty day loss of privileges imposed **[\*26]** on Plaintiff by Gardner on the second misbehavior report was also carried out, even if it were, the penalty would be too *de minimis* to constitute adverse action.

2006 WL 1289256, at *7. Therefore, I recommend that Gardner be granted summary judgment dismissing Plaintiff's retaliation claim against him.

2. Due Process

Plaintiff claims that Gardner denied his Fourteenth Amendment right to due process by finding him guilty of the charges of possessing contraband and refusing a direct order in each of the two **[*27]** misbehavior reports filed by Cusack, despite clear and compelling evidence at the hearings that the charges were false and without merit, and the misbehavior reports had been written in direct retaliation for Plaintiff's verbal grievance to Lutz. (Dkt. Nos. 12 at ¶¶ 84, 88; 28-15 at 1; 28-16 at 1.)

To prevail on a § 1983 claim for denial of Fourteenth Amendment procedural due process rights, a plaintiff must demonstrate that he possessed a protected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000). Due process generally requires that "some kind of hearing" be provided to an individual by the state prior to depriving them of a property or liberty interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995); *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004) (same). There is no evidence that **[*28]** counseling and reprimand constitutes an atypical and significant hardship. (Dkt. No. 28-15 at 1.) Furthermore, Plaintiff did not serve any of the thirty days in keeplock, and it appears that the penalty of thirty day loss of packages, commissary, and phone may not have been carried out either. (Dkt. No. 28-16 at 1.) At most, the evidence shows that Plaintiff lost his post-adjustment privileges — extra benefits such as headphones, extra clothing

and personal property — for thirty-six days. *Id.* at 45-46.

"[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord*, 441 F. Supp.2d 631, 640 (S.D.N.Y. 2006); *see also Husbands v. McClellan*, 990 F. Supp. 214, 217 (W.D.N.Y. 1998) (holding temporary loss of various privileges — telephone, package, commissary and recreation — did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate"); *Johnson v. Enu*, No. 08-CV-158 (FJS/DRH), 2011 WL 3439179, at *12, 2011 U.S. Dist. LEXIS 86831, at *34-35 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not **[*29]** give rise to a protected liberty interest); *Edelkind v. Killian*, No. 09 Civ. 5835 (SHS)(MHD), 2011 WL 10599973, at *16, 2011 U.S. Dist. LEXIS 157207, at *46 (S.D.N.Y. Aug. 31, 2011) ("loss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest.").

I find that Plaintiff's thirty-six day loss of post-adjustment privileges, and a thirty day loss of telephone, commissary, and recreation, if those losses in fact occurred, do not give rise to a protected liberty interest. Therefore, I recommend that Defendant Gardner also be granted summary judgment dismissing Plaintiff's claim against him for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the hearings on the misbehavior reports written by Defendant Cusack.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED** and that the Court enter judgment in Defendants' favor; and it is

**ORDERED** that the Clerk provide Plaintiff with

2013 U.S. Dist. LEXIS 142053, *29

copies of all of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to **[*30]** file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs*., 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: July 25, 2013

Syracuse, New York

/s/ Thérèse Wiley Dancks

Thérèse Wiley Dancks

United States Magistrate Judge



# Pettus v. McCoy

United States District Court for the Northern District of New York

September 13, 2006, Decided

9:04-cv-0471

**Reporter**

2006 U.S. Dist. LEXIS 65221 *; 2006 WL 2639369

JAMES PETTUS, 03-R-3597, Plaintiff, v. JOSPEH MCCOY, Superintendent, DEPUTY RYAN, Defendants.

**Subsequent History:** Related proceeding at Pettus v. Corcoran, 2006 U.S. Dist. LEXIS 89256 (N.D.N.Y, Dec. 11, 2006)

**Counsel:** [*1] James Pettus, Plaintiff, Pro se, Comstock, NY.

For Joseph McCoy, Superintendent, Deputy Ryan, Defendants: Charles J. Quackenbush, New York State Attorney General - Albany Office, Albany, NY.

**Judges:** Thomas J. McAvoy, Senior, U.S. District Judge.

**Opinion by:** Thomas J. McAvoy

# Opinion

## DECISION and ORDER

Plaintiff commenced the instant action asserting various violations of his constitutional rights arising out of his placement at the Southport Correctional Facility. In his Complaint, Plaintiff alleges that he was improperly sent to the Special Housing Unit ("SHU") at a maximum security facility and that being in SHU has put his life in jeopardy. Currently before the Court is Defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56

seeking dismissal of the Complaint in its entirety for failure to exhaust administrative remedies.

## I. FACTS [1]

[*2] Plaintiff is an inmate in the custody of the New York State Department of Correctional Services. Plaintiff signed the instant Complaint on April 7, 2004. On his Complaint form, Plaintiff indicated that there is a grievance procedure available to him and that he availed himself of the grievance procedure by filing a complaint with the IGRC [2], followed by an appeal to the superintendent of the facility, and then to the Central Office Review Committee in Albany. The Complaint indicates that Plaintiff is "waiting for response from Albany." The Complaint was filed on April 27, 2004.

On April 12, 2004, prior to the filing of the instant Complaint, Plaintiff filed a grievance relating to the issues presented in this case. On April 19, 2004, the IGRC recommended that Plaintiff's grievance be denied. Plaintiff then appealed that decision to the facility Superintendent. In the meantime, on April 27, Plaintiff commenced the instant litigation. On

---

[1] The following facts are taken from Defendants' statement of material facts submitted pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts are deemed admitted because they are supported by the record evidence and Plaintiff failed to submit an opposing statement of material facts as required by Rule 7.1(a)(3). Plaintiff was specifically advised by Defendants of his obligation to file an opposing statement of material facts and to otherwise properly respond to the motion for summary judgment.

[2] Inmate Grievance Review Committee.

May 3, 2004, after Plaintiff filed **[*3]** the Complaint in this case, the Superintendent denied Plaintiff's grievance. On May 5, 2004, Plaintiff appealed the decision to the Central Office Review Committee in Albany. On June 23, 2004, the Central Office Review Committee denied Plaintiff's appeal. Plaintiff did not file any other grievances in connection with the matters raised in this lawsuit.

Defendants now move to dismiss on the ground that Plaintiff commenced the instant action before fully exhausting his available administrative remedies.

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in Neal v. Goord, 267 F.3d 116 (2d Cir. 2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." Id. at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." Id.

In this case, Defendants have established from a legally sufficient **[*4]** source that an administrative remedy is available and applicable. Mojias v. Johnson, 351 F.3d 606, 610 (2d Cir. 2003); see also 7. N.Y.C.R.R. § 701.1, et seq. Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. Neal, 267 F.3d 116.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

Dated: September 13, 2006

Thomas J. McAvoy

Senior, U.S. District Judge

---



# Robinson v. Henschel

United States District Court for the Southern District of New York

March 26, 2014, Decided; March 26, 2014, Filed

10 Civ. 6212 (PGG)

**Reporter**

2014 U.S. Dist. LEXIS 40490 *

LATEE ROBINSON, Plaintiff, - against - J. HENSCHEL, SGT. WARD, T. LUCAS, CORRECTION OFFICER TITKA, K. JOHNSON, MACKO, CARON, SUPERINTENDENT PHILLIPS, STEIBAUGH, SULLIVON, LIEUTENANT ALEXANDER, R. HAMILTON, C. FRASER, CORRECTIONAL OFFICER D. KAUFMAN, C. WILSON, R. ARRICK, CORRECTIONS OFFICER D. HUTTEL, T. KOHLER, T. STEVENS, SCHMITT, CORRECTION OFFICER R. WARD, NOVOA, PRISON MEDICAL STAFF'S RN STAFF, KRAUSE, B. ROBERTS, and SUPERINTENDENT ROBERT ERCOLE, Defendants.

**Counsel:** [*1] Latee Robinson, Plaintiff, Pro se, Comstock, NY.

For J. Henschel, correctional service prison guard officer sued in his individual and official capacity, T. Lucas, Shield # D.S.S. sued in his individual official capacity, Correction Officer Titka, Shield # Co. sued in his individual official capacity, K. Johnson, Shield # Co. sued in his individual official capacity, Macko, Shield # Co., Superintendent Phillips, Shield # Co., Steibaugh, Shield # Lt., Sullivon, Shield # Lt., Lieutenant Alexander, Shield # Sergeant, R. Hamilton, Shield # Co., C. Fraser, Shield # Sergeant sued in his individual official capacity, Correctional Ofc. D. Kaufman, Shield # Co. sued in his individual official capacity, C. Wilson, Shield # Sergeant sued in his individual official capacity, R. Arrick, Shield # Co. sued in his individual official capacity, Corrections Officer D. Huttel, Shield # Co. sued in his individual official capacity, T. Kohler, Shield # Co. sued in her individual official capacity, Schmitt, Shield # Lt., Correction Officer R. Ward, Shield # Lt., Novoa, Shield # P.A. medical, B. Roberts, Shield # CO; sued in his official capacity, Defendants: Kruti D Dharia, State of New York Office of the [*2] Attorney General, New York, NY.

**Judges:** Paul G. Gardephe, United States District Judge.

**Opinion by:** Paul G. Gardephe

# Opinion

## MEMORANDUM OPINION & ORDER

PAUL G. GARDEPHE, U.S.D.J.:

Pro se Plaintiff Latee Robinson brings this action pursuant to 42 U.S.C. § 1983, alleging that Defendants — correction officers and supervisors at the Green Haven Correctional Facility ("Green Haven") — violated his constitutional rights. (Am. Cmplt. (Dkt. No. 61)) Many of Plaintiff's claims were previously dismissed. (See Dkt. No. 46) The remaining defendants — Ercole, Steinbaugh, Fraser, Wilson, Kaufman, Kohler, Huttel, and Arrick ("Defendants") — have moved for summary judgment on Plaintiff's remaining claims. (Dkt. No. 70) For the reasons stated below, Defendants'

motion will be granted in part and denied in part.

## BACKGROUND[1]

On August 3, 2012, Plaintiff filed an Amended Complaint alleging that Defendants used excessive force against him on three occasions in April and May 2007. (Am. Cmplt. (Dkt. No. 61)) Plaintiff alleges that on April 24, 2007, an unnamed Green Haven correction officer shut a cell door on his hand. (Id. at 4) Plaintiff also claims that — later that day — Defendant **[*3]** Kaufman repeatedly slammed his injured hand against a wall during a pat frisk. (Id. at 4-5) Plaintiff further alleges that on May 10, 2007, Defendants assaulted him in a disciplinary hearing room while he was handcuffed. (Id. at 5)

On April 12, 2013, Defendants moved for summary judgment on several grounds, including failure to exhaust administrative remedies, failure to allege the personal involvement of Defendants in the cell door and May 10 incidents, and failure to demonstrate that Defendant Kaufman's use of force on April 24, 2007, rose to the level of a constitutional violation. (Dkt. No. 70; Def. Br. (Dkt. No. 73))

Plaintiff's opposition was due on May 10, 2013. (Dkt. No. 69) On August 28, 2013 — after having received no opposition from Plaintiff — this Court directed that another copy of Defendants' motion papers be sent to Plaintiff at Great Meadow Correctional Facility — the address on file with the Court — and extended the deadline for Plaintiff's opposition papers to October 1, 2013. (Dkt. No. 81) On December 11, 2013, Plaintiff was granted an additional extension of time to January 9, 2014. (Dkt. No. 85) The docket sheet indicates that the December 11, 2013 order and copies **[*4]** of Defendants' motion papers were sent to Plaintiff on December 12, 2013, and that a return receipt was received by the Clerk's Office on December 19, 2013.

---

[1] Familiarity with this Court's prior orders is assumed.

With a February 11, 2014 letter to the Court, Plaintiff submitted thirty-one pages of optometrist and eye care medical reports from various correctional facilities. (Dkt. No. 87) The letter and the eye care reports are not responsive to Defendants' motion and have no bearing on the claims remaining in this case. Accordingly, the Court deems Defendants' summary judgment motion unopposed.

## DISCUSSION

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "[W]here the nonmoving party will bear the burden of proof at trial, Rule 56 permits the moving party to point to an absence of evidence **[*5]** to support an essential element of the nonmoving party's claim." Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991).

In deciding a summary judgment motion, the Court "resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." Cifra v. GE, 252 F.3d 205, 216 (2d Cir. 2001). However, to survive a motion for summary judgment, a plaintiff "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' . . . [He] must come forth with evidence sufficient to allow a reasonable jury to find in [his] favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). "Mere conclusory

statements, conjecture or speculation" by the plaintiff will not defeat a summary judgment motion. Gross v. NBC, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

"Although the same standards apply when a pro se litigant is involved, 'the pro se litigant "should be given special latitude in responding to a summary judgment motion."' . . . [T]he Court must liberally construe the **[*6]** claims of a pro se litigant." Brown v. Selwin, 250 F. Supp. 2d 299, 306-07 (S.D.N.Y. 1999) (quoting Shepherd v. Fraisher, No. 96 Civ. 3283 (JGK), 1999 U.S. Dist. LEXIS 13937, 1999 WL 713839, at *2 (S.D.N.Y. Sept. 14, 1999) (citation omitted)).

Where, as here, "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.'" Vt. Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004) (quoting Amaker v. Foley, 274 F.3d 677, 681 (2d Cir. 2001)); see also D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006). Even an unopposed motion for summary judgment must "fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.'" Vt. Teddy Bear Co., 373 F.3d at 244 (quoting Champion v. Artuz, 76 F.3d 483, 486 (2d Cir. 1996)).

## II. THE APRIL 24, 2007 CELL DOOR INCIDENT

Plaintiff claims that on April 24, 2007, an unnamed Green Haven correction officer escorting him from a disciplinary hearing intentionally **[*7]** shut a cell door on Plaintiff's right hand. (Am. Cmplt. (Dkt. No. 61) at 4) Plaintiff alleges that he suffered injuries — including "disfigure[d] knuckles" and "pain" — as a result. (Id. at 5) Plaintiff has not alleged that other officers were present or otherwise involved in this incident.

## A. Applicable Law

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991); McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir. 1977)). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); see Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) ("[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior."); Garcia v. Watts, No. 08 Civ. 7778 (JSR) (HBP), 2009 U.S. Dist. LEXIS 84692, 2009 WL 2777085, at *12-13 (S.D.N.Y. Sept, 1, 2009). **[*8]** Mere presence in the "prison chain of command" is not sufficient to demonstrate personal involvement for purposes of Section 1983. See Ayers v. Coughlin, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam).

With respect to defendants in supervisory positions, the Second Circuit has instructed that

> [t]he personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on

information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

## B. Analysis

Here, Plaintiff has not offered any evidence that any of the Defendants were personally involved in the April 24, 2007 cell door incident. The Amended Complaint [*9] does not indicate that any of the Defendants participated in or witnessed this incident. In his deposition, Plaintiff stated, "Like I said in my report,... I was being escorted by a prison guard in a disciplinary hearing. And I'm unfamiliar with that prison guard, I don't know his name, and I never seen him before." (Harkins Decl. (Dkt. No. 75), Ex. A ("Deposition Tr.") at 14) Plaintiff has not demonstrated — or even alleged — that any of the Defendants who may have supervised the unnamed officer were aware of the incident, were responsible for a policy or custom under which it occurred, or were grossly negligent in supervising the unidentified officer.

Because Plaintiff has not offered evidence sufficient to raise a factual issue as to whether any Defendant was personally involved in the cell door incident, Defendants' motion for summary judgment will be granted as to this claim. See Pravda v. City of Albany, N.Y., 956 F. Supp. 174, 182 (N.D.N.Y. 1997) (granting summary judgment as to individual defendants where only "John Doe" officers were alleged to have participated in the use of force and plaintiff provided only "conclusory allegations . . . insufficient to establish the personal [*10] involvement of the[ ] [named] individual Defendants in Plaintiff's alleged constitutional deprivations").

## III. THE APRIL 24, 2007 PAT FRISK

Plaintiff alleges that on April 24, 2007 — after the cell door incident — Defendant Kaufman used

excessive force against him during a pat frisk. (Amended Cmplt. (Dkt. No. 61) at 4-5) According to Plaintiff, Kaufman knew that Plaintiff's hand had been injured, but he nonetheless squeezed the hand during the pat frisk, causing Plaintiff "extreme pain." (Id. at 4) Defendant Kaufman then allegedly "slamm[ed]" Plaintiff's hand repeatedly against a wall where Plaintiff was being frisked, causing injuries to his knuckles. (Id. at 5; Deposition Tr. 21)

Defendant Kaufman claims that the pat frisk was necessary to determine whether Plaintiff was carrying contraband, and he denies that the force used was excessive. (See Kaufman Decl. (Dkt. No. 77)) In his affidavit, Kaufman states that while he was escorting inmates to and from the facility's medical center to receive medication on April 24, 2007, he saw an inmate pass something to Plaintiff, and then observed Plaintiff put his hand over his mouth.[2] (Id. ¶ 5) Suspecting that Plaintiff had received contraband [*11] from the other inmate, Kaufman directed him to place his hands on a hallway wall so that he could be frisked. (Id. ¶¶ 5-7)

Plaintiff refused to do so, stating that his hand hurt. (Id. ¶ 7) Kaufman states that the hand was not bandaged and did not appear to be injured. (Id.) Plaintiff's refusal to comply made Kaufman "suspicious that he was palming contraband and attempting to avoid detection." (Id. ¶ 8) Kaufman was also escorting approximately thirty inmates from the medical center at that time, and was concerned that "Plaintiff's non-compliance could have provoked a disturbance from the inmates waiting to leave, which is . . . a significant concern within a correctional facility." (Id. ¶ 9) According to Kaufman, he "took [P]laintiff's left hand, guided it to the wall, and told him to place the heel of his hand, or the base of his wrist, on the wall." (Id. ¶ 7) He then conducted the frisk "without further incident." (Id.)

After the pat frisk, Plaintiff was taken to the

---

[2] Plaintiff denies that he received anything from the other inmate. (Deposition Tr. 21)

prison's medical facility pursuant to an institutional policy that requires inmates to be seen by medical staff "following any use of **[\*12]** force." (Healey Decl. (Dkt. No. 76) ¶ 5) Plaintiff's hand had been examined earlier that day at the medical facility, after Plaintiff claimed that a cell door had been shut on his hand. (Id. ¶ 4) At that time, a nurse had observed "a small abrasion . . . on [P]laintiff's left hand . . . [and] minor swelling, but . . . Plaintiff had full range of motion with his left hand and was able to make a fist." (Id.) Plaintiff left the earlier examination "before being seen by a medical provider, thus refusing evaluation and care." (Id.) He signed a "Refusal of Medical Examination or Treatment" form. (Id., Ex. B)

During the examination after the pat frisk, a different nurse observed "that there was slight swelling on his left knuckles which had been noted earlier in the day, but had full range motion with his left hand, and that his skin was fully intact. (Id. ¶ 6) Additionally, Plaintiff had a superficial abrasion on his left finger that had also been noted earlier in the day." (Id.) No other injuries were observed. (Id.)

## A. Applicable Law

"The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual **[\*13]** punishments,' . . . including the 'unnecessary and wanton infliction of pain.'" Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000) (quoting Rhodes v. Chapman, 452 U.S. 337, 345-46, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981)). "A claim of cruel and unusual punishment . . . has two components — one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." Id. (citing Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992); Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999)). "To establish a constitutional violation, and hence a claim pursuant to section 1983, a plaintiff must

meet both a subjective and an objective requirement." Virella v. Pozzi, No. 05 Civ. 10460 (RWS), 2006 U.S. Dist. LEXIS 67359, 2006 WL 2707394, at \*3 (S.D.N.Y. Sept. 20, 2006) (emphasis added).

"Subjectively, the plaintiff must demonstrate that the defendant acted wantonly. The essential question is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" Id. (quoting Hudson, 503 U.S. at 7) (internal citation omitted); see also Sims, 230 F.3d at 21. Force is not wanton when it is minimal and employed for the purpose of subduing a prisoner. See, e.g., Allaway v. Mc Ginnis, 473 F. Supp. 2d 378, 382-83 (W.D.N.Y. 2007) **[\*14]** (four punches that officer delivered as "'softening blows' administered 'for the sole purpose of getting plaintiff to comply with the officer[']s orders'" not wanton); Boomer v. Lanigan, No. 00 Civ. 5540 (DLC), 2002 U.S. Dist. LEXIS 20514, 2002 WL 31413804, at \*6 (S.D.N.Y. Oct. 25, 2002) (conduct not wanton when officers used "minimal force" in pushing plaintiff into holding cell "after holding him in place for several minutes in an effort to settle him down").

As to the objective inquiry, "plaintiff must show that the violation is 'sufficiently serious or harmful.'" Virella, 2006 U.S. Dist. LEXIS 67359, 2006 WL 2707394, at \*3 (quoting United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999)). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.'" Hudson, 503 U.S. at 9 (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). However, "a claim of excessive force may be established even if the victim does not suffer 'serious' or 'significant' injury, provided that the amount of force used is more than 'de minimis,' or involves force that is 'repugnant to the conscience of mankind.'" Walsh, 194 F.3d at 47-48 (quoting Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976); **[\*15]** Hudson, 503 U.S. at 9-10). "'[A] de minimis use of force will rarely suffice to state a

constitutional claim.'" Griffin v. Crippen, 193 F.3d 89, 91 (2d Cir. 1999) (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

The objective inquiry is "context specific, turning upon 'contemporary standards of decency.'" Blyden, 186 F.3d at 263 (quoting Hudson, 503 U.S. at 8). Offense to decency, rather than severity of the injury, is dispositive: "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated. . . . whether or not significant injury is evident." Hudson, 503 U.S. at 9.

## B. Analysis

As to his claim against Defendant Kaufman, Plaintiff has not offered sufficient evidence to satisfy either the subjective or the objective component of an excessive force claim.

As to the subjective component, Plaintiff has not shown that the force used was applied "maliciously and sadistically to cause harm." Sims, 230 F.3d at 21 (quoting Hudson, 503 U.S. at 7). The evidence shows that Kaufman conducted the pat frisk out of concern that Plaintiff had obtained contraband. It is undisputed that Kaufman used force on Plaintiff's hand **[*16]** only after Plaintiff refused to comply with his instructions during the frisk. Plaintiff's refusal to comply increased Kaufman's suspicion that Plaintiff had, in fact, obtained contraband. Plaintiff's insubordination also created a risk that Kaufman would lose control over the thirty inmates he was then escorting back to their cells from the medical center.

Forcing Plaintiff's hand against the wall addressed both concerns. The action was designed to quickly reveal whether Plaintiff was in fact holding contraband, thus permitting Kaufman to return to his assignment of escorting the thirty inmates back to their cells. Under these circumstances — and given Plaintiff's refusal to obey — Kaufman's conduct cannot be characterized as wanton. See Chambliss v. Rosini, 808 F. Supp. 2d 658, 669

(S.D.N.Y. 2011) (subjective component of excessive force claim was not established because "the force exerted upon plaintiff was applied in a good-faith effort by [the officer] to maintain or restore discipline following [the inmate's] extremely disruptive behavior" and "the record [was] entirely devoid of any evidence that tend[ed] to **[*17]** show that [the officer's] conduct was in any[ ]way malicious or sadistic"); Gashi v. Cnty. of Westchester, No. 02 Civ. 6934 (GBD), 2007 U.S. Dist. LEXIS 19789, 2007 WL 749684, at *8 (S.D.N.Y. Mar. 12, 2007) (granting defendants summary judgment where plaintiff's claim was "lacking . . . any evidence that the . . . officers acted wantonly in an attempt to maliciously or sadistically cause plaintiff injury, or that the force was not applied in good faith to maintain or restore discipline."). Plaintiff has thus not satisfied the subjective component of the excessive force test.

In evaluating the objective component, courts in this District have noted that "conducting pat frisks on prisoners is a necessary procedure to ensure safety and security of prisons, and correction officers are authorized to conduct random pat frisks on free movement inmates going to or coming from services and programs pursuant to DOC policy." Tavares v. City of New York, No. 08 Civ. 3782 (PAE) (JCF), 2011 U.S. Dist. LEXIS 137381, 2011 WL 5877550, at *6 (S.D.N.Y. Oct. 17, 2011), adopted by, No. 08 Civ. 3782 (PAE), 2011 U.S. Dist. LEXIS 135390, 2011 WL 5877548 (S.D.N.Y. Nov. 23, 2011) (internal quotation and citation omitted). "[C]ase law reflects that actions taken consistent with a forceful pat frisk **[*18]** — the most serious contact alleged by the plaintiff — are not sufficiently 'repugnant to the conscience of mankind' to give rise to an Eighth Amendment claim." Id. (quoting Hudson, 503 U.S. at 10) (de minimis use of force where no "evidentiary material in the record reveal[ed] that [inmate] suffered any harm other than a few minutes of verbal abuse, unwanted pat-frisking, and the resulting pressure on his previously injured hand"); Kalwasinski v. Artuz, No. 02 CV 2582 (LBS), 2003 U.S. Dist. LEXIS 22731, 2003 WL 22973420, at

*6-7 (S.D.N.Y. Dec. 18, 2003) (de minimis use of force where defendant pressed the Plaintiff's face into the wall while conducting a pat frisk); Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) ("[K]icking an inmate's ankles and feet [during a pat frisk] . . . is de minimis . . .").

Accepting Plaintiff's description of his hand being "slammed" repeatedly against the wall, the amount of force Kaufman applied in doing so was de minimis. "The force alleged in this case is not different in degree from the force deemed de minimis in numerous other cases. [For example,] [a] correction officer's forcing an inmate's face into a prison wall, though clearly unpleasant to endure, would **[*19]** not appear 'repugnant to the conscience of mankind.'" Taylor v. N.Y. Dep't of Corr., No. 10 Civ. 3819 (JPO), 2012 U.S. Dist. LEXIS 90008, 2012 WL 2469856, at *5 (S.D.N.Y. June 27, 2012) (quoting Hudson, 503 U.S. at 9-10). Moreover, Plaintiff's medical records indicate that his existing hand injuries were not exacerbated, and that he suffered no additional injuries during his encounter with Kaufman. See Chambliss, 808 F. Supp. 2d at 668-69 ("[T]here is no indication from the record that plaintiff sustained a serious injury as a result of this incident. While plaintiff contends that [the officer's] conduct caused an injury to his right hand and wrist, . . . [plaintiff] concedes that his hand and wrist were injured prior to the incident. . . . [T]he uncontroverted evidence shows that [plaintiff's] existing wrist and hand injury was not seriously aggravated by [the officer's] conduct. . . . At most, the record establishes that [plaintiff] was subjected to a de minimis amount of force as a result of which he suffered no discernible injury.").

The lack of additional injury to Plaintiff's hand demonstrates that Kaufman's actions were not sufficiently serious to rise to the level of a constitutional violation. See, e.g., Espinal v. Goord, No. 00 Civ. 2242 (AJP), 2001 U.S. Dist. LEXIS 5688, 2001 WL 476070, *13 n.46 (S.D.N.Y. May 7, 2001) **[*20]** ("[A]llegations that [officer] hit [inmate] two or three times in the face, causing his face to turn red, but resulting in no other injuries . .

. are insufficient to state an Eighth Amendment claim."); Yearwood v. LoPiccolo, No. 95 Civ. 2544 (DC), 1998 U.S. Dist. LEXIS 12302, 1998 WL 474073, *1, *7 (S.D.N.Y. Aug. 10, 1998) (de minimis use of force where plaintiff alleged that "[an officer] supposedly grabbed his neck and 'started choking [him] and [another officer] hit [him] on the right side of [his] head with a pair of keys and [a third officer] punch[ed] [him] in the mouth busting [his] bottom lip'" but medical records did not reflect any injuries from the encounter); DeArmas v. Jaycox, No. 92 Civ. 6139 (LMM), 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993), aff'd, 14 F.3d 591 (2d Cir. 1993) (de minimis use of force where inmate was "punched once and kicked once and, consequently, suffered a bruise and an injured right knee"). "Where, as here, a plaintiff alleges only a degree of roughness that is common in prison contexts, and has not claimed a lasting or even fleeting injury resulting from the defendant's conduct, courts **[*21]** in this circuit have routinely held that such conduct is insufficiently serious to support an Eighth Amendment claim." Vogelfang v. Capra, 889 F. Supp. 2d 489, 507 (S.D.N.Y. 2012).

Accordingly, Defendants will be granted summary judgment on Plaintiff's claims arising out of the April 24, 2007 pat frisk.

## IV. THE MAY 10, 2007 INCIDENT

Plaintiff alleges that Defendants Kaufman, Kohler, Arrick, Huttel, Wilson, Fraser, Steinbaugh, and Ercole assaulted him while he was handcuffed at a disciplinary hearing on May 10, 2007. (Am. Cmplt. (Dkt. No. 61) at 5) At his deposition, Plaintiff testified that approximately eight officers punched and kicked him, and beat him with a baton and handcuffs, for approximately twenty minutes. (Deposition Tr. 33) Three or four officers then escorted Plaintiff to the medical facility, punching him and slamming him into walls on the way there. (Id. at 34) Plaintiff claims that as a result he

"suffer[ed] pain physically to [the] face, head, back, chest, and all over [his] body." (Am. Cmplt. (Dkt. No. 61) at 5)

Defendants argue that they are entitled to summary judgment on this claim because Plaintiff has not exhausted his administrative remedies. (Def. Br. (Dkt. No. **[\*22]** 73) at 9-11) Alternatively, Defendants Ercole, Steinbaugh, Wilson, Fraser, Kohler, Huttel, and Arrick argue that they are entitled to summary judgment because Plaintiff has not offered facts showing that they were personally involved in the May 10 incident. (Id. at 13-15)

## A. Exhaustion of Administrative Remedies

### 1. Defendants' Successive Summary Judgment Motions Regarding the May 10, 2007 Incident

The May 10 alleged assault was the subject of a motion to dismiss earlier in this case. Defendants argued at that time that Plaintiff had not exhausted his administrative remedies. (See Jan. 30, 2012 Order (Dkt. No. 46) at 16-22) In support of their motion, Defendants

> submitted material outside the pleadings, including an affidavit and copies of Robinson's grievance history. . . . Defendants [also] gave notice to Robinson that the Court might treat Defendants' Rule 12(b)(6) motion as a motion for summary judgment. . . . In response, Robinson filed an opposition, arguing that summary judgment [was] not appropriate. . . . Accordingly, the Court . . . convert[ed] Defendants' Rule 12(b)(6) motion to a motion for summary judgment . . .

(Id. at 18) This Court went on to deny Defendants' motion as to **[\*23]** the May 10 incident, because of evidence in the record that an Inmate Grievance Program supervisor might have refused to process Plaintiff's appeal of a denial of his grievance. (Id. at 22)

Defendants now renew their argument that they are entitled to summary judgment on Plaintiff's claim concerning the May 10 incident, because of his failure to exhaust his administrative remedies. (Def. Br. (Dkt. No. 73) at 9-11) The first issue raised by Defendants' motion is whether it is appropriate for this Court to consider multiple summary judgment motions concerning this claim.

"The Court 'do[es] not approve in general the piecemeal consideration of successive motions for summary judgment' because parties ought to be 'held to the requirement that they present their strongest case for summary judgment when the matter is first raised.'" Siemens Westinghouse Power Corp. v. Dick Corp., 219 F.R.D. 552, 554 (S.D.N.Y. 2004) (quoting Allstate Fin. Corp. v. Zimmerman, 296 F.2d 797, 799 (5th Cir. 1961)) (alteration in original). "[T]he Court certainly has discretion to review a successive summary judgment motion seeking precisely the same relief as before . . ." Id. (citing Wechsler v. Hunt Health Sys., Ltd., 198 F. Supp. 2d 508, 514 (S.D.N.Y. 2002)). **[\*24]** However, "[a] party may renew its motion for summary judgment . . . [only if] it is supported by new material." Wechsler, 198 F. Supp. 2d at 514 (citing Keehan v. Keehan, No. 96 Civ. 2481 (PKL), 2000 U.S. Dist. LEXIS 5369, 2000 WL 502854, at \*3 (S.D.N.Y. Apr. 25, 2000)); see also Twin Labs., Inc. v. Weider Health & Fitness, 720 F. Supp. 31, 34 (S.D.N.Y. 1989), aff'd, 900 F.2d 566 (2d Cir. 1990). A successive motion for summary judgment is "procedurally improper" if the movant does "not raise[ ] any new facts or arguments which it could not have raised in the first round of briefing." Siemens Westinghouse Power Corp., 219 F.R.D. at 554.

In support of the exhaustion arguments in the instant motion, Defendants have submitted (1) an affidavit from the Inmate Grievance Program Supervisor at Green Haven Correctional Facility; (2) a copy of Robinson's grievance complaint regarding the May 10, 2007 incident; (3) a form reflecting the superintendent's denial of that complaint and Plaintiff's appeal; (4) a grievance log reflecting the superintendent's denial of the

grievance; and (5) the Central Office Review Committee's denial of Plaintiff's appeal. (See Mauro Decl. (Dkt. No. 78) & Exs. A-D)

These documents are all records [*25] of the Department of Correctional Services and were available to Defendants in March 2011 when they filed their motion to dismiss. Defendants will not be permitted a "second bite at the apple." The newly submitted evidence should have been presented in March 2011, in connection with Defendants' motion at that time. See Jackson v. Goord, No. 06-CV-6172 CJS, 2013 U.S. Dist. LEXIS 51781, 2013 WL 1560204, at *5 (W.D.N.Y. Apr. 10, 2013) (quoting Middlegate Dev., LLP v. Beede, Civ. Action No. 10-0565-WS-C, 2011 U.S. Dist. LEXIS 88327, 2011 WL 3475474, *11 n.26 (S.D. Ala. Aug. 9, 2011)) (observing "the importance of not allowing parties to 'treat their initial summary judgment motions as a "dry run" which they would have an opportunity to redo or supplement — at considerable additional cost to opposing parties and at a considerable drain to scarce judicial resources — via a new Rule 56 motion later on to correct any deficiencies identified by opposing counsel or the court in processing the initial motion'"). In sum, Defendants' successive motion for summary judgment on exhaustion grounds is "procedurally improper" and is properly denied on that basis alone. See Siemens Westinghouse Power Corp., 219 F.R.D. at 554.

## 2. Plaintiff's Exhaustion of His [*26] Administrative Remedies

Even if this Court were to consider the merits of Defendants' exhaustion argument, it would conclude that there is a material factual dispute as to this issue.

Under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

remedies as are available are exhausted." This requirement "'applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'" Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009) (quoting Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002)). Therefore, "the Prison Litigation Reform Act's exhaustion requirement . . . applies to excessive force claims." Hemphill v. New York, 380 F.3d 680, 681 (2d Cir. 2004). "[C]ompliance with state procedural rules is necessary to achieve '[t]he benefits of exhaustion [that] can be realized only if the prison grievance system is given a fair opportunity to consider the grievance.'" [*27] Espinal, 558 F.3d at 124 (quoting Woodford v. Ngo, 548 U.S. 81, 95, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)) (second and third alterations in original).

"Section 1997e(a) requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" Hernandez v. Coffey, 582 F.3d 303, 305 (2d Cir. 2009) (quoting Woodford, 548 U.S. at 90 (internal quotation marks omitted) (emphasis in original)). "[B]ecause 'it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion[,]' . . . [t]he exhaustion inquiry . . . requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." Espinal, 558 F.3d at 124 (quoting Jones v. Bock, 549 U.S. 199, 218, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)).

As to Plaintiff's claims here, the PLRA "requires complete exhaustion in accordance with the administrative procedures within the New York State Department of Correctional Services ('DOCS')." Muhammad v. Pico, No. 02 Civ. 1052 (AJP), 2003 U.S. Dist. LEXIS 13402, 2003 WL 21792158, at *7 (S.D.N.Y. Aug. 5, 2003).

The regular DOCS grievance procedure

consists of three tiers. First the inmate **[*28]** files a level 1 grievance . . . with the Inmate Grievance Resolution Committee ("IGRC") . . . Next, the inmate has . . . to appeal the IGRC decision to the superintendent of the facility . . . The inmate's final opportunity for resolution of his grievance is to appeal to the [Central Office Review Committee or] CORC . . ."

Hemphill, 380 F.3d at 682.

It is undisputed that Plaintiff properly pursued his administrative remedies with respect to the alleged May 10, 2007 assault through at least the first two tiers of the grievance process. (See Def. Br. (Dkt. No. 73) at 9-10; Mauro Decl. (Dkt. No. 78) ¶¶ 4-6) On May 23, 2007, Plaintiff filed an inmate grievance complaint alleging that he was physically assaulted on May 10, 2007. (Mauro Decl. (Dkt. No. 78), Ex. A) The IGP received this grievance on June 1, 2007. (Id.) Superintendent Ercole denied the grievance on June 27, 2007. (Id., Ex. B)

To appeal the superintendent's decision, Plaintiff was required to file an appeal with the CORC within seven days of receiving the decision, pursuant to 7 N.Y.C.R.R. 701.5(d)(1)(i). Plaintiff filed his appeal on August 3, 2007, and the CORC received it on August 22, 2007. (Mauro Decl. (Dkt. No. 78), Exs. **[*29]** B, D) The CORC refused to accept Plaintiff's appeal, however, finding that it was untimely. (Id., Ex. D) The CORC concluded that "the dates [Plaintiff] wrote on [the] form . . . indicate[ ] [that he] exceeded the 7 day time limit on CORC appeals." (Id. ¶ 8 & Ex. D) On the appeal form, however, Plaintiff had written that he was "not appealing [the] decision late, [because he only] received [a] copy [of the decision on] 8-3-07," and thus was filing his appeal on the same day that he had received the superintendent's decision. (Id., Ex. B)

"[T]he exhaustion of administrative remedies must be . . . in compliance with a prison grievance program's deadlines . . ." George v. Morrison-Warden, No. 06 Civ. 3188 (SAS), 2007 U.S. Dist.

LEXIS 42640, 2007 WL 1686321, at *2 (S.D.N.Y. June 11, 2007). "Without mitigating circumstances, courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." Soto v. Belcher, 339 F. Supp. 2d 592, 595 (S.D.N.Y. 2004). Accordingly, if Plaintiff's appeal was, in fact, untimely, then he would have failed to exhaust his administrative remedies with respect to the May 10, 2007 incident.

Defendants have not **[*30]** offered any affirmative evidence as to when Plaintiff received the superintendant's decision, however, and thus have not established that his appeal to the CORC was untimely. In concluding that Plaintiff's appeal was untimely, the CORC did not cite to DOC records establishing when Plaintiff was provided with a copy of the superintendant's decision. Instead, the CORC noted that it appeared from Plaintiff's appeal form that Plaintiff— in referencing when he had received the superintendant's decision — changed the date from "7-3-07" to "8-3-07." (See Mauro Decl. (Dkt. No. 78), Ex. D) Defendants rely on this observation to argue that Plaintiff received the superintendant's decision on July 3, 2007. (Def. Br. (Dkt. No. 73) 10-11)

Defendants have not offered evidence demonstrating that Plaintiff actually received the decision on July 3, 2007, however. The alleged "date change" is not dispositive of this issue for several reasons. First, it is not clear that Plaintiff changed the date on the appeal form. Second, even if he did change the date, it is not clear whether that change was made to correct a simple error or whether the change indicates that Plaintiff actually received the superintendant's **[*31]** decision on July 3, 2007. Most importantly, Plaintiff asserts in writing on this form that he did not receive the superintendant's decision until August 3, 2007. Accordingly, this form cannot be relied on to conclusively demonstrate the opposite — i.e., that he received the decision on July 3, 2007.

Because there is a genuine issue of material fact as

to whether Plaintiff's appeal was timely, there is a genuine issue of material fact as to whether Plaintiff exhausted his administrative remedies with respect to the May 10, 2007 incident. Accordingly, Defendants are not entitled to summary judgment on exhaustion grounds.

## B. Personal Involvement of Defendants Ercole, Steinbaugh, Wilson, Fraser, Kohler, Huttel, and Arrick in the May 10, 2007 Incident

Defendants Ercole, Steinbaugh, Wilson, Fraser, Kohler, Huttel, and Arrick argue that they are entitled to summary judgment on Plaintiff's claim concerning the May 10 incident because Plaintiff has not offered facts demonstrating their personal involvement in that alleged assault. (Def. Br. (Dkt. No. 73) 13-15)

As discussed above, to defeat a summary judgment motion, Plaintiff must demonstrate the personal involvement of Defendants in the alleged [*32] violation of his constitutional rights on May 10, 2007. See Wright, 21 F.3d at 501. In the Amended Complaint, Plaintiff alleges that "[o]n May 10, 2007 . . . Officer Kaufman, Kohler, Arrick, Huttel, or Sgt. Wilson, Sgt. Fraser or Lt. Steinbaugh and [E]rcole, Robert, Superintendant all assaulted Plaintiff . . ." (Am. Cmplt. (Dkt. No. 61) at 5) When questioned about this incident at his deposition, Plaintiff stated that Kaufman had repeatedly hit him and placed him "like [in] all different type[s] of odd positions and leg locks and . . . tossed [him] around the room from wall to wall." (Deposition Tr. 32) Approximately eight other officers then entered the room and beat Plaintiff. (Id. at 33) When asked to identify these other officers, Plaintiff testified that he believed that they were "all of the officers in the report," although he did not "know the[ir] names." (Id. at 32-33) Defendants argue that "the report" Plaintiff referred to is the "Use of Force Report" created by Defendant Fraser after the incident. (Def. Br. (Dkt. No. 73) at 14; Harkins Decl. (Dkt. No. 75), Ex. B) That report names Defendants Kohler, Kaufman,

and Fraser as the staff members involved in the incident. (See [*33] Harkins Decl. (Dkt. No. 75), Ex. B)

Defendant Kaufman's personal involvement in the May 10 incident is undisputed.[3] In his written account of the incident, he describes how he "grabbed Robinson[,] . . . spun him around, and guided him to the corner of the room." (Pltf. Opp. (Dkt. No. 40) at 51 (May 10, 2007 Green Haven Correctional Facility Inter-Departmental Communication from Kaufman to Fraser ("Kaufman Report"))) Defendant Kohler then "applied mechanical wrist restraints" to Plaintiff, while Kaufman held both of Plaintiff's wrists together. (Id.) When Plaintiff "continually attempted to come out of the corner by pushing his way out," Kaufman "push[ed] him back into it" and then eventually placed Plaintiff in a leg lock on the floor. (Id.) The Use of Force report states that Plaintiff "continued to struggle with both officers" after being handcuffed. (Harkins Decl. (Dkt. No. 75), Ex. B at 1 (emphasis added))

At his deposition, Plaintiff testified [*34] that handcuffs were used to beat him, and that after he was handcuffed, he could not defend himself. (Deposition Tr. 33) The assault in the hearing room "finally stopped with . . . [the officers] on top of [him] and handcuffs in the back, bleeding." (Id. at 33-34) The fact that Plaintiff was handcuffed during the alleged assault is a significant component of the excessive force claim that Plaintiff has made. Evidence that Kohler handcuffed Plaintiff in the midst of the physical altercation with Kaufman and Kohler — an altercation that continued even after Plaintiff was handcuffed — raises a genuine issue of material fact regarding Kohler's involvement in the alleged beating when considered together with Plaintiff's deposition testimony.

_____

[3] Defendants concede that "[i]n both the complaint and in his deposition, Plaintiff is consistent in . . . alleging the personal involvement of Defendant Kaufman in an excessive use of force [on May 10, 2007]." (Def. Br. (Dkt. No. 73) at 14)

2014 U.S. Dist. LEXIS 40490, *34

Kaufman's report of the incident further states that, while Kaufman was pushing Plaintiff back into the corner of the room, Fraser "entered the room and ordered that Robinson be taken to the floor." (Pltf. Opp. (Dkt. No. 40) at 51 (Kaufman Report)) In response, Kaufman "grabbed [Plaintiff's] left lower leg with both hands and stood up so he was off balance" and, "[a]fter the inmate was on the floor," put him in a leg lock. (Id.) The Use of Force Report [*35] states that Fraser "forced the Inmate to the [f]loor" and "held the Inmate [d]own . . . [while Kaufman applied the leg lock] until the escort officers arrived." (Harkins Decl. (Dkt. No. 75), Ex. B at 2) This evidence indicates that Fraser was not only aware of Kaufman's conduct, but also directly participated in the use of force against Plaintiff.

Plaintiff's testimony and DOC records of the May 10 incident also raise a genuine issue of material fact as to Defendant Huttel's involvement in the incident. In his report, Kaufman states that "[a]fter [Plaintiff] was on the floor, I applied a figure four leg lock until the response team arrived. Officer Huttel then relieved me." (Pltf. Opp. (Dkt. No. 40) at 51 (Kaufman Report)) According to Huttel's report, he "assisted in standing the inmate up and escorting him to the [medical] clinic. . . . [while maintaining] control of the inmate's left side. . . . When [Huttel] removed the [Plaintiff's] restraints in the clinic, [Huttel] received a significant amount of the inmate['s] blood on [his] left hand." (Pltf. Opp. (Dkt. No. 40-1) at 2 (May 10, 2007 Green Haven Correctional Facility Inter-Departmental Communication from Huttel to Fraser ("Huttel [*36] Report")))

At his deposition, Plaintiff testified that several officers entered the room while Kaufman was holding him in a leg lock; that these officers beat him; and that these officers continued to beat him while escorting him to the medical facility. (Deposition Tr. 32-34) Given that the record demonstrates that Huttel was one of the officers who entered the room and escorted Plaintiff to the medical unit, there is a factual issue as to whether Huttel was personally involved in the alleged beating.

Defendants Arrick and Wilson were also part of the response team that entered the room after Kaufman restrained Plaintiff, and both officers assisted in escorting Plaintiff to the medical facility. In Arrick's report of the incident, he states that he "assisted in standing the inmate up and escorting him to the clinic. . . . [while maintaining] control of the inmate['s] right side." (Pltf. Opp. (Dkt. No. 40-1) at 3 (May 10, 2007 Green Haven Correctional Facility Inter-Departmental Communication from Arrick to Fraser ("Arrick Report"))) Wilson states that "[w]ith Officer Huttel on Robinson['s] left side and Officer Arrick on his right side, [he] escorted Robinson to the hospital clinic." [*37] (Id. at 4 (May 10, 2007 Green Haven Correctional Facility Inter-Departmental Communication from Wilson to Fraser ("Wilson Report"))) In light of Plaintiffs account of the beating he received when the responding officers entered the room and escorted him to the medical facility, there is a factual issue as to Arrick's and Wilson's involvement in the incident.

Lieutenant Steinbaugh was also present for the physical altercation between Plaintiff, Kohler, and Kaufman. In his report of the incident, Steinbaugh states that he gave orders to Plaintiff— while the other officers attempted to place mechanical restraints on his wrists — and that he "called for the area sergeant to report." (Id. at 5 (May 10, 2007 Green Haven Correctional Facility Memorandum from Steinbaugh to Ercole ("Steinbaugh Report"))) Wilson states that he, Arrick, and Huttel responded to Steinbaugh's call. (Id. at 4 (Wilson Report)) Steinbaugh was present when those officers arrived and escorted Plaintiff from the room. (Id. at 5 (Steinbaugh Report)) Steinbaugh's presence in the room throughout the encounter raises factual issues as to whether he directly participated in the assault and whether — as a supervisor of the other [*38] officers — he failed to properly supervise those officers or remedy the alleged misconduct that he observed taking place. See Colon, 58 F.3d at 873.

As to Superintendant Ercole, there is no evidence that he was present for the alleged beating, but the record indicates that he encountered Plaintiff soon thereafter. Plaintiff testified that — after he was brought to the medical facility — "the superintendent came to see me and told me — and I remember — 'We finally got your ass.'"[4] (Def. Br. (Dkt. No. 73) at 14) When asked to clarify who said that to him, Plaintiff testified that Ercole made this statement. (Id.) This evidence is sufficient to raise a genuine question of material fact as to whether Ercole "after being informed of the violation . . . , failed to remedy the wrong," "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," "was grossly negligent in supervising subordinates who committed the wrongful acts," or "exhibited deliberate indifference to the rights of [Plaintiff] by failing to act on information indicating that unconstitutional acts were occurring." Colon, 58 F.3d at 873.

For the reasons stated above, Defendants' motion for summary judgment on Plaintiff's claims regarding the May 10, 2007 incident will be denied.

## CONCLUSION

Defendants Ercole, Steinbaugh, Fraser, Wilson, Kaufman, Kohler, Huttel, and Arrick's motion for summary judgment on Plaintiff's claims regarding [*40] the cell door and the pat frisk incidents on

April 24, 2007 is granted. Defendants' motion for summary judgment on Plaintiffs' claims regarding the May 10, 2007 incident is denied. Defendants' motion for permission to reply to Plaintiff's February 11, 2014 letter is denied as moot. The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 70, 88).

The Clerk is further ordered to terminate as defendants J. Henschel, Sgt. Ward, T. Lucas, Correction Officer Titka, K. Johnson, Macko, Caron, Superintendent Phillips, Sullivon, Lieutenant Alexander, R. Hamilton, T. Stevens, Schmitt, Correction Officer R. Ward, Novoa, Prison Medical Staffs RN Staff, Krause, and B. Roberts.[5]

The Clerk of the Court is directed to mail a copy of this Order to Latee Robinson, 06-A-1498, Great Meadow Correctional Facility, Box 51, Comstock, NY 12821-0051.

Dated: New York, New York

March 26, 2014

SO ORDERED.

/s/ Paul G. Gardephe

Paul G. Gardephe

United States District Judge

---

---

[4] Defendants quote [*39] and cite to these portions of Plaintiff's deposition in their brief. A transcript reflecting this testimony has not been provided to the Court, however. (See Harkins Decl. (Dkt. No. 75), Ex. A) Given the liberal treatment afforded pro se litigants — particularly in the context of summary judgment motions — the Court will consider the referenced excerpts in evaluating whether a genuine issue of material fact exists. See F.T.C. v. Med. Billers Network, Inc., 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008) ("Although [a pro se litigant's] arguments may ultimately be rejected if unsupported by the law or the evidence, the Court will afford him 'special solicitude' in responding to [a] motion for summary judgment. In particular, the Court will consider the best arguments suggested by [his] submissions and allow [him] to benefit from the [opposing party's] briefs and supporting papers whenever appropriate.").

[5] The Amended Complaint contains no allegations concerning J. Henschel, Sgt. Ward, T. Lucas, Correction Officer Titka, K. Johnson, Macko, Caron, Superintendent Phillips, Sullivon, Lieutenant Alexander, R. Hamilton, T. Stevens, Schmitt, Correction Officer R. Ward, Novoa, Prison Medical Staff's RN Staff, Krause, or B. Roberts. Plaintiff has likewise not suggested that these individuals played any role in the April 24 and May 10 incidents. Accordingly, to the extent any claims remain against these Defendants, those [*41] claims are dismissed. Cf. Medina v. Hunt, No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748, at *4 (N.D.N.Y. Sept. 25, 2008) ("[A] district court may, sua sponte, address whether a pro se prisoner has failed to state a claim upon which relief may be granted.").



## Shaw v. Prindle

United States District Court for the Northern District of New York

July 10, 2015, Decided; July 10, 2015, Filed

No. 12-CV-1281 (FJS/CFH)

**Reporter**

2015 U.S. Dist. LEXIS 104431 *

MICHAEL DAVID SHAW, Plaintiff, v. S. PRINDLE, Correction Officer; RUSSO, Captain, Acting Deputy Superintendent of Security; and ROLLIN LARKIN, Superintendent, Defendants.[1]

**Subsequent History:** Adopted by, Summary judgment granted by, Request denied by, As moot, Judgment entered by Shaw v. Prindle, 2015 U.S. Dist. LEXIS 104168 (N.D.N.Y, Aug. 10, 2015)

**Prior History:** Shaw v. Prindle, 2013 U.S. Dist. LEXIS 188919 (N.D.N.Y, Dec. 4, 2013)

**Counsel:  [*1]** MICHAEL DAVID SHAW, Plaintiff, Pro se, Napanoch, New York.

For Defendant: KEVIN M. HAYDEN, ESQ., Assistant Attorney General, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, New York.

**Judges:** Christian F. Hummel, United States Magistrate Judge.

**Opinion by:** Christian F. Hummel

## Opinion

### REPORT-RECOMMENDATION AND ORDER[2]

---

[1] Prindle is the only remaining defendant.

[2] This matter was referred to the undersigned for report and

Plaintiff <u>pro se</u> Michael David Shaw ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that defendant Correction Officer S. Prindle ("Prindle" or "defendant") violated his constitutional rights under the Eighth Amendment.[3] Presently before the Court is defendant's motion for summary judgment. Dkt. No. 50. Plaintiff opposes the motion. Dkt. No. 52. For the following reasons, it is recommended that defendant's motion be granted.

## II. Background

### A. **Facts**[4]

---

recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3] As discussed <u>infra</u>, all allegations in plaintiff's amended complaint were dismissed with prejudice except for plaintiff's Eighth Amendment claim against Prindle. See Dkt. Nos. 10, 35.

[4] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for **[*2]** summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection III (A) infra. At the time of the incident described in the amended complaint, plaintiff was confined at Eastern Correctional Facility ("Eastern C.F."). Dkt. No. 50-2 at 1.[5] Prindle, who had sixteen years of experience, was employed by DOCCS at Eastern C.F. and was working on November 11, 2011. Id. Prior to November 11, 2011, Prindle had no contact with plaintiff. Id. On November 11, 2011, Prindle observed plaintiff displaying stamps in the recreation yard.[6] Id. at 2. Upon the completion of the recreation period, Prindle escorted plaintiff to the search shack [*4] for a routine pat frisk. Dkt. No. 50-2 at 1. Plaintiff cleared the metal detector and Prindle ordered plaintiff to face the wall, untie his shoes, place his hands on the wall, and stand with his feet shoulder-width apart. Id. In addition to plaintiff and Prindle, there were approximately six or seven other officers present. Dkt. No. 50-4 at 9.[7]

Prindle directed plaintiff to remove his hood and sweatshirt.[8] Dkt. No. 50-4 at 9. Prindle commenced

---

the pat frisk and used his hands to check along the outside of plaintiff's clothing. Id. Prindle removed plaintiff's belt and put his hands in plaintiff's waist and zipper area. Dkt. No. 50-4 at 10. Prindle asked what type of underwear plaintiff was wearing. Id. at 11. Prindle searched inside plaintiff's pants pockets and then searched plaintiff's groin and crotch, with his hands over plaintiff's clothes. Id. at 18. The search of plaintiff's rectum, testicles [*5] and crotch lasted two to three minutes, but not more than five minutes. Dkt. No. 50-4 at 10-11, 17-19, 45. Prindle did not touch plaintiff's penis or put any part of his hand inside plaintiff's rectum. Id. at 18-19. Plaintiff was clothed during the search and the entire pat frisk was conducted above and outside plaintiff's clothing. Id. at 15, 19. At one point during the search, plaintiff "spun off the wall" and told Prindle to "calm down." Id. at 23. Plaintiff then returned to his position on the wall so that the search could continue. Dkt. No. 50-4 at 23.

Prindle declared that he conducted the pat frisk in accordance with DOCCS directives and in a professional manner. Dkt. No. 50-5 at 3. Prindle states that he, "placed the web of my left hand (the area between the thumb and index finger) into his groin." Id. Prindle further avers that he touched the outer thigh of plaintiff's legs, wrapped his fingers around the plaintiff's legs, and patted down plaintiff's ankles. Id. Prindle concedes that the frisk included a search of plaintiff's genital [*6] area and buttocks over his clothing, but claims that he did not linger or prolong his search of these areas. Id.

Upon completing the pat frisk, Prindle discovered that plaintiff was in possession of stamps in violation of prison rules.[9] Dkt. No. 50-5 at 3. The

---

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

Local Rule 7.1(a)(3) (emphasis in original).

Defendant filed a Statement of Material Facts. Plaintiff has not properly responded but admits the [*3] facts contain in certain paragraphs of defendant's Statement of Material Facts. The facts set forth in this section are taken from : (1) defendant's Statement of Material Facts; (2) plaintiff's deposition transcript; and (3) defendant's affidavit. Dkt. No. 60-4 at 2-9. To the extent that the "facts" asserted defendant in the Statement of Material Facts are supported by the record, the Court will consider them in the context of the within motion. The facts recited are for the relevant time period as referenced in the amended complaint.

[5] Citations to page numbers refer to the pagination generated by CM/ECF, not the page numbers generated by the parties.

[6] Stamps are prohibited in the recreation yard because they are used

---

to purchase items or gamble. Dkt. No. 50-5 at 2.

[7] On December 22, 2014, plaintiff testified at a deposition. Dkt. No. 50-4 at 1-57.

[8] In support of the motion herein, Prindle provided an affidavit. Dkt. No. 50-5. Prindle does not address the issue of whether he asked plaintiff to remove his hood and sweatshirt.

[9] Defendant claims plaintiff possessed thirty-four stamps. Dkt. No. 50-2 at 9. Plaintiff claims he was in possession of thirty-three stamps. Dkt. No. 52-1 at 2.

entire search — including the time it took for: plaintiff to enter the metal detector; remove his shoes, hood and sweatshirt; defendant to complete the pat frisk; and plaintiff to get dressed — took twenty minutes to complete. Dkt. No. 50-4 at 18, 25; Dkt. No. 50-2 at 4. As a result of the search, plaintiff claims he suffered pain in his left pinky toe and mental anguish. Id. at 29, 38.

## B. Procedural History

On August 15, 2012, plaintiff filed his complaint in this action. Dkt. No. 1. On December 13, 2012, plaintiff filed an amended complaint.[10] Dkt. No. 9. Upon review of plaintiff's amended complaint, the Court directed defendants Prindle, Rollin Larkin ("Larkin") and Russo to respond to the allegations in the amended complaint. Dkt. No. 10. On August 20, 2013, defendants moved for judgment **[*7]** on the pleadings pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(c) and dismissal of plaintiff's complaint. Dkt. No. 25. The Court granted the motion on behalf of Larkin and Russo and denied the motion with respect to plaintiff's Eighth Amendment claim against Prindle. Dkt. No. 35. On December 22, 2014, plaintiff appeared at a deposition. Dkt. No. 50-4. On May 4, 2015, defendant filed the within motion pursuant to Fed. R. Civ. P. 56 seeking judgment as a matter of law with respect to plaintiff's Eighth Amendment claim. Dkt. No. 50. Plaintiff opposes the motion. Dkt. No. 52.

## III. Discussion[11]

Plaintiff contends that Prindle sexually assaulted him during the pat frisk in violation of the Eighth Amendment. As a result, plaintiff suffered pain in his left foot, extreme emotional distress,

---

[10] On November 19, 2012, the Court dismissed plaintiff's complaint for failure to state a claim and provided plaintiff with an opportunity to amend. Dkt. No. 8.

[11] All unpublished decisions cited herein, unless otherwise indicated, are attached to this Report- Recommendation.

sleeplessness, mental anguish, insecurity, anxiety, fear, and humiliation. See Am. Comp. at 13.

## A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to any material **[*8]** fact, it was supported by affidavits or other suitable evidence, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of demonstrating the absence of disputed material facts by providing the court with portions of pleadings, depositions, and affidavits which support the motion. FED. R. CIV. P. 56 (c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing a genuine issue for trial. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). For a court to grant a motion for summary judgment, it must be apparent that no rational finder of fact could find in favor of the non-moving party. Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Federal Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," . . . that a pro se litigant's

submissions must be construed "liberally,". . . and that such submissions must be read to raise the strongest **[*9]** arguments that they "suggest," . . . . At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, . . . or arguments that the submissions themselves do not "suggest," . . . that we should not "excuse frivolous or vexatious filings by pro se litigants," . . . and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law.

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

## B. Eighth Amendment

A claim of cruel and unusual punishment in violation of the Eighth Amendment has both objective and subjective components. The subjective component focuses on the defendant's motive for his or her conduct (Hudson v. McMillian, 503 U.S. 1, 7-8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)), and requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness'" in light of the particular circumstances surrounding the challenged conduct. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (quoting Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)); see, e.g., Sims v. Artuz, 230 F.3d 14, 21 (2d Cir.2000); Davidson v. Flynn, 32 F.3d 27, 30 & n.2 (2d Cir.1994). "Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims." Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir.1997). "[S]evere or repetitive sexual abuse **[*10]** of an inmate by a prison officer can be objectively serious enough to constitute an Eighth Amendment violation" because "no legitimate law

enforcement or penological purpose can be inferred" from such conduct. Id. (citation and internal quotation marks omitted). However, minor, isolated incidents, even if inappropriate, will not normally state a valid cause of action under the Eighth Amendment. Id. For example, an isolated incident of inappropriate touching that occurred during a search of a prisoner for contraband, even if true, does not constitute an Eighth Amendment violation. Id. at 861 (the episodes of touching may be despicable and potentially the basis for tort action, but do not involve a harm of federal constitutional proportions); see also Moncrieffe v. Witbeck, No. 97-CV-253 (NAM), 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457, at *5 (N.D.N.Y. June 29, 2000) (dismissing inmate's sexual harassment claim based on two incidents of improper touching during pat frisks as failing to state a cognizable Eighth Amendment claim). "Numerous courts in this Circuit have held that allegations of isolated sexual abuse during frisk searches do not implicate the Eighth Amendment." Hilson v. Maltese, 09-CV-1373 (NAM/ATB), 2012 U.S. Dist. LEXIS 185414, *26, 2012 WL 6965105, at *8 (N.D.N.Y. Dec. 14, 2012) (citations omitted).

In opposition to defendant's motion, plaintiff asserts that his, "[a]mended Complaint contains plausible facts where Defendant Simon Prindle violated Plaintiff's constitutional Eighth Amendment Rights, **[*11]** by subjecting him to malicious and sadistic acts of sexually motivated abuse and misconduct." Dkt. No. 52-1 at 3. Plaintiff also argues that he has sufficiently plead that he sustained an injury as a result of the pat frisk, to warrant denial of the motion. Dkt. No. 52-2 at 11. Although plaintiff's allegations were sufficient to survive the pleading stage, on a motion for summary judgment, plaintiff must come forward with competent, admissible evidence demonstrating a triable issue of fact for jury to resolve. Fed. R. Civ. P. 56(a). Plaintiff has not met that burden.

This case involves a single instance of alleged sexual abuse by Prindle with conduct and actions that are not "objectively severe" when compared to

the relevant caselaw. Compare, e.g. Jones v. Rock, No. 12-CV-447 (NAM/TWD), 2013 U.S. Dist. LEXIS 127809, *53, 2013 WL 4804500, at *19 (N.D.N.Y. Sept. 6, 2013) (the claim that the defendant "shoved his fingers between plaintiff's buttock with force and that one of his fingers invaded the plaintiff's anus . . . and groped the plaintiff's genitals until the plaintiff screamed with pain" was insufficient to establish an Eighth Amendment claim); see also Excell v. Fischer, No. 08-CV-945 (DNH/RFT), 2009 U.S. Dist. LEXIS 88506, *21, 2009 WL 3111711, at *7 (N.D.N.Y. Sept. 24, 2009) (the claim that the defendant grabbed and squeezed the plaintiff's penis during a pat frisk was insufficient to state an Eighth Amendment claim); see also Davis v. Castleberry, 364 F. Supp. 2d 319, 321 (W.D.N.Y. 2005) (allegation that the defendant grabbed the [*12] plaintiff's penis during a pat frisk was insufficient to state a claim); see Harry v. Suarez, 10-CV-6756 (NRB), 2012 U.S. Dist. LEXIS 79551, 2012 WL 2053533, *3 (S.D.N.Y. Jun. 4, 2012) (granting summary judgment dismissing claim that corrections officer "groped [plaintiff's] genitals, buttocks, and inner thighs for up to fifty three seconds in the course of a frisk"); Montero v. Crusie, 153 F.Supp.2d 368, 373, 375 (S.D.N.Y.2001) (granting summary judgment where plaintiff alleged that "on several occasions" corrections officer squeezed his genitals while pat-frisking him).

In a recent case in this District with strikingly similar facts, the Court held that the plaintiff failed to state an Eighth Amendment claim against the same defendant, Prindle. In Crawford v. Cuomo, No. 13-CV-406, (NAM/CFH), 2014 U.S. Dist. LEXIS 28488, 2014 WL 897046, at *4 (N.D.N.Y. March 6, 2014), the plaintiff claimed that Prindle ran his hands down his chest area, grabbed the plaintiff's penis and held it, pinned the plaintiff to the wall, pushed his knee in the plaintiff's back and grabbed the plaintiff's crotch area. The plaintiff further alleged that Prindle "squeezed and roamed with his hands around [the plaintiff's] penis and down his thigh." Id. The plaintiff admitted to being

fully clothed during the incident and did not allege that Prindle touched him beneath his clothing. Id. The plaintiff did not allege that Prindle touched him with any part of his body except his hands, [*13] and briefly, his knee. Id. The plaintiff also did not allege any penetration. Id. Noting that the plaintiff alleged only a single incident, which was not excessive in duration, the Court held, "[the plaintiff]'s claim is indistinguishable from the claims dismissed by numerous district courts in this Circuit on the ground that 'isolated instances . . . of fondling and groping' are not sufficiently severe to support an Eighth Amendment cause of action." Id. (citing inter alia Castro—Sanchez v. N.Y.S. Dep't of Corr. Servs., No. 10 Civ. 8314, 2012 U.S. Dist. LEXIS 141292, 2012 WL 4474154, *1 (S.D.N.Y. Sept. 28, 2012) (denying leave to amend complaint to add Eighth Amendment claim alleging that corrections officer pulled down the plaintiff's pants and groped his buttocks); see also Morrison v. Cortright, No. 04-CV-6209, 397 F.Supp.2d 424, 425 (W .D.N.Y. Nov. 9, 2005) (dismissing Eighth Amendment claim which included allegations that corrections officer rubbed his penis against the plaintiff's buttocks during strip frisk)).

Here, the facts surrounding Prindle' s pat frisk, are less objectively severe than the allegations by Crawford.[12] In this matter, there was one incident, of limited duration, while plaintiff was fully clothed. Prindle did not touch, fondle or grab plaintiff's penis. While Prindle "pressed his body" against plaintiff's body, this brief and limited contact is not severe enough to rise to the level of a constitutional violation. See, e.g. [*14] , LaRocco v. N.Y.C. Dep't of Corrs., No. 99 CIV 9759, 2001 U.S. Dist. LEXIS 13839, 2001 WL 1029044, at *5 (S.D.N.Y. Aug. 31, 2001) (holding that the claim that the defendant threw the plaintiff against the wall and pressed his body against the plaintiff's was not severe enough to be considered objectively serious) (citing Boddie, 105 F.3d at 859-60) (holding that the allegation that the defendant

---

[12] In Crawford, the Court was presented with a motion to dismiss, not a motion for summary judgment.

"pressed against" the plaintiff without consent, touched and verbally harassed the plaintiff was not objectively, sufficiently serious).

In opposition to the present motion, plaintiff relies upon Lewis v. Fischer, 08-CV-3027 (GJ/LB), 2009 U.S. Dist. LEXIS 19626, 2009 WL 689803 (E.D.N.Y. Mar. 12, 2009), the case cited by the Court in the Order denying Prindle's motion for judgment on the pleadings. Dkt. No. 35. The Court cited Lewis and reasoned:

> . . . this is a motion for judgment on the pleadings; and, therefore, the Court must accept as true all of the well-pleaded factual allegations in Plaintiff's complaint. In light of these standards, the Court finds that Plaintiff has alleged sufficient facts to state a plausible Eighth Amendment claim against Defendant Prindle based on his alleged sexual assault of Plaintiff on November 11, 2011.

Dkt. No. 35 at 9-10.

Although Lewis offered support [*15] for denying defendant's motion on the pleadings, the motion presently before this Court is one for summary judgment and the Court is not required to accept the allegations in the amended complaint as true. See, e.g., Ryan v. New York State Thruway Auth., 889 F. Supp. 70, 75 (N.D.N.Y. 1995). "It is important to recognize the difference between disposing of the case on a motion to dismiss and resolving the case later in the proceedings." See McGuire v. Warren, 207 F. App'x 34, 35 (2d Cir. 2006) (on a motion to dismiss, the issue is not whether the plaintiff is likely to prevail but whether the plaintiff is entitled to offer evidence to support his claims) (citations omitted).

In Lewis, the Court denied the defendant's motion to dismiss, finding that the plaintiff sufficiently plead a cause of action for sexual abuse in violation of the Eighth Amendment. See Lewis, 2009 U.S. Dist. LEXIS 19626, 2009 WL 689803, at *1. In this matter, the parties have had an opportunity to engage in discovery, and the record presently before the Court reveals important factual

dissimilarities between this action and the Lewis case. In Lewis, the Court noted that the plaintiff alleged that the defendant, "reached inside his pants and fondled his penis and squeezed his testicles causing severe pain." 2009 U.S. Dist. LEXIS 19626, [WL] at *5. Here, plaintiff admits that Prindle never reached inside his clothes and explicitly stated that Prindle [*16] did not touch his penis or squeeze his genitals. Dkt. No. 50-4 at 18. In Lewis, the search took place in a hallway and was not a routine search, but performed to harass and humiliate the plaintiff. See Lewis, 2009 U.S. Dist. LEXIS 19626, [WL] at *5. Here, plaintiff testified that the search took place in the "search shack" in the presence of six or seven officers but plaintiff has not established, with competent evidence in admissible form, that the pat frisk was harassing or punitive in nature. Dkt. No. 50-4 at 8.[13] Finally, although plaintiff initially alleged that Prindle searched his groin and crotch for twenty minutes, plaintiff's deposition testimony belies that claim. See Dkt. No. 50-4 at 10. During his deposition, plaintiff admitted that the search of his body was no more than five minutes in length and the search of his groin, rectum and crotch area was "about two to three minutes." Id. Plaintiff explained that the entire search, from start to finish, was twenty minutes. Id. at 13.

Further fatal to plaintiff's claim is that plaintiff has not produced evidence that he sustained a sufficiently serious deprivation or injury as a result of the search. See Cox v. Malone, 199 F. Supp. 2d 135, 140 (S.D.N.Y. 2002) (holding that a scratched hand and alleged psychological injuries resulting from a pat frisk are de minimis). Plaintiff did not seek or receive any medication or treatment for mental health issues. Dkt. No. 50-4 at 39. Plaintiff claims that he suffered injury to his left pinky toe as

---

[13] In his submissions, plaintiff provides contradictory arguments. In his Memorandum of Law, plaintiff attempts to prove, citing documents that are not in proper evidentiary form, that the search was "random." However, in his affidavit, plaintiff admits [*17] that the search was "routine." See Dkt. No. 50-2 at 5; see also Dkt. No. 52-1 at 3.

well as mental distress as a result of the pat frisk, but he has not demonstrated any severe physical or psychological harm with competent admissible evidence. See Moncrieffe, 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457, at *5.

Plaintiff presents unsupported claims that Prindle, "has a long standing history (years) of sexually abusive behavior," and "fetish for sexually abusing prisoners. Which is well documented." Dkt. No. 52-1 at 2; Dkt. No. 52-2 at 10. However, the record is devoid of any evidence that Prindle ever abused plaintiff or any other inmate. Moreover, even assuming Prindle had been the subject of abuse complaints, plaintiff does not claim that he was the victim of any abuse by Prindle other than the **[*18]** single episode on November 11, 2011. Indeed, plaintiff admits he had no contact with Prindle prior to that date.

Plaintiff has not produced any evidence establishing that Prindle's search was anything more than a standard pat frisk or that Prindle "intentionally and forcibly inflicted unnecessary and wanton pain." The record demonstrates that the incident complained of in the amended complaint was an isolated incident and further, that Prindle's conduct and actions were not sufficiently severe to invoke the protections afforded by the Eighth Amendment. Thus, it is recommended that defendant's motion for summary judgment be granted.

## C. Qualified Immunity

Prindle argues that even if plaintiff's Eighth Amendment claim is substantiated, he is nevertheless entitled to qualified immunity. Qualified immunity generally protects government officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (J. McAvoy), aff'd

80 F. App'x 146 (2d Cir. 2003). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might **[*19]** still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citation omitted)). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). Only if there is a constitutional violation does a court proceed to determine whether constitutional rights were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.

Here, the second prong of the inquiry need not be addressed with respect to plaintiff's claims against Prindle because, as discussed supra, it has not been shown that Prindle violated plaintiff's constitutional rights. Accordingly, in the alternative, it is recommended that defendant's motion on this ground be granted.

## III. CONCLUSION

**WHEREFORE**, based on the findings set forth above, it is hereby:

**RECOMMENDED** that defendant's motion for summary judgment (Dkt. No. 50) be **GRANTED**.

**ORDERED** that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such **[*20]** objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE**

2015 U.S. Dist. LEXIS 104431, *20

**REVIEW**. <u>Roldan v. Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993) (citing <u>Small v. Secretary of Health and Human Services</u>, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

Dated: July 10, 2015

Albany, New York

/s/ Christian F. Hummel

Christian F. Hummel

U.S. Magistrate Judge

---

**End of Document**



# Tavares v. City of New York

United States District Court for the Southern District of New York

October 17, 2011, Decided; October 17, 2011, Filed

08 Civ. 3782 (PAE) (JCF)

**Reporter**

2011 U.S. Dist. LEXIS 137381 *; 2011 WL 5877550

PEDRO JUAN TAVARES, Plaintiff, - against - CITY OF NEW YORK; EMANUEL BAILEY, Warden; VANESSA SINGLETON, Deputy Warden; MS. DRAIN, Captain; MS. GLOVER, Captain; MS. PENNANT, Correction Officer; MR. JEAN, Correction Officer; Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Certificate of appealability denied, Summary judgment denied by Tavares v. City of New York, 2011 U.S. Dist. LEXIS 135390 (S.D.N.Y., Nov. 23, 2011)

**Prior History:** Tavares v. City of New York, 2010 U.S. Dist. LEXIS 3615 (S.D.N.Y., Jan. 19, 2010)

**Counsel:** [*1] Pedro Juan Tavares, Plaintiff, Pro se, East Elmhurst, NY.

For City of New York, Warden Emmanuel Bailey, George Motcham Detention Center, Miss Glover, Captain, Mr. Jean, Corr. Officer, Deputy Venessa Singliton, Captain Drain, Corr. Officer Pennant, Defendants: Brian Christopher Francolla, New York City Law Department, New York, NY.

**Judges:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE. HONORABLE PAUL A. ENGELMAYER, U.S.D.J.

**Opinion by:** JAMES C. FRANCIS IV

# Opinion

REPORT AND RECOMMENDATION

TO THE HONORABLE PAUL A. ENGELMAYER, U.S.D.J.:

Pedro Juan Tavares, a prison inmate, brings this action pro se pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against the City of New York (the "City"), George Motchan Detention Center ("GMDC") Warden Emanuel Bailey, Deputy Warden Vanessa Singleton, Captain Drain, Captain Glover, Correction Officer Pennant, and Correction Officer Jean.[1] The plaintiff alleges that while he was detained at GMDC on Rikers Island, the defendants violated his civil rights by (1) subjecting him to excessive force; (2) failing to intervene during the use of force; (3) failing to train and supervise the assaulting officer; (4) conspiring to cover up the assault, thereby denying him due process and equal protection [*2] of the laws; and (5) neglecting to prevent the conspiracy. The plaintiff claims that the defendants either participated in, observed, or approved these unconstitutional acts. Finally, the plaintiff alleges municipal liability on the part of the City of New York and also raises various state law claims.

The parties now cross-move for summary judgment. The defendants contend that: (1) the plaintiff's excessive force and conspiracy claims

---

[1] The parties have not provided the first names of defendants Drain, Glover, Pennant, or Jean.

fail as a matter of law; (2) his claims against defendants Warden Bailey, Deputy Warden Singleton, and Officer Pennant must be dismissed for lack of personal involvement; (3) the individual defendants are entitled to qualified immunity; (4) the plaintiff cannot establish a claim for municipal liability against the City; and (5) his state law claims must be dismissed because his notice of claim was untimely. For the reasons set forth below, I recommend that the plaintiff's motion be denied and summary judgment be granted for the defendants.

Background

The plaintiff's claims arise from an incident that he alleges occurred on the evening of July 17, 2007 during his **[*3]** pretrial detention at GMDC. At approximately 7:20 p.m., Mr. Tavares was returning to his assigned housing unit after picking up his medication. (Amended Complaint ("Am. Compl."), ¶ 14). The plaintiff claims that while he walked back to his dormitory, Officer Jean ordered him to stop to allow Captain Drain and Officer Pennant to pass by the area. (Am. Compl., ¶ 14). Mr. Tavares alleges that as Officer Jean told him to stop, he raised his left arm and touched the plaintiff's face. (Am. Compl., ¶ 14). Officer Jean "just touched [him], not hit [him]," and Mr. Tavares was not hurt by the contact. (Deposition of Pedro Tavares dated March 10, 2009 ("Tavares Dep."), attached as Exhibit E to Defendants' Rule 56.1 Statement ("Def. 56.1 Statement"), at 42-43). Mr. Tavares then "verbally reprimanded" Officer Jean, asking why the officer touched his face. (Am. Compl., ¶ 15; Tavares Dep. at 43, 50). According to Mr. Tavares, Officer Jean responded by "throwing [him] up against the wall, spreading [his] legs by kicking [him] harshly on both . . . ankles," and "compressing [his] chest against the wall [such] that plaintiff thought he was going to pas[s] out." (Am. Compl., ¶ 16). Mr. Tavares claims **[*4]** he was then "maliciously pat frisked and verbally abused" by Officer Jean for several minutes, until Captain Drain commanded Officer Jean to stop and

sent the plaintiff to his dormitory. (Plaintiff's Reply to Defendants' Motion for Summary Judgment ("Pl. Reply"), ¶ 11; Am. Compl., ¶¶ 17, 37). Mr. Tavares asserts that Officer Pennant did not speak or otherwise intervene at any time during the incident. (Am. Compl., ¶ 38). In his deposition, Mr. Tavares acknowledged that the difference between this incident and the other hundreds of times he has been frisked in prison is that he was forced to put his hands against the wall and spread his legs, rather than simply being asked to do so. (Tavares Dep. at 56-57).

On July 18, 2007, Mr. Tavares wrote a grievance letter complaining about the incident to the Office of the Inspector General ("OIG"), and sent a copy of the grievance to Warden Bailey. (Am. Compl., ¶ 18; Letter of Pedro Tavares dated July 18, 2007 ("Grievance Letter"), attached as Exh. 9 to Am. Compl.; Def. 56.1 Statement, ¶ 19). Records attached to the plaintiff's Amended Complaint indicate that OIG did not receive his grievance until September 25, 2007. (GMDC Intake Received Record, **[*5]** dated September 28, 2007, attached as Exh. 3 to Am. Compl.; Affidavit of Deputy Warden Mark Scott dated Feb. 12, 2009, attached as Exh. 16 to Am. Compl. ("According to Use of Force Allegation Package # 1394/07, plaintiff did not file a formal complaint with the [Department of Correction of the City of New York ("DOC")] Investigation Division pertaining to an alleged Use of Force that took place on July 17, 2007, until September 25, 2007.")). On October 10, 2007, Captain Glover contacted the plaintiff and requested that he provide a statement on the matter. (Am. Compl., ¶¶ 19, 28). On or around that same date, Captain Glover notified Mr. Tavares that she had completed the investigation and, after interviewing the personnel allegedly involved, determined his grievance had no merit. (Am. Compl., ¶ 20).

Mr. Tavares complains that the defendants failed to timely investigate his grievance, based on the 15-day lapse between the OIG intake date and the date he was interviewed by Captain Glover. (Am.

Compl., ¶¶ 19, 28, 33). The plaintiff assigns primary responsibility for this delay to Warden Bailey: Mr. Tavares asserts the warden had notice of his grievance prior to September 25 based on the [*6] alleged date of its dispatch, but failed to investigate the complaint until notified by OIG. (Am. Compl., ¶¶ 33-34). Mr. Tavares also contends that Warden Bailey and Deputy Warden Singleton conspired to erase security camera footage of the incident. (Pl. Reply at 16). Deputy Warden Singleton's purported culpability stems from her "suspicious[]" failure to indicate whether she had reviewed the footage in her report of October 17, 2007, as well as the plaintiff's assertion that she was "the only authority that had immediate access to the monitor room where [the recordings] are kept." (Am. Compl., ¶¶ 35-36). Mr. Tavares also alleges that Captain Glover did not ask to review the footage in contravention of DOC Operations Order 12/07 Section IV(E) (1), which directs "the Deputy Warden for Security, or designee, to review the recording, if available, as soon as practical to determine the validity of [a use of force] allegation." (Am. Compl., ¶ 31; DOC Operations Order 12/07, Recording Equipment/Medium and Electronic Evidence, dated August 13, 2007, attached as Exh. 16 to Am. Compl.). Mr. Tavares also claims that Captain Drain and Officer Pennant later denied witnessing the incident "because [*7] there is no video tape to [prove his] allegation." (Am. Compl., ¶ 39). The plaintiff alleges that the sum of the defendants' actions establish the formation of a conspiracy to "cover up the assault" and "prevent the investigation of it." (Am. Compl., ¶ 44). He further claims that this conspiracy was undertaken because he is Hispanic, although he alleges no supporting facts. (Am. Compl., ¶ 28).

Mr. Tavares reported experiencing physical pain during the alleged assault, though he did not receive any marks or bruises. (Am. Compl., ¶¶ 22-24; Tavares Dep. at 56, 51). In his grievance written the following day, Mr. Tavares' sole complaint regarding any physical harm during the pat frisk concerned his having to put pressure on his left hand, which he had previously injured. (Grievance Letter) ("I have a left hand fracture that [] happened on the day and time of my arrest and the last time Officer Jean thr[ew] me against the wall, I landed on my left hand, putting a lot of pressure on it."). The record of plaintiff's medical examination on October 10, 2007 indicates that, nearly three months after the incident, the plaintiff complained only of pain in his left hand, for which he was provided [*8] Motrin as treatment. (DOC Injury to Inmate Report dated October 10, 2007, attached as Exh. 15 to Am. Compl.).

Mr. Tavares contends that he now "suffer[s] from [a] lumb-sacral low disc problem on his lower back," "hip fluid on his left hip," and "degenerative blunting of the anterosuperior acetabular labra," as a result of the incident. (Am. Compl., ¶ 25). Although the plaintiff's medical records indicate he has been diagnosed with various back- and hip-related conditions, (Exhs. 10-12, attached to Am. Compl.), he provides no evidence which connects them to the pat frisk. In his deposition, Mr. Tavares admitted that none of the medical professionals who have examined him since July 17, 2007 attribute his conditions to the incident. (Tavares Dep. at 70).

## Discussion

### A. Standard for Summary Judgment

Summary judgment is appropriate where the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002); Andy Warhol Foundation for the Visual Arts, Inc. v. Federal Insurance Co., 189 F.3d 208, 214 (2d Cir. 1999). The moving party [*9] bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The opposing party then must come forward with "specific facts showing that there is a genuine issue for trial."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Where the non-movant fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. Celotex, 477 U.S. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249 (citation omitted), and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. See id. at 249-50. "The litigant [*10] opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (internal quotations and citations omitted); see also Jeffreys v. City of New York, 426 F.3d 549, 554 (2d. Cir. 2005) ("nonmoving parties must do more than simply show that there is some metaphysical doubt as to the material facts, and they may not rely on conclusory allegations or unsubstantiated speculation" (internal quotations and citations omitted)); Goenaga v. March of Dimes Birth Defects Foundation, 51 F.3d 14, 18 (2d Cir. 1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (quoting First

National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288, 88 S. Ct. 1575, 20 L. Ed. 2d 569 (1968)).

Where [*11] a litigant is pro se, his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." Pabon v. Wright, 459 F.3d 241, 248 (2d Cir. 2006) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. Lee v. Coughlin, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (quoting Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991)) ; see also Kadosh v. TRW, Inc., No. 91 Civ. 5080, 1994 U.S. Dist. LEXIS 17390, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("[t]he work product of pro se litigants should be generously and liberally construed, but [the litigant's] failure to allege either specific facts or particular laws that have been violated, renders his attempt to oppose defendants' motion ineffectual"); Stinson v. Sheriff's Department of Sullivan County, 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (liberal standard accorded to pro se pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. Section 1983 [*12] Claims

Civil liability is imposed under 42 U.S.C. § 1983 upon persons who, while acting under color of state law, deprive an individual of rights, privileges, or immunities guaranteed by the Constitution or laws of the United States. 42 U.S.C. § 1983. Section 1983 is not a source of substantive rights, but rather, provides a vehicle for vindicating federal rights conferred elsewhere in the federal statutes and Constitution. See Graham v. Connor, 490 U.S. 386, 393-94, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 61 L. Ed. 2d 433 (1979)). As a threshold matter, analysis of a claim brought under Section 1983 begins with identification of the

precise constitutional right allegedly violated. See Baker, 443 U.S. at 140. Here, the plaintiff's Section 1983 claims are grounded in the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

1. Excessive Force

Although a prisoner's claim that he was subjected to excessive force by prison officials is rooted in the Eighth Amendment's prohibition against cruel and unusual punishments, Mr. Tavares' excessive force claim is analyzed under the Due Process Clause of the Fourteenth Amendment, because it arose while he was held in pretrial detention. [*13] See Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) ("a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the . . . Due Process Clause of the Fourteenth Amendment if held in state custody"); United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999). Nonetheless, it is well-established in this Circuit that "an unconvicted detainee's rights are at least as great as those of a convicted prisoner," Weyant v. Okst, 101 F.3d 845, 856 (2d Cir. 1996) (citing City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244, 103 S. Ct. 2979, 77 L. Ed. 2d 605 (1983)), and, in practice, the analysis "involves the same test as that used to analyze claims by convicted inmates under the Eighth Amendment." Mayo v. County of Albany, 357 Fed. Appx. 339, 341 (2d Cir. 2009); see also Walsh, 194 F.3d at 48.

To establish a claim of cruel and unusual punishment cognizable under the Eighth Amendment, an excessive force claimant must satisfy a two-part inquiry consisting of both objective and subjective elements. Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999) (citing Wilson v. Seiter, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)). The objective element focuses on the harm done in light [*14] of "contemporary standards of decency," Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009), and asks whether "the deprivation alleged is 'sufficiently serious' or 'harmful enough' to reach constitutional

dimensions." Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993) (internal citations omitted). Although not dispositive, '[t]he absence of serious injury is . . . relevant to the Eighth Amendment inquiry." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citing Hudson v. McMillian, 503 U.S. 1, 7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992)). The subjective element requires a showing that the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Wright, 554 F.3d at 268 (quoting Blyden, 186 F.3d at 262) (internal quotations omitted)). The 'wantonness' inquiry turns on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. (citing Hudson, 503 U.S. at 7).

The Supreme Court has made clear, however, that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition [*15] de minimis uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" Hudson, 503 U.S. at 9-10 (citations omitted). Therefore, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights," Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973), nor will "every malevolent touch by a prison guard give[] rise to a federal cause of action." Hudson, 503 U.S. at 9.

According to the facts alleged by Mr. Tavares, the use of force upon which his Section 1983 claims rest consists of Officer Jean throwing him up against the wall, kicking his legs apart, subjecting him to a forceful pat frisk, and verbally harassing him; and by the failure of Captain Drain and Officer Pennant to intervene and prevent the alleged assault.

The plaintiff's description of the incident does not permit a finding that Officer Jean's alleged conduct was "objectively 'harmful enough' to establish a

constitutional violation." Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298). First, the physical injuries reported by the plaintiff that can fairly be attributed to Officer Jean's alleged **[*16]** conduct are de minimis. Mr. Tavares admits that he was not marked or bruised when his legs were kicked apart, and although he complains of being forcefully "compressed" against the wall, he walked unassisted to his dormitory only moments later. In his grievance letter -- written the day after the incident -- Mr. Tavares complained about the manner in which Officer Jean executed the pat frisk, but, with respect to his injuries, alleged only that he was forced to put pressure on his previously injured hand. Similarly, the record of the plaintiff's medical examination on October 10, 2007 indicates he complained only of the pain in his left hand. As for Mr. Tavares' unsupported allegations regarding his back- and hip-related conditions, he concedes he cannot set forth any evidence which attributes them to the July 17, 2007 incident.

Courts in this Circuit have routinely found such types of minimal injuries and pain insufficiently serious or harmful to satisfy the objective element of the Eighth Amendment analysis. See, e.g., Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997) (inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by prison officials insufficient); James v. Phillips, No. 05 Civ. 1539, 2008 U.S. Dist. LEXIS 30615, 2008 WL 1700125, at *4-5 (S.D.N.Y. April 9, 2008) **[*17]** (finding de minimis use of force when prison guard shoved inmate into door which resulted in swelling of inmate's chin); Virella v. Pozzi, No. 05 Civ. 10460, 2006 U.S. Dist. LEXIS 67359, 2006 WL 2707394, at *3 (S.D.N.Y. Sept. 20, 2006) (only de minimis force used where officer swung keys at plaintiff, making contact with his head and causing a bump); Espinal v. Goord, No. 00 Civ. 2242, 2001 U.S. Dist. LEXIS 5688, 2001 WL 476070, at *4, *13 (S.D.N.Y. May 7, 2001) (use of force was de minimis where guard struck plaintiff in face two or three times, causing his face to turn red, but resulting in no other injuries); Yearwood v. LoPiccolo, No. 95 Civ. 2544, 1998 U.S. Dist.

LEXIS 12302, 1998 WL 474073, at *1, *7 (S.D.N.Y. Aug. 10, 1998) (finding de minimis use of force where guard choked plaintiff, hit his head with a pair of keys, and punched him in the lip); Show v. Patterson, 955 F. Supp. 182, 192-93 (S.D.N.Y. 1997) (only de minimis force used where officer pushed inmate against wall); Gonzalez v. Coughlin, No. 92 Civ. 7263, 1996 U.S. Dist. LEXIS 12770, 1996 WL 496994, at *4-5 (S.D.N.Y. Aug. 21, 1996) (finding no excessive use of force where plaintiff alleged corrections officers tripped him to the ground and hit him in the knee); DeArmas v. Jaycox, No. 92 Civ. 6139, 1993 U.S. Dist. LEXIS 1292, 1993 WL 37501, at *4 (S.D.N.Y. Feb. 8, 1993) **[*18]** (finding de minimis use of force where inmate suffered a bruise and injured right knee after being punched and kicked once).

Second, conducting pat frisks on prisoners is a necessary procedure to ensure safety and security of prisons, and correction officers are authorized to "conduct random pat frisks on free movement inmates going to or coming from services and programs" pursuant to DOC policy. (Operations Order # 35/90, Random Pat Frisk Program, dated October 18, 1990, attached as Exh. F to Def. 56.1 Statement). Even assuming that the pat frisk was conducted in response to the plaintiff's "verbal[] reprimand[]" of Officer Jean, the amount of force used in the course of conducting the pat frisk does not rise to the level of a constitutional violation. Again, case law reflects that actions taken consistent with a forceful pat frisk -- the most serious contact alleged by the plaintiff -- are not sufficiently "repugnant to the conscience of mankind," Hudson, 503 U.S. at 10, to give rise to an Eighth Amendment claim. See, e.g., Kalwasinski v. Artuz, No. 2 Civ. 2582, 2003 U.S. Dist. LEXIS 22731, 2003 WL 22973420 (S.D.N.Y. Dec. 18, 2003) (finding claim that guard used excessive force when he pressed inmate's face into **[*19]** the wall during a pat frisk after inmate had been arguing with him insufficient to survive summary judgment); Aziz Zarif Shabazz v. Pico, 994 F. Supp. 460, 471 (S.D.N.Y. 1998) ("although

kicking an inmate's ankles and feet [during a pat frisk] cannot be condoned, this use of force is de minimus and insufficient to rise to the level of a constitutional violation"); Candelaria v. Coughlin, 787 F. Supp. 368, 374-75 (S.D.N.Y. 1992) (finding guard's action of pushing his fist against inmate's neck as he obtained inmate's identification card was de minimis); Anderson v. Sullivan, 702 F. Supp. 424, 427 (S.D.N.Y. 1988) (excessive force claim dismissed where prison officials pushed inmate into bar and put his hands behind his back to apply handcuffs, in that such actions were reasonably related to the application of restraints, and incident resulted in little or no harm to inmate).

Finally, absent a showing of actionable injury, Mr. Tavares' claim that Officer Jean verbally harassed him while conducting the pat frisk fails to establish an Eighth Amendment violation. See, e.g., Aziz Zarif Shabazz, 994 F. Supp. at 474 ("verbal harassment or profanity alone, unaccompanied by any injury, no matter [*20] how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable") (internal citations and quotations omitted); Brown v. Croce, 967 F. Supp. 101, 104 (S.D.N.Y. 1997) (citing Purcell v. Coughlin, 790 F.2d 263, 265 (2d Cir. 1986) (holding that a claim that a prison guard called an inmate names did not allege any appreciable injury and was properly dismissed)); Malsh v. Austin, 901 F. Supp. 757, 763 (S.D.N.Y. 1995) ("[v]erbal assault, standing alone, is not a judicially cognizable injury in a § 1983 civil rights action") (internal quotations omitted).

In sum, neither Mr. Tavares' pleadings, deposition testimony, nor any other evidentiary material in the record reveal that he suffered any harm other than a few minutes of verbal abuse, unwanted pat-frisking, and the resulting pressure on his previously injured hand; such injuries are de minimis, and do not give rise to an action under Section 1983. Because the plaintiff cannot satisfy the objective element of the excessive force standard, Officer Jean is entitled to summary judgment on this claim.

## 2. Failure to Intervene

Mr. Tavares further [*21] contends that Captain Drain and Officer Pennant had an affirmative duty to intervene to protect his Eighth Amendment rights from being infringed, and that as a result of their failure to do so, he suffered the unlawful assault. (Plaintiff's Memorandum of Law in Support of His Motion for Summary Judgment ("Pl. Memo."), dated April 25, 2011, at 16-19, 27). "A law enforcement officer has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in his presence by other officers." O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used, . . . [or] that any constitutional violation has been committed by a law enforcement official." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citing O'Neill, 839 F.2d at 11-12).

There can be no failure to intervene, however, where there was no constitutional violation. Feinberg v. City of New York, No. 99 Civ. 12127, 2004 U.S. Dist. LEXIS 16098, 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004) ("If the Court determines that the officer's conduct [*22] did not violate a constitutional right, however, the analysis ends.") (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)); accord Foy v. City of New York, No. 03 Civ. 7318, 2004 U.S. Dist. LEXIS 18274, 2004 WL 2033074, at *3 (S.D.N.Y. Sep. 10, 2004). As the use of force by Officer Jean was not unlawful, there was no duty to intervene. Therefore, the plaintiff's Section 1983 claims against Captain Drain and Officer Pennant are fatally deficient as well, and summary judgment must be granted to the defendants on this claim.

## C. Conspiracy Claims

Mr. Tavares also asserts that the defendants conspired to "cover up the assault" and "prevent the investigation of it" in violation of his right to equal

2011 U.S. Dist. LEXIS 137381, *22

protection of the laws, and his due process right to "present evidence on his defense," which is construed as a claim of denial of access to the courts.[2] (Am. Compl., ¶ 44; Pl. Reply at 16). The plaintiff pursues these claims under 42 U.S.C. §§ 1983, 1985, and 1986. (Am. Compl., ¶ 44).

1. Section 1983 Conspiracy

To state a claim for conspiracy under § 1983, a plaintiff must demonstrate (1) an agreement between two or more state actors or a state actor and a private party, (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. See Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir. 2002); Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999). Thus, the plaintiff must include allegations or competent evidence to show "that defendants acted in a willful manner, culminating in an agreement, understanding or meeting of the minds that violated [his] rights, privileges, or immunities secured by the Constitution or federal courts." Hameed v. Pundt, 964 F. Supp. 836, 839 (S.D.N.Y. 1997) [*24] (internal citation and quotation marks omitted); Katz v. Morgenthau, 709 F. Supp. 1219, 1231 (S.D.N.Y. 1989), rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989). "Without such a meeting of the minds, the independent acts of two or more wrongdoers do not amount to a conspiracy." National Congress for Puerto Rican

Rights v. City of New York, 75 F. Supp.2d 154, 168 (S.D.N.Y. 1999) (internal citations omitted). However, "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Dwares v. City of New York, 985 F.2d 94, 100 (2d Cir. 1993) (citing Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977) (internal quotations and alterations omitted)).

Mr. Tavares alleges that (1) Warden Bailey received notice of his grievance prior to the date it was received by OIG, but chose not to investigate until on or about October 10; (2) Warden Bailey and Deputy Warden Singleton agreed to erase the security camera footage of the incident; and (3) following [*25] destruction of the footage, Warden Bailey, Deputy Warden Singleton, Captain Glover, Captain Drain, and Officer Pennant conspired to cover up the alleged assault. (Pl. Reply at 15-16). In particular, the plaintiff alleges that Captain Glover violated DOC policy by failing to view the security video footage during her investigation, and Captain Drain and Officer Pennant denied witnessing the incident to excuse their intentional failure to file an incident report. (Pl. Memo. at 26-27).

Aside from these conclusory allegations, Mr. Tavares has not presented evidence that there was any agreement or "meeting of the minds" between the defendants to violate his constitutional rights. Since "an essential element in a claim of conspiracy . . . is an agreement to do so among the alleged co-conspirators," National Congress for Puerto Rican Rights, 75 F. Supp. 2d at 168, the plaintiff's conclusory assertions of a conspiratorial agreement cannot withstand summary judgment.

Equally important, Mr. Tavares' conspiracy claim fails because he cannot state a claim that his rights were violated as a result of the defendants' conduct. See Romer v. Morgenthau, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000) ("if a [*26] plaintiff cannot

---

[2] The Supreme Court has grounded the right of access to the courts in the Fourteenth Amendment Due Process Clause, Wolff v. McDonnell, 418 U.S. 539, 579, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); Boddie v. Connecticut, 401 U.S. 371, 380-81, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971), and Equal Protection Clause, Pennsylvania v. Finley, 481 U.S. 551, 557, 107 S. Ct. 1990, 95 L. Ed. 2d 539 (1987), [*23] the Fifth Amendment Due Process Clause, Walters v. National Association of Radiation Survivors, 473 U.S. 305, 335, 105 S. Ct. 3180, 87 L. Ed. 2d 220 (1985), the First Amendment Petition Clause, Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 513, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972), and the Article IV Privileges and Immunities Clause, Chambers v. Baltimore & Ohio Railroad Co., 207 U.S. 142, 148, 28 S. Ct. 34, 52 L. Ed. 143, 6 Ohio L. Rep. 498 (1907).

sufficiently allege a violation of his rights, it follows that he cannot sustain a claim of conspiracy to violate those rights"). In this case, the right alleged to be violated by the conspiracy is his right of access to the courts.

"The right of access to the courts . . . assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." Wolff v. McDonnell, 418 U.S. 539, 579, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). To state a Section 1983 claim for violation of the right to access the courts, a plaintiff must allege facts which indicate that (1) the defendants "deliberately and maliciously interfered" with his access; and that (2) this conduct "materially prejudiced a legal action he sought to pursue," Smith v. O'Connor, 901 F. Supp. 644, 649 (S.D.N.Y. 1995), "such as the dismissal of an otherwise meritorious legal claim." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003) (citations omitted).

The Supreme Court has held that "the right [of access to the courts] is ancillary to the underlying claim, without which a plaintiff could not have suffered injury by being shut out of court." Christopher v. Harbury, 536 U.S. 403, 415, 122 S. Ct. 2179, 153 L. Ed. 2d 413 (2002). [*27] To satisfy the injury requirement, therefore, the plaintiff must identify a separate, "ancillary" legal claim that has been materially prejudiced by the alleged denial, and that is "non-frivolous" and "arguable" in nature. Id.; see also Cancel v. Goord, No. 00 Civ. 2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at *4 (S.D.N.Y. March 29, 2001) ("the plaintiff must show that a non-frivolous legal claim had been frustrated or was being impeded due to the actions of prison officials") (internal citations and quotation marks omitted).

In this case, Mr. Tavares cannot demonstrate that any conduct by the defendants resulted in an actionable injury. He alleges that the defendants prevented him from presenting evidence -- most critically, the security video footage of the incident

-- that would establish the allegedly unlawful assault by Officer Jean. However, the footage Mr. Tavares seeks to introduce would merely corroborate his own allegations; yet his underlying excessive force claim fails even on the facts as he alleges them. Therefore, even assuming the defendants conspired to erase the video footage as the plaintiff claims, he suffered no material prejudice as a result. Thus, because the actual violation of a [*28] constitutional right is a "natural prerequisite to a claim of conspiracy to violate such right," Romer, 119 F. Supp. 2d at 363, the plaintiff's conspiracy claim regarding denial of access fails. Accordingly, summary judgment must be granted to defendants on this claim.[3]

2. Sections 1985 and 1986

Section 1985(3) prohibits conspiracies that are intended to deprive "either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3). To sustain a claim under Section 1985(3), a plaintiff must demonstrate "some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' actions." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993) [*29] (citing Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971)). Section 1986 provides a cause of action against anyone who "having knowledge that any of the wrongs conspired to be done and mentioned in Section 1985 are about to be committed, and having power to prevent or aid, neglects to do so." Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085, 1088 (2d Cir. 1993) (internal citation and quotation marks omitted). Thus, a Section 1986 claim must be predicated upon a valid Section 1985

---

[3] In the plaintiff's memorandum in support of his motion for summary judgment, he alleges in the alternative that the defendants have committed spoliation of evidence, and he seeks an adverse inference sanction. However, his spoliation claim fails on the same grounds as his denial-of-access claim: because his excessive force claim fails based on his own allegations, an adverse inference would be of no benefit.

claim. Id. (citing Dacey v. Dorsey, 568 F.2d 275, 277 (2d Cir. 1978)); Brown v. City of Oneonta, New York, 221 F.3d 329, 341 (2d Cir. 2000).

Although Mr. Tavares alleges that the purported conspiracy was undertaken by the defendants because he is Hispanic, he has alleged no facts and offered no evidence to show that racially discriminatory animus motivated the purported conspiracy. Furthermore, any claim of conspiracy, whatever the motivation, fails for the reasons discussed above. Summary judgment should therefore be granted to the defendants on these claims.

D. Municipal Liability

Mr. Tavares next seeks to hold the City liable under Section 1983 on the basis of the defendants' alleged failure [*30] to train and supervise Officer Jean, as well as its "approv[al] or ratifi[cation]" of the defendants' allegedly unlawful conduct.

Municipalities may be held liable under Section 1983 if "action pursuant to official municipal policy of some nature caused a constitutional tort." Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). Municipal liability may also arise where policymaking officials exhibit deliberate indifference to constitutional deprivations caused by subordinates, effectively ratifying the conduct. See, e.g., Amnesty America v. Town of West Hartford, 361 F.3d 113, 127 (2d Cir. 2004).

As a threshold matter, to survive summary judgment on a Section 1983 municipal liability claim, the plaintiff must be able to show that his constitutional rights were violated by prison officials. See Matican v. City of New York, 524 F.3d 151, 154 (2d Cir. 2008). If no constitutional violation has occurred, the municipality cannot be liable under Section 1983, regardless of whether the officers acted pursuant to a municipal policy or custom. Id. at 154 (municipal liability precluded where police officers' actions did not violate plaintiff's constitutional [*31] rights) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986)); see also Martinez v. City of New York, 340 Fed. Appx. 700, 702 (2d Cir. 2009) ("A municipality cannot be liable for acts by its employees which are not constitutional violations.") (internal citation omitted); Bonilla v. Jaronczyk, 354 Fed. Appx. 579, 582 (2d Cir. 2009) (individual liability of corrections officers was prerequisite for municipal liability to arise from allegations that inmate's constitutional rights were violated). Similarly, "a municipality cannot be liable for inadequate training or supervision when the officers involved . . . did not violate the plaintiff's constitutional rights." Curley v. Village of Suffern, 268 F.3d 65, 71 (2d Cir. 2001) (citing Amato v. City of Saratoga Springs, 170 F.3d 311, 320 (2d Cir. 1999) ("a claim of negligent training is only actionable where some constitutional violation actually occurred")); Ricciuti v. New York City Transit Authority, 124 F.3d 123, 132 (2d Cir. 1997) ("a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised").

Because Mr. [*32] Tavares cannot show that any of his constitutional rights were violated by the individual defendants, he cannot maintain his Section 1983 claims against the City of New York.

E. State Law Claims

Because the defendants' motion for summary judgment as to all federal claims should be granted, the Court should decline to exercise supplemental jurisdiction over the plaintiff's state law claims against the defendants. See 28 U.S.C. § 1367 (c) (3).

Conclusion

For the reasons set forth above, I recommend that the plaintiff's motion for summary judgment be denied, and the defendants' motion for summary

2011 U.S. Dist. LEXIS 137381, *32

judgment be granted in all respects. Pursuant to 28 U.S.C. § 636(b) (1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of Court, with extra copies delivered to the Chambers of the Honorable Paul A. Engelmayer, U. S. D. J., Room 670, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

/s/ **[*33]** James C. Francis IV

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York

October 17, 2011

---

**End of Document**



# Trowell v. Santamore

United States District Court for the Northern District of New York

February 9, 2018, Decided; February 9, 2018, Filed

9:16-CV-00639 (MAD/TWD) Lead Case; 9:16-CV-01203 (MAD/TWD) Member Case

**Reporter**
2018 U.S. Dist. LEXIS 22878 *

RAMZIDDEN TROWELL, also known as RAMZIDDIN TROWELL, Plaintiff, v. SANTAMORE, W. GARLAND, B. FLEURY, W. VESNESKE, JOHN DOES 1-5, Defendants.

**Subsequent History:** Adopted by, Summary judgment granted by, Judgment entered by Trowell v. Santamore, 2018 U.S. Dist. LEXIS 45215 (N.D.N.Y., Mar. 20, 2018)

**Prior History:** Trowell v. Upstate Corr. Facility, 2016 U.S. Dist. LEXIS 168826 (N.D.N.Y., Dec. 7, 2016)

Trowell v. Garland, 2017 U.S. Dist. LEXIS 155567 (N.D.N.Y., Sept. 21, 2017)

**Counsel:** [**\*1**] RAMZIDDEN TROWELL, Plaintiff, Pro se, Brooklyn, New York.

For Defendants: WILLIAM A. SCOTT, ESQ., MELISSA A. LATINO, ESQ., OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, New York.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

## Opinion

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT AND RECOMMENDATION

## I. INTRODUCTION

### A. Case No. 9:16-CV-00639

On June 6, 2016, *pro se* Plaintiff Ramzidden Trowell commenced the Lead case ("Trowell I") in this consolidated 42 U.S.C. § 1983 civil rights action against Defendants Upstate Correctional Facility ("Upstate"), Upstate Sergeant ("Sgt.") Santamore, and Upstate Correctional Officer ("CO") W. Garland. (Dkt. No. 1.[1]) On initial review by the Hon. Mae A. D'Agostino, District Court Judge, conducted pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's original complaint against Santamore, Garland, and Upstate, liberally construed, was found to allege the following Eighth Amendment claims arising out of his confinement at Upstate: (1) excessive force against Santamore, and Does 1-5; (2) deliberate indifference to his serious medical needs by Upstate staff; (3) conditions of confinement; and (4) failure to protect. (Dkt. No. 4 at 6. [**\*2**] [2]) Plaintiff's claims

---

[1] Unless otherwise identified, docket references are to Trowell I, Case No. 9:16-CV-00639.

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

arose in part out of an incident at Upstate with Santamore and the five Does alleged to have occurred at Upstate on February 29, 2016, and an incident at Upstate with Garland alleged to have occurred on March 18, 2016. *Id.* at 5-9.

The complaint was dismissed with prejudice against the Upstate medical staff and without prejudice against Garland. *Id.* at 19-20. The sole claim in Plaintiff's original complaint that survived initial review was his Eighth Amendment excessive force claim against Santamore and John Does 1-5. *Id.*

On December 7, 2016, Judge D'Agostino allowed Plaintiff to file a supplemental complaint which was ordered incorporated into his original complaint. (Dkt. Nos. 17-18.) In his supplemental complaint, Plaintiff added Upstate Sgt. Vesneske, Manson, Upstate CO Succee, and Upstate CO Fleury as Defendants, and asserted a harassment claim against Garland.[3] (Dkt. No. 18 at 11-15.) Plaintiff also alleged Eighth Amendment claims against Vesneske and Succee for harassing and threatening him. *Id.* at 12-13. The incident out of which those claims arose was alleged to have occurred on August 5, 2016. *Id.*

In her December 7, 2016, Decision and Order addressing, *inter alia*, Plaintiff's motion to dismiss, Judge D'Agostino dismissed **[*3]** the claims asserted in the supplemental complaint against Garland, Vesneske, Succee, and Manson, and allowed the sexual abuse claim against Fleury to proceed. (Dkt. No. 17 at 17-18.)

On June 9, 2017, Defendants Santamore and Fleury filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure on the grounds that Plaintiff failed to exhaust his

administrative remedies and is unable to establish an Eighth Amendment violation by the moving Defendants. (Dkt. No. 27.) Plaintiff filed opposition papers on July 5, 2017 (Dkt. No. 30), and Defendants filed a reply on July 7, 2017. (Dkt. No. 31.)

## B. Case No. 16-CV- 01203

On January 19, 2017, Plaintiff filed the Member case against Defendants Garland and Vesneske. ("Trowell II"). (Trowell II, Dkt. No. 1.) Plaintiff added Fleury as a Defendant in his amended complaint (Trowell II, Dkt. No. 11), which was accepted for filing and service and became the operative pleading in the action on March 23, 2017. (Trowell II, Dkt. No. 18.) The claims in Plaintiff's amended complaint in Trowell II arose out of the same August 5, 2016, incident as the claims in Plaintiff's supplemental complaint in Trowell I. (Trowell II, Dkt. No. 11.)

On August 14, 2016, Defendants filed a motion for judgment **[*4]** on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and to abate or stay the proceedings in Trowell II on the grounds that the claims asserted in Plaintiff's supplemental complaint in Trowell I are substantially similar to those asserted in Trowell II. (Trowell II, Dkt. Nos. 29; 29-1 at 5-9.) The Hon. Brenda K. Sannes filed a Memorandum-Decision and Order on November 2, 2017, denying Defendants' motion for a stay and for dismissal on the pleadings and consolidating Trowell II with Trowell I. (Trowell II, Dkt. No. 34 at 2.) In a November 3, 2016, Text Order, Judge Sannes ordered that Trowell I be designated the Lead case and Trowell II the Member case. (Dkt. No. 32; Trowell II, Dkt. No. 35.)

## C. The Consolidated Action

Following consolidation, this Court issued a Text Order directing the consolidated Defendants to file a supplemental brief in support of the pending

---

[3] Plaintiff did not list Fleury as a Defendant in his supplemental complaint but did include allegations of sexual abuse against him which were addressed in Judge D'Agostino's Decision and Order on Plaintiff's motion to dismiss. (Dkt. No. 17 at 8.) Judge D'Agostino directed that Fleury be added as a Defendant to the docket. *Id.* at 17-18.

motion for summary judgment and granted Plaintiff permission to file a supplemental brief in response. (Dkt. No. 33.) The Court subsequently granted defense counsel's request to file supplemental declarations with the supplemental brief. (Dkt. Nos. 35, 36.) Defendants filed their supplemental papers on November 30, 2017. (Dkt. No. 37.) Plaintiff [*5] has filed no response.

For reasons explained below, the Court recommends that Defendants' motion for summary judgment in the consolidated action be granted. The Court further recommends that the consolidated action be *sua sponte* dismissed as against the unidentified John Does 1-5 pursuant to 28 U.S.C. § 1915(e).

## II. FACTUAL BACKGROUND

### A. Santamore and John Does 1-5

Plaintiff was transferred from Downstate Correctional Facility to Upstate on February 29, 2016. (Dkt. No. 1 at 5.) During intake, Plaintiff was taken to the I.D. room for pictures and told once he was returned to the block he would see medical. (Dkt. No. 27-3 at 81.) When he was placed in a holding cell, Plaintiff asked to see a nurse because he had not had his medication for two days. *Id.*; Dkt. No. 18 at 5. According to Plaintiff, he was told he had already seen medical, when he had not, and he began to yell, demanding to see a sergeant. (Dkt. No. 18 at 6.) An unidentified sergeant and five COs approached the holding pen and threatened Plaintiff and told him "if he [did not] shut the fuck up and sign [his] name on some paper that [he] refused to sign that [he] would receive more than medical attention." *Id.* Plaintiff signed the paper but kept [*6] asking to see medical. *Id.* Having been placed on notice he was being threatened and ignored by a sergeant and 5 COs, Plaintiff began to look for support from other inmates by yelling and demanding to see medical. *Id.*

The sergeant and five COs ultimately took Plaintiff

to the infirmary. *Id*; Dkt. No. 27-3 at 99. Plaintiff claims Santamore was in charge once Plaintiff was in the infirmary and joined with the unidentified sergeant and COs who had brought him there in telling Plaintiff to strip and in hitting and kicking him when he refused to give up his undershorts. (Dkt. No. 27-3 at 103-08.) Plaintiff contends the hitting and kicking continued until he complied and gave them his undershorts. *Id.* at 112. Plaintiff testified at his deposition that he could not see who was hitting and kicking him because he was facing the wall. (Dkt. No. 27-3 at 107, 110.) Plaintiff also testified he saw Santamore at the door when they first put him in the room but was not sure whether Santamore came in. *Id.* Plaintiff claims he was then left in the room with no clothing. (Dkt. No. 18 at 7.)

Plaintiff contends he was taken to the infirmary at around 5:00pm on February 29, 2016, and was left there without any clothes [*7] other than a little gown, hurt, cold, and humiliated until around 1:00pm on March 1, 2016. (Dkt. Nos. 18 at 7; 27-3 at 101, 116.) According to Plaintiff, Santamore was also at the infirmary the morning of March 1st. (Dkt. No. 27-3 at 109.) Plaintiff was told he was going to go see a "psych" and was cuffed and made to sit in the corner of the room with only a little gown while he spoke with a gentleman named Kemp from the Office of Mental Health ("OMH"). *Id.* at 109, 117. Kemp told Plaintiff he would see medical after Kemp was done seeing him. *Id.* at 118. Plaintiff testified that after Kemp left, Santamore told him to come to the door to be uncuffed, and he would see medical when Santamore was done with him. *Id.* at 118-20. After Plaintiff was uncuffed, he was told he was going back to the block. *Id.* at 121. When Plaintiff arrived at the block, he was forced into a cell with a cellmate with gang affiliation who sexually assaulted him. *Id.* at 121-22; Dkt. No. 18 at 8.

In his declaration in support of Defendants' motion, Santamore denies participating in Plaintiff's transport, being present when Plaintiff was placed in the infirmary on February 29, 2016, and using

any force on Plaintiff. (Dkt. No. 27-6 at ¶¶ 4, 12.[4]) According to Santamore, he did **[*8]** have interaction with Plaintiff on March 1, 2016, when he was asked to respond when Plaintiff, after being handcuffed for a mental health consult, refused to allow officers to remove the cuffs. *Id.* at ¶ 7. Santamore states in his declaration that Plaintiff ultimately complied and no force was used. *Id.* at ¶ 8.

## B. Garland, Vesneske, and Fleury

On the morning of August 5, 2016, CO Garland was with RN Elizabeth White when she came to give Plaintiff his medication. (Dkt. Nos. 18 at 12; 27-3 at 143; 37-3.) Plaintiff claims Garland told him to state his name and I.D. number. (Dkt. No. 27-3 at 143.) Plaintiff provided the information to the nurse and reached out his hand to get his medication. *Id.* According to Plaintiff, Garland blocked the nurse and told Plaintiff to state his I.D. number again. *Id.* Plaintiff asked the nurse if she had heard him and she shook her head. *Id.* Plaintiff then asked for his daily medication. *Id.* Plaintiff claims that Garland then tried to close the slot through which Plaintiff had reached for his medication on his arm, resulting in a row of cuts on Plaintiff's arm. *Id.*

Plaintiff began asking for a sergeant and Vesneske came to see him. *Id.* at 144. Plaintiff claims he told **[*9]** Vesneske he had been assaulted and did not receive his medication, and Vesneske put his hand on Garland's shoulder and walked away with him. *Id.* Vesneske came back and asked Plaintiff if he wanted to see mental health, and Plaintiff responded he did not want to see mental health but did want to see medical for his arm. *Id.* at 144-45. When Vesneske told Plaintiff he was going to cuff up and go to mental health, Plaintiff refused and asked him to call the Deputy and a lieutenant. *Id.* The Deputy of Programs, a lieutenant, and a captain

---

[4] Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

came one at a time, and Plaintiff tried to explain what Garland had done to him and that he did not need mental health and was not going to go there and be stripped of his clothes and left to freeze. *Id.* at 145, 158-59, 197. Lieutenant Eddy told Plaintiff if he did not cuff up an extraction team would be sent in. *Id.* at 157-58. When Captain Dominique came and told Plaintiff the same thing, Plaintiff began breaking down. *Id.* at 159. Plaintiff claims to have handed the Deputy some paperwork and expected her to put her foot down and tell them to take Plaintiff to medical, but that did not happen. *Id.* Garland, who had returned to Plaintiff's cell, told him he was going to be extracted from his cell and beaten. *Id.* at 170-71. Vesneske **[*10]** came and told Plaintiff the same thing. *Id.* at 171.

According to Plaintiff, he was gassed with a spray in his cell, beaten by an extraction team consisting three men wearing masks and suits, and rendered briefly unconscious by a kick to the side of the head. *Id.* at 145, 173-84. When Plaintiff awoke, he was handcuffed and shackled and put in a shower area where they washed off the chemicals. *Id.* at 183. The extraction team then dragged Plaintiff to the holding pen holding him up by his arms. *Id.* at 146, 155. The team thereafter dragged Plaintiff to the infirmary where he was again beaten. *Id.* Plaintiff testified at his deposition that Vesneske and CO Fleury were involved, and that Fleury placed his finger in Plaintiff's rectum. *Id.* The Use of Force Report regarding the August 5, 2016, incident submitted by Plaintiff notes that Fleury "using both hands, spread Trowell's buttocks to visually inspect the area" during the strip frisk that was conducted in the infirmary. (Dkt. No. 30-1 at 20-21.)

In his declaration submitted in support of Defendants' motion, Garland states that on August 5, 2016, while he was assisting the nurse with medications, Plaintiff refused to state his name and DIN number when asked by the nurse. (Dkt. No. 37-1 at ¶¶10-12.) **[*11]** Garland then directed Plaintiff to state his number and Trowell refused saying he did not have to give his number. *Id.* at ¶¶

14-15. According to Garland, Plaintiff's refusal to give his I.D. number was considered a refusal of his medication, so the visit was ended and Plaintiff's medication was not provided to him. *Id.* at ¶ 16. Garland denies ever closing the protective hatch cover on Plaintiff's arm or hand. *Id.* at ¶ 17. Garland contends that if Plaintiff had tried to stick his arm out of the slot and grab his medication after the nursing visit had been terminated, Garland would have called the area supervisor to report Plaintiff's noncompliance with staff direction and would never have slammed the hatch cover on his hand. *Id.* at ¶¶ 20-21. Garland at no time saw an injury to Plaintiff's hand or arm. *Id.* at ¶ 22.

Garland further states in his declaration that later that morning he gave Plaintiff a direct order to secure his exercise pen by closing the door because exercise time had ended. *Id.* at ¶ 24. Plaintiff refused and covered his cell door window with a towel. *Id.* at ¶ 25. Garland issued an Inmate Misbehavior Report ("IMR") charging Plaintiff with interference with movement and **[*12]** failing to obey a direct order. *Id.* at ¶ 26 and p. 11.

Nurse White has submitted a declaration in which she states that she did not observe Garland close the hatch cover on Plaintiff's arm or hand or injure Plaintiff in any way during med runs on August 5, 2016. (Dkt. No. 37-3 at 3, 14, 15.) White examined Plaintiff after he was extracted from his cell and found a superficial laceration on his right hand and a minor abrasion in this left shoulder area. *Id.* at ¶ 20.

In his declaration, Vesneske states that he was called to Plaintiff's cell on August 5, 2016, when Plaintiff refused to remove the towel from the window of his cell door, in violation of DOCCS rules of conduct. (Dkt. No. 37-2 at ¶¶ 7-8.) Vesneske does not recall his exact conversation with Plaintiff, but in a memo prepared on February 21, 2017, in response to a grievance filed by Plaintiff, Vesneske indicated he did not recall Plaintiff bringing any issue regarding a cut on his hand to his attention. *Id.* at ¶ 9.

According to Vesneske, at some point following Plaintiff's refusal to remove the towel, OMH staff member J. Marinelli went to speak with Plaintiff and advised Vesneske he was authorizing Plaintiff to be put on OMH watch **[*13]** for claims of self-harm. *Id.* at ¶ 10. Vesneske explained that once an OMH staff member authorizes an inmate to be placed on OMH watch, he must be taken from his cell for observation, and if he does not comply, extraction protocols must be executed. *Id.* at ¶ 11. Despite several direct orders by staff, Plaintiff refused to exit his cell voluntarily. *Id.* at ¶ 13.

Extraction using chemical agents, which are used to help gain an inmate's compliance, was authorized by the Acting Superintendent, and medical notified Vesneske that Plaintiff was medically cleared for use of the chemicals. *Id.* at ¶¶ 14-17. Vesneske, who has been involved in multiple cell extractions, saw nothing out of the ordinary and did not see any use of excessive force on Plaintiff. *Id.* at ¶¶ 24, 31. A nurse examined Plaintiff and did not note any serious injuries, and Plaintiff refused medical attention. *Id.* at ¶ 34. According to Vesneske, while he and other officers were taking Plaintiff to OMH, Plaintiff was banging his head on the walls and bars. *Id.* at ¶ 35.

Fleury also filed a declaration in support of Defendants' motion. (Dkt. No. 27-8.) According to Fleury, he did participate in the cell extraction on August 5, 2016, **[*14]** and at no time did he insert a finger in Plaintiff's rectum, call him a bitch, or use any more force than was necessary to remove him from his cell and ensure safe transport to the infirmary. *Id.* at ¶¶ 4, 12-13.

## C. Plaintiff's Grievances

### 1. Defendants' Evidence on Failure to Exhaust

Defendants assert that Plaintiff failed to exhaust his administrative remedies with regard to the February 29, 2016, and August 5, 2016, incidents about

which he complains.[5] In her declaration in support of Defendants' motion, Donna Wilcox, Inmate Grievance Program ("IGP") Supervisor at Upstate, stated that at the time Plaintiff was housed at Upstate the facility had a fully functional inmate grievance process. (Dkt. No. 27-10 at ¶¶ 1,8.) Wilcox is responsible for keeping records of grievances filed by inmates at the facility level at Upstate. *Id.* at ¶ 9. At the request of defense counsel, Wilcox searched the IGP records to determine if Plaintiff had filed any grievances relating to the February 29, 2016, and August 5, 2016, incidents. *Id.* at ¶ 10. Wilcox discovered Plaintiff had filed only two grievances while at Upstate in 2016, one of which involved the August 5, 2016, incident, and neither of which involved **[*15]** the February 29, 2016, incident. *Id.* at ¶¶ 11, 14.

Grievance UST-59509-16, filed on October 28, 2016, entitled "Strip Frisk/Assault," complained about alleged physical and sexual assaults during the August 5, 2016, incident.[6] (Dkt. No. 27-12 at 1-3.) The grievance described Plaintiff's claims that: (1) Garland attempted to close the slot on his left arm; (2) he was gassed and assaulted in his cell; (3) he was dragged to the infirmary in his shorts and assaulted again; (4) he was left in a room in pain without any medical attention for ten days; and (5) one of the unknown masked officers, later identified by Plaintiff as Fleury, stuck his finger in Plaintiff's rectum. *Id.*

On March 9, 2016, the Upstate Superintendent rendered a determination noting that Plaintiff had complained of both physical and sexual assaults and stating that Plaintiff's sexual assault claim, made under the Prison Rape Elimination Act (PREA), was being separately investigated. (Dkt.

No. 27-12 at 13.) The Superintendent concluded that "[u]pon review of the information submitted, no misconduct by staff was found and no further action will be taken at this time. Grievance is denied." *Id.* According to Karen Bellamy, Director **[*16]** of the DOCCS IGP and custodian of the records maintained by the Central Office Review Committee ("CORC"), the only grievance appealed to CORC by Plaintiff while he was at Upstate was unrelated Grievance UST-59857-16. (Dkt. No. 27-13 at ¶¶ 1-2, 12-15.)

2. Plaintiff's Evidence Regarding Exhaustion

At his deposition, Plaintiff testified he filed a grievance with regard to the February 29, 2016, incident involving Santamore but never received a response. (Dkt. No. 27-3 at 123, 128.) Plaintiff initially testified that he wrote the grievance around April 2016, and handed it to a female Deputy, and that it was the first time he attempted to file a grievance involving the issue in the infirmary with Santamore. *Id.* at 134-35. He subsequently testified it may have been even later because he did not attempt to file the grievance until he was moved to level three, which occurred some where around May or June of 2016. *Id.* at 137-38.

In opposition to Defendants' motion, Plaintiff has submitted a copy of a grievance, dated December 5, 2016, which references the February 29, 2016, incident with Santamore and states that he had previously filed a grievance regarding the incident and never received a response. (Dkt. No. 30-1 at **[*17]** 2-6.) In a memorandum from Wilcox to Plaintiff, dated December 7, 2016, submitted by Plaintiff, Wilcox informed Plaintiff that a grievance had to be submitted within twenty-one calendar days after the occurrence; an IGP Supervisor could grant an exception to the time limit within forty-five days after the alleged occurrence; and an inmate could pursue a complaint that an exception was denied by filing a separate grievance. *Id.* at 1.

As to Grievance UST-59509-16, Plaintiff does not dispute his failure to appeal to CORC but claims the Superintendent's decision advised him he had

---

[5] Although Plaintiff claims he also saw Santamore on March 1, 2016, he has not alleged misconduct by Santamore on that date, and IGP Supervisor Wilcox has confirmed no grievance was filed regarding March 1, 2016. (Dkt. No. 27-10 at ¶ 11.)

[6] The other grievance, Grievance UST-59857-16, involved an unrelated incident that occurred on November 19, 2016. (Dkt. No. 27-10 at ¶¶ 13-14.)

exhausted his administrative remedies. (Dkt. No. 27-3 at 203.) The Superintendent's determination does not, in fact, state that Plaintiff's administrative remedies have been exhausted. (Dkt. No. 27-12 at 13.) The sole reference to exhaustion found in the record is an October 28, 2016, memorandum from IGP Supervisor Debyah to Plaintiff informing him that "[y]our PREA allegations will be deemed exhausted upon filing for Prison Litigation Reform Act (PLRA) purposes." *Id.* at 4.

## III. APPLICABLE SUMMARY JUDGMENT LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no **[*18]** genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint **[*19]** is to be treated as an affidavit.[7] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must **[*20]** resolve all ambiguities and draw all reasonable inferences

---

[7] Plaintiff's original and supplemental complaints in Trowell I (Dkt. No. 18) and his amended complaint in Trowell II (Trowell II, Dkt. No. 11) are properly verified under 28 U.S.C. § 1746. (Dkt. No. 72 at 12-13.) *See LeBoeuf, Lamb, Greene & McRae, L.L.P. v. Worsham*, 185 F.3d 61, 65-66 (2d Cir. 1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding pro se, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 U.S. Dist. LEXIS 16767, 1999 WL 983876 at *3 (S.D.N.Y. Oct. 28, 1999)[8] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

## IV. PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a pro se] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). In this case, Plaintiff has failed to respond to Defendants' statement of material facts as required under N.D.N.Y. L.R. 7.1(a)(3).[9] (*See* Dkt. Nos. 30 and 30-1.)

Where a party has failed to respond to the movant's statement of material facts, the facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record,[10] and

---

[8] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[9] L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's statement of material facts. Under the rule, the response "shall mirror the movant's statement of material facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises."

[10] L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However,

(2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure and L.R. 7.1.[11] *See Champion,v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996) **[*21]** .

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit has ruled that "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules," including local rules relating to requirements regarding the submission of and response to statements of material facts on summary judgment motions, and to "conduct an assiduous review of the record." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record in this case.

## V. LEGAL STANDARD FOR THE EXHAUSTION OF ADMINISTRATIVE REMEDIES

Defendants seek summary judgment on Plaintiff's excessive force claims on the ground that he failed to exhaust his administrative **[*22]** remedies under the DOCCS IGP. Under the PLRA, "[n]o action

---

*see Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[11] Defendants included the requisite notification of the consequences of failing to respond to a summary judgment motion in accordance with their notice of motion. (Dkt. No. 27 at 4.)

shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1854-55, 195 L. Ed. 2d 117 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged **[*23]** occurrence. *Id.* § 701.5(a)(1). A representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Special **[*24]** procedures are used when, as in this case, the grievance involves a claim of staff misconduct. *Id.* § 701.8. A grievance alleging staff misconduct, once it is given a number and recorded, must be sent directly to the superintendent, and the superintendent must issue a decision within twenty-five days. *Id.* § 701.8(f). If the grievant wishes to appeal a decision by the Superintendent to CORC, he must file a notice of decision to appeal with the inmate grievance clerk at the bottom of the Superintendent's decision within seven days of receipt of the decision. *Id.* § 701.8(h). CORC is required to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.8(i) (incorporating § 701.5).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,'" assuming there is another step in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 U.S. Dist. LEXIS 35483, 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013)

2018 U.S. Dist. LEXIS 22878, *24

("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can and must be appealed to the next level . . . to complete the grievance process.").

Generally, if a plaintiff fails to follow each **[*25]** of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotations and citations omitted). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotations and internal citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are **[*26]** not available to prisoners under the PLRA. *Id.* at 1859-60. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."

*Id.* Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry. *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 U.S. Dist. LEXIS 94188, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds, Woodford*, 548 U.S. at 94-95. Plaintiff must then establish that the IGP grievance procedure was unavailable to him. *See Jones*, 549 U.S. at 216.

## VI. ANALYSIS

### A. Administrative Exhaustion as to Santamore and John Does 1-5

The Court finds Defendants have satisfied **[*27]** their burden of showing that Plaintiff failed to satisfy the IGP exhaustion requirements with regard to the incident alleged to have taken place with Santamore and the five John Does on February 29, 2016. A search of IGP records at Upstate by Wilcox uncovered no grievance by Plaintiff with regard to the incident. (Dkt. No. 27-10 at ¶¶ 10-11, 14.) According to Bellamy, the single grievance appealed to CORC by Plaintiff, Grievance UST-59857-16, involved an unrelated matter. (Dkt. No. 27-12 at ¶¶ 1-2, 12-15.) Thus, Defendants have shown that Plaintiff failed to complete all of the required steps under the IGP with regard to the February 29, 2016, incident. *See Woodford*, 548

U.S. at 88 (complete exhaustion requires properly using all steps required by the administrative review process applicable to the institution in which an inmate is confined).

Moreover, the Court finds that Plaintiff has failed to show that the grievance procedure was unavailable to him as is his burden under *Ross*, 136 S. Ct. at 1859. Plaintiff claims he filed a grievance regarding the Santamore incident but never received a response. (Dkt. Nos. 27-3 at 123, 128; 30-1 at 2.) However, at his deposition, Plaintiff testified that he filed the grievance (no copy of which [*28] has been produced as evidence by Plaintiff) at the very earliest in April 2016 and possibly in May or June, rendering it untimely under the IGP, which requires filing within twenty-one days of the incident being grieved. (Dkt. No. 27-3 at 134-35, 137-38.) *See* 7 N.Y.C.R.R. § 701.5(a)(1). Plaintiff has offered no evidence that the grievance procedure was "unavailable" between the time of the February 29, 2016, incident and the claimed filing of an untimely grievance in April, May, or June of 2016. Plaintiff's December 5, 2016, grievance regarding the February 29, 2016, incident with Santamore was clearly untimely and was rejected. (Dkt. No. 30-1 at 1.)

Based upon the foregoing, the Court finds that Plaintiff failed to file a timely grievance regarding the Santamore incident despite the availability of the IGP and recommends that Santamore be granted summary judgment on the grounds that Plaintiff failed to exhaust his administrative remedies.

The Court also recommends that the consolidated action be *sua sponte* dismissed with prejudice as against John Does 1-5, who are alleged to have been involved in the February 29, 2016, excessive force incident. (Dkt. No. 27-3 at 103-08.) 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds [*29] *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that . . . the action . . . fails to state a claim upon which relief can be granted." 28 U.S.C. §

1915(e)(2)(B)(ii). *See also Webster v. Penzetta*, 458 Fed. Appx. 23, 25 (2d Cir. 2012) ("A district court has inherent authority to dismiss meritless claims *sua sponte*."); *Ramrattan v. Fischer*, No. 13 Civ. 6890 (KPF), 2015 U.S. Dist. LEXIS 74510, 2015 WL 3604242, at *3 (S.D.N.Y. June 9, 2015) ("[E]ven where Defendants have not sought dismissal of a particular claim, the Court has the authority to screen sua sponte an *in forma pauperis* complaint and must dismiss a complaint, or portion thereof, that is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.") (citing 28 U.S.C. § 1915(e)(2)(B) and *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998)).

Plaintiff's allegations supporting his Eighth Amendment excessive force claims against John Does 1-5 are essentially the same as those asserted against Santamore. (*See* Dkt. No. 1 at ¶¶ 2, 4-7, 9-12, 14, 19.) There is no evidence whatsoever that Plaintiff administratively exhausted his claims against John Doe 1-5. Therefore, the Court recommends that the case be *sua sponte* dismissed with prejudice against John Does 1-5 for failure to exhaust under 28 U.S.C. § 1915(e)(2)(B).

## B. Administrative Exhaustion as to Garland, Vesneske, and Fleury

Defendants concede that Plaintiff filed Grievance [*30] UST-59509-16 with regard to the August 5, 2016, incident involving Garland, Vesneske, and Fleury. (Dkt. No. 27-12 at 1-3.) However, they have submitted evidence showing that Plaintiff did not file an appeal with CORC from the Superintendent's denial of the grievance on March 9, 2017, thereby satisfying their burden of showing Plaintiff's failure to exhaust under the IGP. (Dkt. Nos. 27-12 at 13; 27-13 at ¶¶ 1-2, 12-15; 27-16 at 11.)

As noted above, Plaintiff claims he was not required to appeal the denial of Grievance UST-59509-16 to CORC because in his denial, the

Superintendent informed Plaintiff his grievance had been exhausted. (Dkt. No. 27-3 at 203.) However, as discussed above, the Superintendent's determination said no such thing. The determination said only that the PREA sexual assault claim was being separately investigated and the remainder of Plaintiff's grievance was denied. (Dkt. No. 27-12 at 4, 13.)

Based upon the foregoing, the Court finds that Garland, Vesneske, and Fleury have met their burden of showing Plaintiff failed to exhaust his Eighth Amendment excessive force claim against them in that by admittedly not appealing to CORC from the Superintendent's denial of his grievance as to [*31] the excessive force claims, Plaintiff failed to properly complete all of the steps required by the IGP. *See Woodford*, 548 U.S. at 88. The Court further finds that Plaintiff has failed to show that exhaustion was unavailable and recommends that Defendants Garland and Vesneske be granted summary judgment on failure to exhaust grounds.

The Court, however, recommends that Fleury be granted summary judgment on failure to exhaust grounds solely with respect to Plaintiff's Eighth Amendment excessive force claim. The Court recommends Fleury be denied summary judgment on failure to exhaust grounds with respect to Plaintiff's Eighth Amendment sexual abuse claim in that documents submitted by Defendants indicate the sexual abuse claim against Fleury (his PREA allegation) was deemed exhausted for PLRA purposes upon Plaintiff's filing of Grievance UST-59509-16 under the IGP. (*See* Dkt. No. 27-12 at 4.)

### C. Fleury's Entitlement to Summary Judgment on the Merits on Plaintiff's Eighth Amendment Sexual Abuse Claim

#### 1. Record Evidence Regarding the Alleged Sexual Abuse

In his supplemental complaint, Plaintiff alleges that after he had been dragged to the infirmary on August 5, 2016, "Fleury put a gloved finger in [his rectum] and called [him] a bitch." (Dkt. No. 18 at 13.) In [*32] his October 26, 2016, grievance, Plaintiff wrote "once down in the infirmary out of eye sight I was assaulted again I was held down on a bed while one of the unknown masked officers stuck a finger in my anus." (Dkt. No. 27-12 at 3.)

At his deposition, Plaintiff testified Fleury "put his finger in my ass, talking about I had a weapon." (Dkt. No. 27-3 at 146.) According to Plaintiff, Vesneske was present and was holding the camera when the alleged incident with Fleury occurred. *Id.* at 195. Plaintiff testified that when Fleury put his finger in Plaintiff's rectum, Plaintiff reached up and grabbed the front of Fleury's helmet to see his face and was given an IMR for assaulting Fleury. *Id.* at 186, 188, 190. Plaintiff acknowledged at his deposition that Defendants had video camera footage of the incident. *Id.* at 186, 195.

Fleury submitted a declaration in support of Defendants' motion in which he referred to a video submitted by Defendants which shows that an involuntary strip frisk was ordered and conducted pursuant to DOCCS directives while Plaintiff was in the infirmary. (Dkt. No. 27-8 at ¶12.) Fleury denies inserting his finger in Plaintiff's rectum and also denies calling Plaintiff a "bitch" and states the video shows that neither [*33] he nor any other officer inserted a finger into Plaintiff's rectum. *Id.* at ¶¶ 10, 12. As noted above, the Use of Force Report regarding the August 5, 2016, states that Fleury "using both hands, spread Trowell's buttocks to visually inspect the area" during the strip frisk. (Dkt. No. 30-1 at 20-21.)

Fleury also submitted a statement in connection with the PREA investigation in which he denied sticking his finger in Plaintiff's rectum. (Dkt. No. 27-12 at 11.) Vesneske submitted a signed statement, date February 2, 2017, as a part of the investigation in which he stated he "did not observe any staff stick their finger in Trowell's butt." *Id.* at 10. Lt. Salls submitted a signed statement indicating Plaintiff had refused to comply with the strip frisk procedures in the infirmary and that force

was authorized and used to complete the frisk. *Id.* at 9. According to Salls, "at no time did [he] observe any staff sexually assault inmate Trowell by placing a finger or any object in his anus." *Id.* Salls stated that the entire incident was documented in UI-16-0082 and UI-16-0073.[12] *Id.* M. Kelsh, Acting DDS, who conducted the PREA investigation, reported to Superintendent Uhler on March 6, 2017, that he had reviewed **[*34]** the video for the PREA complaint and found no evidence supporting Plaintiff's complaint; staff were interviewed and provided written statements denying the allegations; and had interviewed Plaintiff. *Id.* at 7. Kelsh found no merit to Plaintiff's PREA complaint. *Id.*

2. Legal Analysis

In *Boddie v. Schnieder*, 105 F.3d 857, 859 (2d Cir. 1997), the Second Circuit held that sexual abuse by a corrections officer can give rise to an Eighth Amendment claim. However, it is not enough that a corrections officer engaged in direct contact with an intimate area of an inmate's body. In *Crawford v. Cuomo*, 796 F.3d 252, 257 (2d Cir. 2015), the Court explained, that "[i]n determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." (citing *Whitley v. Albers*, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (explaining that the Eighth Amendment analysis turns on "whether force was applied in a good faith effort to maintain or restore order or discipline or maliciously and sadistically for the very purpose of causing harm" (internal quotation marks omitted)).

Plaintiff claims Fleury inserted his finger in Plaintiff's rectum while he was being held down on a bed in the infirmary and acknowledges **[*35]** the incident was captured by video camera. (Dkt. No. 27-12 at 3.) Fleury denies doing so, and his denial is supported by Vesneske and Salls, both of whom were present in the infirmary at the time of the alleged incident. (Dkt. Nos. 27-8 at ¶¶ 10, 12; 27-12 at 9-10.)

Significantly, even if Fleury did as Plaintiff claims, the summary judgment record supports a determination that Fleury was engaged in legitimate official duties at the time, and there is nothing in the record suggesting Fleury did it to arouse or gratify himself or humiliate Plaintiff, crucial elements of an Eighth Amendment sexual abuse claim. *See Crawford*, 796 F.3d at 257. To the contrary, the evidence reveals that Fleury and other corrections personnel were in the process of attempting to perform a strip search on Plaintiff when he was placed on the bed in the infirmary, that Plaintiff failed to comply with the strip search and force was authorized, and that as part of the strip search, Fleury "spread Trowell's buttocks to visually inspect the area." (Dkt. Nos. 27-8 at ¶ 12; 27-12 at 9; 30-1 at 20-21.) The videotape of the strip search, submitted as evidence by Defendants, supports their contention that Plaintiff was resisting being strip searched at the time **[*36]** Fleury allegedly put his finger in Plaintiff's rectum, and that an element of force was used to complete the search.[13] (Dkt. No. 27-4.)[14]

Generally, "[r]esolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment." *United States v. REM*, 38 F.3d 634, 643 (2d Cir. 1994). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the [video]

---

[12] Videos UI-16-0082 and UF-16-0073, which show Plaintiff's extraction from his cell, the shower stop, travel through the hallway to the infirmary, and the frisk search that took place in the infirmary have been submitted as evidence in support of Defendants' motion and have been viewed by the Court. (Dkt. No. 27-4.) The Court did not observe anything in the video supporting Plaintiff's sexual assault claim.

[13] There has been no claim that the videotape was doctored or altered in any way. *See Scott*, 550 U.S. at 378.

[14] The videotapes were provided to the Court for viewing via conventional filing.

2018 U.S. Dist. LEXIS 22878, *36

record," so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[15] *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The Court finds that even if a rational jury could conclude that Fleury put his finger in Plaintiff's rectum during the strip search, which seems highly unlikely given the video, a rationale jury could not find that Fleury was engaged in conduct that served no penological purpose at the time, or that Fleury intended under the circumstances revealed by the video and other evidence to gratify his sexual desire or humiliate Plaintiff.

Concluding that no rational jury could find in Plaintiff's favor on his Eighth Amendment sexual abuse claim, the Court recommends that Fleury be granted summary judgment on the merits.

**WHEREFORE [*37]** , it is hereby

**RECOMMENDED** that consolidated Defendants' motion for summary judgment in the consolidated action (Dkt. No. 27) be **GRANTED IN ITS ENTIRETY**; and it is further

**RECOMMENDED** that the consolidated action be *sua sponte* **DISMISSED WITH PREJUDICE** against John Does 1-5 pursuant to 28 U.S.C. § 1915(e); and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[16] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health & Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 9, 2018

Syracuse, New York

/s/ Thérèse Wiley Dancks

Thérèse Wiley Dancks

United States Magistrate Judge

---

End of Document

---

[15] In *Scott*, 550 U.S. at 380, the Supreme Court made clear that video evidence submitted in connection with a summary judgment motion should absolutely be considered in determining whether material issues of fact exist.

[16] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).



# Williams v. Novak

United States District Court for the Northern District of New York

August 9, 2018, Decided; August 9, 2018, Filed

9:16-CV-1211 (GTS/TWD)

**Reporter**
2018 U.S. Dist. LEXIS 135423 *

WONDER WILLIAMS, Plaintiff, v. MRS. NOVAK, as representative of the estate of Novak, et al., Defendants.

**Counsel:** [*1] WONDER WILLIAMS, Plaintiff, Pro se, Marcy, NY.

For Defendants: AIMEE M. PAQUETTE, ESQ., Assistant Attorney General, OF COUNSEL, BARBARA D. UNDERWOOD, Attorney General of the State of New York, Albany, NY.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

# Opinion

## ORDER AND REPORT-RECOMMENDATION

## I. INTRODUCTION

Plaintiff Wonder Williams commenced this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on October 6, 2016. (Dkt. No. 1.) Plaintiff has alleged the following violations of his First and Eighth Amendment rights while he was incarcerated at Auburn Correctional Facility ("Auburn"): (1) acts of retaliation by Defendant Auburn Corrections Officer ("C.O.") Christopher Novak ("Novak") and

Auburn Sergeant Patrick Donnelly ("Donnelly")[1] against Plaintiff for filing grievances and making verbal and written complaints, in violation of Plaintiff's First Amendment rights; and (2) Eighth Amendment conditions of confinement claims against Novak and Donnelly for moving him to, and forcing him to remain in, allegedly uninhabitable cell I-3, and against Novak for denying Plaintiff's request for cleaning materials despite the deplorable conditions; (3) supervisory liability claims against Auburn Superintendent Harold Graham ("Graham"), Auburn Captain [*2] Brian Chuttey ("Chuttey"), Auburn First Deputy Superintendent Grafton Robinson ("Robinson"), Department of Corrections and Community Supervision ("DOCCS") Commissioner Anthony Annucci ("Annucci"), Auburn Lieutenant Timothy Quinn ("Quinn"), and Auburn Captain Edward Fagan ("Fagan") for failure to correct their subordinates Novak and Donnelly's retaliatory conduct against Plaintiff and failure to remedy Plaintiff's allegedly deplorable conditions of confinement in cell I-3, despite receiving notice thereof, in violation of Plaintiff's First and Eighth Amendment rights; and (4) a supervisory liability claim against Donnelly, as Novak's supervisor, for knowing of Novak's retaliatory harassment and threats against Plaintiff and failing to take action to correct the situation. Defendants have been sued solely in their individual capacities. (Dkt. No. 1.)

---

[1] Novak is now deceased and Mrs. Novak, in her capacity as representative of her late husband's estate (referred to herein as "Novak"), has been substituted as a Defendant. (Dkt. No. 67.)

2018 U.S. Dist. LEXIS 135423, *2

Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 39.) Plaintiff has responded in opposition to the motion, and Defendants have replied. (Dkt. Nos. 61 and 69.) Plaintiff has moved for the imposition of spoliation sanctions against Defendants pursuant to Rule 37 of the Federal Rules of Civil Procedure relating to the tape over of videotapes Plaintiff had requested be preserved for litigation [*3] following the incidents out of which his claims arise. (Dkt. No. 62.) Defendants have opposed the motion. (Dkt. No. 68.)

For reasons explained below, the Court recommends that Defendants' summary judgment motion be granted in part and denied in part, and that Plaintiff's motion for spoliation sanctions be denied without prejudice to renewal at trial.

## II. FACTUAL BACKGROUND

### A. October 15, 2013, Incident with Novak

Plaintiff was placed in administrative segregation in the Special Housing Unit ("SHU") at Auburn on or about March 15, 2010. (Dkt. No. 39-10 at 11.[2]) Plaintiff was still in administrative segregation in SHU on October 15, 2013, when a nurse approached his cell for sick call. (Dkt. Nos. 61-3 at ¶ 4[3]; 61-4 at 2.) Plaintiff asked the nurse for pain medication in a low tone to maintain confidentiality. *Id.* According to Plaintiff, Novak did not like that he and the nurse were speaking in low tones and later returned to Plaintiff's cell to question him about what he and the nurse had discussed. (Dkt. Nos. 61-3 at ¶ 5; 61-4 at 2.) Plaintiff told Novak that his confidential medical information was none of his business. *Id.* Novak

---

[2] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[3] Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

became angry and told Plaintiff if he wanted to know something, [*4] Plaintiff had better tell him. *Id.*

Plaintiff wrote a grievance (AUB-63882-13) regarding the incident on October 15, 2013. (Dkt. No. 61-4 at 2-3.) The grievance was filed on November 5, 2013, and on December 4, 2013, the Superintendent denied Plaintiff's request for relief finding that a thorough investigation revealed no support for his allegations of misconduct by Novak. *Id.* at 6. The Inmate Grievance Program ("IGP") Central Office Review Committee ("CORC") likewise found insufficient evidence to substantiate malfeasance. *Id.* at 8.

The grievance record included a memorandum from Novak to Lieutenant Vasile ("Vasile"), dated November 7, 2013, stating that Novak had spoken to Plaintiff regarding his inappropriate behavior towards the nurse on October 15, 2013, but at no time had he harassed Plaintiff and did not recall using foul language. (Dkt. No. 61-4 at 5.) RN Hoover, the nurse involved in the October 15, 2013, incident, submitted a November 21, 2013, statement to Vasile disclosing that Plaintiff had spoken loudly at her to "be quiet and use a lower tone of voice," when she was doing sick call with Novak on October 15, 2013. *Id.* at 7.

### B. Move to Cell I-3

Plaintiff claims that later in the day on October 15, [*5] 2013, Novak and Donnelly came to his cell and ordered him to pack up to be moved to SHU cell I-3. (Dkt. No. 61-3 at ¶ 10.) Plaintiff did not want to move to the cell but was ordered to do so by both Novak and Donnelly, whom Plaintiff claims were responsible for escorting him to the cell, moving him in, and leaving him there. *Id.* at ¶¶ 10, 21.

According to Plaintiff, the cell had not been cleaned or sanitized before he moved in and was in an unsanitary, hazardous state unfit for human habitation. *Id.* at ¶¶ 10-11. Plaintiff described the

cell as barren with a cold cracked concrete floor and a broken sink with used toothpaste, dried human spit, hair, blood, and other unsanitary substances on it. *Id.* at ¶ 12. Plaintiff claims the toilet, which was not functioning properly, was repulsive and unsanitary with dried spit, feces (inside and smeared on the bowl), and urine splashed up on the walls, giving off a sickening and noxious odor, which left Plaintiff nauseous and dizzy and gave him headaches and watery eyes. (Dkt. No. 61-3 at ¶¶ 13-14.) Plaintiff claims Novak denied his request for cleaning supplies, and that he never received cleaning supplies during his stay in cell I-3. (Dkt. No. **[*6]** 39-2 at 27-28.)

Plaintiff has described the mattress as badly damaged, torn and shredding, very flat, stained with dried ejaculate and blood, and smelling of feces and urine. (Dkt. No. 61-3 at ¶ 16.) The pillow was ripped, soiled, and dirty and stained with food, dirt, ejaculate, and urine. *Id.* at ¶ 17. Plaintiff also noticed while in the cell that it had an insect and vermin problem. *Id.* at ¶ 19. Plaintiff claims cell I-3 contained no clean drinking water, and although he was given water with chow, no one came around with buckets of water, and he experienced painful headaches and dehydration. (Dkt. Nos. 1 at ¶ 17; 39-2 at 28, 68.) In his affidavit in opposition to Defendants' motion, Plaintiff goes further suggesting he was only given four or five ounces of water once or twice every two days or so, and that as a result he suffered painful headaches, lethargy, and constipation. (Dkt. No. 61-3 at ¶¶ 68-70.) Plaintiff states in his affidavit, that he complained of stomach pains, an upset stomach, constipation, and cracked lips due to dehydration. *Id.* at ¶¶ 72-74.

According to Plaintiff, on October 17, 2013, he stopped Robinson and spoke with him about the inhumane living conditions in **[*7]** cell I-3. *Id.* at ¶ 11. Plaintiff complained to Robinson about the cell's deplorable state, not being given cleaning supplies, and Robinson's subordinates Novak and Donnelly's retaliation against him. *Id.* Plaintiff asked Robinson to have him moved and to preserve the SHU video for October 15 and 17, 2013, for

future court proceedings. *Id.* Plaintiff claims Robinson showed disinterest and told Plaintiff he would see about it. *Id.* at ¶ 12; *see also* Dkt. No. 39-2 at 30. Robinson did not have Plaintiff moved from the cell after being shown the conditions. (Dkt. No. 61-3 at ¶ 12.) Plaintiff remained in cell I-3 for thirty-four days until his transfer to another cell on November 17, 2013. (Dkt. No. 39-12 at ¶ 8.)

## C. Grievances Regarding Cell I-3 Conditions

### 1. October 18, 2013, Grievance (AUB-63832-13)

Plaintiff submitted a grievance, dated October 18, 2013, and filed on October 23, 2013, regarding the condition of the mattress in cell I-3. (Dkt. No. 39-3 at 4.) Plaintiff described the mattress as flat and tearing. *Id.* Plaintiff claimed the mattress aggravated his back pain, was difficult to sleep on, and needed to be replaced with a brand new mattress. *Id.* According to Plaintiff, the area supervisor **[*8]** had been made aware of the mattress issue on the previous three days, and Plaintiff had yet to receive a new mattress. *Id.*

The Inmate Grievance Resolution Committee ("IGRC") found, based upon the investigation done on the grievance, that Plaintiff's mattress was not flat and was the same as most mattresses. *Id.* at 7. The decision also noted that the facility tries to swap out the oldest mattresses with the newest. Robinson, acting for the Superintendent agreed with the findings of the IGRC. *Id.* at 5; Dkt. No. 39-18 at ¶ 6. On appeal to CORC, Plaintiff argued that staff never investigated his complaints about the mattress or interviewed him and had never seen the mattress. (Dkt. No. 39-3 at 5.) CORC noted the investigative finding that the mattress had been inspected and found in serviceable condition. *Id.* at 1. According to Plaintiff, at no point did grievance investigators come to his cell to inspect the mattress or interview him regarding the grievance, and throughout the grievance process no one identified the SHU staff personnel who said the mattress was not flat. (Dkt. No. 61-3 at ¶ 39.)

### 2. October 19, 2013, and November 15, 2013,

Consolidated Grievances (AUB-63881-13)

Plaintiff submitted an October 19, **[\*9]** 2013, grievance, which was filed on November 5, 2013, and a November 15, 2013, grievance complaining about the conditions in cell I-3 and claiming he was placed in the inadequate cell by Novak and Donnelly in retaliation for writing letters and grievances. (Dkt. No. 61-4 at 12-14.) In his declaration, Donnelly states that Plaintiff was not transferred to cell I-3 due to retaliation and, in fact, Donnelly was unaware of any grievances Plaintiff had filed against him or any other officer at the time of the move. (Dkt. No. 39-12 at ¶ 7.)

The conditions complained of in the grievances were essentially the same as those listed above but also included a clogged vent and the absence of a mirror. (Dkt. No. 61-4 at 12.) Plaintiff complained in the October 19, 2013, grievance that he had requested cleaning supplies and hot water from Novak, and Novak had responded "[d]eal with it, I'm not giving you shit . . . [n]ot my problem, maybe you'll learn your lesson about writing people up." *Id.* According to Plaintiff, Novak laughed and walked away. *Id.* Plaintiff claimed that as of the date of the grievance, he had not received any cleaning supplies, and the sink had not been fixed. *Id.* Plaintiff testified **[\*10]** at his deposition that he never received cleaning supplies during the time he was in cell I-3, and the plumbing was never repaired. (Dkt. No. 39-2 at 27-28.)

On November 10, 2013, Vasile interviewed Plaintiff regarding the October 19, 2013, grievance. (Dkt. Nos. 61-3 at ¶ 49; 61-4 at 16.) In a November 12, 2013, written report to Chuttey, Vasile indicated he had interviewed Plaintiff regarding the grievance, and Plaintiff reiterated the complaints in the grievance and told Vasile he had received cleaning materials and cleaned up cell I-3. (Dkt. No. 61-4 at 16.) According to Plaintiff, when Vasile came to the cell to interview him, Plaintiff informed him of the gross conditions in the cell and showed him the plumbing that was out of order. (Dkt. No. 61-3 at ¶ 49.) Contrary to Vasile's report

to Chuttey, Plaintiff claims he told Vasile he had not received cleaning materials and had been unable to adequately clean the cell, although he had tried to do so with his t-shirt and sock. *Id.* Plaintiff requested that Vasile pull the surveillance videos and review them for use as evidence in his grievance and to preserve them as evidence for any intended litigation. *Id.*

As a part of the October **[\*11]** 19, 2013, grievance investigation, Novak submitted a November 7, 2013, written statement that the cell Plaintiff moved into on October 15, 2013, had been cleaned out before Plaintiff moved in and the toilet, sink, and light were fully operational. (Dkt. No. 61-4 at 17.) In a November 9, 2013, statement in the grievance record, Donnelly stated that cells are cleaned after they are vacated according to SHU cleaning procedures, Plaintiff never complained to him about a dirty cell or broken sink, and as of November 9, 2013, the sink in cell I-3 worked properly. *Id.* at 21. In his declaration, Donnelly states that he recalls Plaintiff complaining about his sink not working properly subsequent to November 9, 2013, and Plaintiff was moved to a new cell shortly thereafter. (Dkt. No. 39-12 at ¶ 11.) Donnelly also denied having told Plaintiff "if you stop writing people and things up maybe I'll eventually have you moved to a better cell" as Plaintiff claimed in his grievance. *Id.*

The Superintendent denied Plaintiff's consolidated grievances, stating that a thorough investigation had been conducted, and there was no evidence to support Plaintiff's allegations of staff misconduct. *Id.* at 15. CORC wrote in part in **[\*12]** its decision on Plaintiff's appeal:

> CORC notes that this matter has been properly investigated by the facility administration. Sergeant D . . . and Officer N . . . deny making unprofessional comments, and state that grievant's cell was fully operational and cleaned before he moved into it. Further, Sergeant D . . . states that the grievant did not stop him at any time to address concerns regarding the condition of his cell. It is also

noted that the mattress was not flat, they are replaced as new ones become available, and that the grievant was moved to a different cell on 11/17/13.

(Dkt. No. 39-4 at 1.) CORC noted in its decision on the consolidated grievances that Plaintiff had made a request to Vasile during the investigation that he be allowed to use the SHU surveillance camera as a witness, and wrote "[w]ith respect to grievant's appeal, CORC upholds the discretion of the facility administration to review videotapes when deemed necessary based on security concerns, unusual interests, etc." *Id.* at 18.

Plaintiff claims that neither Vasile nor any other investigator investigated his November 15, 2013, grievance, and that no follow up investigations or reports were done on the appeal of the grievance [*13] to CORC. (Dkt. No. 61-3 at ¶ 60.)

## D. October 19, 2013, Written Complaints to DOCCS Officials Regarding Cell Conditions and Verbal and Written Follow Up By Plaintiff

On October 19, 2013, Plaintiff sent written complaints regarding conditions in cell I-3 to Defendants Annucci, Graham, Robinson, Chuttey, and Quinn. (Dkt. No. 1-3 at 3-19.)

1. Annucci

In an October 19, 2003, letter to Annucci, Plaintiff complained of being kept in a gross and inhumane isolation cell as a result of his write ups on facility staff. The specific complaints regarding the cell conditions and mattress are essentially the same as those described above. *Id.* at 3. Plaintiff also complained he was denied cleaning supplies and was told by staff to "deal with it," and that they might move him to a functioning cell if he stopped writing complaints. (Dkt. No. 1-3 at 3.) Plaintiff requested that Annucci move him to a more acceptable cell and discipline his subordinates. *Id.* The letter does not name either Novak or Donnelly. *Id.* At his deposition, Plaintiff testified he did not know if he received responses to his written

complaints from Annucci. (Dkt. No. 39-2 at 58.)

2. Graham

Plaintiff wrote to Graham on October 19, 2013, to complain [*14] about being ordered by Novak and Donnelly to move into an out-of-order cell that was "terrible and completely inhumane, indecent, and unacceptable." (Dkt. No. 1-3 at 9.) The letter describes generally the same complaints about cell conditions and denial of cleaning supplies as described above. *Id.* Plaintiff also complains in the letter about being unable to adequately hydrate himself due to the broken sink. *Id.* Plaintiff informed Graham that Novak and Donnelly were aware of the terrible condition of the cell when they moved him in and despite Plaintiff's verbal complaints had done nothing to fix the conditions or move him to another cell. *Id.* He also informed Graham that Novak had told him placement in the cell was intentional because of Plaintiff's write-ups on staff, and that Donnelly, acting in concert, had told Plaintiff if he stopped writing grievances he would be moved out eventually. *Id.*

Plaintiff told Graham he had seen Graham making rounds in SHU on October 17, 2013, and complained that Graham had ignored him when Plaintiff called out to him. *Id.* Plaintiff noted in the letter that he had spoken to Robinson that day, but that Robinson had done nothing. *Id.* Plaintiff asked Graham [*15] to move him out of the cell and discipline the officers. *Id.*

Plaintiff wrote to Graham again on November 4, 2013, reminding him, *inter alia*, of the problems with the cell. (Dkt. No. 1-3 at 21.) According to Plaintiff, on November 5, 2013, he saw Graham on SHU rounds and stopped Graham at his cell, and told Graham about Novak and Donnelly's retaliatory conduct and the cruel punishment of being confined in cell I-3. (Dkt. No. 61-3 at ¶ 89.) Plaintiff claims to have shown Graham the deplorable conditions in his cell, including the major problems and the leaks. *Id.* Graham showed no concern and walked away and did not order Plaintiff moved from cell I-3. *Id.* Plaintiff sent

another letter to Graham regarding the condition of the cell on November 6, 2013, and again asked for Graham's assistance. (Dkt. Nos 1-3 at 23; 61-3 at ¶ 90.)

Plaintiff testified at his depositions that he did not recall if he received responses from Graham to his written complaints. (Dkt. No. 39-2 at 57.)

### 3. Robinson

In an October 19, 2013, letter to Robinson, Plaintiff reminded him of their October 17, 2013, conversation regarding the condition of his cell in which Robinson had told Plaintiff he would see about it, and **[*16]** that Robinson had not come back and Plaintiff had not been moved. (Dkt. No. 1-3 at 13.) Plaintiff told Robinson he was on notice of the conditions and in his position had the authority to move Plaintiff to a better cell immediately. *Id.* Plaintiff again asked Robinson to order that he be removed from the cell and placed in another one and to place Plaintiff's letter in the appropriate files. *Id.* Plaintiff wrote to Robinson again on November 3, 2013, complaining, *inter alia*, about still being confined in the gross conditions of cell I-3. (Dkt. Nos. 1-3 at 19; 61-3 at ¶ 35.)

### 4. Chuttey

On October 19, 2013, Plaintiff sent a written complaint to Chuttey as a member of the executive team and a captain supervising SHU. (Dkt. No. 1-3 at 6.) Plaintiff articulated generally the same complaints about the condition of the cell, and headaches and lack of hydration, and complained that Novak and Donnelly were fully aware that placing him in that cell was wrong and a violation of his rights. *Id.* Plaintiff asked Chuttey to immediately order that he be placed in another cell and have his sink repaired. *Id.* Plaintiff testified at his deposition that he did not recall if he received responses from Chuttey **[*17]** to any written complaints. (Dkt. No. 39-2 at 60.)

### 5. Quinn

Plaintiff's final letter of October 19, 2013, was to Quinn. Plaintiff reiterated his complaints about the cell and lack of cleaning supplies, and told Quinn he had been placed in the cell by Donnelly and Novak in retaliation for making meritable complaints about Quinn's subordinate staff in SHU. (Dkt. No. 1-3 at 16.) Plaintiff asked Quinn to investigate and correct the wrongs committed by his staff. *Id.* Plaintiff testified at his deposition that he did not recall if he received responses from Quinn to any written complaints. (Dkt. No. 39-2 at 59.)

## E. November 2 and 3, 2013, Incidents with Novak

### 1. Incidents as Described by Plaintiff

Plaintiff claims that on November 2, 2013, Novak approached his cell and began to harass him about filing grievances and complaining to Novak's superiors. (Dkt. No. 61-3 at ¶ 76.) According to Plaintiff, Novak said "Williams, you're a real piece of shit, you know that. Because you've been complaining on me, first chance that comes around I'm gonna make something bad happen to you, this is my world, nobody can help you in here" and "I'm gonna jam you up really nice for those complaints on me." *Id.* Novak **[*18]** then walked away, and Plaintiff wrote a grievance regarding the alleged retaliatory threat the same day. (Dkt. No. 61-3 at ¶ 76.)

Plaintiff claims Novak engaged in more retaliation over his grievances and complaints against Novak and others the next day, November 3, 2013. *Id.* at ¶ 79. Novak approached Plaintiff's cell and destroyed the cell's wall radio and jacks preventing Plaintiff from passing the time listening to programs or music on the SHU headphones. *Id.* Afterwards Novak told Plaintiff "you don't deserve no fucking headphones for all these complaints you wrote . . . ." and to "sit in there and be miserable asshole." *Id.* Novak followed up with "[i]f you write this up on me, I'll break your fucking neck, got that?" *Id.* According to Plaintiff, Novak continued "If you're smart we won't be hearing anymore complaints from you . . . . those grievances won't get you no

where, nothing is gonna change, forget all that bullshit about how you prisoners got rights . . . You're in the wrong place for that and as far as I am concerned, you don't have any . . . ." *Id.* Plaintiff wrote a grievance the same day. *Id.* at ¶ 80.

## 2. Plaintiff's Grievances

Plaintiff's November 2 and 3, 2013, grievances **[*19]** were consolidated under the grievance number AUB-63978-13. (Dkt. Nos. 61-3 at ¶ 61; 61-4 at 59, 67.) The contents of the November 2 and 3, 2013, grievances is essentially the same as Plaintiff's description of the harassment by Novak on the dates set forth. (Dkt. Nos. 61-3 at ¶¶ 76, 79; 61-4 at 59, 67.) Novak submitted a statement to Donnelly denying he harassed and threatened Plaintiff and denying he made the statements attributed to him by Plaintiff. (Dkt. No. 61-4 at 62.) Donnelly submitted a statement concluding that the matter consisted of an inmate's word versus an employee's word, and that the allegations could not be substantiated by fact. *Id.* at 63. Therefore, Donnelly found no evidence to support the grievance. *Id.* The combined grievances were denied by the Superintendent based upon a lack of evidence supporting Plaintiff's allegations of staff misconduct. (Dkt. No. 61-4 at 64.) On his appeal, Plaintiff requested the SHU area cameras as his witness to the actions on which his grievances were based, and indicated he had informed Lieutenant Blowers of the witness. *Id.* CORC upheld the Superintendent's determination. *Id.* at 65.

## 3. Written Complaints

In his November 3, 2013, written complaint to **[*20]** Robinson, Plaintiff complained of being harassed by Novak on November 2, 2013, and asked that the surveillance video and audio recordings from 9:00am to 11:00am be preserved for presentation as evidence in a court of law. (Dkt. No. 61-4 at 69.)

In his November 4, 2013, written complaint to Graham, Plaintiff complained that on November 2 and 3, 2013, Novak had wrongfully harassed, threatened, and retaliated against him for writing and pursuing grievances. *Id.* at 71. Plaintiff told Graham that Novak constantly caused him problems, and he had written and spoken to supervisors regarding staff violations against him but it had just kept getting worse, and he asked Graham to investigate. *Id.* In his November 6, 2013, written complaint to Graham, Plaintiff reminded Graham of the November 4, 2013, written complaint he had sent him and wrote "This has not been my first letter to you, you said that you've received my prior letter(s) in your mailbox. So when are you gonna take any action to help me or do something." *Id.* at 75.

Plaintiff also made a written complaint to Chuttey on November 4, 2013, letting him know that his subordinates continued to wrongfully and unlawfully retaliate, harass, and threaten Plaintiff **[*21]** due to his grievances and complaints. *Id.* at 73. Plaintiff described his November 2 and 3, 2013, encounters with Novak and told Chuttey that Novak tried to intimidate him to stop him from writing grievances. (Dkt. No. 61-4 at 73.) Plaintiff asked Chuttey to step up and handle the matter. *Id.*

## F. December 9, 2013, Incident with Novak

Plaintiff claims Novak approached his cell on December 9, 2013, and stated "[y]ou still bitching and complaining to people about me. I'm gonna make your life a living hell." Novak then threatened to move Plaintiff into another "fucked up dirty infested cell" even worse than the last if he attempted to write any more grievances. (Dkt. No. 61-3 at ¶ 96.) According to Plaintiff, Novak's actions were in retaliation for grievances he had written against Novak dated October 15 and 19, and November 2, 3, and 15, 2013, and written complaints he had sent to Novak's superiors. *Id.* Plaintiff claims to have notified the area supervisor about Novak's threats and reprisals, and that no action was taken. *Id.* at ¶ 98.

Plaintiff wrote a grievance (AUB-64154-13) on

December 9, 2013, complaining of the retaliatory encounter with Novak that day and stating that the area supervisor had [*22] been made aware of the incident. (Dkt. No. 61-4 at 77.) The grievance also mentioned in passing harassment by Novak on November 15 and 27, 2013, which Plaintiff had attempted resolve informally. *Id.* Plaintiff complained about the grievance system and its so-called "investigations." *Id.* He requested that Novak be properly disciplined, supervised, and ordered to stop taking adverse actions against him. *Id*

The grievance was denied by the Superintendent based upon Novak's denial and the lack of evidence supporting Plaintiff's claim. *Id.* at 81, 82, 84. In his appeal statement, Plaintiff indicated that he had advised staff that the SHU cameras were his evidence and witness. *Id.* at 81. CORC also denied the grievance. *Id.* at 78.

## G. December 21 and 22, 2013, Incidents

### 1. December 21, 2013, as Described by Plaintiff

Plaintiff claims that on December 21, 2013, Novak committed acts of retaliation against him for his October 15 and 19, 2013, grievances and his complaint letters to superiors regarding Novak's actions. (Dkt. No. 61-3 at ¶ 100.) According to Plaintiff, Novak approached his cell and told him to pack up because he was going to be moved to another "fucked up" and "out of service cell" because he had filed grievance AUB-63978-13 [*23] (the November 2 and 3, 2013, incidents) against Novak and had not dropped the complaints. *Id.* Novak told Plaintiff that his complaints did "not mean shit" to anybody, and Plaintiff was in a no-win situation because it was his word against Novak's. *Id.*

Novak and Donnelly came back minutes later. *Id.* at ¶ 101. Donnelly had grievance AUB-63978-13 and asked Plaintiff if he had anything to add or wanted to drop the complaint against Novak. *Id.* Plaintiff told Donnelly he wanted the SHU video camera recordings to be used as evidence in support of his

complaint and for future litigation, and Donnelly said "that ain't gonna happen." *Id.*

### 2. December 22, 2013, Incident as Described by Plaintiff

Plaintiff claims Novak came to his cell again the next day, threw some plastic bags into the slot and told Plaintiff to pack up because he was being moved to another out-of-service and "fucked-up cell." (Dkt. No. 61-3 at ¶ 104.) When Plaintiff asked why, Novak told him he had given Plaintiff fair warning about writing grievances and making verbal and written complaints. *Id.* Novak allegedly told Plaintiff he was going to break his arms and kick all his teeth out as soon as he had the opportunity and threatened [*24] Plaintiff's life. (Dkt. No. 61-3 at ¶ 104.) Novak told Plaintiff to be packed when he came back. *Id.* When Donnelly came by later, Plaintiff asked him if he had ordered Novak to move Plaintiff to another cell and Donnelly said he had not ordered any move. (Dkt. No. 1 at ¶ 56.)

Plaintiff has submitted a declaration from inmate Ronald Mask, dated December 23, 2013, stating that Novak told Plaintiff to pack up and threatened bodily harm to Plaintiff due to grievances against Novak and complaints against another corrections officer. (Dkt. No. 61-4 at 108-09.) Mask also heard Novak threaten to kick Plaintiff's teeth out. *Id.* Plaintiff was not moved to another cell on December 22, 2013. (Dkt. No. 39-2 at 50.)

### 3. Consolidated Grievances (AUB-64191-14)

Plaintiff filed grievances regarding the December 21 and 22, 2013, incidents, and the grievances were again consolidated. (Dkt. No. 61-4 at 86, 96.) The grievances essentially followed the averments in Plaintiff's affidavit in opposition. (Dkt. No. 61-3 at 100, 104.) Novak denied threatening and harassing Plaintiff on December 21 and 22, 2013, and telling him he had to pack his cell to move. (Dkt. No. 64-1 at 93.) Donnelly denied that Plaintiff [*25] asked for the video footage for December 21 and 22, 2013, and claimed Plaintiff never told him about anything Novak had done. *Id.* at 92.

The Superintendent denied the consolidated grievances based on Novak and Donnelly's denials and found no evidence to support Plaintiff's grievance. *Id.* at 87. CORC upheld the Superintendent's determination and upheld "the discretion of the facility administration to review videotapes when deemed necessary based on security concerns, unusual incidents, etc." *Id.* at 89.

### 4. Written and Verbal Complaints

Plaintiff sent a written complaint, dated December 22, 2013, to Chuttey, complaining of Novak's behavior and Donnelly not only failing to stop it but seemingly encouraging it. (Dkt. No. 61-4 at 98.) Plaintiff chided Chuttey for his lack of concern with correcting the problems and violations of his staff and with failing to respond to Plaintiff's written complaints. *Id.* Plaintiff placed Chuttey on notice to preserve SHU-I-tank's video and audio recording, cameras CS-85 and CS-84, for 7:30am through 9:30am on December 21, 2013, and from 7:30am to 3:00pm on December 22, 2013, for evidence in intended litigation regarding the incidents with Novak and Donnelly. *Id.*

On December 26, 2013, [*26] Plaintiff stopped Graham while he was on his SHU rounds and spoke to him about the December 21, 2013, incident with Novak and a host of other incidents with Novak and Donnelly. (Dkt. No. 61-3 at ¶ 108.) Plaintiff informed Graham he wanted SHU security camera recordings for I-tank on those dates properly preserved for evidence in intended litigation regarding the incidents with Novak and Donnelly. *Id.*

On December 28, 2013, Plaintiff sent written notices to Graham, Robinson, and Quinn to preserve the SHU surveillance recordings for 7:30am through 9:30am on December 21, 2013, and from 7:30am to 3:00pm on December 22, 2013, for evidence in intended litigation regarding the incidents with Novak and Donnelly. (Dkt. No. 61-4 at 100-105.)

## H. January 25, 2014, Incident with Donnelly

### 1. January 25, 2014, Incident as Described by Plaintiff

According to Plaintiff, on January 25, 2014, Donnelly approached him during TV recreation time, snatched the TV power cord out of the socket and, referring to grievance AUB-64191-4 which Plaintiff had filed against Novak and Donnelly, said "[i]s there gonna be anymore of these[?]" (Dkt. No. 61-3 at ¶ 111.) Donnelly then threatened that if Plaintiff wrote any more [*27] grievances, there would be no more TV time. Donnelly proceeded to order an officer to handcuff Plaintiff and return him to his SHU cell, which meant Plaintiff's TV time was terminated approximately an hour early. (Dkt. No. 61-3 at ¶ 111.) Plaintiff claims the entire episode was recorded in video and audio on SHU surveillance equipment. *Id.*

### 2. January 30, 2014, Grievance (AUB-642-64289-14)

On January 30, 2014, Plaintiff wrote a grievance against Donnelly regarding the January 25, 2014, television incident. (Dkt. No. 61-4 at 114-15.) Plaintiff explained in the grievance that he had been taken out of his cell for a couple of hours of TV and to eat his commissary, which was allowed while he was in administrative segregation in SHU. *Id.* at 114. Plaintiff then described the incident as set forth above. *Id.* at 114; Dkt. No. 61-3 at ¶ 111. Plaintiff identified the SHU surveillance cameras and audio in the TV room as witnesses to the incident with Donnelly. *Id.* (Dkt. No. 61-4 at 114.)

During investigation of the grievance, Donnelly denied threatening Plaintiff. (Dkt. No. 61-4 at 118.) Donnelly acknowledged unplugging the television but claimed to have done so when the two hours of administrative segregation television [*28] was done. *Id.*; Dkt. No. 39-12 at ¶ 14. Donnelly also acknowledged asking Plaintiff about grievance AUB-64191-14 at the end of television time. (Dkt. No. 61-4 at 118.) The Superintendent denied the grievance based on lack of evidence to support staff misconduct. *Id.* at 116. The Superintendent noted

that the unit video was reviewed and did not substantiate Plaintiff's claim of retaliation. *Id.* at 116-17.

On his appeal to CORC, Plaintiff requested that a copy of the reviewed surveillance video be preserved for CORC review and asked to purchase a copy of the video. *Id.* CORC upheld the Superintendent's determination and advised Plaintiff he could initiate a Freedom of Information Act Request for consideration to obtain the videotape he was requesting in accordance with facility procedures. *Id.* at 111.

### 3. Written and Verbal Complaints

On January 25, 2014, Plaintiff wrote to Robinson complaining about the encounter with Donnelly in the television room and asking Robinson to conduct an investigation of his own regarding the continuous harassment and threats by his staff. (Dkt. No. 61-4 at 121.) Plaintiff also asked that the SHU surveillance video be retained for future litigation. *Id.*

Plaintiff made a written complaint to Graham **[*29]** on January 27, 2014, complaining of Donnelly's actions in the television room on January 25, 2014, and further complaining that the harassment and retaliation had been allowed to go on for too long without Annucci, Graham, Robinson, or Chuttey putting an end to it, or even taking it seriously. *Id.* at 126. Plaintiff asked why Graham had not done anything. *Id.* Plaintiff attached a notice to safely preserve the SHU surveillance video and audio from specific cameras and microphones from approximately 10:30am to 10:50am on January 25, 2014. *Id.* at 124-25.

On January 28, 2014, Plaintiff wrote letters to Annucci and Fagan complaining of continued inaction by them with regard to repeated mistreatment, threats, and punishment sustained in retaliation for filing meritorious grievances expressing his concerns, despite being all too aware of the continued adverse actions taken against him. *Id.* at 122-23. Plaintiff also informed them of the

incident with Donnelly on January 25, 2014, and requested that video and audio recordings be safely preserved for litigation. *Id.*

## III. APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine **[*30]** issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to

be **[\*31]** treated as an affidavit.[4] *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005), the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could **reasonably** find for the plaintiff." (emphasis in original). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys*, 426 F.3d at 554 (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations. "*Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the **[\*32]** court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the pro se party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to

overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP) (JCF), 1999 U.S. Dist. LEXIS 16832, 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999)[5] (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

Defendants have argued that the New York State Dead Man's Statute, N.Y. C.P.L.R. § 4519 applies with respect to decedent Novak, and that Rule 56(e) "requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial." (Dkt. No. 39-21 at 9-10.) The Court finds the Dead Man's Statute inapplicable in this civil rights action.

Federal Rule of Evidence 601, which generally determines the admissibility of evidence in federal court, provides that "in a civil case, state law governs the witness's competency regarding a claim or defense *for which state law supplies the rule of decision*." F.R.E. 601. (emphasis supplied). State dead man's statutes have been found inapplicable in federal civil rights actions in which federal, not state, law, supplies the rule of decision. *See, e.g., Savarese v. Agriss*, 883 F.2d 1194, 1200 n. 10 (3rd Cir. 1989) (finding **[\*33]** the Pennsylvania dead man's act would not apply to a federal civil rights action); *Longoria v. Wilson*, 730 F.2d 300, 304 (5th Cir. 1984) (finding no error by district court in refusing to apply state dead man's statute to a federal question based civil rights action under § 1983); *see also Dilegge v. Gleason*, 131 F. Supp. 2d 520, 525 (S.D.N.Y. 2001) (under F.R.E. 601, the dead man's statute applies only where state law provides the rule of decision and is inapplicable in a Title VII discrimination action); *L.H. Pittson Area Sch. Dist.*, 130 F. Supp. 3d 918, 932 n.18 (M.D. Pa. 2015) (dead man's statute only applies in federal cases where state substantive law applies, not to any claim under federal law); *Estate of Sharkey v. Pine Tree Distributors, Inc.*, 174 F. Supp. 2d 380, 384 (D. Md. 2001) (holding state

---

[4] The Court finds that Plaintiff's complaint is properly verified. (Dkt. No. 1 at 26.)

[5] Copies of all unpublished decisions cited herein will be provided to Plaintiff in accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Dead Man's Statute inapplicable in federal question case).

## IV. LEGAL STANDARDS FOR PLAINTIFF'S CLAIMS

### A. Eighth Amendment Conditions of Confinement

Plaintiff has alleged Eighth Amendment conditions of confinement claims against Defendants Novak and Donnelly with regard to his placement in cell I-3 from October 15, 2013, through November 17, 2013. (Dkt. No. 1 at 24-25.) The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The prohibition extends to prison conditions. *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998). "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are **[*34]** subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citations and internal quotation marks omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to support a claim for unconstitutional conditions of confinement. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must satisfy both an objective and a subjective element. *Farmer*, 511 U.S. at 834, 837. To satisfy the objective element, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of harm." *Id.* at 834. To satisfy the subjective element, a plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind . . ., such as deliberate indifference to inmate health or safety." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citations and internal quotation marks omitted).

To establish the objective element, an inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id.* Health includes the risk of serious damage to "physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). Prison officials violate the **[*35]** Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker*, 717 F.3d at 125(quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar*, 683 F.3d at 57 (citation and internal quotation marks omitted).

When the challenged prison conditions include exposure to unsanitary conditions, the Second Circuit has been unwilling "to set a minimum duration and minimum severity of an exposure for it to reach the level of a constitutional violation." *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). There is no "bright-line durational requirement for a viable unsanitary conditions claim. Nor is there some minimal level of grotesquerie required . . . ." *Id.* Courts must "evaluate the product of these two components [on a case-by-case basis and] whether exposure to human waste is cruel and unusual depends on both the duration and severity of exposure." *Id.* "The severity of an exposure may be less quantifiable than its duration, but its qualitative offence to a prisoner's dignity should be given due consideration." *Id.*

[*36] "Even if no single condition of confinement would be unconstitutional in itself, exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Rhodes v. Chapman*, 452 U.S. 337, 363, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981) (internal quotation marks and citation omitted). "Conditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise." *Walker*, 717 F.3d at 125 (quoting *Seiter*, 501 U.S. at 304). Sanitary living conditions have been found by the Second Circuit to constitute a "basic human need." *Id.*

To constitute deliberate indifference under the subjective element, "[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57; *see also Trammell v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective element in cases involving prison conditions is "deliberate indifference to inmate health or safety."). "The official must be both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence is not enough. *Id.* at 835.

## B. First Amendment Retaliation

Plaintiff has asserted First Amendment retaliation claims against Defendants Novak and Donnelly. (Dkt. No. 1 at 24.) To prevail on a First Amendment retaliation claim, an inmate must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected [conduct] and the adverse action." *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (quoting *Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009)); *see also Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir.

2004) (quoting *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema*, 534 U.S. 506, 508, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)). "Adverse action" for purposes [*37] of a retaliation claim has been defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381. Otherwise, the retaliatory act is simply *de minimis* and outside the scope of constitutional protection. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (citing *Dawes*, 239 F.3d at 492-93). The adverse action inquiry is a contextual one. *Mateo v. Fischer*, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (citing *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). "Prisoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes*, 239 F.3d at 493 (quoting *Thaddeus X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)).

An inmate bears the burden of showing that "the protected conduct was a substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing [*38] *Colon*, 58 F.3d at 873). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro*, 791 F. Supp. 2d at 370 (citations omitted).

Because of the relative ease with which claims of retaliation can be incanted, courts have scrutinized retaliation claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds, Swierkiewicz*, 534 U.S. at 506. As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official--even those otherwise not rising to the level of a constitutional violation--can be characterized as a constitutionally proscribed retaliatory act.

*Dawes*, 239 F.3d at 491. Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient. *Flaherty*, 713 F.2d at 13; **[*39]** *see also Houston v. Goord*, No. 9:03-CV-1412 (GTS/DEP), 2009 U.S. Dist. LEXIS 27481, 2009 WL 890658, at *11 (N.D.N.Y. Mar. 31, 2009) ("Analysis of retaliation claims . . . requires thoughtful consideration of the evidence presented concerning the protected activity in which the inmate Plaintiff has engaged and the adverse action taken against him or her, as well as the evidence tending to link the two. When such claims, which ordinarily are exceedingly case specific, are alleged in only conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, the entry of summary judgment dismissing plaintiff's retaliation claims is warranted.").

Even if a plaintiff makes the appropriate showing of retaliation, a defendant may avoid liability if he demonstrates that he would have taken the adverse action even in the absence of the protected conduct. *See Scott v. Coughlin*, 344 F.3d 282, 287-88 (2d Cir. 2003) (defendant may be entitled to summary judgment upon showing that the alleged retaliatory action would have taken even without the improper motivation).

## C. Supervisory Liability

Plaintiff has asserted supervisory liability claims against Defendants Annucci, Graham, Robinson, Chuttey, Quinn, Fagan, and Donnelly with respect to the conditions of confinement and **[*40]** retaliation claims asserted against Novak and Donnelly. (Dkt. No. 1 at 24-25.) The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 U.S. Dist. LEXIS 25367, 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (citing *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the **[*41]** alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873.[6]

"Fundamentally, for a supervisor to be liable under Section 1983, there must 'of course' have 'been an underlying constitutional deprivation' by a subordinate, *Blyden*, 186 F.3d at 265, and a 'causal link' between the supervisor's conduct and the violation of the plaintiff's civil rights." *Nicholson v. Fischer*, No. 13-CV-6072-FPG-MWP, 2018 U.S. Dist. LEXIS 72199, 2018 WL 2009432, at *5 (W.D.N.Y. April 30, 2018) (citing *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002)).

# V. ANALYSIS OF CONDITIONS OF CONFINEMENT CLAIM AGAINST NOVAK AND DONNELLY

Plaintiff has alleged Eighth Amendment conditions of confinement claims against Novak and Donnelly based upon their actions in moving him to cell I-3 on October 15, 2013, denial of Plaintiff's request for cleaning supplies, and their alleged failure to move him [*42] to another cell, despite the unsanitary and uninhabitable condition of cell I-3, and to have the allegedly broken sink repaired. (Dkt. No. 61-3 at ¶¶ 10-19, 68-74.) Plaintiff has claimed, upon information and belief based on his own personal experience, that the officer in charge of SHU, in this case Donnelly, has the authority to arrange to have an inmate relocated to another cell.

(Dkt. No. 61-3 at 30.) Other than Donnelly's statement that the move was not made in retaliation for grievances by Plaintiff, there appears to be no record evidence as to who, if not Donnelly, made the decision to move Plaintiff to cell I-3 and why Plaintiff was moved. (Dkt. No. 39-12 at ¶ 7.)

## A. Objective Element

As explained above, an Eighth Amendment conditions of confinement claim has both objective and subjective elements. With regard to the objective element, Plaintiff claims, *inter alia*, that the cell had a broken sink with used toothpaste, dried human spit, hair, blood, and other unsanitary substances on it; an improperly functioning toilet with repulsive and unsanitary dried spit and feces inside and smeared on the bowl and urine splashed up on the wall; feces crusted on the floors, walls, ceiling, ceiling light, [*43] and wall desk; excess dust that could not go out clogged vents; a puddle of water from a leaking toilet; flying insects and vermin, including spiders and spider webs and roaches; and a torn, damaged, dirty mattress and pillow stained with dried ejaculate and blood, and smelling like urine and feces. (Dkt. No. 1 at ¶¶ 8-16.) According to Plaintiff, the broken plumbing, sink, and toilet gave off a noxious odor that made him sick to his stomach and caused him to vomit and experience dizziness, nausea, burning and watery eyes, and painful headaches. *Id.* at ¶ 16. Plaintiff also claims there was no drinking water and he was given an inadequate amount of water each day which led to dehydration and constipation. *Id.* at ¶¶ 17; Dkt. No. 63-1 at ¶¶ 68-70, 72-74. Plaintiff contends Novak refused to give him any cleaning supplies leaving him with only a sock and a t-shirt with which to try to clean. (Dkt. No. 1 at ¶¶ 21, and 27.)

There is significant conflict in the record evidence regarding the condition of cell I-3 while Plaintiff was being housed there from October 15, 2013, through November 17, 2013. (Dkt. Nos. 1 at ¶ 10; 39-12 at ¶ 8.) Donnelly has stated in his declaration

---

[6] The Second Circuit has thus far not determined whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

that cells are cleaned **[*44]** out in accordance with SHU cleaning procedures after they are vacated, and the filthy conditions Plaintiff described in his grievances with regard to cell I-3 are simply not true. (Dkt. No. 39-12 at ¶ 10.) Donnelly also claims that Plaintiff never stopped him to complain about the conditions in his cell until November 9, 2013, when he complained that his sink, which Donnelly claims had theretofore been working properly, was not working.[7] *Id.* at ¶¶ 9-11. Novak submitted a statement in response to Plaintiff's grievance regarding the conditions of cell I-3 claiming that the cell had been cleaned out before Plaintiff moved in and the toilet, sink, and light were fully operational, and that Plaintiff never complained to him about the condition of the cell. (Dkt. No. 61-4 at 4.)

Defendants submitted records of cell repairs and repair requests for cell I-3 from October 2013, to December 2013, which show no repair orders during Plaintiff's occupancy in the cell. (Dkt. No. 39-5.) Plaintiff claims that during the duration of his stay in cell I-3, he requested SHU staff to submit a work maintenance order for repair of the sink, toilet, and plumbing both verbally and in writing. (Dkt. No. 61-3 at **[*45]** ¶¶ 55-56.) According to Plaintiff, he had no control over if and when maintenance work orders were submitted by SHU staff, and that inmates had no ability to submit work orders themselves. *Id.* at ¶¶ 57-58. The Court has found no visual or documentary evidence, *i.e.*, video, photographs, or inspection reports, in the summary judgment record documenting the condition of the cell when Plaintiff was moved in, or at any time during the thirty-four days he was confined there, that would resolve the factual conflict on summary judgment.

As discussed above, where challenged prison conditions include exposure to unsanitary conditions, the court must consider both the duration and severity of the conditions on a case-by-case basis. *Willey*, 801 F.3d at 68. The Court finds that evidence presented by Plaintiff regarding the unsanitary conditions and broken sink in cell I-3, the thirty-four day duration and the medical problems suffered by him as a result, if believed, could lead a reasonable jury to conclude that the cumulative effect of the conditions to which Plaintiff claims to have been exposed to deprived him of safe and sanitary living conditions and an adequate supply of potable water, both basic human needs, and **[*46]** also constituted a significant offence to Plaintiff's dignity. *See id.* (confinement in an unsanitary cell exposed to human waste supports an unconstitutional conditions of confinement claim depending on both the duration and severity of the exposure ); *Wright v. McMann*, 387 F.2d 519, 522 (2d Cir. 1967) (holding prisoner in a cell that was "fetid and reeking from the stench of the bodily waste of previous occupants which . . . covered the floor, sink, and toilet," would violate the Eighth Amendment); *Garraway v. Griffin*, 707 F. App'x 16, 18 (2d Cir. 2017) (claim that plaintiff was knowingly placed in a cell with a feces-soiled mattress and defendants refused to replace it despite his documented complaints sufficient to raise an issue of fact on conditions of confinement claim); *Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) (noting that the denial of "basic sanitation . . . is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose), *superseded by statute on other grounds as stated in Ghana v. Holland*, 226 F.3d 175, 184 (3d Cir. 1992); *Benitez v. Mailloux*, No. 9:05-1160 (NAM/RFT), 2009 U.S. Dist. LEXIS 56786, 2009 WL 1953752, at *2 (N.D.N.Y. July 2, 2009) (factfinder may properly consider that SHU was grossly unsanitary, with fecal matter and dead insects on the floor and walls, that plaintiff was deprived of cleaning materials for some period of time thereafter, as well **[*47]** as allegations of lack of running water and bitter cold for a longer time in evaluating Plaintiff's conditions of confinement claim).

---

[7] The Court notes that Plaintiff complained of the sink in his October 19, 2013, grievance. (Dkt. No. 39-4 at 5.) Cell repair records show repair for "sink running" in cell I-3 requested on November 20, 2103. (Dkt. No. 39-5 at 1.)

It is well established that "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment," *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The Court finds that an assessment of credibility is clearly required with regard to the objective element of Plaintiff's conditions of confinement claims.

## B. Subjective Element

The Court finds that there is also a substantial issue of material fact on the question of whether Novak and Donnelly acted with deliberate indifference to Plaintiff's health and safety, given the parties' contrasting evidence regarding Novak and Donnelly's knowledge of the conditions and allegedly intentional conduct in placing and keeping Plaintiff in an unsanitary cell with a broken sink for thirty-four days, without any real ability on Plaintiff's part to remedy the conditions. *Walker*, 717 F.3d at 125. Plaintiff claims that Novak and Donnelly moved him to cell I-3, and neither Defendant has denied having a role in the decision to move Plaintiff, identified the person or persons who made the decision, or provided any insight **[*48]** as to the reason for the move. (Dkt. No. 61-3 at ¶ 11.) According to Plaintiff, when Novak denied him cleaning materials, Novak said "Deal with it. I'm not giving you shit," and in response to Plaintiff's complaint about the plumbing problems and lack of clean water, Novak said "not my problem" and smile and laughed at Plaintiff as he walked away. (Dkt. No. 61-3 at ¶ 26.)

As with the objective element, the Court finds that a reasonable jury could, if Plaintiff's claims were believed, conclude that Novak and Donnelly had acted with deliberate indifference to Plaintiff's health and safety by intentionally moving Plaintiff into a cell with allegedly unsanitary conditions of confinement and a broken sink and refusing his requests to be moved and for cleaning materials, thereby satisfying the subjective element of Plaintiff's claim. Therefore, the Court recommends that Novak and Donnelly be denied summary judgment on Plaintiff's Eighth Amendment conditions of confinement claim.

## VI. ANALYSIS OF RETALIATION CLAIMS AGAINST NOVAK AND DONNELLY

### A. Placement and Retention in Cell I-3 and Denial of Cleaning Products Against Novak and Donnelly

Plaintiff claims that Novak and Donnelly ordered him to pack his belongings **[*49]** and then moved him to cell I-3, which was not fit for human occupation, on October 15, 2013, in retaliation for writing grievances and complaint letters. (Dkt. Nos. 1 at ¶ 29; 61-3 at ¶¶ 10-11, 21; 61-4 at 12-4.) Donnelly has denied that Plaintiff was transferred to cell I-3 for writing grievances and does not recall whether on that date he was aware of any grievances Plaintiff had filed against him or any other officer. (Dkt. No. 39-12 at ¶ 7.)

The law is clear that "[t]he filing of grievances is a constitutionally protected activity" for purposes of a retaliation claim. *Davis*, 320 F.3d at 352-53. Plaintiff, however, has failed to identify any grievances or complaints he made against either Novak or Donnelly, or for that matter anyone else, prior to October 15, 2013, when he was moved to cell I-3.

In his October 19, 2013, and November 15, 2013, consolidated grievances, Plaintiff included statements allegedly made to him by Novak and Donnelly suggesting the move to cell I-3 had been made because of Plaintiff's grievances. (Dkt. No. 61-4 at 12-14.) When questioned at his deposition, however, Plaintiff testified he did not know exactly why Novak was retaliating against him but thought it might have to do with **[*50]** the incident with the nurse a short time earlier that day. (Dkt. No. 39-2 at 20-21.)

Plaintiff did write a grievance dated October 15, 2013, against Novak with respect to Novak's alleged harassment regarding Plaintiff's conversation with RN Hudson at sick call that day, but that grievance was not filed until November 5, 2013, long after the move. (Dkt. No. 61-4 at 2-3.) Moreover, according to Plaintiff, he was told to pack his belongings to move to a new cell several minutes after Plaintiff had refused to disclose the nature of his conversation with the nurse, which would not have left Plaintiff time to write the grievance before the move. (Dkt. No. 1 at ¶ 7.) A grievance filed after the allegedly retaliatory action, cannot not be a substantial factor in the alleged retaliation. *See Diaz v. Fischer*, No. 08-CV-1208 (LEK/DRH), 2010 U.S. Dist. LEXIS 27383, 2010 WL 1132772, at *9 (N.D.N.Y. Feb. 23, 2010). Furthermore, even assuming for purposes of this motion that Novak and Donnelly were involved in the decision to move Plaintiff to cell I-3, Plaintiff's failure to specify what grievances or written complaints he had made and the causal connection, if any, between the identified grievances or complaints, and Novak and Donnelly's alleged adverse action, is fatal to Plaintiff's cell I-3 retaliation claim. **[*51]** *See, e.g., Houston*, 2009 U.S. Dist. LEXIS 27481, 2009 WL 890658, at *11 (entry of summary judgment dismissing a retaliation claim is warranted where the claim is alleged in only conclusory fashion not supported by evidence "establishing the requisite nexus between any protected activity and the adverse action complained of"); *Diaz*, 2010 U.S. Dist. LEXIS 27383, 2010 WL 1132772, at *9 (conclusory and general conclusions that plaintiff was retaliated against because of his reputation for filing grievances in the past is insufficient to maintain plaintiff's retaliation claim); *Ochoa v. DeSimone*, No. 9:06-CV-119 (DNH/RFT), 2008 U.S. Dist. LEXIS 76256, 2008 WL 4517806, at *5 (N.D.N.Y. Sept. 30, 2008) (failure to specify what grievances he filed and against whom fatal to plaintiff's retaliation claim).

Therefore, the Court recommends that summary judgment be granted in Novak and Donnelly's favor on Plaintiff's cell I-3 retaliation claim.

## B. Remaining Retaliation Claims Against Novak

1. Description of Claims

Plaintiff has alleged a number of harassing and threatening actions by Novak, which Novak told him were taken because of grievances and complaints Plaintiff had written. Plaintiff claims that on November 2, 2013, Novak harassed and threatened him by calling Plaintiff "a real piece of shit," and telling Plaintiff that he was going to "make something bad" happen to him, and "jam" him up for filing **[*52]** complaints. (Dkt. No. 61-3 at ¶ 76.) Plaintiff further claims that on November 3, 2013, Novak pulled the radio jack for Plaintiff's cell out of the wall, told Plaintiff he did not deserve headphones and to "sit in there and be miserable asshole," and told him "[i]f you write [destruction of the cell's wall radio and jacks] up on me, I'll break your fucking neck, got that?" *Id.* at ¶ 79. The record of repairs to cell I-3 submitted by Defendants show that the wall jacks were out and a request for repair was submitted on November 20, 2013, after Plaintiff had been moved from cell I-3. (Dkt. No. 39-5 at 2.)

According to Plaintiff, on December 9, 2013, Novak threatened to make his life a living hell and to move him into another "fucked up dirty infested cell" if he wrote any more grievances. *Id.* at ¶ 96. On December 21, 2013, Novak allegedly told Plaintiff to pack up to move to a "fucked up" and "out of service cell" for being hardheaded and continuing to file grievances. (Dkt. No. 1 at ¶ 51.) On December 22, 2013, Novak allegedly again told Plaintiff to pack up to move to another out-of-service and "fucked-up cell," threatened to break his arms and kick all his teeth out as soon as he had **[*53]** the opportunity, and threatened Plaintiff's life. *Id.* at ¶ 104.

2. Protected Conduct

As noted above, the filing of a grievance constitutes protected First Amendment conduct on a retaliation

claim. *Davis*, 320 F.3d at 352-53. Inmate's written and verbal complaints to corrections officers and prison officials have also been found to constitute activity protected by the First Amendment. *See e.g.*, *Monko v. Cusack*, No. 9:11-CV-1218 (GTS/TWD), 2013 U.S. Dist. LEXIS 139074, 2013 WL 5441724, *10 (N.D.N.Y. Sept. 27, 2013); *Decayette v. Goord*, No. 9:06-CV-783, 2009 U.S. Dist. LEXIS 48127, 2009 WL 1606753, at *9 (N.D.N.Y. June 8, 2009); *Brewer v. Kamas*, 533 F. Supp. 2d 318, 329 (W.D.N.Y. 2008); *Smith v. Woods*, No. 9:03-CV-480, 2006 U.S. Dist. LEXIS 29744, 2006 WL 1133247, at *10 (N.D.N.Y. April 24, 2006), *aff'd*, 219 F. App'x 110 (2d Cir. 2007). Therefore, the record evidence establishes that Plaintiff's remaining retaliation claim against Novak satisfies the first element of a retaliation claim.

3. Adverse Action

a. Legal Standard

"It is well-settled that 'verbal harassment, or even threats, are generally held not to rise to the level of adverse action that will support a First Amendment retaliation claim.'" *Thomas v. Pingotti*, No. 9:17-CV-0300 (GTS/DEP), 9:17-CV-0377 (GTS/ATB), 2017 U.S. Dist. LEXIS 144173, 2017 WL 3913018, at *4 (N.D.N.Y. Sept. 6, 2017) (quoting *Rosales v. Kikendall*, 677 F. Supp. 2d 643, 648 (W.D.N.Y. 2010)); *see also Reed v. Doe No. 1*, No. 9:11-CV-0250 TJM), 2013 U.S. Dist. LEXIS 138712, 2013 WL 5441503, at *6 (N.D.N.Y. Sept. 27, 2013) ("it is well-established, however, that verbal harassment and derogatory comments by prison workers aimed at an inmate, however unprofessional, do not rise to a level of constitutional significance, and therefore cannot constitute adverse action sufficient to support a retaliation **[*54]** cause of action."); *Grays v. Elmira Corr. Facility*, No. 1:13-CV-00532 EAW, 2017 U.S. Dist. LEXIS 99576, 2017 WL 2779751, at *3 (W.D.N.Y. June 26, 2017) ("broad illusions to possible future injury, are insufficient to state a First Amendment claim for retaliation); *Kemp v. LeClaire*, No. 03-0844, 2007 U.S. Dist. LEXIS 21342, 2007 WL 776416, at *15 (W.D.N.Y. Mar.

12, 2007) (statements like "your day is coming," "you'll be sent to your mother in a black box," and you'll get your black ass kicked" not adverse actions); *Bartley v. Collins*, No. 95 Civ. 10161, 2006 U.S. Dist. LEXIS 28285, 2006 WL 1289256, at *6 (S.D.N.Y. May 10, 2006) ("[V]erbal threats such as 'we going to get you, you better drop the suit,' do not rise to the level of adverse action.").

"[S]ome verbal threats, even if not serious enough to implicate the Eighth Amendment, can constitute an adverse action." *Mateo*, 682 F. Supp. 2d at 434; *Barrington v. New York*, 806 F. Supp. 2d 730, 746 (S.D.N.Y. 2011) (holding that verbal threats may constitute adverse action for purpose of a First Amendment retaliation if the threat is sufficiently specific). Whether threats constitute adverse action in a particular case is dependent upon the specificity of the threat and the context in which it was made. *See Sharpe v. Taylor*, No. 9:05-CV-1003 (GTS/GHL), 2009 U.S. Dist. LEXIS 125251, 2009 WL 1743987, at *9 (N.D.N.Y. Mar. 26, 2009); *Hofelich v. Ercole*, No. 06 Civ. 13697 (PKC), 2010 U.S. Dist. LEXIS 37804, 2010 WL 1459740, at *2 (S.D.N.Y. Apr. 8, 2010) ("whether [verbal threats] constitute adverse action seems to depend on their specificity and the context in which they are uttered"); *Lunney v. Brureton*, No. 04 Civ. 2438 (LAK)(GWG), 2007 U.S. Dist. LEXIS 38660, 2007 WL 1544629, at *23 (S.D.N.Y. May 25, 2007) (collecting cases); *Hepworth v. Suffolk Cty.*, No. 02-CV-6473, 2006 U.S. Dist. LEXIS 73368, 2006 WL 2844408, at *8-9 (E.D.N.Y. Sept. 29, 2006) (numerous verbal threats that inmate "would receive another beating or be killed" was enough evidence that a "reasonable jury could find that the officers unconstitutionally retaliated **[*55]** against" inmate); *see also Kerman v. City of New York*, 261 F.3d 229, 242 (2d Cir. 2001) (officer's statement to plaintiff that he "would teach [plaintiff] a lesson and give him something to sue for" stated a retaliation claim); *Quezada v. Roy*, No. 14-CV-4056, 2015 U.S. Dist. LEXIS 140653, 2015 WL 5970355, at *23 (S.D.N.Y. Oct. 13, 2015) ("threat to kill someone for filing a grievance is sufficiently serious that it might well deter a person of ordinary

firmness from exercising his First Amendment rights").

In *Ford v. Palmer*, 539 F. App'x 5 (2d Cir. 2013), the Second Circuit found that threats need not always be definite and specific to constitute adverse action and determined that a retaliation claim based on a corrections officer's threat to poison plaintiff by putting some kind of substance in his hot water in retaliation for filing grievances should not have been dismissed *sua sponte* as a matter of law. *Id.* at 7. The Court reasoned that in the context presented "the vague nature of the alleged threat *i.e.*, not telling Ford when or how Officer Law planned to poison him could have enhanced its effectiveness as a threat and increased the likelihood that a person of ordinary firmness would be deterred from filing."

A pattern of harassment and vague threats may be considered collectively in determining whether there has been adverse action for purposes of a First Amendment retaliation claim. *See Morgan v. Luft*, No. 9:15-CV-0024 (GTS/DJS), 2017 U.S. Dist. LEXIS 97447, 2017 WL 9511158, at *5 (N.D.N.Y. June 22, 2017) (a persistent **[*56]** pattern of threats over a period of time makes the threats more credible and could allow a reasonable factfinder to conclude that the threats were sufficient to deter a person of ordinary firmness from filing further grievances); *Tirado v. Shutt*, No. 13 Civ. 2848 (LTS) (AJP), 2015 U.S. Dist. LEXIS 21189, 2015 WL 774982, at *12 (S.D.N.Y. Feb. 23, 2015) (a pattern of harassment and vague threats can potentially constitute adverse action); *Dabney v. Maddock*, No. 10-CV-519, 2011 U.S. Dist. LEXIS 153935, 2011 WL 7479164, at *4 (N.D.N.Y. Nov. 29, 2011) (isolated instances that alone do not rise to the level of adverse actions, may "collectively . . . suffice to constitute adverse actions").

b. Analysis of Novak's Alleged Adverse Action

Even if true, calling Plaintiff "a real piece of shit" on November 2, 2103, and any other verbally harassing comments Novak is claimed to have made were by themselves *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Reed*, 2013 U.S. Dist. LEXIS 138712, 2013 WL 5441503, at *6 (verbal harassment does not constitute adverse action for purposes of a retaliation claim). The Court also finds that Novak's alleged threats to "make something bad" happen to Plaintiff and "jam" him up (Dkt. No. 61-3 at ¶ 76), and to make his life a living hell, *id.* at ¶ 96, if he continued to write grievances and complaints, even when considered together, are too vague to constitute adverse action for purposes of a retaliation claim. **[*57]** *See, e.g., Kemp*, 2007 U.S. Dist. LEXIS 21342, 2007 WL 776416, at *15; *Sharpe v. Taylor*, No. 05-CV-1003, 2009 U.S. Dist. LEXIS 51258, 2009 WL 1743987, at *9 (N.D.N.Y. June 18, 2009) ("vague intimations of some unspecified harm generally will not rise to the level of adverse action for purposes of a retaliation claim").

Given the context in which Novak's alleged threats to Plaintiff on December 9, 21 and 22, 2013, that Plaintiff was being moved into a "fucked up" and "out of service cell" for continuing to write grievances and complaints, the Court finds those statements standing alone also fail to constitute adverse action for purposes of a retaliation claim, largely because no move occurred on any of those days, and a few hours after Novak's alleged threat on December 22, 2013, Donnelly told Plaintiff no move was planned. (Dkt. Nos. 1 at ¶ 56; 61-3 at ¶¶ 100-04.)

However, the Court reaches a different conclusion with regard to the issue of adverse action when it considers collectively the harassing and vaguely threatening comments attributed to Novak by Plaintiff; Novak's conduct in pulling Plaintiff's radio jack out of the wall; and Novak's specific threats to Plaintiff on November 3, 2013, that if he did not stop writing grievances and complaints he would "break Plaintiff's fucking neck," and on December 22, 2013, that he was going to break his **[*58]** arms and kick all his teeth out as soon as he had the opportunity, and kill Plaintiff. (Dkt. No. 61-3 at ¶¶ 79,104.) *See Lunney*, 2007 U.S. Dist.

LEXIS 38660, 2007 WL 1544629, at *23 (threat to break plaintiff's "fuckin' neck" if he did not stop writing grievances sufficient to support retaliation claim); *Quezada*, 2015 U.S. Dist. LEXIS 140653, 2015 WL 5970355, at *23 (threat to kill plaintiff found to support retaliation claim).

The Court finds that a reasonable fact finder, considering collectively the alleged pattern of harassment and threats by Novak, could conclude they were sufficient to deter a person of ordinary firmness from filing further grievances. *See Morgan*, 2017 U.S. Dist. LEXIS 97447, 2017 WL 9511158, at *5 (a persistent pattern of threats over a period of time makes the threats more credible and could allow a reasonable fact finder to conclude that the threats were sufficient to deter a person of ordinary firmness from filing further grievances); *Tirado*, 2015 U.S. Dist. LEXIS 21189, 2015 WL 774982, at *12 (a pattern of harassment and vague threats can potentially constitute adverse action); *Dabney v. Maddock*, No. 10-CV-519, 2011 U.S. Dist. LEXIS 153935, 2011 WL 7479164, at *4 (N.D.N.Y. Nov. 29, 2011) (isolated instances that alone do not rise to the level of adverse actions, may "collectively . . . suffice to constitute adverse actions").

4. Causal Connection between the Protected Conduct and Adverse Action

a. Temporal Relationship

The alleged harassing and threatening statements by Novak and his pulling Plaintiff's **[*59]** radio jack out of the wall occurred during the period from November 2, 2013, through December 22, 2013. (Dkt. No. 61-3 at ¶¶ 76, 79, 96, 100, 104.) The first grievance filed by Plaintiff against Novak identified in the record relates to the incident on October 15, 2013, was written on October 15, 2013, and was filed in the grievance office on November 5, 2013, subsequent to the November 2 and 3, 2013, instances of retaliation alleged against Novak by Plaintiff. (Dkt. 61-4 at 2-3, 6.) Therefore, Novak cannot be found to have retaliated against Plaintiff for his October 15, 2013, grievance on November 2

and 3, 2013.

Plaintiff's October 19, 2013, grievance regarding the conditions in cell I-3, Novak's alleged refusal to give Plaintiff cleaning supplies, and Novak's alleged response, "[n]ot my problem, maybe now you'll learn your lesson about writing people up," when Plaintiff told him the sink was broken, was also filed in the grievance office on November 5, 2013, subsequent to the alleged retaliation on November 2 and 3, 2013. *Id.* at 61-4 at 12, 15. The November 15, 2013, grievance with which it was consolidated, also post-dated the November 2 and 3, 2013, incidents of alleged retaliation by Novak.

However, **[*60]** Plaintiff's October 19, 2013, written complaints to Annucci, Graham, Robinson, Chuttey, and Quinn regarding the conditions of cell I-3, and Novak and Donnelly's alleged retaliatory conduct in placing Plaintiff in cell I-3, which were also protected conduct, preceded the incidents of November 2 and 3, 2013. (Dkt. No. 1-3 at 3-19.) Moreover, the alleged retaliation by Novak on December 9, 21, and 22, 2013, came after the filing of Plaintiff's grievances regarding Novak's alleged retaliation on November 2 and 3, 2013, on November 25, 2013. (Dkt. No. 61-4 at 59, 64, 67.) In addition, Plaintiff's grievance regarding Novak's alleged retaliation on December 9, 2013, was filed on December 20, 2013, a day before the December 21, 2013, and two days before the December 22, 2013, incidents of alleged retaliation. *Id.* at 64.

b. Alleged Statements by Novak Concerning Motivation

Plaintiff claims that on November 2, 2013, Novak told Plaintiff that "[b]ecause you've been complaining on me, first chance that comes around I'm gonna make something bad happen to you, this is my world, nobody can help you in here" and "I'm gonna jam you up really nice for those complaints on me." (Dkt. No. 61-3 at ¶ 76.) Plaintiff **[*61]** also claims that on November 3, 2013, when Novak destroyed the cell's wall radio Nowak told him he didn't deserve "no fucking headphones for all these complaints you wrote." *Id.* at ¶ 79. According to

Plaintiff on December 9, 2013, Novak told him "[y]ou still bitching and complaining to people about me, I'm gonna make your life a living hell." *Id.* at ¶ 96. On December 21, 2013, Novak allegedly told Plaintiff he was going to be moved to another "fucked up" cell because he had filed grievance AUB-63978-13 against Novak regarding the November 2 and 3, 2013, incidents. *Id.* at ¶ 100.

The Court finds that the temporal relationship between Plaintiff's specifically identified grievances and written complaints and the alleged instances of retaliation, along with the evidence submitted by Plaintiff showing that Novak himself causally connected the harassment and threats to Plaintiff's grievances and written complaints against him, are sufficient to create a genuine issue of fact on the issue of causation with regard to Plaintiff's November 2 and 3, 2013, and December 9, 22, and 23, 2013, retaliation claims against Novak. *See Morgan v. Luft*, No. 9:15-CV-0024 (GTS/DJS), 2017 U.S. Dist. LEXIS 97447, 2017 WL 4326082, at *6 (N.D.N.Y. June 22, 2017) (finding a substantial issue of fact [*62] on causation where plaintiff claimed defendant explicitly connected his threats to a grievance written by plaintiff) (quoting *Colon*, 58 F.3d at 873).

Based upon the foregoing, the Court recommends that Novak be denied summary judgment on Plaintiff's November 2 and 3 and December 9, 21, and 22, 2013, First Amendment retaliation claims.

## C. Remaining Retaliation Claims Against Donnelly

Plaintiff claims that on January 25, 2015, Donnelly pulled the television power cord out of the socket during Plaintiff's television time, asked if Plaintiff was going to file any more grievances, and had him taken back to his cell early with a threat to take away his television privileges if there were more grievances. (Dkt. No. 1 at ¶¶ 68-69.) The Court finds that no reasonable jury could conclude that the alleged retaliatory actions "would deter a

similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381. The acts were *de minimis* and outside the scope of constitutional protection. *Roseboro*,791 F. Supp. 2d at 366.

Plaintiff has also asserted a general supervisory liability claim against Donnelly based upon his alleged knowledge of Novak's retaliatory harassment and threats and failure as Novak's supervisor to take action to correct [*63] Novak's behavior. (Dkt. No. 1 at ¶ 40.) More specifically, Plaintiff claims that on November 3, 2013, when he complained to Donnelly about Novak's harassing and threatening conduct concerning moving him again a short time earlier, Donnelly "in a deliberately indifferent manner, simply shrugged his shoulders and giggled like a little school girl about what he heard, and walked away." *Id.* at ¶ 56. Donnelly denies it occurred and claims that Plaintiff never complained to him about Novak. (Dkt. No. 39-12 at ¶ 7.)

The Court finds that even if Donnelly had responded in that manner, the Court has already determined that Novak's action in telling Plaintiff he was going to move to another "fucked up" cell on November 3, 2013, was not in and of itself sufficient to constitute adverse action for purposes of a retaliation claim. Absent an underlying constitutional deprivation by a subordinate, there can be no supervisory liability. *Blyden*, 186 F.3d at 265.

Based on the foregoing, the Court recommends that Defendant Donnelly be granted summary judgment on Plaintiff's remaining retaliation and supervisory liability claims.

## VII. ANALYSIS OF SUPERVISORY LIABILITY CLAIMS AGAINST ANNUCCI, GRAHAM, ROBINSON, CHUTTEY, QUINN, AND [*64] FAGAN

"Fundamentally, for a supervisor to be liable under Section 1983, there must of course have been an

underlying constitutional deprivation by a subordinate . . ., and a causal link between the supervisor's conduct and the violation of the plaintiff's civil rights." *Nicholson v. Fischer*, No. 13-CV-6072-FPG-MWP, 2018 U.S. Dist. LEXIS 72199, 2018 WL 2009432, at *5 (W.D.N.Y. April 30, 2018) (quoting *Blyden*, 186 F.3d at 265 and *Poe*, 282 F.3d at 140) (internal quotations marks omitted). Plaintiff's supervisory liability claims in this case are based upon the Defendant supervisory officials' allege failure to correct the wrongs regarding the condition of cell I-3 and retaliation by Novak and Donnelly, despite having been placed on notice. (Dkt. No. 39-2 at 56-62.) *See Colon*, 58 F.3d at 873. Plaintiff relies largely on grievances filed by him, written complaints he sent to the supervisory official Defendants, and verbal complaints made to them in support of his supervisory liability claims.

## A. Annucci

Plaintiff wrote to Annucci on October 19, 2013, complaining of the conditions in cell I-3 and complaining of un-named staff telling him he might be moved out if he stopped writing complaints. ((Dkt. No. 1-3 at 3.) Plaintiff also wrote to Annucci on January 28, 2014, complaining of his failure to take action with regard to repeated mistreatment and punishment **[*65]** in retaliation for filing grievances despite being aware of the continued adverse action against him and informing Annucci of the allegedly retaliatory act by Donnelly on January 25, 2014. (Dkt. No. 61-4 at 122-23.) There is no acknowledgment or response from Annucci to either letter in the summary judgment record, and Plaintiff testified at his deposition he did not know if Annucci responded to the October 19, 2013, letter. (Dkt. No. 39-2 at 58.) There is also no evidence in the record that Annucci took any action in response to Plaintiff letters.

Writing letters and grievances to a supervisory official in insufficient to establish notice of a constitutional violation and personal involvement.

*See Flynn v. Ward*, No. 9:15-CV-1028 (TJM/CFH), 2018 U.S. Dist. LEXIS 96821, 2018 WL 3195095, at *13 (N.D.N.Y. June 7, 2018) (citing *Smart v. Goord*, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner . . . cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff] . . . ."); *Thompson v. Pallito*, 949 F. Supp. 2d 558, 575-76 (D.Vt. 2013) (if merely writing an unanswered letter to a prison official were sufficient to establish personal involvement, it would "contravene the black-letter principle that § 1983 does not allow for respondeat superior liability.")

Therefore, the Court recommends that Annucci be granted summary judgment.

## B. Graham

On October 19, **[*66]** 2013, Plaintiff wrote to Graham complaining of the inhumane conditions in cell I-3; Novak and Donnelly's role in placing Plaintiff in the cell and ignoring his complaints about the conditions and his requests to be moved; Novak and Donnelly working in concert to force Plaintiff to stop writing grievances; and Robinson's failure to respond to Plaintiff's request to take remedial action and have Plaintiff moved to another cell. (Dkt. No. 1-3 at 9-10.) On November 4, 2013, Plaintiff wrote to Graham reminding him of the problems with the cell and complaining about the November 2 and 3, 2013, incidents with Novak. *Id.* at 21.

Plaintiff claims to have stopped Graham in SHU on November 5, 2013, told him about the retaliatory conduct by Novak and Graham, and shown him the inhumane conditions in cell I-3. (Dkt. No. 61-3 at ¶ 89.) On November 6, 2013, Plaintiff wrote to Graham again and reminded him of their discussion the day before and writing "[y]ou are well aware that this cell is not up to minimum standards and is indecent. You've seen it with your own eyes while speaking to me its horrible state of condition You told me that you would 'take care of the matter.'" *Id.* at 23. (unaltered text).

Plaintiff wrote [*67] to Graham on December 26, 2013, to complain about the December 21, 2013, incident with Novak, and on December 28, 2013, wrote complaining about wrongdoing by Novak and Donnelly on December 21 and 22, 2013. (Dkt. Nos. 61-3 at ¶ 108; 61-4 at 102.) On January 27, 2014, Plaintiff wrote to Graham to complain about the television incident with Donnelly on January 25, 2014. (Dkt. No. 61-4 at 102.) At his deposition, Plaintiff was unable to recall if he received responses to his written complaints to Graham, and there is no evidence in the summary judgment record showing that Graham responded to Plaintiff's written complaints. (Dkt. No. 39-2 at 57.)

Plaintiff's written complaints to Graham regarding the conditions in cell I-3 and alleged acts of retaliation by Novak and Donnelly, absent a response, investigation, or action by Graham, are insufficient to show personal involvement for purposes of supervisory liability. *See Flynn*, 2018 U.S. Dist. LEXIS 96821, 2018 WL 3195095, at *13; *Smart*, 441 F. Supp. 2d at 643; *Thompson*, 949 F. Supp. 2d at 575-76. Therefore, the Court finds that Plaintiff's complaints to Graham regarding Novak and Donnelly's alleged retaliation, without response or action from Graham, are not enough to raise an issue of fact on personal involvement with regard to Plaintiff's retaliation claims, [*68] and that Graham is entitled to summary judgment with regard to the retaliation claims. However, according to Plaintiff, Graham personally observed the conditions in the cell, and after seeing the inhumane conditions in the cell on October 17, 2013, Graham did nothing. Graham has not submitted a declaration in support of his motion. Therefore the Court finds that there is an issue of fact as to whether Graham was personally involved in the conditions of confinement violation of Plaintiff's Eighth Amendment rights under the fourth *Colon* criteria precluding summary judgment.

In his capacity as Superintendent at Auburn, Graham issued decisions on Plaintiff's grievances AUB-63978-13 (November 2 and 3, 2013,

incidents with Novak); AUB-64154-13 (December 9, 2013, incident with Novak); AUB-64191-14 (December 21 and 22, 2013, incidents with Novak and Donnelly); and AUB-642-64289-14 (January 25, 2014, incident with Donnelly).[8] (Dkt. No. 61-4 at 64, 81, 87, 116-17.) As a general rule, the review denial or affirmance of a grievance insufficient to establish personal involvement by a supervisory official. *Perilla v. Fischer*, No. 13-CV-398M, 2013 U.S. Dist. LEXIS 154449, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). There is no indication Graham did anything more than rely upon the [*69] investigation conducted by subordinate officers in summarily denying Plaintiff's grievances. Therefore, the Court finds that Graham was not personally involved by virtue of his decisions on Plaintiff's three retaliation grievances against Novak.

Based upon the foregoing, the Court recommends that Graham be granted summary judgment except as to Plaintiff's supervisory liability claim regarding the conditions of confinement claim with respect to which the Court recommends denial of the motion.

## C. Robinson

Plaintiff claims that on October 17, 2013, he stopped Robinson in SHU, told him about the deplorable state of cell I-3, not being given cleaning supplies, and Novak and Donnelly's retaliation against him.[9] (Dkt. Nos. 39-2 at 30, 62;

---

[8] Because the Court has determined that the television incident with Donnelly on January 25, 2013, did not involve adverse action for purposes of a retaliation claim, there can be no supervisory liability against Graham or any of the other Defendants with respect to the related retaliation claim. *See Blyden*, 186 F.3d at 265.

[9] In his complaint and in his October 19, 2013, letters to both Robinson and Graham Plaintiff referenced verbally complaining to Robinson about the inhumane conditions in cell I-3 with no reference to having shown Robinson the conditions in the cell. (Dkt. Nos. 1 at ¶ 31; 1 3 at 9, 13.) At his deposition, Plaintiff testified he believed Robinson had seen the cell but offered no details. (Dkt. No. 61-1 at 62.) It was not until his declaration in opposition to Defendants' motion for summary judgment that Plaintiff specifically claimed to

2018 U.S. Dist. LEXIS 135423, *69

61-3 at ¶ 11.) According to Plaintiff, Robinson showed disinterest but told Plaintiff he would see about it. (Dkt. Nos. 39-2 at 30; 61-3 at ¶ 12.) Robinson did not have Plaintiff moved after the conversation. *Id.* Plaintiff wrote to Robinson on October 19, 2013, complaining about the cell and reminding Robinson about their conversation on October 17, 2013, when Robinson had told Plaintiff he would see about it but did not come back or have Plaintiff moved. **[*70]** (Dkt. No. 1-3 at 13.) Plaintiff wrote to Robinson again on November 3, 2013, complaining about retaliatory conduct by Novak on November 2 and 3, 2013. (Dkt. Nos. 1-3 at 19; 61-3 at ¶ 35.) Plaintiff also wrote to Robinson on January 25, 2013, complaining of the television incident of that date with Donnelly and other harassment and threats by staff. (Dkt. No. 61-4 at 121.)

In his declaration in support of his motion for summary judgment, Robinson has stated he does not recall Plaintiff complaining to him verbally or in writing about the conditions of his cell or actions of Novak. (Dkt. No. 39-18 at ¶ 4.) The Court finds nothing in the record showing that Robinson responded to, investigated, or took other action with regard to Plaintiff's written or verbal complaints about the alleged condition of his cell and alleged retaliation by Novak and Donnelly, or that he had personal knowledge beyond Plaintiff's written and verbal complaints. Therefore, the Court recommends summary judgment in Robinson's favor. *See Burns v. Fischer*, No. 13-CV-0486 (LEK/CFH), 2014 U.S. Dist. LEXIS 51361, 2014 WL 1413387, at *7 (N.D.N.Y. Feb. 3, 2014); *Alvarado v. Westchester Cty.*, 22 F. Supp. 3d 208, 215 (S.D.N.Y. 2014) ("[B]ecause Section 1983

liability cannot be predicated on a theory of *respondeat superior*, . . . a defendant's mere receipt of a letter or grievance, without personally investigating or acting **[*71]** thereon, is insufficient to establish [personal involvement]." (internal quotation marks and citations omitted)).

## D. Chuttey

On October 19, 2013, Plaintiff wrote to Chuttey complaining about the cell I-3 conditions, lack of potable water, and lack of cleaning supplies. (Dkt. No. 1-3 at 16.) Plaintiff also complained that Novak and Donnelly were fully aware of the cell conditions when they moved him there. *Id.* He asked Chuttey to order that Plaintiff be placed in another cell and have the sink repaired. Plaintiff wrote to Chuttey again on November 4, 2013, to complain about harassment, threats, and retaliation by Novak, inform Chuttey of the encounters with Novak on November 2 and 3, 2013, and to ask Chuttey to intervene. (Dkt. No. 61-4 at 73.) Plaintiff claims that on November 18, 2013, he stopped Chuttey in the hall and asked if he had received Plaintiff's November 4, 2013, complaint letter, with Chuttey responding that he had received and read the letter. (Dkt. No. 1 at ¶ 47.) In a December 22, 2013, written complaint to Chuttey, Plaintiff again complained of Novak's behavior and of Donnelly seemingly encouraging it and chided Chuttey for his failure to intervene and correct the problem. **[*72]** (Dkt. No. 61-4 at 98.)

Plaintiff testified at his deposition that he could not recall if he received any response to his letters from Chuttey. (Dkt. No. 39-2 at 60.) There are no responses from Chuttey, nor is there any evidence in the record showing that Chuttey took any action with respect to any of Plaintiff's complaints. Moreover, even if Chuttey did acknowledge receipt of Plaintiff's November 4, 2013, letter, "a defendant's mere 'receipt' of a letter . . . without personally investigating or acting [thereon] is insufficient to establish personal responsibility." *Burns*, 2014 U.S. Dist. LEXIS 51361, 2014 WL

---

have also shown Robinson the conditions in the cell on October 17, 2013. (Dkt. No. 61-3 at ¶ 41).While it is not within the district court's purview to weigh the credibility of the parties at the summary judgment stage, where Plaintiff relies exclusively on his own testimony, and where as here, the testimony is contradictory and incomplete it is appropriate for the court to make some assessment of the Plaintiff's account. *Jeffreys*, 426 F.3d at 554. The Court does not find Plaintiff's claim that he showed Robinson the inside of his cell in opposition to Defendants' motion sufficient to avoid summary judgment.

1413387, at * 7. Therefore, the Court recommends that Chuttey be granted summary judgment.

## E. Quinn

Plaintiff wrote to Quinn about the cell I-3 conditions and lack of cleaning supplies on October 19, 2013, and asked Quinn to investigate and correct the wrongs being done Plaintiff. (Dkt. No. 1-3 at 16.) Plaintiff wrote to Quinn again on December 28, 2013, informing him of Novak and Donnelly's threats and intimidation on December 21 and 22, 2013, in violation of his rights, complaining about the ineffectiveness of the inmate grievance program, noting that Quinn had not responded to Plaintiff's prior letters informing him of staff misconduct, **[\*73]** and asking that Quinn perform his duty to correct the situation. (Dkt. No. 61-4 at 100-01.)

Plaintiff testified at his deposition that he did not recall if he received a response from Quinn to any of his written complaints (Dkt. No. 39-2 at 59), and there are no responses from Quinn in the summary judgment record. There is also no evidence that Quinn took any action with respect to Plaintiff's complaints. Therefore, the Court recommends that Quinn be granted summary judgment. *See Flynn*, 2018 U.S. Dist. LEXIS 96821, 2018 WL 3195095, at *13.

## F. Fagan

Plaintiff wrote to Fagan on January 28, 2014, informing him of the incident with Donnelly on January 25, 2014, and complaining of his continued inaction with regard to Plaintiff's repeated retaliatory mistreatment, despite being aware of the continued adverse actions taken against him. (Dkt. No. 61-4 at 122-23.) Plaintiff testified at his deposition that he did not recall if he spoke directly to Fagan about his complaints or if Fagan responded to his letter. (Dkt. No. 39-2 at 61.) There is no written response from Fagan, nor is there evidence of any action by Fagan in response to

Plaintiff's letter in the summary judgment record. Therefore, the Court recommends that Fagan be granted summary judgment. **[\*74]**

## VIII. QUALIFIED IMMUNITY

Defendants have collectively included a request for qualified immunity in which they recite boilerplate law on entitlement to qualified immunity and state as conclusion, without analysis of the manner in which the Defendants have satisfied the criteria for qualified immunity in this case, that "[f]or all of the reasons already outlined above, it is clear that Defendants acted reasonably under the circumstances and are entitled to summary judgment on the grounds of qualified immunity." (Dkt. No. 39-21 39.)

Under a qualified immunity defense, "[a] governmental official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate clearly established rights or if it would have been objectively reasonable for the official to believe his conduct did not violate plaintiff's rights." *Reuland v. Hynes*, 460 F.3d 409, 419 (2d Cir. 2006) (quoting *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003)). A defendant's motion for summary judgment on the basis of qualified immunity must fail where a factual question exists on the issue of intent or motive. *Johnson v. Ganim*, 342 F.3d 105, 117 (2d Cir. 2003).

The Court has determined that Plaintiff has raised an issue of fact with regard to his conditions of confinement claim against Novak and Donnelly. The courts have long recognized **[\*75]** that depriving an inmate of "basic human needs," which has been found to include "safe and sanitary living conditions" violates his rights under the Eighth Amendment. *Phelps*, 308 F.3d at 185); *see also Farmer*, 511 U.S. at 837. In *Garraway*, 707 F. App'x at 18, the Second Circuit concluded that "[the constitutional magnitude" of failing to respond to an inmate's complaints of unsafe and unsanitary conditions, "if proved, was clearly

established by [the date of plaintiff's claims] so as to defeat defendant's claim of qualified immunity." Likewise, an inmate's right to be free from retaliation for the exercise of a First Amendment right was clearly established at the time of the alleged retaliation against Plaintiff in this case. *See Pidlypchak*, 389 F.3d at 380. Moreover, Defendants' argument for qualified immunity is devoid of any evidence showing that it was objectively reasonable for them to believe their alleged conduct did not violate plaintiff's constitutional rights in this case with respect to the claims on which the Court has recommended denial of summary judgment. *Id.* at 39.

Based on the foregoing, the Court recommends that Defendants all be denied summary judgment on qualified immunity grounds without prejudice.

## IX. CONCLUSION

In sum, the Court recommends that Defendants' motion for summary judgment (Dkt. No. 39) be **[*76]** granted in part as follows: (1) judgment in Novak's favor on Plaintiff's First Amendment retaliation claim related to cell I-3; (2) judgment in Donnelly's favor on all of Plaintiff's First Amendment retaliation and supervisory liability claims; (3) judgment in Robinson, Chuttey, Quinn, and Fagan's favor on Plaintiff's supervisory liability claims; and (4) judgment in Graham's favor on all of Plaintiff's supervisory liability claims related to Plaintiff's First Amendment retaliation claims against Novak and Donnelly. The Court further recommends that Defendants' motion for summary judgment be denied in part as follows: (1) denial as to Plaintiff's Eighth Amendment conditions of confinement claim against Novak and Donnelly; (2) denial as to Plaintiff's First Amendment retaliation claims against Novak, with the exception of the retaliation claim related to cell I-3; and (3) denial as to Plaintiff's supervisory liability claim against Graham on Plaintiff's Eighth Amendment conditions of confinement claim. In addition, the Court recommends denial of Defendants' motion

for summary judgment on qualified immunity grounds without prejudice.

If the District Court accepts this Report-Recommendation, the following § 1983 claims will remain for trial: (1) Plaintiff's Eighth Amendment conditions of confinement **[*77]** claims against Novak and Donnelly related to cell I-3; (2) Plaintiff's First Amendment retaliation claims against Novak, with the exception of the retaliation claim related to cell I-3; (3) Plaintiff's supervisory liability claim against Graham on Plaintiff's Eighth Amendment conditions of confinement claim; and (4) to the extent allowed by the District Court, Defendants' claim of entitlement to qualified immunity.

## X. PLAINTIFF'S MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

Plaintiff has moved pursuant to Rule 37 of the Federal Rules of Civil Procedure for the imposition of sanctions against Defendants for spoliation of evidence, namely, tape over of SHU I-tank surveillance audio and video recordings for the locations and time periods of the incidents relevant to Plaintiff's claims, despite Plaintiff's timely notice to Defendants to preserve the tapes for expected litigation. (Dkt. No. 62-1.) In their opposition, Defendants challenge the adequacy and timing of Plaintiff's notices to preserve the tapes. (Dkt. No. 68 at 7-9.) Defendants also point out Plaintiff's failure to show exactly what he believes the tapes would show, although Defendants themselves offer no evidence that the videos would not be probative on Plaintiff claims. *Id.* at 6. In addition, Defendants argue **[*78]** Plaintiff has failed to produce evidence that Defendants destroyed the videos with the requisite culpable state of mind. *Id.* at 9. Aside from alluding generally to the videos being recorded over, neither party provides evidence regarding what constitutes "the Department of Correction and Community Supervision's good faith operation of it's video system," relied upon by Defendants or the timing and circumstances of any

relevant tape over vis-a-vis the notices to preserve provided by Plaintiff. *Id.*

The Court has concluded that there is insufficient information in the parties' motion papers on which to rule on the issue of spoliation. The Court has also concluded, however, that for purposes of its recommendation on Defendants' motion for summary judgment it is not necessary to do so. The Court's recommendation that Novak and Donnelly be granted summary judgment on Plaintiff's retaliation claim relating to his placement in cell I-3 is based upon a legal determination regarding the absence of evidence showing protected First Amendment conduct. The Court has denied summary judgment with regard to Plaintiff's remaining retaliation claims and his Eighth Amendment conditions of confinement claim against Novak and Donnelly based on **[\*79]** the evidence in the summary judgment record. The Court has recommended that Donnelly be granted summary judgment on the retaliation claim involving the television based upon a legal determination that the incident, as described by Plaintiff himself, did not constitute adverse action.

Because the motion papers provide inadequate information on which to properly determine Plaintiff's motion for spoliation sanctions, and the Court finds it unnecessary to do so for purposes of this Report-Recommendation, the Court denies Plaintiff's motion without prejudice to reconsideration or renewal including, if necessary, a hearing in the District Court in connection with any trial held in the matter.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part; and it further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendant Novak on Plaintiff's First Amendment retaliation claims related to his being moved to and kept in cell I-3, and **GRANTED** to Donnelly on all of Plaintiff's retaliation and supervisory liability claims; and it is further

**RECOMMENDED** that summary judgment be **DENIED** to both Novak and Donnelly on Plaintiff's Eighth Amendment conditions **[\*80]** of confinement claim with regard to cell I-3, and **DENIED** to Novak on all of Plaintiff's First Amendment retaliation claims with the exception of the claim related to his being moved to and kept in cell I-3; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendants Robinson, Chuttey, Quinn, and Fagan on Plaintiff's supervisory liability claims; and it is further

**RECOMMENDED** that summary judgment be **GRANTED** to Defendant Graham on Plaintiff's supervisory liability claim related to his First Amendment retaliation claims, and that it be **DENIED** on Plaintiff's supervisory liability claim related to his Eighth Amendment conditions of confinement claim; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment on qualified immunity grounds be denied as to all Defendants without prejudice to reconsideration at trial; and it is hereby

**ORDERED** that Plaintiffs motion for sanctions against Defendants for spoliation of evidence (Dkt. No. 62) be denied without prejudice to a request for reconsideration or renewal at trial; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the **[\*81]** Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[10] Such

---

[10] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen

2018 U.S. Dist. LEXIS 135423, *81

objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: August 9, 2018

Syracuse, New York

/s/ Thérèse Wiley Dancks

Thérèse Wiley Dancks

United States Magistrate Judge

---

End of Document

---

days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. 6(a)(1)(C).



# Williams v. Smith

United States District Court for the Northern District of New York

January 26, 2015, Decided; January 26, 2015, Filed

9:11-CV-0601 (LEK/TWD)

**Reporter**

2015 U.S. Dist. LEXIS 31816 *

DEANDRE WILLIAMS, Plaintiff, v. N. SMITH, et al., Defendants.

**Subsequent History:** Summary judgment granted by, Injunction denied by, As moot Williams v. Smith, 2015 U.S. Dist. LEXIS 30949 (N.D.N.Y, Mar. 13, 2015)

**Counsel:** [*1] DEANDRE WILLIAMS, Plaintiff, Pro se, Romulus, NY.

For Defendants: JUSTIN L. ENGEL, ESQ., OF COUNSEL, HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, Albany, NY.

**Judges:** Thérèse Wiley Dancks, United States Magistrate Judge.

**Opinion by:** Thérèse Wiley Dancks

# Opinion

## REPORT-RECOMMENDATION

This pro se prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff DeAndre Williams, an inmate in the custody of the New York Department of Corrections ("DOCS"),[1] alleges that Defendants violated his constitutional rights during his confinement at Upstate Correctional Facility ("Upstate"). (Dkt. No. 1.) The complaint, which is 315 pages long including exhibits, describes myriad incidents occurring over a six-year period. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 107.) For the reasons discussed below, I recommend that the Court grant Defendants' motion.

## I. FACTUAL AND PROCEDURAL SUMMARY

At his deposition, Plaintiff testified that a specialist from outside the Upstate facility saw him regarding his torn right meniscus in 2004. (Dkt. No. 107-9 at 70:21-25, 71:1-3, 72:3-10.) Plaintiff testified that the specialist "also said there was a problem with the left knee." *Id.* at 71:3-4. However, a letter from the specialist attached to the complaint makes no mention of Plaintiff's left knee. (Dkt. No. 1-2 at 75.) Plaintiff testified that he told the specialist that his left knee was worse than his right knee. (Dkt. No. 107-9 at 70:22-23.) The specialist recommended arthroscopy, but Plaintiff declined. (Dkt. No. 1-2 at 75.)

---

[1] On April 1, 2011, DOCS merged with the Division of Parole to form the Department of Corrections and Community Supervision. The events giving rise to Plaintiff's [*2] complaint occurred before the merger and the Court will therefore refer to the agency by its former name.

2015 U.S. Dist. LEXIS 31816, *2

Thereafter, a surgeon came to Upstate to see Plaintiff. (Dkt. No. 107-9 at 71:4-5.) Plaintiff was transported to that appointment in a wheelchair. *Id.* at 71:15-16. The surgeon informed Plaintiff that he was going to operate on Plaintiff's right knee. *Id.* at 71:5-7. Plaintiff told the surgeon that he did not "want an operation because this is the problem that I have; I don't have a torn meniscus, I have jumper's knee" and [*3] that his left knee was worse than his right knee. *Id.* at 71:8-11. Plaintiff testified that the surgeon did not pay attention to him and was "determined to operate on the wrong knee." *Id.* at 71:11-13. Plaintiff testified that Defendant Nurse Administrator Nancy Smith called the surgeon out of the room to talk. *Id.* at 71:14-15, 72:11-14. Plaintiff testified that he was not present for that conversation, but that "it's obvious" that Defendant Smith told the surgeon to operate on Plaintiff's right leg rather than his left leg. *Id.* at 72:23-73:10. No surgery took place that day. *Id.* at 74:10-20. Plaintiff further testified at his deposition that Defendant Smith "directed the surgeon to write in his report that I don't need the wheelchair and I don't need crutches to get around." *Id.* at 72:17-19.

Defendant Smith declares that she "never at any time advised any doctor at Upstate or any outside specialist that plaintiff have the incorrect knee or leg operated on or that plaintiff have any operation on either knee or leg, whatsoever." (Dkt. No. 107-4 ¶ 38.) She further declares that she "never advised or recommended to any doctor at Upstate or any outside specialist that plaintiff did not need [*4] ambulatory aides such as a wheelchair and/or crutches." *Id.* ¶ 39. She declares that, as Nurse Administrator, she does "not make determinations regarding permits for ambulatory aides. Permits of this nature can only be prescribed by a provider and permits of this nature can only be discontinued by a provider." *Id.* ¶ 41.

The complaint alleges that on January 25, 2007, a neurologist from outside the Upstate facility determined that Plaintiff needed to use an elevator due to his physical condition. (Dkt. No. 1-2 at 71; Dkt. No. 107-4 ¶¶ 13-14.) Plaintiff did not receive

an elevator pass. *See, e.g.*, Dkt. No. 1-2 at 90. Plaintiff testified at his deposition that he saw doctors at Upstate once or twice a week from January 2007 through August 2008 and discussed his need for an elevator pass "all the time." (Dkt. No. 107-9 at 30:5-14.) He testified that the doctors told him that he did not need an elevator pass. *Id.* at 30:21-25. However, there is no indication in Plaintiff's medical records that he requested an elevator permit from Upstate after receiving the neurologist's recommendation. (Dkt. No. 107-4 ¶ 16.)

On March 28, 2008, Plaintiff received a right leg brace to treat foot drop. (Dkt. [*5] No. 108 at 11.[2] On April 8, 2008, Plaintiff was seen at sick call and the nurse noted that he appeared "steady on [his] feet." *Id.* at 13. On June 27, 2008, Plaintiff was seen by orthotics with orders to follow up at the next clinic to receive an adjusted leg brace. *Id.* at 34. Plaintiff received a new leg brace on July 25, 2008. *Id.* at 41.

Plaintiff fell on a stairway on August 13, 2008, and was carried on a stretcher to the infirmary for evaluation. (Dkt. No. 1-2 at 61; Dkt. No. 108 at 139.) Plaintiff experienced back and neck pain. (Dkt. No. 1-2 at 61.) A medical staff member documented the incident and Plaintiff's injuries in a progress note and in a call to the central office. *Id.*

As mentioned above, Defendant Smith was the Nurse Administrator at Upstate during the relevant time period. (Dkt. No. 107-4 ¶ 2.) As Nurse Administrator, Defendant Smith is not a primary care provider. *Id.* ¶ 6. She does not generally treat inmates and cannot prescribe medication or medical devices. *Id.* ¶¶ 8-9. She does not have authority to issue medical permits, including elevator permits, without direction [*6] from a provider. *Id.* ¶ 10.

Plaintiff filed a grievance on or about August 28, 2008, complaining that he had not been issued an elevator permit. (Dkt. No. 1-2 at 90.) Defendant

―――――――――――――――

[2] Citations to page numbers in Plaintiff's medical records refer to the page numbers assigned by the Court's electronic filing system.

Smith was assigned to investigate the grievance. (Dkt. No. 107-4 ¶ 28.) She reviewed Plaintiff's chart. (Dkt. No. 1-2 at 90.) It is not clear precisely what the first level review of the grievance said, but Plaintiff's grievance was denied at the Superintendent's level in a decision that cited Defendant Smith's investigation. *Id*. The denial stated that:

> 1. Grievant is currently housed in lower gallery which requires minimal stair usage. NP Parmer deemed elevator order not indicated. Grievant has cane permit for use when he is ambulating out of his cell for any reason. He also has leg braces for use out of cell for stability. . . .
>
> 3. Grievant was seen by Dr. Weissman, FHSD, on 9/8/08. No change in elevator order written or indicated.
>
> 4. Outside providers can recommend only. It is up to the facility provider to determine what, if any, of the recommendations are ordered.
>
> Grievant has braces and a cane to assist with his ambulation. There is no medical indication at this time for an elevator only order.

*Id*.

Plaintiff appealed [*7] the Superintendent's decision. (Dkt. No. 1-2 at 90.) He stated that he needed the elevator pass because he had "just [fallen] on the stairs and cannot ambulate on them." *Id*.

On November 2, 2008, Plaintiff was seen at sick call and requested an elevator permit. (Dkt. No. 108-1 at 11.) This was the first time that Plaintiff's medical record documented any request for an elevator permit. (Dkt. No. 107-4 ¶ 31.)

On November 3, 2008, Upstate granted Plaintiff an elevator pass, noting that Plaintiff was "unable to walk up [and] down stairs." (Dkt. No. 1-2 at 86.) Two days later, the Central Office Review Committee affirmed the Superintendent's decision and denied Plaintiff's grievance. *Id*. at 91. In part, the report stated there was "no medical reason why [Plaintiff] cannot negotiate a flight of stairs" because Plaintiff was seen walking with his cane

and brace. *Id*.

Plaintiff filed a series of grievances against non-defendant Nurse Atkinson. *See, e.g*., Dkt. No. 107-9 at 46:23-47:6. Sometime after October 25, 2007, Defendant Doctor Richard Adams began providing services at Upstate one day per week. (Dkt. No. 107-5 ¶ 2-3.) At his deposition, Plaintiff testified that he saw Defendant Adams three or four [*8] times. (Dkt. No. 107-9 at 49:11-50:5, 64:7-65:20.) Plaintiff testified at his deposition that his first interaction with Defendant Adams occurred when Defendant Adams "[c]all[ed] me in the office and tell me I got to stop writing grievances on Nurse Atkinson." (Dkt. No. 107-9 at 48:12-15.) At that time, Defendant Adams prescribed steroids for Plaintiff. *Id*. at 49:13-21.

Plaintiff's medical records show that Plaintiff was issued a medium sized knee sleeve on February 22, 2010. (Dkt. No. 108-1 at 32.) The same progress note indicates that the sleeve was the wrong size and was returned to the pharmacy in exchange for a large sized knee sleeve. *Id*. Plaintiff received the large knee sleeve sometime before May 4, 2010, when a pharmacy tech called Plaintiff's cell block to confirm that Plaintiff had received it. *Id*. at 39.

Defendant Adams declares that he saw Plaintiff on April 30, 2010, after Plaintiff asked to see a doctor regarding chronic neck pain. (Dkt. No. 107-5 ¶ 10.) Plaintiff arrived at the clinic wearing elastic neoprene knee braces. *Id*. Plaintiff indicated that he had metal braces, which he was not wearing at the visit. *Id*. Plaintiff complained that the braces fit poorly but did not complain of [*9] weakness, giving away, or increased motor difficulty. *Id*. Regarding Plaintiff's neck pain, Defendant Adams noted that Plaintiff "may benefit better from Baclofen rather than Flexiril for neurogenic spasms." *Id*. Regarding the braces, Defendant Adams declares that:

> I noted that plaintiff walked with ataxic gait without support gear, i.e., cane, crutch, walker. I noted that plaintiff had no indications of arthritic pain and my assessment was that he

had some muscular defect. I indicated plaintiff should gain support with regular strengthening and that plaintiff should be observed for further need of increased bracing. As I did not feel that the elastic knee braces plaintiff was wearing at the visit were providing any support to plaintiff, I discontinued use of that particular type of brace . . . . I discontinued plaintiff's use of the elastic neoprene knee braces because it was my professional medical opinion that they were not providing him support and therefore not indicated to treat his complaints. I did not, however, take any action to discontinue use of any type of metal knee brace plaintiff may have had, as I am not an orthopedic doctor and I do not prescribe metal knee braces or **[*10]** know how they are fitted.

(Dkt. No. 107-5 ¶¶ 10-11.) Plaintiff testified at his deposition that two or three weeks after that meeting, Defendant Adams took away one of his braces. (Dkt. No. 107-9 at 53:18-22.) Plaintiff further alleges that Defendant Adams called him a "nigger." *Id*. at 53:8.

Plaintiff filed a grievance on April 30, 2010, alleging that Defendant Adams threatened three times to take away all of Plaintiff's braces if he "keep[s] complaining" and "keep[s] making trouble about the braces." (Dkt. No. 1-2 at 7, 8.) Defendant Adams declares that "at no time did I threaten [P]laintiff that I would take away his knee or leg braces if he continued to file grievances and complaints. In fact, I am not aware of any grievances or complaints [P]laintiff may have filed prior to his April 30, 2010 appointment with me." (Dkt. No. 107-5 ¶ 8.)

In the grievance, Plaintiff also alleged that Defendant Smith informed Defendant Adams that Plaintiff did not need braces and that Plaintiff was a problem. (Dkt. No. 1-2 at 7.) Plaintiff alleges that Defendant Adams never physically examined him regarding the problems Plaintiff had with his braces being too short and tight. *Id*. Additionally, Plaintiff claimed that Defendant Adams told **[*11]** him to

leave when he asked to be examined for neck and spine pain. *Id*. at 8. At his deposition, Plaintiff testified that Defendant Adams told him in that conversation that "he ha[d] a problem with me filing grievances on Nurse Atkinson." (Dkt. No. 107-9 at 63:15-21.)

In June 2010, Plaintiff filed a grievance with the New York State Department of Health. (Dkt. No. 1-2 at 2-3.) Plaintiff claimed that unnamed individuals refused to give him a new brace or allow him to see another doctor for his neck and spinal pain. *Id*. at 2. He also accused Defendant Smith of telling an unnamed doctor to operate on Plaintiff's wrong leg and to take away Plaintiff's wheelchair and crutches. *Id*.

On November 16, 2010, Plaintiff complained of sexual abuse and harassment by Defendant Corrections Officer Facteau.[3] (Dkt. No. 1-2 at 92.) Plaintiff claimed that Defendant Facteau searched him inappropriately by hitting him "between my legs[,] smashing my nutts[,] prost[]ate[, and] my ass." *Id*. Plaintiff said Defendant Facteau used such force that it caused injuries, including swollen genitalia, a swollen prostate, and bloody stool and urine. *Id*. at 98, 103, 105. Plaintiff also claimed that when he attempted to discuss the issue with Defendant Facteau, **[*12]** Defendant Facteau refused to listen. *Id*. at 92. At his deposition, Plaintiff testified that Defendant Facteau struck him "on my groin area. Then, he fondled me from the front to the back, I mean, really fondling me." (Dkt. No. 107-9 at 87:11-12.) Plaintiff testified that this caused him "a little pain." *Id*. at 87: 13-14. He further testified that the only thing Defendant Facteau said to him was, "This is a proper search." *Id*. at 84:21-23.

Defendant Facteau declares that he was directed to conduct a pat frisk of Plaintiff on November 16, 2010. (Dkt. No. 107-6 ¶ 9.) He declares that the

---

[3] This Defendant's name is spelled "Facto" in much of the record. The Court has used the spelling supplied by the Defendant in his declaration filed in support of the motion for summary judgment. (Dkt. No. 107-6.)

2015 U.S. Dist. LEXIS 31816, *12

"standards for inspection of an inmate's person allow for contact through the clothing with the genitalia, groin, breast, inner thigh, and buttocks." *Id*. ¶ 11. He declares that "such contact is deemed a necessary component of a thorough pat frisk and . . . would have been expected for a pat frisk conducted in 2010." *Id*. Defendant Facteau declares that he "may have made contact with plaintiff's genitalia and buttocks, **[\*13]** as is common procedure. However, I did not 'hit' or 'smash' plaintiff as he alleges or use any force against his genitalia and buttocks or otherwise that would cause any injury." *Id*. ¶ 12.

Plaintiff filed this action on May 31, 2011. (Dkt. No. 1.) Defendants moved to dismiss the complaint. (Dkt. No. 36.) On March 29, 2013, the Court granted the motion in part and denied it in part. (Dkt. No. 62.) The Court dismissed twenty-three claims with leave to amend and eight claims without leave to amend. *Id*. at 54-55. The Court granted Plaintiff sixty days to file an amended complaint. *Id*. at 55. The Court directed Defendants to respond to several remaining claims. *Id*. at 56.

Plaintiff did not file an amended complaint. Accordingly, only five claims remain pending in this action: (1) an Eighth Amendment claim against Defendant Smith regarding the elevator pass; (2) a retaliation claim against Defendant Adams regarding Plaintiff's leg braces; (3) an Eighth Amendment medical care claim against Defendant Adams regarding Plaintiff's leg braces; (4) an Eighth Amendment medical care claim against Defendant Smith involving orders to operate on Plaintiff's incorrect leg and to take away his wheelchair and crutches; (5) an Eighth Amendment excessive force claim against Defendant Facteau. **[\*14]** (Dkt. No. 62 at 56.)

Defendants now move for summary judgment of the five remaining claims. (Dkt. No. 107.) Plaintiff has opposed the motion. (Dkt. No. 110.) Defendants have filed a reply. (Dkt. No. 111.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id*. at 273. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 & n.11 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). In determining whether a genuine issue of material[4] fact exists, **[\*15]** the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 309 (2d Cir. 2008).

### B. Legal Standard Governing Motions to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is

---

[4] A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

2015 U.S. Dist. LEXIS 31816, *15

functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint on the ground that the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled [*16] to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not [*17] suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## III. ANALYSIS

### A. Eighth Amendment Claim Against Defendant Smith Regarding Elevator Pass

Construed broadly, the complaint asserts an Eighth Amendment claim against Defendant Smith for investigating Plaintiff's grievance regarding Upstate's failure to issue him an elevator pass. (Dkt. No. 1-2 at 90-91.) Defendants argue that they are entitled to summary judgment of this claim because Plaintiff has not raised a triable issue of fact that (1) Defendant Smith was personally involved in denying the elevator permit; and (2) Defendant Smith acted with deliberate indifference. (Dkt. No. 107-2 at 13-20.[5] Defendants are correct.

#### 1. Personal Involvement

Defendants argue that Defendant Smith was not personally involved in the decision to deny Plaintiff an elevator permit because she merely investigated Plaintiff's grievance regarding the denial of the permit. (Dkt. No. 107-2 at 14-16.) Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged constitutional deprivations is a prerequisite [*18] to an award of

---

[5] Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

2015 U.S. Dist. LEXIS 31816, *18

damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some "tangible connection" between the unlawful conduct and the defendant. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). If the defendant is a supervisory official, a mere linkage to the unlawful conduct through the prison chain of command (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cnty. v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445, 70 L. Ed. 2d 509 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (per curiam); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985) (per curiam). In other words, supervisory officials may not be held liable merely because they held positions of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, supervisory personnel may be considered personally involved if they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (citations omitted).[6]

District courts in this circuit have routinely held that a nurse administrator who investigates a grievance does not become personally involved in the alleged underlying constitutional violation. *De Jesus v. Albright*, No. 08 Civ. 5804 (DLC), 2011 U.S. Dist. LEXIS 23710, at *18-21, 2011 WL 814838, at *5-6 (S.D.N.Y. Mar. 9, 2011);[7] *Gates v. Goord*, No. 99 Civ. 1378 (PKC), 2004 U.S. Dist. LEXIS 12299, at *32-35, 2004 WL 1488405, at *10-11 (S.D.N.Y. July 1, 2004);[8] *Patterson v. Lilley*, No. 02 Civ. 6056 (NRB), 2003 U.S. Dist. LEXIS 11097, at *19-22, 2003 WL 21507345, at *6-7 (S.D.N.Y. June 20, 2003);[9] *Rosales v. Coughlin*, 10 F. Supp. 2d 261, 267 (W.D.N.Y. 1998). Here, Defendant Smith simply investigated Plaintiff's grievance. (Dkt. No. 107-4 ¶ 28.) Thus, Defendant Smith was not personally involved in the alleged **[*20]** constitutional violation. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

2. Deliberate Indifference

Defendants argue that even if Defendant Smith was personally involved in the alleged constitutional violation, she did not act with deliberate indifference. (Dkt. No. 107-2 at 16-20.) Defendants are correct.

In fulfilling their duty to "provide humane conditions of confinement," prison officials must ensure, among other things, that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (citing *Hudson v. Palmer*, 468 U.S. 517, 526-27, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). There are two elements to a prisoner's claim that

---

[6] In *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), the Supreme Court ruled **[*19]** that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). The Second Circuit itself has noted that "*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*." *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012). The Second Circuit

declined to address the issue in *Reynolds*, however, and has not addressed it since that time. I will assume for the purposes of this motion that *Colon* remains good law.

[7] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. (Dkt. No. 107-3 at 1-12.)

[8] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. (Dkt. No. 107-3 at 24-34.)

[9] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. (Dkt. No. 107-3 at 47-52.)

prison officials violated his or her Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman*, 581 F.3d 63, 72 (2d Cir. 2009) (citation and punctuation omitted). "The objective 'medical [*21] need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003) (citation omitted).

Defendants concede for the purposes of the pending motion that Plaintiff's medical conditions were serious. (Dkt. No. 107-2 at 13 n.6.) The issue, then, is whether there is a triable issue of fact that Defendant Smith acted with deliberate indifference. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. "Inmates do not have a right to choose a specific type of treatment." [*22] *Veloz v. New York*, 339 F. Supp. 2d 505, 525 (S.D.N.Y. 2004). More specifically, "[d]ifferences in opinions between a doctor and an inmate patient as to the appropriate pain medication clearly do not support a claim that the doctor was deliberately indifferent to the inmate's serious medical needs." *Wright v. Genovese*, 694 F. Supp. 2d 137, 160 (N.D.N.Y. 2010) (punctuation omitted).

As Defendants correctly note (Dkt. No. 107-2 at 16-19), the pending case is indistinguishable from *Miller v. Rao*, No. 11-CV-0617 (Sr), 2013 U.S. Dist. LEXIS 170412, 2013 WL 6240672 (W.D.N.Y. Dec. 3, 2013).[10] There, an inmate requested orthotic footwear, which he had received during previous prison terms. *Miller*, 2013 U.S. Dist. LEXIS 170412, at *2. The request was denied at several levels and the inmate was instead provided with arch supporting insoles. 2013 U.S. Dist. LEXIS 170412, at *3. The inmate then requested a knee brace and pain medication. 2013 U.S. Dist. LEXIS 170412, at *3-4. He was referred to physical therapy and received anti-inflammatory pain medication. 2013 U.S. Dist. LEXIS 170412, at *4. Thereafter, the inmate filed a grievance regarding the denial of orthotic footwear. 2013 U.S. Dist. LEXIS 170412, at *5. The grievance was forwarded to the nurse administrator for investigation. *Id*. Based on her review of the inmate's medical records, she found that there was "no medical indication for orthotics." *Id*. The nurse administrator reiterated that opinion in her investigation of a later grievance regarding the same issue. 2013 U.S. Dist. LEXIS 170412, at *8-9. The inmate filed suit and the district court granted the nurse administrator's motion for [*23] summary judgment. 2013 U.S. Dist. LEXIS 170412, at *1-2. The court noted that the nurse administrator had played a "limited" role in the inmate's care and that the inmate had received regular medical attention at the facility. 2013 U.S. Dist. LEXIS 170412, at *20-21. In light of those facts, the court found that the inmate's "claims of deliberate indifference to his medical needs can only be viewed as mere disagreement with prison officials about what constitutes appropriate medical care." 2013 U.S. Dist. LEXIS 170412, at *21 (punctuation omitted).

Here, as in *Miller*, there is no evidence that Defendant Smith acted with deliberate indifference. Her role was limited to investigating Plaintiff's

---

[10] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. (Dkt. No. 107-3 at 53-61.)

grievance by reviewing his medical records. (Dkt. No. 107-4 ¶¶ 6-10, 28.) Plaintiff received regular medical attention at Upstate, including seeing doctors once or twice per week from January 2007 through August 2008 (Dkt. No. 107-9 at 30:5-14) and receiving a knee brace (Dkt. No. 108 at 11, 41.) Plaintiff merely disagreed with the facility doctors' decision not to issue him an elevator permit. Therefore, I recommend that the Court grant Defendant Smith's motion for summary judgment [*24] and dismiss the Eighth Amendment claim regarding the elevator pass.

## B. Retaliation Claim Against Defendant Adams Regarding Plaintiff's Leg Braces

Plaintiff alleges that Defendant Adams retaliated against him by threatening to take away his braces if he "keep[s] complaining" and "keep[s] making trouble about the braces." (Dkt. No. 1-2 at 7-8.) Defendants argue that they are entitled to summary judgment of this claim because, *inter alia*, (1) Plaintiff's verbal complaints about medical issues are not protected speech; and (2) even if Plaintiff was engaged in protected conduct, there was no causal connection between Plaintiff's speech and the alleged adverse action by Defendant Adams. (Dkt. No. 107-2 at 25-29.) Because I find that Plaintiff has not raised a triable issue of fact regarding any causal connection between his conduct and Defendant Adams' alleged actions, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claim against Defendant Adams.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. [*25] *See Gill*, 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with

particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983). As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official — even those otherwise not rising to the level of a constitutional violation — can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff — namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection [*26] between the protected speech and the adverse action — in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001)).

Plaintiff alleges that Defendant Adams retaliated against him both for verbally complaining about problems with his braces and for filing grievances against Nurse Atkinson. (Dkt. No. 1-2 at 7-8; Dkt. No. 107-9 at 48:9-49:10.) Defendants argue that, to the extent that Plaintiff claims that the alleged

retaliation was based on Plaintiff's verbal complaints, Plaintiff was not engaged in protected conduct. (Dkt. No. 107-2 at 26.) Defendants are correct. *See Garrido v. Coughlin*, 716 F. Supp. 98, 101 (S.D.N.Y. 1989) (stating that inmate was not engaged in protected conduct when he had "verbal confrontation" with correctional officer). However, the filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Thus, by alleging that Defendant Adams retaliated against him for filing grievances against Nurse Atkinson, Plaintiff has raised a triable issue of fact that he was engaged in protected conduct.

Defendants next argue that there was no causal connection between Plaintiff's protected conduct and the alleged **[*27]** adverse action by Defendant Adams. (Dkt. No. 107-2 at 26-28.) Defendants are correct. Several grievances in which Plaintiff mentions Nurse Atkinson are attached to the complaint in this action, but all of them post-date the time period in which Plaintiff claims that Defendant Adams made comments to him about such grievances. (Dkt. No. 1-2 at 10, 13-14, 32-33, 35-37, 39-41, 117-18; Dkt. No. 1-3 at 40, 42-43, 88-89, 97-99.) Plaintiff has not submitted any evidence in opposition to the motion for summary judgment showing that his grievances against Nurse Atkinson preceded his interactions with Defendant Adams. Adverse actions that predate protected conduct cannot form the basis of a retaliation claim. *See Roseboro v Gillespie*, 791 F. Supp. 2d 353, 368 (S.D.N.Y. 2011) (granting summary judgment for defendant on the basis that his conduct "cannot be retaliatory since it predated the protected speech"); *Verri v. Nanna*, 972 F. Supp. 773, 788 (S.D.N.Y. 1997) ("[C]learly a plaintiff cannot base a claim of retaliation upon complained-of-acts that predated the speech.") (punctuation omitted). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claim against Defendant Adams.

## C. Eighth Amendment Medical Care Claim Against Defendant Adams

Plaintiff alleges that Defendant Adams **[*28]** violated his Eighth Amendment right to adequate medical care by failing to physically examine him regarding the problems he was having with his braces and by asking him to leave when he asked to be examined for neck and spine pain. (Dkt. No. 1-2 at 7-8.) Defendants argue that this claim should be dismissed because Plaintiff has not raised a triable issue of fact that Defendant Adams was deliberately indifferent to Plaintiff's serious medical needs. (Dkt. No. 107-2 at 22-25.) Defendants are correct.

In cases where a "prisoner has actually received medical treatment, deliberate indifference will not be found unless the 'medical attention rendered was so woefully inadequate as to amount to no treatment at all.'" *Gay v. Terrell*, No. 12-CV-2925 (CBA) (VMS), 2013 U.S. Dist. LEXIS 139654, at *45, 2013 WL 5437045, at *19 (E.D.N.Y. Aug. 19, 2013[11] (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).[12] *See, e.g., Perez v. Hawk*, 302 F. Supp. 2d 9, 21 (E.D.N.Y. 2004) (granting defendants' motion to dismiss where documents attached to the complaint showed that prisoner was seen by medical staff approximately thirty times over an eighteen-month period, given medication, and tested for various maladies). Here, Plaintiff was seen by medical staff at Upstate more than 350 times between February 12, 2008, and November 3, 2010. (Dkt. No. 108.) Defendant Adams saw Plaintiff, observed him, **[*29]** suggested changes in medication, and recommended observation to evaluate further need for bracing. (Dkt. No. 107-5 ¶ 10-11.) Although this may not have been the precise treatment Plaintiff wanted, nothing in the record indicates that the treatment was "so woefully

---

[11] LEXIS and Westlaw list different dates for this decision. The Court has used the date used by LEXIS, which represents the date on which the Report-Recommendation containing the quoted language was issued.

[12] Defendants provided Plaintiff with a copy of this unpublished decision with their moving papers. (Dkt. No. 107-3 at 86-105.)

inadequate as to amount to no treatment at all." Thus, Plaintiff has not raised a triable issue of fact that Defendant Adams was deliberately indifferent to his serious medical needs. Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

## D. Eighth Amendment Medical Care Claim Against Defendant Smith

In addressing Defendants' motion to dismiss, the Court construed Plaintiff's inclusion of his June 2010 grievance with the New York State Department of Health as asserting an Eighth Amendment medical care claim against Defendant Smith for advising the surgeon to take away Plaintiff's wheelchair **[*30]** and crutches and to operate on Plaintiff's right leg rather than his left. (Dkt. No. 62 at 22-23.) The Court denied Defendants' motion to dismiss that claim. *Id.* at 24-25. Defendants now move for summary judgment of the claim, arguing that it is barred by the statute of limitations and that, even if the claim is not barred, they are entitled to judgment as a matter of law. (Dkt. No. 107-2 at 20-22.)

The complaint, filed on May 31, 2011, did not specify when Defendant Smith allegedly advised the surgeon to take away Plaintiff's crutches and wheelchair and to operate on the "incorrect" leg. (Dkt. No. 1-2 at 2.) Defendants did not assert a statute of limitations affirmative defense in their answer, filed on July 29, 2013. (Dkt. No. 70.) At Plaintiff's deposition, conducted on February 28, 2014, Defendants learned that the events allegedly occurred in 2004-2005. (Dkt. No. 107-9 at 1, 72:8-10.) However, Defendants did not move to amend their answer to include a statute of limitations defense. Rather, Defendants asserted that defense for the first time in the pending motion for summary judgment, filed on July 25, 2014. (Dkt. No. 107-2 at 20-21.) As Defendants correctly note, "[w]aiver of affirmative defenses **[*31]** not raised in a defendant's answer is not automatic, and 'as a practical matter there are numerous exceptions.'"

*Gilmore v. Gilmore*, 503 F. App'x 97, 99 (2d Cir. 2012) (quoting *Am. Fed. Grp. v. Rothenberg*, 136 F.3d 897, 910 (2d Cir. 1998)). Here, however, the Court declines to decide whether or not one of those exceptions is applicable because Defendants are entitled to judgment on the merits regardless of whether or not they waived their statute of limitations affirmative defense.

As discussed above, a prisoner who alleges that a defendant violated his Eighth Amendment right to adequate medical care must prove, *inter alia*, that the defendant acted with deliberate indifference. *Caiozzo*, 581 F.3d at 72. There is simply no evidence that Defendant Smith consciously and intentionally disregarded Plaintiff's serious medical need. There is no evidence in the record that Defendant Smith instructed the surgeon to operate on the "incorrect" leg or to take away Plaintiff's wheelchair and crutches. Defendant Smith affirmatively declares that she gave no such instructions. (Dkt. No. 107-4 ¶¶ 38-39.) The only "evidence" that the incident occurred as alleged in the complaint is Plaintiff's deposition testimony about what he believes Defendant Smith discussed with the surgeon when she called him out of the room. (Dkt. No. 107-9 at 71:14-73:10.) Speculative **[*32]** testimony with no basis of personal knowledge does not constitute evidence. *See Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004); *Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (rejecting affidavit made on "suspicion . . . rumor and hearsay"); *Spence v. Maryland Cas. Co.*, 803 F. Supp. 649, 664 (W.D.N.Y. 1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd*, 995 F. 2d 1147 (2d Cir. 1993). Therefore, I recommend that the Court grant Defendants' motion for summary judgment of this claim.

## E. Excessive Force Claim Against Defendant Facteau

Plaintiff alleges that Defendant Facteau violated his Eighth Amendment rights by using excessive force. (Dkt. No. 1-2 at 92.) Defendants move for summary judgment of this claim, arguing that there is no evidence that the force was applied maliciously and sadistically to cause harm. (Dkt. No. 107-2 at 29-32.) Defendants are correct.

When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). "In determining whether the use of force was wanton and unnecessary," the court should evaluate "the need for application of force, relationship between that need and the amount of force used, the threat reasonably perceived by responsible officials, [*33] and any efforts made to temper the severity of a forceful response." *Id.* at 7 (citation and quotation marks omitted). Not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (citations and internal quotation marks omitted).

Sexual abuse of a prisoner by a corrections officer may, in some circumstances, violate the prisoner's Eighth Amendment right to be free from cruel and unusual punishment. For example, "severe or repetitive sexual abuse of an inmate by a prison officer" may be actionable under the Eighth Amendment, as may situations where "no legitimate law enforcement or penological purpose can be inferred from the defendant's alleged conduct." However, the Second Circuit and its district courts require allegations of very extreme and severe conduct with no imaginable penological purpose before finding that an inmate has stated an Eighth Amendment sexual abuse claim. Courts considering complaints with allegations more severe than Plaintiff's have routinely found them insufficient. [*34] *Boddie v. Schnieder*, 105 F.3d 857, 860-61 (2d Cir. 1997) (holding that allegation that correctional officer touched inmate's penis on one occasion and pressed against him sexually on another occasion, while "despicable," was insufficient to state Eighth Amendment claim); *Garcia v. Watts*, No. 08 Civ. 7778, 2009 U.S. Dist. LEXIS 84697, 2009 WL 2777085 (S.D.N.Y. Sept. 1, 2009) (allegation that guard subjected prisoner to an "ongoing and continuous pattern of harassment" that extended "over a year" and, on separate occasions, grabbed prisoner's buttocks and rubbed his penis against prisoner's buttocks insufficient to state Eighth Amendment claim); *Excell v. Fischer*, No. 9:08-CV-945, 2009 U.S. Dist. LEXIS 88506, 2009 WL 3111711 (N.D.N.Y. Sept. 24, 2009) (allegation that guard grabbed and squeezed prisoner's penis during pat frisk insufficient to state Eighth Amendment claim); *Sharpe v. Taylor*, No. 9:05-CV-1003, 2009 U.S. Dist. LEXIS 125251, 2009 WL 1743987 (N.D.N.Y. Mar. 26, 2009) (allegation that guard sexually harassed prisoner and fondled his anus insufficient to state Eighth Amendment claim); *Eng v. Therrien*, No. 9:04-CV-1146, 2008 U.S. Dist. LEXIS 2312, 2008 WL 141794 (N.D.N.Y. Jan. 11, 2008) (allegation that guards touched prisoner's penis, testicles, and rectal cavity during several pat frisks insufficient to state Eighth Amendment claim); *Morrison v. Cortright*, 397 F. Supp. 2d 424 (W.D.N.Y. 2005) (allegation that correctional officer shone light up inmate's anus, ran his middle finger between inmate's buttocks causing inmate to urinate on himself, and rubbed his penis against inmate's buttocks during strip frisk insufficient to give rise to constitutional claim); *Davis v. Castleberry*, 364 F. Supp. 2d 319, 321 (W.D.N.Y. 2005) (allegation that correctional [*35] officer grabbed inmate's penis during pat frisk insufficient to state constitutional claim); *Montero v. Crusie*, 153 F. Supp. 2d 368 (S.D.N.Y. 2001) (allegation that, on several occasions, correctional officer squeezed inmate's

2015 U.S. Dist. LEXIS 31816, *35

genitalia while pat-frisking him did not show sufficiently serious deprivation to establish Eighth Amendment violation, particularly when inmate did not allege that he was physically injured by such conduct); *Moncrieffe v. Witbeck*, No. 97-CV-253, 2000 U.S. Dist. LEXIS 9425, 2000 WL 949457 (N.D.N.Y. June 29, 2000) (allegation that two guards each sexually touched prisoner once during pat frisks insufficient to state an Eighth Amendment claim); *Holton v. Moore*, No. CIV. A.96CV0077, 1997 U.S. Dist. LEXIS 16178, 1997 WL 642530 (N.D.N.Y. Oct. 15, 1997) (prisoner's allegations that guard touched his bare chest; put his hands down his pants, parted his buttocks, and touched his anus; and unzipped his pants and touched his penis insufficient to state Eighth Amendment claim); *Williams v. Keane*, No. 95 Civ. 0379, 1997 U.S. Dist. LEXIS 12665, 1997 WL 527677, at *11 (S.D.N.Y. Aug. 25, 1997) (allegation that correctional officer put his hand down inmate's pants and fondled inmate's genitals during pat frisk failed to state constitutional claim).[13]

There is no evidence here that Defendant Facteau subjected Plaintiff to excessive force of either a sexual or nonsexual nature. Plaintiff has not produced any **[*36]** evidence that what occurred was anything other than a standard pat-frisk. Therefore, I recommend that the Court grant Defendants' motion for summary judgment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 107) be **GRANTED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: January 26, 2015

Syracuse, New York

ThÉrése Willey Dancks

United States Magistrate Judge

---

[13] The Court provided Plaintiff with copies of these unpublished decisions in conjunction with its order on Defendants' motion to dismiss. (Dkt. No. 62 at 57.)