UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

TAHEEN HAYES,

                              *Plaintiff*,

-against-                    1:16-CV-1368

TIMOTHY DAHLKE, JASON MEIER, GREGORY LANGTRY, STEPHEN BENCE, EDWARD COON, KRISTOPHER HOFFMAN, JAMES IARUSSO, RAYMOND SHANLEY, AND DANIEL MARTUSCELLO,           (TJM/CFH)

                              *Defendants*.

---

**STATEMENT PURSUANT TO RULE 7.1(a)(3)**

Pursuant to Rule 7.1(a)(3) of the Local Rules of this Court, Defendants Dahlke, Bence, Coon, Hoffman, Iarusso, Shanley and Martuscello contend that as to the following material facts, no genuine issue exists:

1.      Plaintiff Taheen Hayes (DIN 05-A-3850) is an inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 12.

2.      At the time of the events relevant to this matter, Plaintiff was incarcerated at Coxsackie Correctional Facility ("Coxsackie"). *Id*.

3.      Also at that time, Defendants Dahlke, Bence, Coon and Hoffman were Correction Officers at Coxsackie; Defendant Iarusso held the position of Offender Rehabilitation Coordinator at Coxsackie; Defendant Shanley held the position of Deputy Superintendent of Security ("DSS")

1

at Coxsackie; and Defendant Martuscello held the position of Superintendent of Coxsackie. Declaration of Timothy Dahlke ("Dahlke Dec."), ¶ 2; Declaration of Stephen Bence ("Bence Dec."), ¶ 1; Declaration of Edward Coon ("Coon Dec."), ¶ 1; Declaration of Kristopher Hoffman ("Hoffman Dec."), ¶ 2; Declaration of James Iarusso ("Iarusso Dec."), ¶ 5; Declaration of Raymond Shanley ("Shanley Dec."), ¶ 3; Declaration of Daniel Martuscello ("Martuscello Dec."), ¶ 1.

### *April 15, 2016 Pat Frisk*

4. On April 15, 2016, Plaintiff was the subject of a scheduled, routine cell search, which had been pre-approved by Defendant Shanley and conducted by Defendant Dahlke. Dahlke Dec., ¶¶ 9-10; Pederson Dec., Exhibit B, pp. DEF0701, DEF0703.

5. Pursuant to DOCCS Directive 4910, inmates subject to a cell search "shall be pat frisked and may also be scanned with a hand-held metal detector." Dahlke Dec., ¶ 11; *see* Pederson Dec., Exhibit F, Section V(A)(3).

6. Accordingly, prior to searching Plaintiff's cell on April 15, 2016, Defendant Dahlke conducted a pat frisk of Plaintiff. Dahlke Dec., ¶ 12; *see* Pederson Dec., Exhibit B, p. DEF0703.

7. Upon opening Plaintiff's cell, Defendant Dahlke ordered Plaintiff to step out of his cell to be pat frisked, and advised him that his cell would be searched. Dahlke Dec., ¶ 13; *see* Pederson Dec., Exhibit B, p. DEF0703.

8. In conducting the pat frisk, Defendant Dahlke, pursuant to his training, patted down an Plaintiff's arms, shoulders, chest, back, each leg, in between each leg, and along the front of his pants' zipper. Dahlke Dec., ¶ 14; *see* Pederson Dec, Exhibit E, p. 48. The entire pat frisk was conducted outside of Plaintiff's clothing. *See* Dahlke Dec., ¶ 14; *see* Pederson Dec, Exhibit E, p.

54. The pat frisk complied with DOCCS Directive 4910. Dahlke Dec., ¶¶ 14, 19; *see* Pederson Dec., Exhibit F, Section III(B)(1).

9. The standards for inspection of an inmate's person allow for contact through the clothing with the genitalia, groin, breast, inner thighs, and buttocks. Dahlke Dec., ¶ 15; *see* Pederson Dec., Exhibit F, Section III(B)(1). Indeed, such contact is a necessary component of a thorough pat frisk and would have been expected for a pat frisk conducted in 2016. *Id.*

10. Defendant Dahlke conducted the pat frisk of Plaintiff on April 15, 2016 without incident and no contraband was found. Dahlke Dec., ¶ 16; Pederson Dec., Exhibit B, pp. DEF0701, DEF0703.

11. After the pat frisk, Defendant Dahlke ordered Plaintiff to stand on the wall to observe his cell being searched. *Id.* Defendant Dahlke then conducted a cell search and found no contraband. *Id.* Plaintiff was returned to his cell upon completion of the search without incident. *Id.*

12. To the extent Defendant Dahlke may have made contact with Plaintiff's genitalia and/or buttocks during the pat frisk, as is common procedure, such contact was minimal and solely as a result of conducting a pat frisk pursuant to a routine cell search. Dahlke Dec., ¶ 17.

13.

14. Defendant Dahlke did not make any sexual comments or derogatory statements towards Plaintiff during the pat frisk. *Id.*; Pederson Dec., Exhibit E, p. 63.

15. Notwithstanding the foregoing, Plaintiff reported the pat frisk as alleged sexual assault in violation of the Prison Rape Elimination Act ("PREA"). *See* Dkt. No. 12, ¶¶ 7-9.

16.     However, Plaintiff's PREA complaint was investigated; it was found that there was no sexual contact or abuse by Defendant Dahlke.  *See* Pederson Dec., Exhibit B, p. 701.

17.     As part of the investigation, Plaintiff was examined by medical staff; during such examination, Plaintiff did not complain of any injuries from the April 15, 2016 pat frisk, and none were observed.  Pederson Dec., Exhibit B, pp. 701, 709; *see* Pederson Dec., Exhibit E, p. 83.

### *May 15, 2016 Misbehavior Report*

18.     On May 15, 2016, Defendant Hoffman wrote Plaintiff a Tier II misbehavior report for the following violations: creating a disturbance; refusing a direct order; harassment; lying; and threats.  Hoffman Dec., ¶ 6; Dkt. No. 12-1, p. 4.

19.     Plaintiff served only one day in keeplock pending review of the May 15, 2016 misbehavior report because Plaintiff received a Tier III misbehavior report on May 16, 2016, for which he would have been confined in keeplock pending review.  *See* Shanley Dec., ¶ 19, fn. 1; *see* Pederson Dec., Exhibit C, p. 213.  The May 16, 2016 misbehavior report resulted in 30 days of keeplock and loss of certain privileges after a disciplinary hearing was held.  *See* Pederson Dec., Exhibit C, p. 213.

20.     Plaintiff received a second Tier III misbehavior report on May 17, 2016, which resulted in 90 days in the Special Housing Unit ("SHU") and loss of certain privileges after a disciplinary hearing was held.  *See id*.

21.     As he wrote in the May 15, 2016 misbehavior report, while Defendant Hoffman made rounds in A3 Division at Coxsackie on May 15, 2016, he overheard Plaintiff yelling to another inmate about calling the PREA hotline to make bogus complaints in order to cause trouble for staff.  *See* Hoffman Dec., ¶ 6; Dkt. No. 12-1, p. 4.  Defendant Hoffman gave Plaintiff a direct

4

order to stop yelling. *Id*. When Plaintiff said he was not yelling, Defendant Hoffman told him that he had overheard Plaintiff's conversation and gave Plaintiff a second direct order to stop yelling. *Id*. Plaintiff then cursed at Defendant Hoffman and threatened to file a complaint or lawsuit against him. *Id*.

22. The May 15, 2016 misbehavior report was compliant with DOCCS procedures. Hoffman Dec., ¶ 12.

23. There were no false charges in the May 15, 2016 misbehavior report. Hoffman Dec., ¶ 7.

24. Defendant Hoffman did not write the misbehavior report to retaliate against Plaintiff for the PREA complaint Plaintiff made against Defendant Dahlke. Hoffman Dec., ¶ 10.

25. At the time that he wrote the May 15, 2016 misbehavior report, Defendant Hoffman was not aware of the PREA complaint. *Id*.

26. Defendant Hoffman wrote the misbehavior report solely based on misconduct that he had observed on May 15, 2016. Hoffman Dec., ¶ 11.

27. The misconduct described in the May 15, 2016 report was corroborated during a subsequent investigation. Pederson Dec., Exhibit B, p. DEF0700.

28. Notwithstanding the foregoing, the May 15, 2016 misbehavior report was later expunged. *See* Pederson Dec., Exhibit A, pp. DEF0742-743.

29. The reason for the expungement is unknown. *See* Hoffman Dec., ¶ 9.

### *Plaintiff's Verbal Complaints about Defendant Meier*

30. To the extent Defendants Shanley and Martuscello ever advised Plaintiff to handle any issue through the disciplinary process, it would have been to handle his misbehavior reports

through the disciplinary process. Shanley Dec., ¶ 9.

31. As the Superintendent and DSS, Defendants Shanley and Martuscello did not advise inmates to handle complaints about Correction Officers or other security staff through the disciplinary process. *Id*., ¶ 10.

32. According to DOCCS procedure, an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation. Shanley Dec., ¶ 13; Martuscello Dec., ¶ 6. If, during the course of an investigation, the inmate's complaint about staff is found to be credible, the investigation will be referred to the Office of Special Investigations ("OSI") for handling. Shanley Dec., ¶ 16.

33. Accordingly, Defendants Shanley and Martuscello, as the DSS and Superintendent, respectively, had no involvement in investigating such complaints. *Id*., ¶ 13; Martuscello Dec., ¶ 6.

34. While neither Defendant Shanley nor Defendant Martuscello specifically recall speaking to Plaintiff about any alleged threats by Defendant Meier in May of 2016, there is no reason to believe that the process for verbal complaints did not occur. Shanley Dec., ¶ 17; Martuscello Dec., ¶ 7.

35. Defendants Shanley and Martuscello did not fail to act on Plaintiff's verbal complaints. Shanley Dec., ¶ 18; Martuscello Dec., ¶ 8.

36. One of Plaintiff's exhibits to his Amended Complaint confirms that Defendants Shanley and Martuscello took steps to address Plaintiff's concerns and that such concerns were being handled by other staff. *See* Dkt. No. 12-2, p. 13.

37.     While there is no additional documentation of Plaintiff's verbal complaint or a subsequent investigation, the lack of documentation indicates that the assigned Sergeant found that Plaintiff's complaint was not credible and a formal investigation was not required. Shanley Dec., ¶ 18.

38.     Plaintiff alleges that Nurse Tuohy was present during the exchange between Plaintiff and Defendant Meier on May 16, 2016. Shanley Dec., ¶ 19; Dkt. No. 12, ¶¶ 23-25.

39.     Nurses, and any other staff who witness inappropriate behavior towards inmates, are required to report it. Shanley Dec., ¶ 19.

40.     Nurse Tuohy did not report the exchange between Plaintiff and Defendant Meier. *Id.*

41.     Plaintiff alleges that Defendants Shanley or Martuscello should have transferred him to another facility. *See* Pederson Dec., Exhibit E, pp. 189-190.

42.     However, neither the Superintendent nor the DSS are able to transfer inmates to other facilities; transfer is handled by the Office of Classification and Movement. Shanley Dec., ¶ 22.

43.     Likewise, to the extent Plaintiff alleges that Defendants Shanley and Martuscello should have assigned Defendant Meier to a block where Plaintiff was not housed, neither the Superintendent nor the DSS are responsible for CO assignments; those are handled by Chart Sergeants. *Id.*

44.     The alleged assault of Plaintiff by Defendant Meier that occurred on July 30, 2016 was a documented Use of Force. *See generally*, Pederson Dec., Exhibit D.

45. The Use of Force report indicates that only necessary and appropriate force was used to regain control of the situation, and that such force was unrelated to any alleged threats made by Defendant Meier. *See generally*, *id*.

### *June 2016 Meeting with Defendants Shanley and Martuscello*

46. An inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. Martuscello Dec., ¶ 9. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. *Id*. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. *Id*. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction. *Id*. The Hearing Officer, at his or her discretion, makes the decision to invoke deferred time following the hearing on the subsequent disciplinary infraction. *Id*.

47. As Superintendent, Defendant Martuscello was not conducting disciplinary hearings and was not making decisions as to whether to invoke inmates' deferred SHU time. Martuscello Dec., ¶ 10.

48. Defendant Martuscello does not recall meeting with Plaintiff on June 11, 2016; however, at no time did he threaten Plaintiff with deferred SHU time. Martuscello Dec., ¶ 11.

49. As Superintendent, Defendant Martuscello would not have been in a position to invoke Plaintiff's deferred SHU time. *Id*.

50. Plaintiff had several disciplinary infractions at Coxsackie. *See e.g.*, Pederson Dec., Exhibit C, p. DEF0213.

51. Accordingly, to the extent Defendant Martuscello even discussed Plaintiff's deferred SHU time at any point, it would have been to remind Plaintiff of the rules for deferred SHU time: that if Plaintiff received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time. Martuscello Dec., ¶ 13.

52. Defendant Martuscello did not take any retaliatory actions against Plaintiff and never made any attempts to deter him from filing grievances. Martuscello Dec., ¶ 14.

### *July 12, 2016 Grievance Hearing*

53. On July 12, 2016, Plaintiff attended a grievance hearing on his complaint about mail in SHU. Iarusso Dec., ¶ 12; Pederson Dec., Exhibit A, p. DEF0754.

54. On July 12, 2016, Defendant Iarusso was working as a Staff Representative for the IGP. Iarusso Dec., ¶ 10; Pederson Dec., Exhibit A, pp. DEF0752, 754. Defendant Iarusso was not working as the substitute Acting IGP Supervisor on that date. *Id*.

55. As an IGP Staff Representative, Defendant Iarusso's duties included attending grievance hearings with the Inmate Grievance Review Committee. Iarusso Dec., ¶ 11. He was not responsible for filing inmate grievances. *Id*.

56. Prior to his grievance hearing on July 12, 2016, Plaintiff attempted to discuss other grievances, including a grievance against Defendant Martuscello, and persisted with those attempts even after Defendant Iarusso told him – more than once – that he would look into such grievances at a later date, since the purpose of the hearing was to discuss Plaintiff's grievance about SHU mail. Iarusso Dec., ¶ 13.

57. Plaintiff was improperly hindering the grievance process by ignoring Defendant Iarusso's assurances that he would look into Plaintiff's other grievances at a later date. *Id.*; *see* Pederson Dec., Exhibit A, pp. DEF0752-754.

58. As part of a broader exchange, after Plaintiff's persistent questions and demands about other grievances, Defendant Iarusso told Plaintiff that he, personally, would not file a grievance against the Superintendent. Iarusso Dec., ¶ 14; Pederson Dec., Exhibit A, p. DEF0753.

59. Defendant Iarusso did not tell Plaintiff he that would not file Plaintiff's grievance against Defendants Martuscello and Shanley. Iarusso Dec., ¶ 15; *see* Pederson Dec., Exhibit A, p. DEF0753.

60. Defendant Iarusso did not raise his voice or act in a belligerent manner towards Plaintiff. Iarusso Dec., ¶ 16; *see* Pederson Dec., Exhibit A, p. DEF0753.

61. Defendant Iarusso did not express his personal opinion about filing grievances against the Superintendent out of any retaliatory animus towards Plaintiff. Iarusso Dec., ¶ 17.

62. Defendant Iarusso had no intention of deterring Plaintiff from filing grievances against any level of staff at Coxsackie. *Id.*

63. Defendant Iarusso did not threaten to discard Plaintiff's grievance against Defendants Martuscello and Shanley. *Id.*, ¶ 18.

64. Defendant Iarusso did not discard Plaintiff's grievance against Defendants Martuscello and Shanley. *Id.*, ¶ 19.

65. In fact, Plaintiff's grievance against Defendants Martuscello and Shanley was filed – it was combined with his grievance regarding an alleged loss of programs in Grievance No. CX-

19054-16, which was filed on July 25, 2016. Iarusso Dec., ¶ 20; *see generally*, Pederson Dec., Exhibit A, pp. DEF0761-774.

66. Defendant Iarusso never took any retaliatory actions against Plaintiff for writing multiple grievances at Coxsackie. Iarusso Dec., ¶ 21.

### *July 30, 2016 Use of Force*

67. On July 30, 2016, Defendants Coon and Bence responded to a Watch Commander Response shortly after 3:00 p.m. on F-3 Division at Coxsackie. Coon Dec., ¶ 5; Bence Dec., ¶ 5; *see generally*, Pederson Dec., Exhibit D, pp. DEF0369-391.

68. The response was called because Plaintiff had attempted to assault Defendant Meier. *See generally*, Pederson Dec., Exhibit D.

69. Defendant Meier at first used his body weight to restrict Plaintiff's movement, until at least one of Plaintiff's arms could be secured, because Plaintiff was resisting Defendant Meier's attempts to regain control of the situation. Pederson Dec., Exhibit D, p. DEF0376.

70. Next, Defendant Langtry secured Plaintiff's right arm behind his back. Pederson Dec., Exhibit D, p. DEF0378.

71. When Defendant Bence arrived, he assisted those Defendants Meier and Langtry by securing Plaintiff's left arm behind his back until mechanical restraints could be applied. Bence Dec., ¶ 7; Pederson Dec., Exhibit D, p. DEF0380.

72. When Defendant Coon arrived, he observed Plaintiff laying on the floor with his hands secured behind his back by other Correction Officers. Coon Dec., ¶ 6; *see* Pederson Dec., Exhibit D, p. DEF0381.

73. After both of Plaintiff's arms were safely secured behind his back, Defendant Coon assisted by applying mechanical restraints to Plaintiff's wrists. Coon Dec., ¶ 7; Pederson Dec., Exhibit D, p. DEF0381.

74. Plaintiff was then escorted to the medical department by another Correction Officer. Coon Dec., ¶ 8; Bence Dec., ¶ 9; Pederson Dec., Exhibit D, p. DEF0382.

75. Neither Defendant Coon nor Defendant Bence had any further interaction with Plaintiff on July 30, 2016. Coon Dec., ¶ 9; Bence Dec., ¶ 10.

76. Both Defendants Coon and Bence created memoranda documenting their actions on July 30, 2016, according to normal and ordinary DOCCS procedure following a Use of Force incident. Coon Dec., ¶ 10; Bence Dec., ¶ 11; Pederson Dec., Exhibit D, pp. DEF0379-381.

77. The minimal force Defendants Bence used to secure Plaintiff's left arm behind his back was necessary and appropriate under the circumstances, given his attempted assault on staff and resistance to staff attempts to regain control of the situation. Bence Dec., ¶ 12.

78. Aside from the minimal force Defendant Bence used to secure Plaintiff's left arm, Defendant Bence never struck, pushed, kicked, or otherwise used any physical force against Plaintiff on July 30, 2016. Bence Dec., ¶ 13.

79. Defendant Coon's only role in the July 30, 2016 Use of Force incident was to apply mechanical restraints to Plaintiff's wrists. Coon Dec., ¶ 11.

80. Accordingly, the only force Defendant Coon used towards Plaintiff on July 30, 2016 was the minimal force associated with applying mechanical restraints. *Id*.

81. Aside from such minimal force, Defendant Coon never struck, pushed, kicked, or otherwise used any physical force against Plaintiff on July 30, 2016. Coon Dec., ¶ 12.

82. Plaintiff's medical records indicate that when he was examined after the Use of Force, he had a cut above his eye that required stitches. Pederson Dec., Exhibit D, pp. DEF0385-387.

83. Plaintiff did not complain of any injuries to his arms or wrists, and no such injuries were noted. *See id.*

### *Plaintiff's Grievances*

84. Rachael Seguin is the Assistant Director of the Inmate Grievance Program ("IGP") for DOCCS. Declaration of Rachael Seguin ("Seguin Dec."), ¶ 1.

85. Ms. Seguin in not a party to this lawsuit, but has submitted a declaration in support of Defendant's motion for summary judgment. *Id.*, ¶ 3.

86. As the IGP Assistant Director, Ms. Seguin is the custodian of records maintained by the Central Office Review Committee ("CORC"), which is the body that renders the final administrative decisions under DOCCS' IGP. *Id.*, ¶ 2.

87. The inmate grievance process involves three steps: (i) complaint to the Inmate Grievance Resolution Committee ("IGRC") at the individual facility; (ii) appeal to the Superintendent of the facility; and (iii) appeal to CORC. *Id.*, ¶ 5.

88. CORC is the final appellate level of the IGP. *Id.*, ¶ 6.

89. DOCCS also provides an expedited procedure for the review of grievances alleging harassment by DOCCS employees. *Id.*, ¶ 7. While the expedited procedure allows for direct forwarding of such a grievance to the Superintendent of the facility, an inmate must still appeal the determination to CORC in accordance with the normal grievance procedure in order to exhaust his administrative remedies before filing suit. *Id.*

90. CORC maintains files of grievance appeals to CORC in accordance with DOCCS Directive #4040. *Id*., ¶ 8. The CORC database contains records of all appeals of grievances that were heard and decided by CORC since 1990. *Id*.

91. Complaints alleging abuse or retaliation by facility staff against inmates who utilize the grievance process, as alleged by Plaintiff in this matter, are proper subjects for grievances under DOCCS grievance procedures as outlined in 7 N.Y.C.R.R. § 701.1, *et seq*. *Id*., ¶ 10.

92. DOCCS records reflect that during Plaintiff's incarceration at Coxsackie, Coxsackie had a fully functioning inmate grievance process available to all inmates, and all inmates had full access to CORC in order to appeal facility-level grievance determinations. *Id*., ¶ 12.

93. Plaintiff filed Grievance No. CX-18983-16 on June 17, 2016. Seguin Dec., Pederson Dec., ¶ 13; Exhibit A, p. DEF0733. There, Plaintiff alleged that Defendant Hoffman falsified a misbehavior report in retaliation for having reported an alleged sexual assault by Defendant Dahlke. *Id*., pp. DEF0734-735.

94. CORC's determination on Grievance No. CX-18983-16, dated February 22, 2017, was mailed to the Coxsackie IGRC, for transmittal to Plaintiff, on March 3, 2017. Seguin Dec., ¶ 16.

95. Plaintiff filed Grievance No. CX-19053-16 on July 25, 2016. Seguin Dec., ¶ 17; Pederson Dec., Exhibit A, p. DEF0750. There, Plaintiff alleged that Defendant Iarusso informed Plaintiff that he would not personally file any grievances complaining about the Superintendent. *Id*. Plaintiff does not allege in this grievance that Defendant Iarusso's alleged actions were retaliatory. Seguin Dec., ¶ 17; Pederson Dec., Exhibit A, p. DEF0751.

14

96. CORC's determination on Grievance No. CX-19053-16, dated April 12, 2017, was mailed to the Coxsackie IGRC, for transmittal to Plaintiff, on April 22, 2017.  Seguin Dec., ¶ 20.

97. Plaintiff filed Grievance No. CX-19054-16 on July 25, 2016.  Seguin Dec., ¶ 21; Pederson Dec., Exhibit A, p. DEF0763.  There, Plaintiff alleged that he was removed from his mess hall job in retaliation for filing a PREA complaint, and that when he tried to address that removal with Defendants Martuscello and Shanley they intimidated him, and Defendant Martuscello threatened to invoke Plaintiff's "deferred time" in the Special Housing Unit.  Seguin Dec., ¶ 21; *see* Pederson Dec., Exhibit A, pp. DEF0763-765.  Plaintiff also alleged that such intimidation and threats were made after Plaintiff brought up previous complaints and grievances.  Seguin Dec., ¶ 21; *see* Pederson Dec., Exhibit A, p. DEF0764.

98. CORC's determination on Grievance No. CX-19054-16, dated May 3, 2017, was mailed to the Coxsackie IGRC, for transmittal to Plaintiff, on June 5, 2017.  Seguin Dec., ¶ 24.

99. Plaintiff filed Grievance No. CX-19094-16 on August 9, 2016.  Seguin Dec., ¶ 25; Pederson Dec., Exhibit A, pp. DEF0777.  There, Plaintiff alleged that he was assaulted by Defendant Meier and other unnamed officers on July 30, 2016, in retaliation for having reported an alleged sexual assault by Defendant Dahlke.  Seguin Dec., ¶ 25; *see* Pederson Dec., Exhibit A, pp. DEF0778-781.  Plaintiff also alleged that Defendant Martuscello failed to take "responsible action to protect [Plaintiff's] safety" prior to the July 30, 2016 incident.  Seguin Dec., ¶ 25; Pederson Dec., Exhibit A, p. DEF0779.

100. Plaintiff did not complain in Grievance No. CX-19094-16 that Defendant Shanley (or any other DOCCS staff) failed to protect him from an alleged use of excessive force by Defendants Meier, Langtry, Bence and Coon.  *See id.*

101. Nor did Plaintiff file any separate grievance appeals to CORC against Defendant Shanley complaining of such alleged failure to protect him. Seguin Dec., ¶ 25.

102. CORC's determination on Grievance No. CX-19094-16, dated May 31, 2017, was mailed to the Coxsackie IGRC, for transmittal to Plaintiff, on July 10, 2017. Seguin Dec., ¶ 28.

103. Plaintiff filed the original complaint in this matter on November 17, 2016. Dkt. No. 1.

104. Thus, Plaintiff knowingly filed the complaint *before* he received notice of CORC's determinations on Grievance Nos. CX-18983-16, CX-19053-16, CX-19054-16, and CX-19094-16. *See* Dkt. No. 1; Seguin Dec., ¶ 29.

Dated: Albany, New York
       August 22, 2018

    BARBARA D. UNDERWOOD
    Attorney General of the State of New York
    *Attorney for Defendant*
    The Capitol
    Albany, New York 12224-0341

    By: *s/ Helena Pederson*
        Helena Pederson
        Assistant Attorney General, of Counsel
        Bar Roll No. 520491
        Telephone: (518) 776-2596
        Fax: (518) 915-7738 (Not for service of papers.)
        Email: Helena.Pederson@ag.ny.gov

To:    Taheen Hayes
       DIN 05A3850
       Plaintiff, *pro se*
       Upstate Correctional Facility
       P.O. Box 2000
       309 Bare Hill Road
       Malone, NY 12953