**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

TAHEEN HAYES,

                                    Plaintiff,

                                                                    No. 9:16-CV-1368
                                                                    (TJM/CFH)

                v.

T. DAHKLE, et al.,

                                    Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

Taheen Hayes
05-A-3850
Elmira Correctional Facility
P.O. Box 500
Elmira, New York 14902
Plaintiff pro se

Attorney General for the                      HELENA O. PEDERSON, ESQ.
    State of New York                          Assistant Attorney General
The Capitol
Albany, New York 12224
Attorney for Defendants

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## REPORT-RECOMMENDATION AND ORDER[1]

        Plaintiff pro se Taheen Hayes ("plaintiff"), an inmate who was, at all relevant times,

in the custody of the New York Department of Corrections and Community Supervision

("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants,

_____

        [1] This matter was referred to the undersigned for Report-Recommendation and Order pursuant to
28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Superintendent ("Supt.") Daniel F. Martuscello, Deputy Superintendent of Security ("DSS") Raymond Shanley, Corrections Officer ("C.O.") T. Dahkle, C.O. Jason A. Meier, C.O. Gregory E. Langtry, C.O. Stephen A. Bence, C.O. E. Coon, C.O. K. Hoffman, and Officer Rehabilitation Counselor ("O.R.C.") James Iarusso – who, at all relevant times, were employed at Coxsackie Correctional Facility ("Coxsackie") – violated his constitutional rights under the First and Eighth Amendments.  Dkt. No. 12 ("Am. Compl.").  Presently pending before the Court is defendants' Motion for Partial Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.").  Dkt. No. 58.  Plaintiff opposed defendants' motion, and defendants filed a reply.  Dkt. Nos. 67, 69.  For the following reasons, it is recommended that defendants' motion be granted on the basis of plaintiff's failure to exhaust his claims, excluding his Eighth Amendment sexual assault claim.  As to plaintiff's sexual assault claim, it is recommended that such claim be dismissed on the merits.  Alternatively, if the District Judge should not agree with the undersigned's recommendation as to plaintiff's failure to exhaust, it is recommended that defendants' motion be granted in part and denied in part.

## I. Background

### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II infra.  On or about April 15, 2016, C.O. Dahkle subjected plaintiff to sexual abuse and retaliated against him in response to plaintiff's February 2016 grievance against him.  Am. Compl. ¶ 1.  While conducting the frisk, C.O. Dahkle "had his

lower body (genitals) pressed up against [plaintiff's] butt" and tightly pressed his hands down plaintiff's back and "into the crack of his butt (inside) all the way down and around [his] [groin]." Id. ¶ 4.  During the subsequent search of plaintiff's cell, C.O. Dahkle asked, "[d]o you consider yourself a male or female?" and "[d]o you suck dick or fuck men?"  Id. ¶ 6.  On April 16, 2016, plaintiff reported the incident to the Prison Rape Elimination Act ("PREA") hotline.  Id. ¶ 7.  The next day, plaintiff again reported the incident to the PREA hotline and filed a grievance with Coxsackie.  Id. ¶¶ 8-9.  On April 18, 2016, plaintiff reported the sexual assault to Supt. Martuscello during the Superintendent's "rounds" in the cafeteria.  Id. ¶ 10.  Supt. Martuscello informed plaintiff that someone would contact him about the incident.  Id. ¶ 11.  Later that day, plaintiff was interviewed by the Office of Mental Health and Coxsackie Medical staff.  Id. ¶ 12.

On May 15, 2016, C.O. Hoffman "falsified a misbehavior report which subjected [plaintiff] to confinement for retaliation . . . because [plaintiff] filed a sexual assault complaint against T. Dahkle and was rumored by Coxsackie Correctional Officers to be working with the Office of Special Investigation." Am. Compl. ¶¶ 19, 20.  The following day, plaintiff was placed in keeplock[2] pending a disciplinary hearing for C.O. Hoffman's misbehavior report.  Id. ¶ 20.

On May 16, 2016, plaintiff met with C.O. Meier and non-party C.O. Rowe.  Am. Compl. ¶ 21.  When asked why he was keeplocked, plaintiff explained C.O. Hoffman's alleged retaliatory misbehavior report.  Id.  C.O. Meier called plaintiff a "fucking liar" and

---

[2] "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

stated that he heard plaintiff telling other inmates to call the PREA hotline and falsely report incidents of sexual abuse.  Id.  Plaintiff assured C.O. Meier that he was mistaken, and C.O. Meier became "very upset" and agitated and ordered plaintiff back to his cell.  Id. ¶¶ 21, 22.  Later that day, plaintiff attended his keeplock admission interview with a non-party nurse while in the presence of C.O. Meier and C.O. Rowe.  Id. ¶ 23.  The nurse asked plaintiff if he had been sexually abused while in Coxsackie.  Id. ¶ 24.  When plaintiff answered affirmatively, C.O. Meier "went crazy," yelling, "faggots like you get C.O.'s [sic] fucking fired.  You want to play these fucking games?"  Id.  C.O. Meier pointed his fingers directly in plaintiff's face and threatened to "fuck [plaintiff] up right now."  Id. ¶¶ 26, 27.

On May 17, 2016, plaintiff was transferred to the Special Housing Unit ("SHU").[3] Am. Compl. ¶ 30.  On May 23, 2016, plaintiff again expressed his fear and frustrations about his safety to Supt. Martuscello and DSS Shanley, showing them the allegedly false May 15, 2016 misbehavior report from C.O. Hoffman and explaining C.O. Meier's threats. Id. ¶ 32.  Supt. Martuscello and DSS Shanley told plaintiff to resolve his problems at an upcoming disciplinary hearing.  Id.

On May 26, 2016, plaintiff filed a grievance for the "constant retaliatory practices by way of disciplinary action and harrasment [sic] from C.O. Hoffman, threats from C.O. Meier for filing grievances and a sexual complaint on Dahkle."  Am. Compl. ¶ 36.  In this grievance, plaintiff also "raise[d] the issue of the failure to protect" and how he feared for

---

[3] SHUs exist in all maximum and certain medium security facilities.  The units "consist of single-occupancy cells grouped so as to provide separation from the general population . . . ."  N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b).  Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required.  Id. at pt. 301.

his life.  Id.  Plaintiff sent a copy of this grievance to Supt. Martuscello.  Id.  On June 10, 2016, plaintiff was released from SHU.  Id. ¶ 37.  When plaintiff asked his O.R.C. Counselor why a disciplinary hearing for C.O. Hoffman's misbehavior report had never been conducted, the Counselor told him that the misbehavior report did not exist.  Id.

On June 11, 2016, Supt. Martuscello and DSS Shanley ordered plaintiff to the Captain's office.  Am. Compl. ¶ 39.  Supt. Martuscello yelled at plaintiff for filing complaints about the alleged sexual assault and other harassment to outside New York State agencies.  Id.  DSS Shanley warned plaintiff that because he was the Deputy Director of Security, if plaintiff initiated any further complaints, "anything [could] happen to [him]" for "security reasons."  Id.  Supt. Martuscello threatened that if plaintiff continued to "make an issue," he would place him back in SHU.  Id. ¶ 41.  Four days later, plaintiff filed a grievance regarding this meeting.  Id. ¶ 42.  Plaintiff also filed a complaint with non-party Anthony J. Annucci, the acting Commissioner of DOCCS, regarding the sexual abuse, threats, harassment, and retaliatory practices he experienced at Coxsackie.  Id.

On June 20, 2016, plaintiff was transferred to a different housing unit.  Am. Compl. ¶ 43.  Upon arrival, C.O. Hoffman stated, "[d]on't get comfortable Hayes, you'll be out of here soon."  Id.  C.O. Hoffman further stated, "you mess with one of us (C.O.'s) you got to deal with all of us."  Id.  On July 7, 2016, C.O. Hoffman banged on plaintiff's cell, and told him that the May 15, 2016 misbehavior report he filed against plaintiff "don't [sic] exist" and that "Dahkle said hi."  Id. ¶ 47.

On July 12, 2016, plaintiff attended a grievance hearing concerning a recent grievance for SHU mail pickup.  Am. Compl. ¶ 48.  O.R.C. Iarusso was present at the

hearing.  Id.  Plaintiff requested permission to inquire about his grievance against Supt. Martuscello and DSS Shanley that had not been filed, and O.R.C. Iarusso denied that request, stating that he did not care about plaintiff's grievance.  Id. ¶¶ 48, 49.  He further informed plaintiff that he had thrown away plaintiff's grievance and that "as far as [he] was concerned, any grievances about the Superintendent [he] would never personally file anyway."  Id.

On July 30, 2016, C.O. Meier attacked plaintiff from behind and slammed him into the ground.  Am. Compl. ¶ 55.  C.O. Meier then sat on plaintiff's back and repeatedly punched him in the back, head, and face with closed fists.  Id. ¶ 56.  C.O. Langtry, C.O. Bence, and C.O. Coon joined in, kicking and punching plaintiff all over his body as he lay handcuffed on the floor.  Id. ¶ 57.

## B. Defendants' Recitation of the Facts

In support of this motion, defendants filed a Statement of Material Facts.[4]

---

[4] Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts.  The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts

### 1. April 15, 2016 Pat Frisk

On April 15, 2016, plaintiff was the subject of a scheduled, routine cell search that had been pre-approved by DSS Shanley.  Dkt. No. 58-3 ¶ 4.  C.O. Dahkle carried out the search.  Id.  Pursuant to DOCCS policy, plaintiff was pat frisked prior to the cell search.  Id. ¶¶ 5, 6.  As part of the pat frisk, C.O. Dahkle patted down plaintiff's arms, shoulders, chest, back, each leg, in between each leg, and along the front of plaintiff's pants' zipper.  Id. ¶ 8.  C.O. Dahkle conducted the entire pat frisk outside of plaintiff's clothing.  Id.  "The standards for inspection of an inmate's person allow for contact with the genitalia, groin, breast, inner thighs, and buttocks."  Id. ¶ 9.  C.O. Dahkle conducted the April 15, 2016 pat frisk without incident, and no contraband was found.  Id. ¶ 10.

After the pat frisk, C.O. Dahlke ordered plaintiff to stand on the wall and observe his cell being searched.  Dkt. No. 58-3 ¶ 11.  C.O. Dahkle did not find contraband in plaintiff's cell, and plaintiff returned to his cell.  Id.  Insofar as C.O. Dahkle made contact with plaintiff's genitalia or buttocks during the pat frisk, such contact was minimal and solely as a result of conducting the pat frisk.  Id. ¶ 12.  C.O. Dahkle did not make any sexual or derogatory comments toward plaintiff during the pat frisk.  Id. ¶ 14.  Nevertheless, plaintiff reported the pat frisk as an alleged sexual assault in violation of PREA.  Id. ¶ 15.  An investigation following the PREA complaint found no sexual contact or abuse by C.O. Dahkle.  Id. ¶ 16.  During plaintiff's physical examination by the medical staff, plaintiff did

that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R.  7.1(a)(3).

not complain of injuries from the April 15, 2016 pat frisk, and the medical staff did not observe any injuries.  Id. ¶ 17.

## 2. May 15, 2016 Misbehavior Report

On May 15, 2016, C.O. Hoffman issued plaintiff a Tier II misbehavior report, accusing plaintiff of creating a disturbance, refusing a direct order, harassment, lying, and threats.  Dkt. No. 58-3 ¶ 18.  Plaintiff served one day in keeplock pending review of the May 15, 2016 misbehavior report as plaintiff received a Tier III misbehavior report on May 16, 2016, "for which he would have been confined in keeplock pending review." Id. ¶ 19. Plaintiff served thirty days in keeplock and sustained a loss of certain privileges in relation to the May 16, 2016 misbehavior report.  Id.  Plaintiff received a Tier III misbehavior report on May 17, 2016, which resulted in ninety days in SHU and a loss of certain privileges.  Id. ¶ 20.

Pursuant to the May 15, 2016 misbehavior report, C.O. Hoffman overheard plaintiff telling another inmate about calling the PREA hotline to make "bogus complaints in order to cause trouble for staff."  Dkt. No. 58-3 ¶ 21.  C.O. Hoffman gave plaintiff a direct order to stop yelling, and plaintiff stated that he had not been yelling.  Id.  C.O. Hoffman informed plaintiff that he had overheard his conversation, and gave plaintiff a second direct order to stop yelling.  Id.  The misbehavior report then states that plaintiff cursed at C.O. Hoffman, and threatened to file a complaint or lawsuit against him.  Id.  At the time he authored the May 15, 2015 misbehavior report, C.O. Hoffman was unaware of plaintiff's PREA complaint against C.O. Dahkle.  Id. ¶ 25.  Although the alleged misconduct was later corroborated

8

during a subsequent investigation, the May 15, 2016 misbehavior report was later expunged for unknown reasons.  Id. ¶¶ 27, 28-29.

### 3. Plaintiff's Verbal Complaints about C.O. Meier

"To the extent that [Supt.] Martuscello and [DSS] Shanley ever advised plaintiff to handle any issue through the disciplinary process, it would have been to handle his misbehavior reports through the disciplinary process."  Dkt. No. 58-3 ¶ 30.  Pursuant to DOCCS policy, "an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation."  Id. ¶ 32.  If an inmate's complaint was found to be credible, then the investigation would be referred to the Office of Special Investigations ("OSI").  Id.  As such, Supt. Martuscello and DSS Shanley had no personal involvement in investigating plaintiff's complaints.  Id. ¶ 33.  Although neither Supt. Martuscello nor DSS Shanley recall speaking with plaintiff regarding any alleged threats by C.O. Meier in May 2016, "there is no reason to believe that the process for verbal complaints did not occur."  Id. ¶ 34.  Moreover, Supt. Martuscello and DSS Shanley do not have the authority to transfer plaintiff to another facility.  Id. ¶¶ 41, 42.  Supt. Martuscello and DSS Shanley also were not responsible for C.O. assignments, and, thus, could not assign C.O. Meier to a different housing block.  Id. ¶ 43.  The Use of Force report concerning C.O. Meier's alleged use indicates that "only necessary and appropriate force was used to regain control of the situation, and that such force was unrelated to any alleged threats made by [C.O.] Meier."  Id. ¶ 45.

### 4. June 2016 Meeting with Supt. Martuscello and DSS Shanley

> An inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days. The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction. The Hearing Officer, at his or her discretion, makes the decision to invoke deferred time following the hearing on the subsequent disciplinary infraction.

Dkt. No. 58-3 ¶ 46 (internal citations omitted). Supt. Martuscello does not recall meeting with plaintiff on June 11, 2015. Id. ¶ 48. He did not threaten plaintiff with deferred SHU time, and, as Superintendent, does not make the decision as to whether to invoke an inmate's deferred SHU time. Id. ¶¶ 47, 49. If Supt. Martuscello did discuss deferred SHU time with plaintiff, "it would have been to remind Plaintiff of the rules for deferred SHU time: that if Plaintiff received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time." Id. ¶ 51.

### 5. July 12, 2016 Grievance Hearing

On July 12, 2016, plaintiff attended a "grievance hearing" on his complaint regarding mail in SHU. Dkt. No. 58-3 ¶ 53. On that date, O.R.C. Iarusso worked as a staff representative for the Coxsackie Inmate Grievance Program ("IGP"). Id. ¶ 54. Prior to his July 12, 2016 grievance hearing, plaintiff had attempted, on multiple occasions, to discuss other grievances, including a grievance against Supt. Martuscello, after O.R.C. Iarusso told

him he would look into these grievances at a later date. Id. ¶ 56. O.R.C. Iarusso informed plaintiff that the purpose of the July 12, 2016 hearing was to discuss plaintiff's grievance regarding SHU mail. Id. ¶ 56. "As part of a broader exchange, after Plaintiff's persistent questions and demands about other grievances, Defendant Iarusso told Plaintiff that he, personally, would not file a grievance against the Superintendent." Id. ¶ 58. As a IGP Staff Representative, O.R.C. Iarusso is not responsible for filing inmate grievances. Id. ¶ 55. O.R.C. Iarusso did not tell plaintiff that he would not file plaintiff's grievance against Supt. Martuscello and DSS Shanley, and had no intention of deterring plaintiff from filing grievances against Coxsackie staff. Id. ¶¶ 59, 62. Further, O.R.C. Iarusso did not threaten to discard plaintiff's grievance against Supt. Martuscello and DSS Shanley, nor did he discard such grievance. Id. ¶¶ 63, 64. In fact, plaintiff's grievance against Supt. Martuscello and DSS Shanley was filed and consolidated with plaintiff's grievance concerning an alleged loss of programs. Id. ¶ 65.

### 6. July 30, 2016 Use of Force

On July 30, 2016, C.O. Coon and C.O. Bence "responded to a Watch Commander Response" that stated that plaintiff had attempted to assault C.O. Meier. Dkt. No. 58-3 ¶¶ 67, 68. C.O. Meier first used his body weight to restrict plaintiff's movement until at least one of plaintiff's arms could be secured, as plaintiff resisted C.O. Meier's attempts to regain control of the situation. Id. ¶ 69. C.O. Langtry then secured plaintiff's right arm behind his back. Id. ¶ 70. When C.O. Bence arrived, he assisted C.O. Meier and C.O. Langtry by securing plaintiff's left arm behind his back until mechanical restraints could be applied.

Id. ¶ 71.  When C.O. Coon arrived, he observed plaintiff laying on the floor with his hands secured behind his back by the other corrections officers.  Id. ¶ 72.  After the corrections officers secured plaintiff's arms behind his back, C.O. Coon applied mechanical restraints to plaintiff's wrists.  Id. ¶ 73.  An unnamed corrections officer then escorted plaintiff to the medical department.  Id. ¶ 74.

C.O. Coon and C.O. Bence authored memorandum documenting their actions on July 30, 2016 using normal and ordinary DOCCS procedure following a Use of Force incident.  Dkt. No. 58-3 ¶ 76.  C.O. Bence used minimal force to secure plaintiff's left arm behind his back in an attempt to regain control of the situation after plaintiff's alleged attempted assault on staff and resistance.  Id. ¶ 77.  C.O. Coon's only role in the July 30, 2016 Use of Force incident was to apply mechanical restraints to plaintiff's wrists.  Id. ¶ 79.  Plaintiff's medical records indicate that, following the July 30, 2016 Use of Force incident, he sustained a cut above his eye that required stitches.

### III. Discussion[5]

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions,

---

[5] All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

answers to interrogatories, and admissions on file, together with the affidavits, if any,"

which support the motion.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317,

323 (1986).  A fact is material if it may affect the outcome of the case as determined by

substantive law, such that "a reasonable jury could return a verdict for the nonmoving

party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "In determining whether

summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all

reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d

Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show

that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923

F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A non-moving party must

support such assertions by evidence showing the existence of a genuine issue of material

fact.  See id.  "When no rational jury could find in favor of the non-moving party because

the evidence to support is so slight, there is no genuine issue of material fact and a grant

of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219,

1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford

the non-movant special solicitude.  See Triestman v. Fed. Bureau of Prisons, 470 F.3d

471, 477 (2d Cir. 2006).  As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se
> litigant is entitled to "special solicitude," . . . that a pro se
> litigant's submissions must be construed "liberally," . . . and
> that such submissions must be read to raise the strongest

> arguments that they "suggest," . . . .  At the same time, our
> cases have also indicated that we cannot read into <u>pro</u> <u>se</u>
> submissions claims that are not "consistent" with the <u>pro</u> <u>se</u>
> litigant's allegations, . . . or arguments that the submissions
> themselves do not "suggest," . . . that we should not "excuse
> frivolous or vexatious filings by <u>pro</u> <u>se</u> litigants," . . . and that
> <u>pro</u> <u>se</u> status "does not exempt a party from compliance with
> relevant rules of procedural and substantive law . . . .

<u>Id.</u> (citations and footnote omitted); <u>see</u> <u>also</u> <u>Sealed Plaintiff v. Sealed Defendant</u>, 537 F.3d

185, 191-92 (2d Cir. 2008).


## B. Exhaustion

Defendants contend that plaintiff failed to exhaust his remaining claims except for

his Eighth Amendment sexual assault claim.  Def. Mem. of Law at 4 n.2, 6.  Plaintiff claims

that administrative remedies were unavailable to him.  Dkt. No. 67-1 ("Pl. Opp.") at 4-6.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any

administrative remedies available to him or her before bringing an action for claims arising

out of his or her incarceration.  <u>See</u> <u>Porter v. Nussle</u>, 534 U.S. 516, 524 (2002); <u>see</u> <u>also</u>

<u>Woodford v. Ngo</u>, 548 U.S. 81, 82 (2006).  The exhaustion requirement applies "to all

inmate suits about prison life, whether they involve general circumstances or particular

episodes, and whether they allege excessive force or some other wrong."  <u>Porter</u>, 534 U.S.

at 532.  Further, the exhaustion requirement applies even where the prisoner seeks relief

not available in the administrative grievance process, such as monetary damages.  <u>Id.</u> at

524.  To exhaust administrative remedies, the inmate must complete the full administrative

review process set forth in the rules applicable to the correctional facility in which he or she

14

is incarcerated.  See Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted).  The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, __ U.S. __,136 S. Ct. 1850, 1862 (2016).  Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA.  Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[6]

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858.  Under this exception, courts must determine whether administrative remedies were "available" to a prisoner.  Id.  The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)).  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id.  Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a

---

[6] In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception.  See Williams, 829 F.3d at 123.  The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S. Ct. at 1858-59).

grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

## 1. Did Plaintiff Exhaust his Administrative Remedies?[7]

Defendants do not dispute that plaintiff filed grievances pertaining to a majority of his claims in the underlying action.  However, defendants argue that plaintiff "knowingly filed the complaint before he received notice of CORC's determinations" regarding his grievances.  Def. Mem. of Law at 9 (emphasis omitted).  On June 17, 2016, plaintiff filed a filed grievance (CX-18983-16) alleging that C.O. Hoffman falsified a misbehavior report in retaliation for plaintiff reporting an alleged sexual assault by C.O. Dahkle.  Dkt. No. 58-2 ¶ 93.  CORC rendered their determination on grievance CX-18983-16 on February 22, 2017, and mailed the disposition to plaintiff on March 3, 2017.  Id. ¶ 94.  On July 25, 2016, plaintiff filed a grievance (CX-19053-16) alleging that O.R.C. Iarusso informed plaintiff that he would not file plaintiff's grievances complaining about Supt. Martuscello.  Id. ¶ 95.  Plaintiff did not claim that O.R.C. Iarusso's alleged actions were retaliatory.  Id.  CORC rendered their determination on grievance CX-19053-16 on April 12, 2017, and mailed the

_____

[7] First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1).  An IGP representative has sixteen calendar days to informally resolve the issue.  Id. § 701.5(b)(1).  If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing.  Id. §§ 701.5(b)(2)(i)-(ii).  If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination.  Id. § 701.5(c)(1).  If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination.  Id. §§ 701.5(d)(i)-(ii).  CORC must review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received."  Id. § 701.5(d)(3)(ii).  Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program.  N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

disposition to plaintiff on April 22, 2017.  Id. ¶ 96.

On July 25, 2016, plaintiff filed a grievance (CX-19054-16) alleging that he had been removed from his mess hall job in retaliation for filing a PREA complaint.  Dkt. No. 58-3 ¶ 97.  Plaintiff also alleged that when he attempted to address his removal with Supt. Martuscello and DSS Shanley, they intimidated him, and Supt. Martuscello threatened to invoke plaintiff's "deferred time" in SHU.  Id.  Plaintiff claimed that Supt. Martuscello and DSS Shanley intimidated and threatened him after plaintiff brought up previous complaints and grievances.  Id.  CORC rendered their determination on grievance CX-19054-16 on May 3, 2017, and mailed the disposition to plaintiff on June 5, 2017.  Id. ¶ 98.  On August 9, 2016, plaintiff filed a grievance (CX-19094-16) alleging that C.O. Meier and other unnamed corrections officers assaulted him on July 30, 2016 in retaliation for reporting an alleged sexual assault by C.O. Dahkle.  Id. ¶ 99.  Plaintiff also alleged that Supt. Martuscello failed to take "responsible action to protect [plaintiff's] safety" prior to the July 30, 2016 incident.  Id.  Plaintiff did not allege DSS Shanley failed to protect him from the alleged excessive use of force.  Id. ¶ 100.  CORC rendered their determination on grievance CX-19094-16 on May 31, 2017, and mailed the disposition to plaintiff on July 10, 2017.  Id. ¶ 102.  Plaintiff filed the original complaint in this action on November 17, 2016.  See Dkt. No. 1.

It is well-settled that "the PLRA requires that an inmate plaintiff must exhaust his available administrative remedies before commencing a lawsuit in federal court with respect to prison conditions."  Peoples v. Beldock, 212 F. Supp. 2d 141, 142 (W.D.N.Y. 2002); see McMillian v. Walters, No. 9:16-CV-0277 (MAD/DJS), 2017 WL 8894737, at *2

(N.D.N.Y. Dec. 18, 2017) ("The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action.") (citation omitted); White v. Drake, No. 10-CV-1034 (GTS/DRH), 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011) ("Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit.") (citation omitted).  The record is clear that plaintiff filed this action on November 17, 2016, and, at that time, CORC had yet to issue decisions on grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX-19094-16.  See Dkt. No. 58-18 at 9-21.   DOCCS IGP Assistant Director Rachael Seguin declared that, based on her review of DOCCS records, CORC mailed their determinations on plaintiff's grievances CX-18983-16; CX-19053-16; CX-19054-16; and CX to the Coxsackie Inmate Grievance Review Committee ("IGRC") for transmittal to plaintiff on March 3, 2017; April 22, 2017; June 5, 2017; and July 10, 2017 – nearly three and a half months after plaintiff commenced this action.  See Dkt. No. 58-18 ("Seguin Decl.") ¶¶ 16, 20, 24, 28.  Moreover, the undersigned notes that the fact that plaintiff received the CORC responses after the filing of his original complaint does not cure the procedural defect.  See Gizewski v. New York State Dep't of Corr. & Cmty. Supervision, No. 9:14-CV-0124(GTS/DJS), 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016) ("It is well established that [r]eceiving a decision from CORC after filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted before filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice.") (internal quotation marks and citations omitted).  Thus, the record is clear that

plaintiff did not fully exhaust his administrative remedies prior to filing this lawsuit as CORC's decisions were outstanding.  See Peoples, 212 F. Supp. 2d at 142; McMillian, 2017 WL 8894737, at *2; White, 2011 WL 4478988, at *3.

## 2. Availability of Administrative Remedies

Plaintiff contends that he should be excused from the exhaustion requirement because administrative remedies were unavailable to him "due to the three rules of Ross v. Blake."  Pl. Opp. at 4-5.  First, plaintiff maintains that he "appealed every grievance in this instant matter to the CORC," and after CORC failed to respond within the thirty-day time frame, he "didn't know what else to do."  Id. at 5.  Second, plaintiff claims that he was confused how to grieve his retaliation claims as he had been "directed to write the Office of Special Investigation," but never received a reply.  Id. at 6.  Finally, plaintiff contends that Supt. Martuscello, DSS Shanley, C.O. Hoffman, O.R.C. Iarusso, and C.O. Meier "individually and collectively thwarted him from using the grievance process."  Id.

As to plaintiff's claim that the grievance process was unavailable due to CORC's delay in rendering their decision on his grievances, the undersigned notes that this is a close question.  There is no dispute that plaintiff completed the grievance procedure as to grievances CX-18983-16, CX-19053-16, CX-19054-16, and CX-19094-16.  See Dkt. No. 58-18 at 9-21.  Courts within this Circuit are split as to whether a delay by CORC constitutes unavailability that would excuse a plaintiff's failure to exhaust his administrative remedies.  Compare Casey v. Brockley, No. 9:13-CV-01271 (DNH/TWD), 2015 WL 8008728, at *6 (N.D.N.Y. Nov. 9, 2015), report-recommendation and order adopted by

2015 WL 7864161 (N.D.N.Y., Dec. 03, 2015) ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust.") and Ford v. Smith, No. 9:12-CV-1109 (TJM/TWD), 2014 WL 652933, at *3 (N.D.N.Y. Feb. 19, 2014) (concluding that CORC's six month delay in responding to his appeal did not render the grievance process unavailable) with Rossi v. Fischer, No. 13-CV-3167 (PKC)(DF), 2015 WL 769551, at *6 (S.D.N.Y. Feb. 24, 2015) ("Because prison officials failed to respond to plaintiff's grievance within the 30 day time limit set by regulation, administrative remedies were not available to the plaintiff and dismissal for failure to exhaust is not appropriate.") and Peoples v. Fischer, No. 11 Civ. 2694(SAS), 2012 WL 1575302, *6 (S.D.N.Y. 2012) on reconsideration in part, 898 F. Supp. 2d 618 (S.D.N.Y. 2012) ("When a prisoner complies with all of the administrative requirements and makes a good-faith effort to exhaust, he should not be denied the opportunity to pursue his grievance in federal court simply because the final administrative decision maker has neglected to issue a final administrative determination.").

In High v. Switz, this Court excused the plaintiff's failure to exhaust his administrative remedies

> where the plaintiff had taken all steps he could to fulfill the last step of the appeal process; where CORC had neglected to respond, not just during the thirty day time limit, but for a period of numerous months thereafter; where CORC had further neglected to respond when Plaintiff wrote to CORC regarding the status of his appeal; and where CORC had only ultimately decided the appeal a year later, after the present [motion] had been filed.

High v. Switz, No. 9:17-CV-1067 (LEK/DJS), 2018 WL 3736794, at *5 (N.D.N.Y. July 9, 2018), report-recommendation adopted by 2018 WL 3730175 (N.D.N.Y., Aug. 6, 2018).

20

Although plaintiff authored letters dated August 11, 2016 and September 10, 2016 requesting to appeal grievances CX-18983-16 and CX-19094-16 directly to CORC due to the Superintendent's failure to render a decision within the twenty-five calendar day time limit, see Seguin Decl. ¶¶ 14, 26; Dkt. No. 58-5 at 16, 44-45, plaintiff has not proffered evidence that he wrote to the Coxsackie IGRC or CORC regarding the timeliness of CORC's response.  See 7 N.Y.C.R.R § 701.5(d)(3)(i) ("If a grievant does not receive a copy of the written notice of receipt [by CORC] within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC.").

Unlike the plaintiff in High, there is no indication in the record that plaintiff wrote to CORC regarding the status of his appeal and CORC further neglected to respond.  See 2018 WL 3736794, at *5.  Thus, the undersigned concludes that CORC's delay in rendering a decision on plaintiff's grievances did not excuse plaintiff from the exhaustion requirement.  See Couvertier v. Jackson, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *5 (N.D.N.Y. June 19, 2014) ("An administrative delay in processing or deciding an inmate's appeal of a grievance, however, does not constitute a special circumstance justifying excusal of the exhaustion requirement. ") (citing Ford v. Smith, No. 12-CV-1109, 2014 WL 652933, at *3 (N.D.N .Y. Feb. 19, 2014) ("CORC's failure to act within the time frame set out in the regulations does not constitute special circumstances justifying the failure to exhaust."); cf. Henderson v. Annucci, No. 14-CV-445A, 2016 WL 3039687, at *10 (W.D.N.Y. Mar. 14, 2016) ("Since plaintiff has been awaiting a decision from CORC for more than two years with respect to his grievance relating to the October

21

22, 2013 incident, such an administrative remedy is no longer available to him for purposes of exhaustion under the PLRA.").

Next, plaintiff claims that he was confused how to grieve his retaliation claims as he had been "directed to write the Office of Special Investigation," but never received a reply. Pl. Opp. at 6.  Plaintiff further states that "through the confusing text and decision [he] didn't know what to do or who should he address the retaliation from defendants about his PREA complaints."  Id.  In support of his argument, plaintiff cites to five entries in the record, including (1) the CORC decision's for grievances CX-18983-16, CX-19054-16, and CX-19094-16; (2) an email from non-party IGP Coordinator Chris VanBergen to the Office of Special Investigations stating that grievance CX-19054-16 appears to be related to plaintiff's April 17, 2016 PREA complaint, and forwarding that grievance to that office "for whatever action is deemed appropriate"; and (3) a memorandum authored by non-party Lt. E. Pahl, dated September 21, 2016, concerning grievance CX-19094-16 and C.O.'s Meier's alleged use of excessive force.  See Dkt. No. 58-5 at 731, 761, 767, 775, 788.  To the extent that plaintiff's argument can be interpreted as suggesting that he was unsure how to grieve his retaliation claim against O.R.C. Iarusso, this claim must fail.  It is clear that plaintiff knew of the grievance process at Coxsackie, as he appealed the grievances in this action to CORC; moreover, plaintiff filed at least two grievances alleging retaliation by Coxsackie staff members in the underlying action.  See generally Dkt. No. 58-5.  Thus, plaintiff's argument suggesting that he was confused as to how to file a retaliation grievance is misplaced.

Finally, plaintiff contends that defendants Supt. Martuscello, DSS Shanley, C.O.

Hoffman, C.O. Meier, and O.R.C. Iarusso thwarted him from using the grievance process. Pl. Opp. at 6.  Plaintiff claims that "every[ ]time [he] use[d] the Coxsackie grievance system to report misconduct or retaliation from defendants . . . [he] was further retaliated against." Dkt. No. 67-3 ¶ 65.  " Administrative remedies are not available if prison officials 'interfere[ ] with an inmate's pursuit of relief' by, for example, misinforming an inmate as to the applicability of the grievance process to the inmate's claims."  Kendall v. Cuomo, No.1:12-CV-3438 (ALC)(RLE), 2017 WL 4162338, at *3 (S.D.N.Y. Sept. 19, 2017) (citing Ross, 136 S.Ct. at 1860); see also Veloz v. New York, 339 F. Supp. 2d 505, 515-16 (S.D.N.Y. 2004) (noting that "[w]hen an inmate's reasonable attempts to exhaust administrative remedies are impeded by a correctional officer" the remedy is unavailable). The undersigned concludes that there is no evidence in the record that any of the defendants interfered with plaintiff's pursuit of the grievance procedure.  In fact, the record clearly establishes that plaintiff was able to access the grievance process as he filed six grievances while housed at Upstate.  See Seguin Decl. at 9.

As plaintiff's bare assertions that defendants thwarted his attempts to file grievances are insufficient to render the grievance process unavailable, defendants have met their burden of showing that plaintiff has failed to exhaust his administrative remedies as to all of his remaining claims, with the exception of his Eighth Amendment sexual assault claim. Accordingly, it is recommended that defendants' Motion for Partial Summary Judgment be granted as to these claims.

### C. Eighth Amendment

### 1. Sexual Assault Claims

Plaintiff claims that C.O. Dahkle sexually assaulted him during a pat frisk on April 15, 2016.  Am. Compl. ¶ 1.  Defendants argue that plaintiff's Eighth Amendment claim must fail because any contact C.O. Dahkle made with plaintiff's body was incidental and a necessary component of the pat frisk.  Def. Mem. of Law at 10-13.  "Because sexual abuse of a prisoner by a corrections officer may constitute serious harm inflicted by an officer with a sufficiently culpable state of mind, allegations of such abuse are cognizable as Eighth Amendment claims."  Boddie v. Schnieder, 105 F.3d 857, 861 (2d Cir. 1997).

In Crawford v. Cuomo, the Second Circuit stated that a single incident of sexual abuse may violate the Eighth Amendment if it is "sufficiently severe or serious."  796 F.3d 252, 257 (2d Cir. 2015).  The Crawford Court explained:

> [t]o show that an incident or series of incidents was serious enough to implicate the Constitution, an inmate need not allege that there was penetration, physical injury, or direct contact with uncovered genitalia.  A corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate, violates the Eighth Amendment.  Similarly, if the situation is reversed and the officer intentionally brings his or her genitalia into contact with the inmate in order to arouse or gratify the officer's sexual desire or humiliate the inmate, a violation is self-evident because there can be no penological justification for such contact.

Id.  Ultimately, in assessing whether an Eighth Amendment violation has occurred, "the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or

24

gratify the officer or humiliate the inmate."  Id. at 257-58 (citing Whitley v. Albers, 475 U.S. 312, 320 (1986) (determining that an Eighth Amendment inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.")).

Plaintiff claims that during the pat frisk, C.O. Dahkle "had his lower body (genitals) pressed-up against [his] butt," as his hands "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt (inside) all the way down and around [his] groan."  Am. Compl. ¶ 4. However, as defendants indicate, the pat frisk occurred prior to a scheduled, routine search of plaintiff's cell, and pat frisks are required before a corrections officer undertakes a cell search.  See Def. Mem. of Law at 11; DOCCS Dir. 4910, Dkt. No. 58-10 at 17 ("Each day, the living quarters of a number of inmates in each housing unit will be searched by correctional employees in accordance with a schedule issued by the Deputy Superintendent of Security or equivalent . . . . Inmates present shall be pat frisked and may also be scanned with a hand-held metal detector.").  Such pat frisks relate to the safety and security of the facility by ensuring that inmates do not possess contraband.  See Def. Mem. of Law at 12.  Pursuant to Directive 4910, "[c]ontact through the clothing with the genitalia . . . and buttocks is a necessary component of a thorough pat frisk.  However, staff must avoid any penetration of the anal or genital opening through the clothing during a pat frisk."  Dkt. 58-10.  Although plaintiff contends that C.O. Dahkle "press[ed] tightly down [plaintiff's] back and into the crack of [his] butt," Am. Compl. ¶ 6, and testified that the search "felt funny" and "more so [a] massage or a caress," there is no indication that C.O. Dahkle penetrated plaintiff's anus, intentionally or otherwise, or in any way squeezed or fondled

25

his genitals.  See Dkt. No. 58-9 ("Pl. Dep.") at 58; Def. Mem. of Law at 12.  In fact, plaintiff testified that the search occurred outside of his clothing.  See Pl. Dep. at 54.  Further, that C.O. Dahkle conducted a thorough search and "may have made contact with [p]laintiff's genitalia and/or buttocks" is insufficient to establish that he conducted the search with an intent to humiliate plaintiff or arouse himself.  See Shaw v. Prindle, 661 F. App'x 16, 19 (2d Cir. 2016) (summary order) (concluding that the court "cannot infer solely from the thoroughness of the search" — described as "excessive searching of [the] crotch area and in between his buttocks and massaging of his rectum and groin area" — that the defendant "intended to search . . . with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]") (alterations and internal quotation marks omitted).

Moreover, although plaintiff contends that C.O. Dahkle made statements like "[d]o you consider yourself a male or female?" and "[d]o you suck dick or fuck men?", Am. Compl. ¶ 6, these comments, made subsequent to the pat frisk, are insufficient to establish that C.O. Dahkle initiated the frisk to humiliate plaintiff or otherwise sexually gratify himself. See Shepherd v. Fischer, No. 08-CV-9297 (RA), 2018 WL 3122053, at *4 (S.D.N.Y. June 26, 2018) ("Comments by a defendant during an interaction thus constitute relevant evidence."); Allen v. Graham, No. 9:16-CV-0047 (GTS/ATB), 2017 WL 5957742, at *6 (N.D.N.Y. Dec. 1, 2017) (concluding that the plaintiff's allegations that the defendant corrections officer "made a few callous and/or offensive remarks while caressing Plaintiff's chest and repeatedly groping Plaintiff's genitals and buttocks" does not amount to an Eighth Amendment violation) (citing Amaker v. Fischer, No. 10-CV-0977A (Sr), 2014 WL 8663246, at *3 (W.D.N.Y. Aug. 27, 2014) (recommending the dismissal of Eighth

26

Amendment sexual-assault claim based on a pat-frisk in which defendant "rub [bed] plaintiff's penis, fondl[ed] and squeez[ed] plaintiff's buttocks and [ran] his index finger across plaintiff's anus," while making inappropriate remarks to plaintiff), report-recommendation adopted by 2015 WL 1822541 (W.D.N.Y. Apr. 22, 2015)).   The undersigned also notes that the substance of C.O. Dahkle's alleged comments, while inappropriate, are not of the kind courts find sufficient to implicate the Eighth Amendment. See Allah v. Morrison, No. 14-CV-6735, 2016 WL 4017340, at *3-4 (W.D.N.Y. July 22, 2016) ("[The defendant's] alleged taunts to [the plaintiff], including the statements, 'you know what I want' and 'give me what I want and you'll get what you want', suggest that [the defendant's] conduct was designed to humiliate [the plaintiff], gratify herself, or both."); see also Crawford, 796 F.3d at 259 ("[The defendant's] demeaning comments, including the statements '[t]hat doesn't feel like a penis to me,' [and] 'I'll run my hands up the crack of your ass if I want to' . . . suggest that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both.").

Thus, the undersigned finds that C.O. Dahkle's alleged contact with plaintiff was incidental to a routine pat frisk, see Crawford, 796 F.3d at 257, and it is recommended that defendants' motion on this ground be granted.


## 2. Excessive Force

Defendants move for summary judgment on plaintiff's excessive force claim as it pertains to C.O. Bence and C.O. Coon.  See Def. Mem. of Law at 19-22.  Plaintiff contends that during the July 30, 2016 use of force incident, C.O. Bence and C.O. Coon kicked and

punched him all over his body as he lay handcuffed on the floor.  Am. Compl. ¶ 57.  To state a prima facie claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements.  See Blyden v. Mancusi, 186 F.3d 252, 262 (2d Cir. 1999).  The objective element of the excessive force analysis is "responsive to contemporary standards of decency" and requires a showing "that the injury actually inflicted is sufficiently serious to warrant Eighth Amendment protection."  Hudson v. McMillian, 503 U.S. 1, 9 (1992) (internal citations omitted); Blyden, 186 F.3d at 262. However, "the malicious use of force to cause harm [ ] constitute[s an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries.  Blyden, 186 F.3d at 263 (citing Hudson, 503 U.S. at 9).  "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind."  Hudson, 503 U.S. at 9-10 (internal quotation marks and citations omitted). "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights."  Sims v. Artuz, 230 F.3d 14, 22 (2d Cir. 2000) (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness."  Sims, 230 F.3d at 21 (internal quotation marks and citation omitted).  The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'"  Id. (quoting Hudson, 503 U.S. at 7).  In determining whether a defendant acted in a malicious or wanton manner, the Second Circuit has identified five

28

factors to consider: "[1] the extent of the injury and the mental state of the defendant[;] [2] . . . the need for the application of force; [3] the correlation between that need and the amount of force used; [4] the threat reasonably perceived by the defendants; and [5] any efforts made by the defendants to temper the severity of a forceful response." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (internal quotation marks and citations omitted).

The undersigned concludes that plaintiff has failed to establish both the objective and subjective elements of his prima facie excessive force claim.  Both C.O. Bence and C.O. Coon declared that they responded to a "Watch Commander Response" on July 30, 2016 under the belief that plaintiff had attempted to assault C.O. Meier.  Dkt. No. 58-11 ("Bence Decl.") ¶ 5; Dkt. No. 58-12 ("Coon Decl.") ¶ 5.  C.O. Bence declared that when he arrived at the incident, he assisted other officers in securing plaintiff's left arm behind his back until mechanical restraints could be applied.  Bence Decl. ¶ 7.  After both of plaintiff's arms were secured behind his back, a third corrections officer applied mechanical restraints to plaintiff's wrists.  Id. ¶ 8.  C.O. Coon declared that he assisted in applying the mechanical restraints.  Coon Decl. ¶ 7.  Plaintiff was then escorted to the medical department.  Bence Decl. ¶ 9.  Although plaintiff contends that C.O. Coon and C.O. Bence kicked and punched him while he lay handcuffed on the ground, Am. Compl. ¶ 57, plaintiff's medical records are not consistent with such injuries.  See Dkt. No. 58-8 at 18-20.[8]  Moreover, plaintiff's medical records do not show injuries to plaintiff's arms or wrists that belie C.O. Bence and C.O. Coon's statements that they only secured plaintiff's arm

---

[8] Although plaintiff's medical records indicate a laceration over his eye, plaintiff attributed that injury to C.O. Meier.  Pl. Dep. at 103-04.

behind his back and applied mechanical restraints, respectively.  See id.; Bence Decl. ¶ 7-8; Coon Decl. ¶ 7.  Still, "certain actions, including malicious use of force to cause harm, constitute Eighth Amendment violations *per se*."  Blyden, 186 F.3d at 263 (emphasis in original).  Although plaintiff's medical records do not support the injuries plaintiff purports to have incurred, "any or even no injuries resulting from the events plaintiff described could amount to a per se constitutional violation."  Brown v. Dubois, No. 9:15-CV-1515 (LEK/CFH), 2017 WL 2983305, at *9 (N.D.N.Y. June 16, 2017) (citing Baskerville v. Mulvaney, 411 F.3d 45, 48-49 (2d Cir. 2005)); Tafari v. McCarthy, 714 F. Supp. 2d 317, 352 (N.D.N.Y. 2010) (internal quotation marks and citation omitted) (denying the defendants' motion for summary judgment because although the plaintiff's injuries were de minimis, "the extent of injury suffered by the inmate is only one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.")

The undersigned finds that there is no indication in the record that C.O. Bence or C.O. Coon acted with malicious or sadistic intent.  Both defendants declared that they arrived at the incident with the understanding that plaintiff had assaulted a staff member.  Bence Decl. ¶ 5; Coon Decl. ¶ 5; Dkt. No. 58-8 at 2.  C.O. Bence declared that the "minimal force [he] used to secure [p]laintiff's left arm behind his back was necessary and appropriate under the circumstances, given his attempted assault on staff and resistance to staff attempts to regain control of the situation."  Bence Decl. ¶ 12.  Thus, "the force exerted upon plaintiff was applied in a good-faith effort by [the defendants[ to maintain or

restore discipline following [plaintiff's alleged] . . . behavior." Chambliss v. Rosini, 808 F.

Supp. 2d 658, 669 (S.D.N.Y. 2011).  Moreover, as defendants point out, plaintiff testified

that he "assume[d]" C.O. Bence and C.O. Coons were kicking and punching him, but that

there was a possibility that they did not take part in the alleged excessive force.  See Pl.

Dep. at 109-110.  Although plaintiff seems to walk back on this testimony in his opposition

papers, see Pl. Opp. at 15-17, plaintiff has failed to proffer evidence, aside from his

conclusory allegations, that contradicts defendants' account of events.

Thus, because plaintiff has not submitted "proof that tends to show that the alleged

force used against him was employed maliciously and sadistically to cause harm, he has

failed to satisfy the subjective prong of his excessive force claim." Chambliss, 808 F.

Supp. 2d at 669 (citing Engles v. Dunbar, No. 09 Civ. 2457(NRB), 2010 WL 5538517, at

*7 (S.D.N.Y. Dec. 30, 2010) (concluding that the subjective component of excessive force

test not satisfied where uncontroverted evidence established that force was used not

maliciously or sadistically, but instead to transport the plaintiff in order to receive medical

attention); Houston v. Horn, No. 09 Civ. 801(DLC), 2010 WL 1948612, at *12 (S.D.N.Y.

May 13, 2010) (concluding that the plaintiff failed to satisfy subjective element of excessive

force claim where he failed to submit proof that contradicted evidence that force was only

used to restore discipline after the plaintiff failed to comply with an officer's order)).  As

such, plaintiff has failed to establish the "necessary level of culpability, shown by actions

characterized by wantonness." Sims, 230 F.3d at 21.  Accordingly, it is recommended that

defendants' motion on this ground be granted.

**D. First Amendment**

Defendants move for summary judgment on plaintiff's retaliation claims as they pertain to C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso.  Plaintiff claims that: (1) C.O. Hoffman "falsified a misbehavior report which subjected [plaintiff] to confinement for retaliation . . . because [plaintiff] filed a sexual assault complaint against T. Dahkle and was rumored by Coxsackie Correctional Officers to be working with the Office of Special Investigation," Am. Compl. ¶¶ 19, 20; (2) Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, id. ¶¶ 39-41; and (3) O.R.C. Iarusso intentionally destroyed his grievances against Supt. Martuscello, id. ¶ 49.

Courts are to "approach  [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]'"  See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002)).  A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009).  "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.'"  Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds

32

by Swierkiewicz, 534 U.S. at 560)).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F. Supp. 2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F. Supp. 2d 423, 433 (S.D.N.Y. 2010) (same). As plaintiff alleges that C.O. Hoffman, Supt. Martuscello, O.R.C. Iarusso retaliated against him because of his PREA complaint, plaintiff has satisfied the first prong of the test as he has engaged in a protected activity. See Gill, 389 F.3d at 384; Am. Compl. ¶¶ 19, 20, 39-41, 49.

### 1. C.O. Hoffman

Defendants argue that plaintiff's retaliation claim against C.O. Hoffman concerning the alleged falsified May 15, 2016 misbehavior report must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 15-16. In the prison context, "adverse action" is objectively defined as conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." Davis, 320 F.3d at 353. "[A]dverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone."

33

Jackson v. Onondaga Cnty., 549 F. Supp. 2d 204, 215 (N.D.N.Y. 2008).  A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action.  See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.").

The record indicates that plaintiff spent one day in keeplock as a result of the May 15, 2016 misbehavior report.  See Dkt. No. 58-7 at 2-4.  Courts in this Circuit are split as to what length of time in disciplinary segregation constitutes adverse action.  See Gill v. Hoadley, 261 F. Supp. 2d 113, 123-24 (N.D.N.Y. 2003) (finding that keeplock confinement of four and twenty-one days constitutes adverse action); Gill v. Tuttle, 93 F. App'x 301, 303-04 (2d Cir. 2004) (summary order) (declining to grant summary judgment on the plaintiff's retaliation claim where the plaintiff spent nine days in keeplock).  In Keesh v. Goord, the Western District of New York found that the plaintiff's one day in keeplock pursuant to an alleged false misbehavior report constituted adverse action where the record suggested that plaintiff may have been deprived of meals during his confinement. See Keesh v. Goord, No. 04-CV-0271, 2007 WL 2903682, at *10 (W.D.N.Y. Oct.1, 2007). Similarly, in Gill v. Tuttle, the Second Circuit found that a "genuine, material question of fact [existed] as to whether a similarly situated person of ordinary firmness would have filed such a grievance, particularly in light of the continued denial of permission to attend

34

religious callouts." Gill, 93 F. App'x at 304.  Unlike in Keesh and Gill, there is no indication that plaintiff suffered adverse conditions such as lack of food or denial of religious services during his one-day confinement.  See id.; Keesh, 2007 WL 2903682, at *10.  As such, the undersigned declines to conclude that C.O. Hoffman's May 15, 2016 misbehavior report that resulted in one-day confinement in keeplock constituted an adverse action.

Even assuming plaintiff had established adverse action, the undersigned finds that such adverse action is not causally connected to plaintiff's filing of the PREA complaint against C.O. Dahkle.  The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff."  Gayle, 313 F.3d at 682. A plaintiff "may do so with circumstantial evidence if it is 'sufficiently compelling[.]'"  Kotler v. Donelli, 382 F. App'x 56, 57-58 (2d Cir. 2010) (summary order) (quoting Bennett v. Goord, 343 F.3d 133, 137 (2d Cir. 2003)).

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation.

Baskerville v. Blot, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

Although C.O. Hoffman's misbehavior report occurred one month after plaintiff filed the PREA complaint against C.O. Dahkle, and, therefore, demonstrates temporal proximity between the protected activity and the adverse action, see Smith v. Miller, No. 15-CV-9561 (NSR), 2017 WL 4838322, at *8 (S.D.N.Y. Oct. 23, 2017) (concluding that the plaintiff had established temporal proximity where the plaintiff's grievance and the alleged false

misbehavior report were separated by only one month), plaintiff fails to establish that his PREA complaint against C.O. Dahkle was a substantial or motivating factor in C.O. Hoffman's decision to issue him a misbehavior report.  See Gayle, 313 F.3d at 682. Plaintiff seems to suggest that because C.O. Dahkle and C.O. Hoffman worked on the same unit floor on May 14 and 15, 2016, C.O. Hoffman was aware that plaintiff had filed a PREA complaint, see Pl. Opp. at 10; however, there is no indication that C.O. Hoffman knew of plaintiff's PREA complaint at the time he authored the misbehavior report.  C.O. Hoffman declared that he was not aware of the PREA complaint on May 15, 2016.  See Dkt. No. 58-14 ("Hoffman Decl.") ¶ 10.  Plaintiff does not allege that C.O. Hoffman made any reference to the PREA complaint when he authored the misbehavior report on May 15, 2016.  See Tirado v. Shutt, No. 13-CV-2848, 2015 WL 774982, at *10 (S.D.N.Y. Feb. 23, 2015) ("Absent evidence that any defendant knew about his . . . grievance, [the plaintiff] has failed to provide any basis to believe that they retaliated against him for a grievance in which they were not named."), adopted in relevant part by 2015 WL 4476027 (S.D.N.Y. July 22, 2015); Am. Compl. ¶¶ 19, 20.

    To the extent that plaintiff references statements that C.O. Hoffman allegedly made on June 20, 2016 and July 7, 2016, warning plaintiff not to get comfortable in his housing unit because "[you] mess with one of the C.O.'s [you] got to deal with all of [us]," and stating that "you won't fucking quit complaining right, well the misbehavior report don't exist anymore" and "Dahkle said hi," the undersigned notes that the Court already concluded that these statements lacked the specificity and seriousness to deter inmates from exercising their First Amendment rights.  See Dkt. No. 33 at 18-19. Moreover, plaintiff

alleges that these statements were made well after C.O. Hoffman issued the misbehavior report, and, therefore, do not establish that C.O. Hoffman had a retaliatory motive when he issued the misbehavior report on May 15, 2016.

Furthermore, the undersigned notes that retaliation is not "reasonably inferred" where a plaintiff's complaint does not involve the defendant alleged to have retaliated against him. Olutosin v. Lee, No. 14-CV-00685 (NSR), 2018 WL 4954107, at *11 (S.D.N.Y. Oct. 12, 2018) (citing Wright v. Goord, 554 F.3d 255, 274 (2d Cir. 2009)). "Retaliation claims have been dismissed when they are supported only by conclusory allegations that the retaliation was based upon complaints against another officer." Jones v. Fischer, No. 9:10-CV-1331 GLS/ATB, 2013 WL 5441353, at *21 (N.D.N.Y. Sept. 27, 2013) (citing Hare v. Hayden, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr.14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.")).  Plaintiff's speculation that C.O. Hoffman retaliated against him because of his PREA complaint against C.O. Dahkle is not supported by the record.  Accordingly, it is recommended that defendants' motion on this ground be granted.

### 2. Supt. Martuscello

Defendants argue that plaintiff's retaliation claim against Supt. Martuscello must fail because plaintiff cannot establish adverse action or causal connection.  See Def. Mem. of Law at 17-18.  As to plaintiff's allegation that Supt. Martuscello threatened to invoke plaintiff's "deferred SHU time" if he continued to file grievances against Coxsackie staff, Am. Compl. ¶¶ 39-41, the undersigned concludes that this does not amount to adverse

action.  "Case law reflects that verbal threats may constitute adverse action, though whether they constitute adverse action seems to depend on their specificity and the context in which they are uttered."  Lunney v. Brureton, No. 04 CIV. 2438LAKGWG, 2007 WL 1544629, at *23 (S.D.N.Y. May 29, 2007).  Plaintiff contends that during an interview with Supt. Martuscello on June 11, 2016, Supt. Martuscello "started yelling at [him[ about all [his] complaints to outside agencies" and reminded plaintiff of his deferred SHU time, "implying that if [plaintiff] continued to make a[n] issue, [Supt. Martuscello would] set [him] up and put [him] back in [SHU]."  Am. Compl. ¶¶ 39-41.  Supt. Martuscello declared that

> an inmate who has been penalized with time in SHU may have any portion of that time deferred up to 180 days.  The Hearing Officer who handles the disciplinary hearing makes the decision to defer time. If the inmate has no disciplinary infractions during the deferral period, the penalty is expunged. However, if the inmate has a subsequent disciplinary infraction during the deferral period, the deferred time may be invoked following a hearing on the subsequent disciplinary infraction.

Dkt. No. 58-17 ("Martuscello Decl.") ¶ 9.  Although Supt. Martuscello declared that he did not recall meeting with plaintiff on June 11, 2016, he stated that, he recalled that plaintiff had several disciplinary infractions at Coxsackie, and, to the extent that he discussed plaintiff's deferred SHU time, "it would have been to remind him of the rules for deferred SHU time: that if he received a misbehavior report for a disciplinary infraction while he had deferred SHU time, the Hearing Officer could decide to invoke that deferred SHU time."  Id. ¶ 13.

Although the undersigned previously found that, given the context and specificity of Supt. Martuscello's statements – referencing plaintiff's deferred SHU time and discussing

plaintiff's grievances and complaints – similarly-situated person of ordinary firmness could be deterred from filing grievances, Dkt. No. 33 at 22, the fully developed record now establishes that, as Superintendent, Supt. Martuscello did not have the authority to determine whether to invoke an inmate's deferred SHU time.  Martuscello Decl. ¶ 10. Moreover, the fact that Supt. Martuscello never followed through on his threats "softens the deterrent considerably."  Mateo v. Fischer, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010).

Furthermore, as defendants note, insofar as Supt. Martuscello did make the alleged statements, there is no indication in the record that plaintiff's complaints and/or grievances were a substantial or motivating factor in doing so, as Supt. Martuscello declared that to the extent that he spoke about deferred SHU time with plaintiff, it would have been to remind him of the rules concerning the implementation of deferred SHU time.  See Martuscello Decl. ¶ 15; Def. Mem. of Law at 17-18.  As defendants further note, the record indicates that plaintiff's grievances against Supt. Martuscello post-date this alleged incident, and, therefore, cannot be the basis of plaintiff's retaliation claim.  See Williams v. Smith, No. 9:11-CV-0601 (LEK/TWD), 2015 WL 1179339, at *10 (N.D.N.Y. Mar. 13, 2015) ("Adverse actions that predate protected conduct cannot form the basis of a retaliation claim."); Am. Compl. ¶¶ 39, 42 (noting that the meeting between plaintiff and Supt. Martuscello occurred on June 11, 2016 and plaintiff filed a grievance against Supt. Martuscello on June 15, 2016).  As such, plaintiff fails to demonstrate a causal connection between his protected conduct and Supt. Martuscello's alleged adverse action.

As plaintiff fails to set forth a prima facie retaliation claim against Supt. Martuscello, it is recommended that defendants' motion on this ground be granted.

### 3. O.R.C. Iarusso

Defendants argue that plaintiff's retaliation claim against O.R.C. Iarusso must fail because plaintiff cannot establish adverse action or causal connection. See Def. Mem. of Law at 18-19. O.R.C. Iarusso declared that on July 12, 2016, plaintiff attended a grievance hearing concerning a complaint about mail in SHU. See Dkt. No. 58-15 ("Iarusso Decl.") ¶ 12. Plaintiff attempted to discuss other grievances with O.R.C. Iarusso, who informed him that he would look into those grievances at a later date as the purpose of the hearing was to discuss the grievance regarding SHU mail. Id. ¶ 13. Plaintiff continued to discuss other grievances, and O.R.C. Iarusso informed him that he, "personally, would not file a grievance against the Superintendent" — meaning it was not his responsibility, as IGP Staff Representative, to file inmate grievances. Id. ¶¶ 11, 14.

To the extent that plaintiff interpreted O.R.C. Iarusso's statement as a threat, "[t]hreats made to an inmate, without more, do not rise to the level of a constitutional violation." Pledger v. Hudson, No. 99 CIV.2167LTS/THK, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (citing Dawes, 239 F.3d at 489). Even if plaintiff interpreted O.R.C. Iarusso's comment as a threatening to not file his grievance against Supt. Martuscello, the record indicates that plaintiff's grievance against Supt. Martuscello was filed and combined with grievance CX-19054-16. See Iarusso Decl. ¶ 20; Dkt. No. 58-5 at 35-45. As defendants note, plaintiff testified that he knew that his grievance against Supt. Martuscello had been filed and consolidated with his grievance concerning loss of programs. Pl. Dep. at 163-64. As such, plaintiff fails to demonstrate that O.R.C. Iarusso took adverse action against him. Moreover, there is no indication in the record that

plaintiff's complaints and/or grievances were a substantial or motivating factor in O.R.C. Iarusso's alleged threat. Accordingly, it is recommended that defendants' motion on this ground be granted.

### E. Supervisory Liability

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991)).  Thus, supervisory officials may not be held liable merely because they held a position of authority.  Id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996).  However, supervisory personnel may be considered "personally involved" if:

> (1) [T]he defendant participated directly in the alleged constitutional violation[;]
>
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[;]
>
> 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom[;]
>
> (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts[;] or
>
> (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (spacing added) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986)).  However, where a plaintiff's sole claim of

involvement of the supervisory defendant is that a superintendent affirmed a denial of a grievance, such is not sufficient to establish personal involvement.  Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002).   Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation.  See Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007). Finally, assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact.  See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009).

Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability.  Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because [p]laintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability").

Plaintiff alleges that Supt. Martuscello and DSS Shanley failed to protect him from C.O. Meier's alleged retaliation and excessive force.  See Am. Compl. ¶ 32.  Defendants argue that plaintiff "cannot demonstrate that [DSS] Shanley and [Supt.] Martuscello failed to act on his verbal complaints about [C.O.] Meier because, as an initial matter, an inmate's verbal complaints of threats by a Correction Officer are delegated to a Sergeant for investigation."  Def. Mem. of Law at 24.  Defendants further argue that Supt. Martuscello

and DSS Shanley took steps to address plaintiff's concerns.  See id.[9]

DSS Shanley declared that

> [w]hen an inmate makes a verbal complaint about alleged
> threats from a CO, a Sergeant is assigned to assess the
> credibility of the complaint and determine whether a formal
> investigation is required. As part of a formal investigation, the
> Sergeant will interview the inmate and direct the accused CO
> to provide written response to the allegations. Neither the
> Superintendent nor DSS are involved in the investigation.
> When an inmate files a grievance about alleged threats from
> a CO, the process is similar to the process for verbal
> complaints; the grievance is delegated to a Sergeant to
> investigate the grievance, and that Sergeant will interview the
> inmate and direct the accused CO to provide a written
> response to the allegations. Neither the Superintendent nor
> DSS are involved in the grievance investigation.  If an inmate
> makes a verbal complaint and files a grievance about alleged
> threats from a Correction Officer, the grievance investigation
> serves as the formal investigation on the verbal complaint in
> order to avoid duplicating efforts.

Dkt. No. 58-16 ("Shanley Decl.") ¶¶ 13-15.  If an inmate's complaint regarding a staff

member is found to be credible, the investigation is referred to OSI.  Id. ¶ 16.  Both Supt.

Martuscello  and  DSS  Shanley  declared  that,  as  Superintendent  and  Deputy

Superintendent of Security, respectively, they had no involvement in the investigation of

plaintiff's complaints.  See Martuscello Decl. ¶ 6; Shanley Decl. ¶ 13.  Both defendants

reference  an  exhibit  attached  to  plaintiff's  amended  complaint  that  they  argue

demonstrates that plaintiff's complaints regarding C.O. Meier were being handled by other

staff.  See Martuscello Decl. ¶ 8; Shanley Decl. ¶ 18; Dkt. No. 12-2 at 13.  However, as

plaintiff notes, the May 19, 2016 letter from plaintiff's social work counselor pre-dates the

---

[9] The undersigned addresses supervisory liability under the fifth Colon factor only as previously
determined in the October 30, 2017  Report-Recommendation and Order.  See Dkt. No. 33 at 35-37.

May 23, 2016 meeting wherein plaintiff contends that he informed Supt. Martuscello and DSS Shanley of his complaints regarding C.O. Meier.  Pl. Opp. at 18; Dkt. No. 12-2 at 13. Moreover, although the May 19, 2016 letter does state that "Mr. Martuscello is looking into [it] as he informed me - 'it is being handled,'" there is no indication that Supt. Martuscello was "looking into" plaintiff's complaints against C.O. Meier.  See Dkt. No. 12-2 at 13.

The undersigned also notes that although defendants argue that the lack of documentation of plaintiff's verbal complaint and/or a subsequent investigation into that verbal complaint means that the assigned Sergeant found that plaintiff's complaint was not credible, Def. Mem. of Law at 24, plaintiff contends that he was never interviewed by a sergeant or other Coxsackie staff member.  Pl. Opp. at 18.  While C.O. Meier's alleged threats and verbal harassment do not amount to constitutional violations for which Supt. Martuscello and DSS Shanley can be held liable, they can serve as "circumstantial evidence of [his] retaliatory intent" in the alleged use of excessive force against plaintiff.. See Baskerville, 224 F. Supp. 2d at 733 n.6 (finding that, although the defendant's comments "did not violate plaintiff's constitutional rights" as First Amendment harassment, the plaintiff's allegations "support[ed] his retaliation claim" as "circumstantial evidence of retaliatory intent.").[10]  Drawing all reasonable inferences in plaintiff's favor, a rational jury could find that Supt. Martuscello was personally involved in the alleged constitutional violations because he was in a position to refer plaintiff's complaints regarding C.O. Meier to a sergeant for investigation, and there is no indication in the record that such referral

_____

[10] Notably, defendants do not move for summary judgment on plaintiff's Eighth Amendment excessive force and First Amendment retaliation claims against C.O. Meier.  See Def. Mem. of Law at 4 n.1.

occurred.  As such, it is recommended that defendants' motion, as it pertains to Supt. Martuscello's referring plaintiff's complaints against C.O. Meier for investigation, be denied.

As to DSS Shanley, the undersigned notes that Ms. Seguin declared that plaintiff failed to grieve his claim that DSS Shanley failed to protect him from C.O. Meier's alleged excessive force.  Seguin Decl. ¶ 25.  Although IGP regulations do not require that an inmate's grievance contain the name of the offending officer, Espinal, 558 F.3d at 126, prison officials must be afforded the time and opportunity to address a complaint internally, and "[i]n order to exhaust . . . inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Johnson v. Testman, 380 F.3d 691, 697 (2d Cir. 2004).  In grievance CX-19094-16, plaintiff specifically refers to Supt. Martuscello's "failure to take reasonable action to protect [him]," Dkt. No. 58-5 at 50; however, there is nothing in plaintiff's grievance that would alert prison officials to investigate a subsequent failure to intervene claim against DSS Shanley; thus, such claim was not properly grieved. See Luckerson v. Goord, No. 00 Civ. 9508(JSR), 2002 WL 1628550, at *2 (S.D.N.Y. July 22, 2002) (determining the plaintiff's claim to be unexhausted and stating, "[f]or [the defendants] now to have to litigate a federal lawsuit premised on allegations that . . . they had no reason to address [in the IGRC] would make a mockery of the exhaustion requirement.").  Indeed, "the mere fact that plaintiff filed some grievance, and fully appealed all the decisions on that grievance, does not automatically mean that he can now sue anyone who was in any way connected with the events giving rise to that grievance." Turner v. Goord, 376 F. Supp. 2d 321, 324 (W.D.N.Y. 2005).  As such, it is recommended that defendants' motion, as it pertains to DSS Shanley, be

45

granted.

To the extent that plaintiff argues that Supt. Martuscello or DSS Shanley should have transferred him to a different facility or re-assign C.O. Meier to a different housing block, neither the Superintendent nor the Deputy Superintendent of Security have the authority to transfer inmates between facilities or assign corrections officers to housing blocks; these tasks are handled by the Office of Classification and Movement and the Chart Sergeants, respectively.  Shanley Decl. ¶ 22.

Accordingly, it is recommended that defendants' motion be granted as to plaintiff's supervisory claims against DSS Shanley.  It is further recommended that defendants' motion be denied on to plaintiff's supervisory claims against Supt. Martuscello.


**F. Qualified Immunity**

Defendants argue that, even if plaintiff's First and Eighth Amendment claims are substantiated, they are entitled to qualified immunity.  Def. Mem. of Law at 25-27.  Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988).  However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified . . . immunity might still be available . . . if it was objectively reasonable for the public official to believe that his acts did not violate those

rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted).  A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation.  Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test as to a majority of his claims.  See subsection II.C.-D. supra, at 24-41.  Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation.  See Aiken, 236 F. Supp. 2d at 230.  As to plaintiff's supervisory claims against Supt. Martuscello, the undersigned rejects defendants' argument that Supt. Martuscello was "acting in accordance with established constitutional rights when . . . [he] referred [p]laintiff's verbal complaints to a Sergeant for handling" as there is no indication that such referral occurred.  See subsection II.E. supra, at 41-46.  Accordingly, it is recommended that defendants' motion on this ground be denied in part as to plaintiff's supervisory claim against Supt. Martuscello, and granted in part as to plaintiff's remaining claims.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Partial Summary Judgment (Dkt. No.

47

58) be **GRANTED**, and the following claims be **DISMISSED with prejudice**:

> (1) Insofar far as it seeks dismissal for plaintiff's failure to exhaust his First Amendment retaliation claims, Eighth Amendment excessive force claims, and supervisory liability claims,

> (2) Insofar as it seeks dismissal of plaintiff's Eighth Amendment sexual assault claim against C.O. Dahkle,

In the alternative, should the District Judge reach the merits of plaintiff's First Amendment, Eighth Amendment, and supervisory claims, it is recommended that defendants' Motion for Partial Summary Judgment be **GRANTED** as to plaintiff's (1) First Amendment retaliation claims against C.O. Hoffman, Supt. Martuscello, and O.R.C. Iarusso; (2) Eighth Amendment excessive force claims against C.O. Bence and C.O. Coon; (3) Eighth Amendment sexual assault claim against C.O. Dahkle; and (4) supervisory liability claim against DSS Shanley, and **DENIED** as to plaintiff's supervisory liability claim against Supt. Martuscello; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on the parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F.2d 15 (2d Cir. 1989); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a),

6(e).[11]

      Dated: December 11, 2018
      Albany, New York

Christian F. Hummel
U.S. Magistrate Judge

_____

[11] If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Id. § 6(a)(1)(C).